**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

**JAWONE D. NICHOLSON**

       *Plaintiff*,

    v.

**BALTIMORE POLICE DEPT., et al.,**

       *Defendants*.

Case No.: 1:20-cv-03146-DKC

**PLAINTIFF'S OPPOSITION TO OFFICER DEFENDANT'S
PARTIAL MOTION TO DISMISS**

COMES NOW the Plaintiff, by and through undersigned counsel, and files this Opposition to Officer Defendant's Motion for Partial Dismissal of Plaintiff's Amended Complaint, stating as follows:

**INTRODUCTION**

On November 10, 2017, Plaintiff Jawone Nicholson ("**Plaintiff**"), then only sixteen years old, was approached by Baltimore Police Officer Damond Durant ("**Defendant Durant**") as Plaintiff was waiting for an after-school program pick-up van at a cul-de-sac behind Plaintiff's home. Defendant Durant demanded to know who Plaintiff was. Plaintiff informed Defendant Durant he was a resident of the area. Defendant Durant, unsatisfied with Plaintiff's answer, continued to interrogate Plaintiff. When Plaintiff attempted to walk away from Defendant Durant, Defendant Durant pulled out his firearm and trained it on Plaintiff. Plaintiff's grandmother, mother, and older sister then exited Plaintiff's home to help Plaintiff and confront his assailant. Once Plaintiff's family members intervened, Defendant Durant identified himself as a Baltimore Police Officer.

Defendant Durant did not have any reasonable suspicion or probable cause to interrogate Plaintiff, or to threaten Plaintiff, a minor child, with his firearm. Plaintiff was only waiting for his after-school pick-up when Defendant Durant violated his rights against excessive force and unreasonable seizure, and had done nothing to give rise to any reasonable suspicion or probable cause that Plaintiff was or had been engaging in any crime. Defendant Durant's unwarranted interrogation and inappropriate, threatening use of his firearm was unconstitutional and severely damaging to Plaintiff. Plaintiff feared for his life, and continues to suffer from extreme and severe emotional stress and anguish.

Defendant Durant now seeks dismissal of Plaintiff's Intentional Infliction of Emotional Distress claim, alleging that Plaintiff did not sufficiently plead extreme and outrageous conduct to support the claim against him; despite Plaintiff's explicit pleading that Defendant Durant pulled his gun on an innocent sixteen-year-old child, sitting outside his own home, causing Plaintiff to fear for his life.

## **FACTUAL BACKGROUND**

Plaintiff was waiting with a schoolmate for a ride from his after-school program pick-up van at around 3:45 p.m. on November 10, 2017, when he was approached by Defendant Durant. Defendant Durant had taken issue with the presence of a young Black male in the neighborhood, and decided to approach Plaintiff without cause or provocation to demand Plaintiff to identify himself and explain why Plaintiff was there.

Claiming that he had never seen Plaintiff around the neighborhood before, Defendant Durant began to aggressively question Plaintiff. Plaintiff explained to Defendant Durant that he lived in the neighborhood, noting that Plaintiff had bever seen Defendant Durant around the

neighborhood before either. Plaintiff told Defendant Durant that he and his classmate were waiting for their after-school pick-up van.

Defendant Durant was unsatisfied with Plaintiff's answers, and continued to intimidate and aggressively question Plaintiff. Beginning to feel unsafe and fear for his physical safety, Plaintiff told Defendant Durant for a second time that he and his classmate were waiting for their after-school pick-up van, and had done nothing wrong. Plaintiff told Defendant Durant that he was free to call the police if he wished.

Plaintiff and his classmate then attempted to remove themselves from the situation and walk away from Defendant Durant. Plaintiff, fearing for his safety, also began to call his grandmother for help. As the boys walked away, Defendant Durant continued to antagonize them, calling out, "Oh, cause you wasn't gonna do shit."

Afraid of what Defendant Durant might do, Plaintiff and his classmate turned back around to keep Defendant Durant in their line of sight as Plaintiff kept trying to contact his grandmother for help. Defendant Durant—who had kept his hands in his coat pockets since he first approached Plaintiff—then pulled his hands out of his pockets, revealing a firearm that he had been concealing and aiming the firearm at Plaintiff, a minor child.

At this point, Plaintiff feared for his life, believing that he was being robbed. By then, Plaintiff's grandmother had answered the phone, and Plaintiff explained to her that a man had pulled a gun on him behind their house. Plaintiff's grandmother, mother, and sister left the house to help Plaintiff. As the women approached, Defendant Durant attempted to conceal his firearm, returning his hands to his pockets.

Plaintiff's mother confronted Defendant Durant, asking him why he had pulled a gun on her son. Defendant Durant menacingly approached the women, keeping his hands concealed in his

pockets. Plaintiff's sister asked Defendant Durant to remove his hands from his pockets since he was carrying a firearm.

Concerned and afraid, Plaintiff's mother called the police. Defendant Durant also contacted the police.

Defendant Durant then told Plaintiff and his family that he did not have to show his hands because he was "Baltimore City." When Plaintiff's mother asked what that meant, Defendant Durant removed a badge from his coat pocket, identifying himself as a Baltimore police officer.

Defendant Durant's unreasonable and unconstitutional interrogation of Plaintiff and use of excessive force by threatening Plaintiff with his firearm severely harmed Plaintiff. Every school day for the next four months, Plaintiff had to walk by the cul-de-sac where Defendant Durant confronted him in order to arrive at school, forcing Plaintiff to relive the life-threatening encounter. Plaintiff lived in constant fear for his safety, and he was constantly afraid of seeing Defendant Durant again. Plaintiff suffered from extreme and severe emotional stress and anguish that physically manifested as anxiety, loss of sleep, depression, bouts of spontaneous crying, hypervigilance, and days-long periods of social withdrawal.

Plaintiff's mother attempted to file a complaint against Defendant Durant the day after the life-threatening encounter. When she arrived at the police station and explained the purpose of her visit to the station, the officers on duty laughed at her, stating, "We heard about this. At least your son didn't die." As it was a Saturday, the officers dismissively told Plaintiff's mother to come back on Monday, as there were no internal investigators available at the station on Saturdays. Shaken by the officers' behavior, Plaintiff's mother instead filed for a peace order against Defendant Durant. She also filed a complaint with the Baltimore City Civilian Review Board a few weeks later.

The complaint led to an internal investigation by Defendant BPD, but the officers conducting the investigation failed to file disciplinary charges before the statute of limitations had expired, resulting in Defendant Durant being permitted to continue serving as a sworn police officer without facing any repercussions or additional training as a result of his illegal and unconstitutional actions.

## STANDARD OF REVIEW

In ruling on a Rule 12(b)(6) motion, this Court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

A complaint needs only to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" to survive a motion to dismiss under Rule 12(b)(6). *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. While a plaintiff needs to show "more than a sheer possibility that a defendant has acted unlawfully," a plaintiff is not required to meet a "probability requirement" to survive a motion to dismiss. *Id*.

## ANALYSIS

Defendant Durant challenges the sufficiency of Plaintiff's Intentional Infliction of Emotional Distress ("**IIED**") claim on two bases: (1) that Plaintiff did not include specific facts regarding his financial or mental suffering, and (2) that Plaintiff did not plead sufficiently extreme and outrageous conduct to support an IIED claim. Neither argument warrants dismissal. Plaintiff has sufficiently pled that Defendant Durant's conduct of holding a child at gunpoint, threatening

his life, for no reason at all other than that Defendant Durant had not personally seen Plaintiff around before, constitutes an extreme and outrageous incident of a police officer grossly abusing his authority and his right to a service weapon to harass and threaten an innocent child. Plaintiff has also sufficiently pled that the extreme and outrageous conduct of Defendant Durant caused Plaintiff severe emotional distress that resulted in physical manifestations and psychological suffering that disrupted Plaintiff's life and left Plaintiff unable to function on a daily basis like a normal teenage boy.

As an initial matter, Defendant Durant has solely requested partial dismissal on Plaintiff's IIED claim only; even if this Court grants Defendant Durant's motion and dismisses Plaintiff's IIED claim, Plaintiff's additional claims for federal and state constitutional violations and other common law torts, Counts I through VIII and X, would survive dismissal.

There are four elements of an IIED claim:

> To recover for IIED under Maryland law, a plaintiff must show that: (1) the defendant's conduct was intentional or reckless; (2) the conduct was extreme or outrageous; (3) there is a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress is severe.

*Brengle v. Greenbelt Homes, Inc.*, 804 F. Supp. 2d 447, 452 (D. Md. 2011) (citing Harris v. Jones, 281 Md. 560, 566 (1977). Defendant Durant appears to challenge Plaintiff's Amended Complaint on the second and fourth elements—while Defendant Durant clearly challenges the second factor, that the conduct at issue was extreme or outrageous, Defendant Durant also vaguely claims that "Plaintiff failed to include specific facts necessary to sustain his claim for IIED," which include "the extent of his financial hardship" and "subjective facts to describe his alleged mental anguish." ECF 27-1 at 6. Plaintiff has interpreted Defendant Durant's challenge as a challenge under the fourth factor, the extent of the emotional distress suffered by Plaintiff, as there is no requirement under Maryland law that Plaintiff plead specific monetary figures to demonstrate financial

hardship and Defendant Durant fails to provide any legal support to demonstrate that providing monetary figures is a pleading requirement.

**I.      Plaintiff Has Sufficiently Demonstrated That Defendant Durant's Conduct of Holding a Child at Gunpoint is Extreme and Outrageous.**

For the second element of an IIED claim, the plaintiff must demonstrate that the conduct at issue was extreme and outrageous. "In determining whether conduct is extreme and outrageous, it should not be considered in a sterile setting, detached from the surroundings in which it occurred." *Harris*, 281 Md. at 568 (citing *Pakos v. Clark*, 253 Or. 113 (1969)).

This Court has noted that the second element requires that "the conduct in question must 'completely violate human dignity,' and 'strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung.'" *Brengle v. Greenbelt Homes, Inc.*, 804 F. Supp. 2d 447, 453 (D. Md. 2011) (quoting *Interphase Garment Sols., LLC v. Fox Television Stations, Inc.*, 566 F. Supp. 2d 460, 466 (D. Md. 2008)). There is a heightened standard typically applied to IIED claims, which "exists to screen out claims amounting to 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities' that simply must be endured as part of life." *Batson v. Shiflett*, 325 Md. 684, 734 (1992) (quoting *Harris*, 281 Md. 560 at 567.

Maryland courts are more likely to find that a plaintiff has adequately stated an IIED claim where the alleged conduct involves a vulnerable victim or an offender abusing his authority or position. Where the victim is considered vulnerable, either by nature or because of some fact known to the offender, the conduct is more extreme and outrageous than similar conduct with a less vulnerable victim. For example, a victim could be considered vulnerable due to external factors easily observable the offender, such as gender or age: "[t]here is a difference between violent and vile profanity addressed to a lady, and the same language to a Butte miner and a United

States marine." *Harris*, 281 Md. at 568. (quoting Prosser, Intentional Infliction of Mental Suffering: A New Tort, 37 Mich.L.Rev. 874, 887 (1939)).

Conduct may also be considered more extreme and outrageous where the offender, through the subject conduct, abuses his authority, or is in a special position to harm the victim due to the offender's employment. Where "the defendant is in a peculiar position to harass the plaintiff, and cause emotional distress," or the defendant's conduct "arise[s] from his abuse of a position," the conduct must be "carefully scrutinized by the courts." *Id.* at 569. For example, this Court has found sufficiently alleged extreme and outrageous conduct in workplace situations, where the abuser is an employer or supervisor. *See Tyndall v. Berlin Fire Co.*, No. CIV.A. ELH-13-02496, 2015 WL 4396529, at *36 (D. Md. July 16, 2015); *see also Rubino v. New Acton Mobile Indus., LLC*, 44 F. Supp. 3d 616, 624 (D. Md. 2014) (finding extreme and outrageous conduct where a CEO "violently approached the Plaintiff, yelled curse words in his face, poked him in the chest, backed him up against the wall, and loudly fired him.").

In this case, there is both a vulnerable victim—a sixteen-year-old child—and an offender who abused his position of authority—a Baltimore City Police officer, who was only able to commit the conduct because of the authority of his position and the firearm that he was issued due to his employment. This officer then abused his position of authority and abused the special grant of authority to carry his firearm by intentionally and recklessly threatening a vulnerable, defenseless child with the deadly weapon for no reason.

Plaintiff, a minor child at the time, was waiting with a friend for their after-school pick-up van behind Plaintiff's own home, where Plaintiff reasonably expected to be safe from violence:

> 16)    On or about November 10, 2017, at approximately 3:45 pm, Plaintiff, who was then just 16 years old, was waiting for a ride from his after-school program pick-up van at a cul-de-sac situated just behind Plaintiff's home.

> 17)    Plaintiff's schoolmate, Brian Hatcher, was also waiting with
> Plaintiff for the after-school pick-up van.

ECF 18 at 4. Plaintiff was suddenly approached by an unknown man, who then aggressively

interrogated Plaintiff for no reason, and for doing nothing more than sitting behind Plaintiff's own

home:

> 18)    Defendant Durant saw Plaintiff waiting for the after-school pick-up
> van and took issue to the presence of a young Black male in the neighborhood.
> Defendant Durant approached Plaintiff, without cause or provocation, and
> demanded to know who Plaintiff was and why Plaintiff was there.

> 19)    Defendant Durant aggressively questioned Plaintiff, claiming that
> he had never seen Plaintiff around the neighborhood before.

> 20)    Seeing someone for the first time is not grounds for probable cause
> or reasonable suspicion.

> 21)    Plaintiff explained to Defendant Durant that he also lived in the
> neighborhood, and that Plaintiff had never seen Defendant Durant either.  Plaintiff
> further explained that he did not have to answer Defendant Durant's questions, but
> informed Defendant Durant that Plaintiff and his friend were waiting for their after-
> school pick-up van.

> 22)     Defendant Durant continued to question Plaintiff in an intimidating
> manner, threatening to call the police even though Plaintiff had done nothing wrong
> and was not required to answer Defendant Durant's questions.

> 23)    At this point, Plaintiff felt unsafe and feared for his physical safety.

ECF 18 at 4-5. Plaintiff felt unsafe being aggressively interrogated by a man Plaintiff did not know,

who had not identified himself in any way, so Plaintiff began to attempt to walk away, to get away

from Defendant Durant. Defendant Durant, however, did not let Plaintiff, a defenseless minor

child, leave, instead antagonizing Plaintiff in an attempt to escalate the situation for no reason:

> 25)    As Plaintiff and his friend were speaking to Defendant Durant,
> Defendant Durant was concealing his hands in his coat pocket.

> 26)    Fearing for their safety, Plaintiff and his friend began to walk away
> from Defendant Durant, and Plaintiff began to call his grandmother from his
> cellphone.

27)     As Plaintiff and his friend walked away, Defendant Durant antagonized Plaintiff, stating, "Oh, cause you wasn't gonna do shit."

28)     Still concerned for their safety, Plaintiff and his friend turned around and faced Durant to make sure they could see him as Plaintiff continued to attempt to reach his grandmother.

ECF 18 at 5. At this point, Defendant Durant escalated the situation on his own despite all of

Plaintiff's attempts to leave, drawing a deadly weapon on a defenseless child, for no reason at all:

29)     Defendant Durant then revealed a firearm he had been concealing in his coat pocket and aimed it at the 16-year-old Plaintiff.

30)     Plaintiff feared for his life and safety, believing he was being robbed.

31)     By then, Plaintiff's grandmother was on the phone, and Plaintiff explained to her that a man was pulling a gun on him behind their house.

ECF 18 at 5. Plaintiff's grandmother, mother, and sister came out of Plaintiff's house, and

Defendant Durant finally identified himself as a police officer, abusing his authority as an officer

to justify brandishing his service weapon on a defenseless child:

32)     Plaintiff's sister, mother and grandmother went outside and saw Defendant Durant confronting Plaintiff, and went down to attempt to protect Plaintiff. As they approached, Defendant Durant attempted to conceal his firearm, but kept his hands in his pocket.

33)     Defendant Durant then approached Plaintiff and Plaintiff's family members.

34)     Plaintiff's mother, Erica Hamlett ("**Ms. Hamlett**"), asked Defendant Durant why he had pulled a gun on her son.

35)     Defendant Durant menacingly approached Ms. Hamlett, Plaintiff, Plaintiff's sister, and Plaintiff's grandmother, keeping his hands in his coat pocket.

36)     Plaintiff's sister, Keymina Johnson, asked Defendant Durant to remove his hands from his pockets since he was carrying a firearm.

37)     Ms. Hamlett then called the police. Defendant Durant also called the police.

38)    Defendant Durant claimed he did not have to show his hands because he was "Baltimore City."

ECF 18 at 5-6. During this interaction, Plaintiff reasonably feared for his life and his friend's, believing that they were both about to be killed by Defendant Durant, as Defendant Durant was aiming a live, deadly weapon at two unarmed teenagers.

The conduct in this case is especially heinous and outrageous because Plaintiff, the victim, was a minor child at the time of the incident; an especially vulnerable victim, which was, or should have been, plainly obvious to Defendant Durant at first glance. Handling a life-or-death situation is difficult enough for a fully-developed adult; it is especially and uniquely difficult for a child to handle.

Further, Defendant Durant, the offender, attempted to use his authority as a Baltimore City Police officer to justify using a deadly weapon to threaten the life of an unarmed teenager, an especially outrageous act given the trust the society places in police officers and the special authority a police officer holds by the very nature of his position. In addition, Defendant Durant would not likely have had the opportunity to threaten and harass Plaintiff without his special position as a police officer, as Defendant Durant threatened Plaintiff with his service weapon, a deadly weapon Defendant Durant would not have possessed but for his employment. *See also Rubino v. New Acton Mobile Indus., LLC*, 44 F. Supp. 3d 616, 624 (D. Md. 2014) (quoting Restatement (Second) of Torts § 46 comment e (1965))("[T]he extreme and outrageous character of the defendant's conduct may arise from his abuse of a position, or relation with another person, which gives him actual or apparent authority over him, or power to affect his interests.")

Clearly, under the careful scrutiny warranted in this case due to the vulnerable nature of Plaintiff and the abuse of Defendant Durant's position, Defendant Durant's conduct was extreme

and outrageous. Plaintiff had merely been sitting, behind Plaintiff's own house. There was no reason, no possible justification, that Defendant Durant could possibly have for threatening Plaintiff's life. And Plaintiff was subject to having his life threatened, fearing for his life and believing that he was about to die, for the sole reason that Plaintiff dared to sit behind Plaintiff's house. Being forced to fear for his life at gunpoint for the sole reason that Plaintiff existed in Plaintiff's own neighborhood is a complete violation of human dignity that struck to the very core of Plaintiff's being. *See Brengle*, 804 F. Supp. 2d at 453.

Defendant Durant points to three cases in particular to support his claim that Plaintiff failed to plead sufficiently outrageous and extreme conduct, arguing that those cases involved "far more extreme and outrageous [conduct] than the subject facts [pled] in Plaintiff's Amended Complaint." ECF 27-1 at 7. Defendant Durant has clearly misinterpreted the basis of Plaintiff's IIED claim, as the two cases are certainly *not* "far more extreme and outrageous" as the conduct involved here.

The main case relied upon by Defendant Durant is *Williams v. Prince George's Cty.*, 112 Md. App. 526 (1996). There, the plaintiff's mother had reported her car stolen to the police. *Id*. at 533. Two or three days later the police located the car and plaintiff's mother recovered the vehicle. *Id*. at 534. Seven weeks afterwards, an officer stopped plaintiff while he was driving the vehicle, drew his service weapon on plaintiff, and ordered plaintiff to get in the car. *Id*. at 535. When backup arrived, the officer ordered plaintiff to get out of the car. *Id*. The officers handcuffed plaintiff without harming him. *Id*. The officers explained that they were arresting plaintiff because he was driving a stolen car. Plaintiff informed the officers it was his mother's car, and the officers immediately confirmed that it was and released plaintiff. *Id*. The court held that "as a matter of law, there was nothing that the arresting officers did that could be characterized as "so outrageous

in character and so extreme in degree as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community" without any analysis. *Id*. at 556.

There are numerous key distinctions between *Williams* and this case. In *Williams*, the officer was uniformed and easily identifiable, and clearly in the process of placing the plaintiff under arrest when he raised his service weapon. Here, Defendant Durant was in plain clothes and did nothing to identify himself at all—Plaintiff initially feared that he was being robbed, and would be killed during the commission of a criminal act, not a lawful arrest.

In *Williams*, the officer had probable cause to stop and detain the plaintiff, as the court explicitly found: "Having probable cause to stop and arrest appellant, Officer Qualls had the legal authority and justification to detain him, at least until it could be ascertained that he was not driving a stolen vehicle." *Id*. at 554-555. Here, Defendant Durant had no probable cause or any possible justification to brandish his firearm at a defenseless child, as Plaintiff had done nothing more than sit and exist in his own neighborhood.

In *Williams*, the officer immediately removed the handcuffs from the plaintiff and even apologized as soon as the plaintiff's mother had confirmed that her car was not stolen: as the plaintiff testified, "after all that was done and said, the only thing he had to say to me, that I'm sorry. He gave me his card; he said call me if you have any trouble, take my card and you give me a call. *Id*. at 535-36. Here, Defendant Durant refused to let Plaintiff peacefully walk away, despite having no probable cause to detain Plaintiff, and continued to harass and antagonize Plaintiff while aiming a deadly weapon at Plaintiff, until after the police had been called.

At its core, *Williams* involved an officer legally conducting an arrest based on faulty information. The information was mistaken, but the court held that the officer had probable cause

for the detainment, and the officer immediately corrected the situation. The officer did not abuse his authority or otherwise harass and abuse the plaintiff for no reason.

Here, a plain-clothes police officer used his service weapon without identifying himself and without any legitimate probable cause or other justification to threaten the life of a teenager, for no purpose other than that the officer had not seen the teenager in the area before. Plaintiff, a vulnerable child victim, rightfully feared that he would be killed, because he did not think that he was being arrested or detained, like in in *Williams*, he thought that he was being robbed at gunpoint. Even worse, the plain-clothes officer continued to attempt to escalate the situation, verbally harassing and antagonizing Plaintiff for no reason, despite Plaintiff's best attempts to leave the situation.

*Branch v. McGeeney*, 123 Md. App. 330 (1998), is similar, in that the conduct at issue arose from a police officer conducting what the officer believed to be legitimate police business. At the time, the Annapolis Police Department had mistakenly interpreted a new regulation regarding the detainment of juveniles to require that the juveniles be fingerprinted at the time of detention. *Id*. at 340. Police were later called out to an apartment complex by a resident annoyed with children throwing acorns at the side of the building. *Id*. at 342. The officers investigated, and then sought the plaintiff to issue a juvenile citation for destruction of property. *Id*. The officers believed that the new regulations required them to transport the child to the station for fingerprinting before releasing her to her parents, which under police regulations required the person transported to the station to be placed in handcuffs. *Id*. at 343. The officers ultimately handcuffed the plaintiff behind her back and placed the plaintiff in the back of the squad car. *Id*. at 344. Due to a confrontation with the child's mother, one of the officers asked a superior for

special permission to release the child to her mother's custody. *Id*. The child was released from the car after no more than 25 minutes. *Id*. at 345.

*Branch* is even farther divorced from this case than *Williams*; even though the plaintiff in *Branch* was also a vulnerable child, the officers were identifiable and conducting a legitimate detainment according to the policies the officers believed to be in place at the time. No weapons were ever unholstered, much less pointed at the child. No one in this situation feared for their life. The handcuffing of a child for a mere 25 minutes during a lawful detainment pales in comparison to Defendant Durant brandishing his firearm at a child for doing nothing more than sitting, causing Plaintiff to legitimately fear for his life and believe that he was being robbed.

Lastly, Defendant Durant points to *Borchers v. Hyrchuk*, 126 Md. App. 10 (1999), which is not factually analogous to this case at all. In *Borchers*, an employee of a camp was having marital difficulties. Id. at 14. She sought advice from a pastor at the camp, who she subsequently began a sexual relationship with. *Id*. While it is notable that the court cited to cases in which similar conduct was severe enough to constitute an IIED claim—notably, where the plaintiff sought marital counseling from a psychologist in an official setting, as the conduct was more atrocious arising from officially-sanctioned treatment—*Borchers* ultimately has no bearing on this case. *Id*. at 19-20.

Ultimately, the key conduct at issue here is not legitimate, though misguided, police practices, as Defendant Durant was plain-clothed, failed to identify himself, and nevertheless had no basis for a legitimate arrest or detention of Plaintiff, or the usage of officially-sanctioned therapy to coerce a person into a sexual relationship. The conduct here is that Defendant Durant, without rhyme or reason, drew and aimed a deadly weapon at Plaintiff, a child, leaving Plaintiff to fear the he was about to be killed.

A closer analogy here, albeit one that does not relate specifically to police officers, are cases involving conduct that has a high risk of death or serious illness or injury, whether or not death or serious illness or injury actually result. For example, this Court has found it to be extreme and outrageous where a person, who knows they have a sexually transmitted disease, sleeps with another person without informing them, thereby risking infecting the other person. This conduct evidences a similar complete disregard for the health and wellbeing of the other individual that is seen in this case: there is *always* a risk that something will go wrong when brandishing a deadly weapon, which is why there are so many legal requirements, regulations and rules regarding officers' usage of their weapons. By pointlessly brandishing his weapon at a defenseless individual without concern or care for what might result from it—an accidental discharge, for example, or a purposeful firing, or an attempt from a third party to protect Plaintiff's life tragically ending in a death or serious injury, not to mention the mental and emotional harm that results, even if the gun never fires—Defendant Durant showed the same careless disregard to Plaintiff's health and wellbeing that an STD-positive individual shows when carelessly having unprotected intercourse with a partner without informing the partner of all the associated risks.

This form of case—where conduct is "highly likely" to result in a serious medical condition—has commonly been accepted by other courts as sufficiently extreme and outrageous:

> Ms. Brengle also notes that there are prior cases, including controlling precedent, holding that one who engages in conduct that is "highly likely" to result in another's affliction with a serious illness with permanent health consequences has committed extreme and outrageous conduct. (*Id*. at 11) (citing *B.N. v. K.K.*, 312 Md. 135, 146–48, 538 A.2d 1175 (1988); *Gonzalez v. Moffitt*, 178 F.3d 1294 (6th Cir.1999) (unpublished); *German v. Fed. Home Loan Mortg. Corp.*, 885 F.Supp. 537, 571–72 (S.D.N.Y.1995); *Leonard v. BASF Corp.*, No. 06–cv–00033, 2006 WL 3702700, at *9 (E.D.Mo. Dec. 13, 2006); *Amica Mut. Ins. Co. v. Henderson*, No. 02–cv–5193, 2003 WL 21196261, at *3–4 (N.D.Ill. May 15, 2003); *Abbatiello v. Monsanto Co.*, 522 F.Supp.2d 524, 536 (S.D.N.Y.2007)). In *B.N. v. K.K.* and *Gonzalez v. Moffitt* defendants who knowingly exposed plaintiffs to the risk of acquiring sexually transmitted diseases were held to have committed extreme and outrageous

conduct. In *German v. Federal Home Loan Mortgage Corp.*, *Leonard v. BASF Corp.*, *Amica Mutual Insurance Co. v. Henderson*, and *Abbatiello v. Monsanto Co.* the defendants were alleged knowingly to have exposed plaintiffs to chemicals or toxins in their homes and failed to provide adequate warning or concealed the danger. In each case, the court deemed the allegations sufficiently extreme and outrageous to survive motions to dismiss. *See German*, 885 F.Supp. at 571–72 (denying motion to dismiss where landlords knowingly exposed tenants to lead paint, "a highly toxic substance to children," thereby putting them at risk for physical and mental injuries); *Leonard*, 2006 WL 3702700 at *9 (denying motion to dismiss IIED claim where defendant knowingly exposed plaintiff to dangerous levels of carcinogens at the manufacturing plant where he was employed causing plaintiff's colon cancer); *Amica Mut. Ins. Co.*, 2003 WL 21196261, at *3–4 (denying motion to dismiss IIED claim where defendants allegedly failed to warn plaintiffs of toxic mold in their home); *Abbatiello*, 522 F.Supp.2d at 536 (finding that an allegation that defendants knowingly subjected individuals to exposure to the highly toxic substance, PCB, "while purposefully concealing from those so exposed the serious injuries that might result from such exposure, and in reckless disregard of these risks, may constitute 'extreme and outrageous' conduct").

*Brengle*, 804 F. Supp. 2d at 454. This Court has similarly found sufficiently extreme or outrageous conduct in similar circumstances involving serious medical conditions. *Id*. at 454-455.

This Court should review this case along the same vein. Defendant Durant exposed Plaintiff to an extraordinarily dangerous condition—being the target of a deadly weapon, that can, and does, kill hundreds of Americans every year—without any consideration at all to the risk to Plaintiff of exposing him to that condition, both the potential physical harms as well as the obvious and known emotional and psychological harm that results from being placed in a life-or-death situation. Defendant Durant had no reason to do so—no legitimate police business, or other justification—and Plaintiff truly believed that he was being robbed, and that he would be killed during the commission of that robbery.

A plaintiff need only pled sufficient facts to demonstrate that a reasonable person could conclude that the conduct was extreme and outrageous for the plaintiff to have adequately presented a prima facie case. If a reasonable mind can conclude that the conduct was sufficient to

support an IIED claim, then dismissal is not appropriate and this Court should reserve the question for a jury to determine:

> It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as extreme and outrageous; where reasonable men may differ, it is for the jury to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.

*Harris*, 281 Md. at 569; *see also Brengle*, 804 F. Supp. 2d at 453 ("Thus at the pleading stage, a plaintiff need only allege conduct that a reasonable juror might deem extreme or outrageous."). A reasonable juror could certainly conclude that placing an unarmed child at gunpoint for no reason at all is extreme and outrageous, and even more so when the offender doing so attempts to justify his blatant harassment and abuse of Plaintiff by relying on his position as a Baltimore City Police officer. Accordingly, this Court should not dismiss Plaintiff's IIED claim on the second factor, and let the jury decide whether Defendant Durant's conduct was extreme and outrageous.

## II. Plaintiff Has Sufficiently Pled that the Extreme and Outrageous Conduct Caused Plaintiff Severe Emotional Distress that left Plaintiff Unable to Function like a Normal Teenager.

To establish a *prima facie* case for the fourth element, "the plaintiff [must] show that he suffered a severely disabling emotional response to the defendant's conduct." *Harris*, 281 Md. at 570. Emotional distress sufficient to establish the fourth element is:

> that which "no reasonable man could be expected to endure." *Takacs v. Fiore*, 473 F.Supp.2d 647, 652 (D. Md. 2007) (citing *Harris*, 280 Md. at 571). A plaintiff meets this threshold when her "emotional distress is so severe as to have disrupted her ability to function on a daily basis." *Id*. (citing *Bryant v. Better Bus. Bureau of Greater Md.*, 923 F.Supp. 720, 750 (D. Md. 1996)).

*Nammack v. Hampstead Pre-Owned*, No. CV DKC 19-1798, 2020 WL 1033589, at *5 (D. Md. Mar. 3, 2020). An adequate emotional response may take different forms, depending on the victim; for example, this Court found sufficient a plaintiff's claims that "his 'inability to sleep, inability to concentrate, inability to communicate or interact with others, inability to perform manual tasks,

inability to have normal sexual relations, [and] inability to have normal bowel functions' left him 'unable to function for several months.'" *Rubino*, 44 F. Supp. 3d at 624. This Court has previously noted that the "threshold is reached when a plaintiff's 'emotional distress is so severe as to have disrupted her ability to function on a daily basis.'" *Takacs v. Fiore*, 473 F. Supp. 2d 647, 652 (D. Md. 2007) (quoting *Bryant*, 923 F.Supp. at 750).

Defendant Durant appears to create new pleading obligations that do not exist under this Court's precedent, without citing to any case law other than authority supporting the general principle that every element of an IIED claim must be pled with specificity. He alleges that Plaintiff failed to include "monetary facts that describe the extent of his financial hardship, medical expenses, expenses related to remedying conclusively alleged anxiety/distress, or other expenses." ECF 27-1 at 6. There is no requirement that Plaintiff pled specific monetary figures to establish damages for an IIED claim. Plaintiff is not obligated to put a dollar figure to medical expenses or financial hardship.

Regardless, Plaintiff is uncertain as to the basis of Defendant Durant's argument generally, given that the specific challenges Defendant Durant raises seem to have no logical connection to Plaintiff's Amended Complaint, despite having "id." citations with no page numbers. Defendant Durant claims that "[t]here are no monetary facts that describe the extent of [Plaintiff's] financial hardship, medical expenses, expenses related to remedying conclusively alleged anxiety/distress, or other expenses." ECF 27-1 at 6. Plaintiff has not alleged any specific harms related to financial hardships or medical expenses, and, as there are no pleading requirements that Plaintiff explicitly allege expenses related to treatments, if any, for the anxiety and distress that he suffered, the issue of specific expenses for the purposes of damages is a question for the jury. Defendant Durant also claims that "[t]here are no subjective facts to describe [Plaintiff's] alleged mental anguish,

emotional distress, loss of dignity, trauma, inconvenience, or exacerbation of preexisting depression." *Id*. Plaintiff has not alleged that he had *preexisting* depression prior to Defendant Durant threatening his life—rather, Plaintiff *developed* depression as a result.

What Plaintiff has alleged is that he has suffered physically and emotionally as a result of the extreme and outrageous conduct of Defendant Durant. Every single school day, for the next four months, Plaintiff was forced to walk past the place where Defendant Durant threatened Plaintiff's life, as there was no other way Plaintiff could get to school. Every single day, Plaintiff was forced to relieve the life-threatening experience whenever he looked out of his bedroom window, which faces the cul-de-sac where Defendant Durant drew a deadly weapon and pointed it directly at Plaintiff:

> 42)     Every school day after the incident for the next approximately four months, Plaintiff had to walk past the cul-de-sac where Defendant Durant confronted him in order to arrive at school, forcing him to relive the life-threatening encounter and live in constant fear for his safety. Plaintiff was constantly afraid of seeing Defendant Durant again.

> 43)     The area where the incident took place is located in view of Plaintiff's bedroom window, forcing him to constantly relive the incident.

ECF 18 at 6-7. The emotional and physical damage suffered by a child forced to face a life-threatening situation, fearing that he was about to die, was compounded by how many times he was forced to relive the experience, which happened on a daily basis. This near-constant barrage of reminders of the incident greatly impacted Plaintiff's life, and disrupted his ability to function day-to-day. The emotional, psychological, and physical suffering certainly amounted to suffering that no reasonable man—or child—could be expected to endure, and included Plaintiff fearing for his life on a daily basis, spontaneously bursting out crying, spending days locked away in extraordinarily long periods of social withdrawal, as well as severe levels of anxiety, depression,

and stress, that caused Plaintiff to lose sleep. Plaintiff also became hypervigilant as a result of

Defendant Durant's conduct and constantly afraid of police:

> 55)    As a direct and proximate result of Defendant Durant's negligent,
> and/or grossly negligent, and/or intentional, and/or malicious conduct, Plaintiff
> suffered physical and emotional damages, being subjected to unconstitutionally
> excessive force and having his search and seizure rights violated by Defendant
> Durant, as well as being made to fear for his life every day he went to school.
> Plaintiff has suffered from extreme and severe emotional stress and anguish
> resulting in physical manifestations, including, but not limited to, anxiety, loss of
> sleep, depression, bouts of spontaneous crying, hypervigilance, days-long periods
> of social withdrawal, as well as experiencing stress and anxiety when around police.

ECF 18 at 9-10.

Plaintiff was unable to sleep. Plaintiff was depressed, stressed, and constantly anxious.

Plaintiff was no longer able to socialize normally, like a normal sixteen-year-old teenager, finding

himself shutting himself away from all contact for days at a time. Plaintiff would randomly burst

out into tears, crying spontaneously at any possible moment, severely disrupting his ability to

function like a normal teenager. On a daily basis, Plaintiff was forced to relive the traumatic

experience, either by looking out his bedroom window or by traveling through the area on his way

to and from school. Plaintiff could no longer trust police, feeling stressed and anxious when

police—the authorities that are supposed to *protect* children like Plaintiff—were around. Plaintiff

became hypervigilant on a constant basis, making it even more challenging for Plaintiff to function

normally as a teenage boy would from day-to-day.

The emotional stress, physical manifestations, and psychological suffering Plaintiff has

endured and pled is sufficient to meet the requirements of the fourth element. Plaintiff has clearly

passed the threshold where "a plaintiff's 'emotional distress is so severe as to have disrupted [his]

ability to function on a daily basis.'" *Takacs v. Fiore*, 473 F. Supp. 2d 647, 652 (D. Md. 2007)

(quoting *Bryant*, 923 F.Supp. at 750), and, like the plaintiff in *Rubino*, Plaintiff was left unable to

function for a long period of time, in which Plaintiff could not communicate or interact normally with other people, sleep, concentrate, or otherwise act like a normal teenager. *See Rubino*, 44 F. Supp. 3d at 624.

Plaintiff has adequately pled that experienced severe emotional distress as a result of the extreme and outrageous conduct of Defendant Durant, specifically alleging the emotional stress he was under, the physical manifestation of the stress that he experienced, and the psychological suffering that resulted from being forced to face a completely needless life-threatening situation in Plaintiff's own backyard. Defendant Durant's claims that Plaintiff failed to plead specific financial hardships or medical expenses is simply irrelevant.

This Court should decline to dismiss Plaintiff's IIED claim against Defendant Durant and deny Defendant Durant's motion.

## CONCLUSION

For all the reasons stated above, this Court should deny Defendant Durant's Motion to Dismiss.

Respectfully submitted,

HANSEL LAW, PC

_____/s/_____
Cary J. Hansel (Bar No. 14722)
cary@hansellaw.com
2514 North Charles Street
Baltimore, MD 21218
T: 301-461-1040
F: 443-451-8606
*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on January 1, 2021, I caused the foregoing to be filed via the

Court's electronic filing system, which will make service on all parties entitled to service.


　　　　　　　　/s/
　　　　　　　Cary J. Hansel