```
 1                        VOLUME I

 2           IN THE UNITED STATES DISTRICT COURT

 3              FOR THE DISTRICT OF MARYLAND

 4   JAWONE D. NICHOLSON

 5              Plaintiff

 6        vs.                          Case No.:

 7   STATE OF MARYLAND, et al.         1:20-cv-03146 DKC

 8              Defendants

 9   _____/

10

11                        VOLUME I

12           The deposition of DAMOND DURANT was held

13   remotely via Zoom videoconference on Friday, June 24,

14   2022, commencing at 11:03 a.m., before Susan M.

15   Liebrecht, Notary Public.

16

17

18

19

20   STENOGRAPHICALLY REPORTED BY:

21   Susan M. Liebrecht, RPR
```

Exhibit 2a

Page 30

Q Okay. All right. The gun that you pulled on Jawone Nicholson in this case, was that a duty weapon or a personally owned gun?

MR. GOLDBERG: Objection to form. You can answer.

A **It is a personal gun that I got permission to use from the Department. Permission to carry from the Department.**

Q What type of gun is it?

MR. GOLDBERG: Objection. Form, foundation. You can answer.

A **It's a Glock 43.**

Q Okay. What caliber is it?

MR. GOLDBERG: Same objection.

A **9 millimeter.**

Q At the time you drew the gun on Jawone Nicholson, it was loaded?

MR. GOLDBERG: Objection. You can answer.

A **Yes.**

Q There was a round in the chamber?

MR. GOLDBERG: Same objection, but you can

Page 31

answer.

A **Yes.**

Q So the gun was ready to fire?

MR. GOLDBERG: Objection. You can answer.

A **Yes.**

Q I always learned the rule that you never point a gun at anyone you're not willing to kill.

Are you familiar with that rule? Have you heard that?

MR. GOLDBERG: Objection. Form, relevance. You can answer.

A **I don't think that's written anywhere, sir. I'm sorry.**

Q I didn't ask you if it was written anywhere. Have you ever heard that?

MR. GOLDBERG: Same objection. You can answer.

MR. HANSEL: Have you ever heard that saying?

A **It's not a belief of mine.**

Q I'm not asking about your beliefs, sir.

Page 32

I'm asking, have you ever heard the saying, you never point a gun at --

A **Yeah.**

Q You have heard it?

MR. GOLDBERG: Same objection, though.

A **Yes, I've heard it.**

Q And you have heard it in the firearms safety training context. Is that right?

MR. GOLDBERG: Objection. Form, foundation. You can answer.

A **Mostly on TV.**

Q Okay. And were you prepared to kill Jawone Nicholson that day? To fire your gun at him?

MR. GOLDBERG: Objection. Form, foundation. You can answer.

A **No.**

Q Why did you point your gun at him?

MR. GOLDBERG: Objection. Form, foundation. You can answer.

A **I didn't point the gun at him.**

Q You admit to me that you removed your gun

Page 33

and had it out. Is that right?

MR. GOLDBERG: Objection to form, but you can answer.

A **Yes.**

Q You had it out in a location where Jawone Nicholson could see it. Is that right?

A **Yes.**

Q Okay. What was your purpose in -- and where was it before you removed it to where he could see it? Where did you have it on your body?

MR. GOLDBERG: Objection. Form, compound, you can answer.

A **In a holster.**

Q And where was the holster, sir?

A **In a pocket.**

Q And describe your dress that day. What were you wearing?

MR. GOLDBERG: Objection. Form, foundation. And we haven't established the date that we're talking about, Cary, but you can answer.

A **A hoodie and some jeans.**

Office (410) 821-4888  
CRC Salomon, Inc.  
2201 Old Court Road, Baltimore, MD 21208  
www.crcsalomon.com - info@crcsalomon.com  
Facsimile (410) 821-4889  
Page: 9 (30 - 33)

Page 34

1  Q   Had you pulled your gun on minors on more
2  than one date in Baltimore?
3       MR. GOLDBERG: Objection. Form,
4  foundation, relevancy. You can answer.
5  **A   No.**
6  Q   Okay. So you know we're talking about the
7  day you pulled your gun on Jawone Nicholson, right?
8       MR. GOLDBERG: Objection. Form. You can
9  answer.
10 **A   I thought you were saying other than that.**
11 Q   Right. I was in the last question, but for
12 the time that we have been speaking here, the majority
13 of the time, you recognize we're talking about your
14 interaction with Jawone Nicholson, right? I'm just
15 making sure.
16      MR. GOLDBERG: Objection to form. You can
17 answer.
18 **A   Yes.**
19 Q   Do you recall the date on which that
20 interaction occurred?
21 **A   I don't remember the date. I remember**

Page 35

1  **when, but I don't remember the exact date.**
2  Q   What time of year was it?
3  **A   Winter. It was cold.**
4  Q   It was cold outside?
5  **A   Yeah.**
6  Q   Okay. And you said you withdrew your gun
7  from a holster in your product. They call it a
8  kangaroo pocket, the one in front of a hoodie. Was it
9  from that pocket or another pocket that you drew the
10 gun?
11      MR. GOLDBERG: Objection to form. You can
12 answer.
13 **A   Hoodie pocket.**
14 Q   And you had a holster in a hoodie pocket.
15 Is that right?
16 **A   Yes.**
17 Q   And was it a pocket style holster? Do you
18 know what I mean by that, first?
19 **A   Yes.**
20 Q   And was it a pocket style holster?
21 **A   Yes.**

Page 36

1  Q   And just for purposes of the record, a
2  pocket style holster is one that is actually meant to
3  be carried in a pocket, usually has a grippy surface to
4  grab the inside of the pocket as you withdraw the
5  firearm and typically doesn't have mechanisms to attach
6  it to a belt because it's supposed to live in a pocket.
7       Is that roughly right? Is that what you
8  think of as a pocket holster?
9  **A   Yes.**
10 Q   Okay. And on the day that you drew your
11 gun on Mr. Nicholson, you say you didn't point it at
12 him. Where was the muzzle pointed?
13      MR. GOLDBERG: Objection. Form.
14 Mischaracterizes testimony, but you can answer.
15 Q   Well, wait. Your lawyer thinks I got that
16 wrong. Did you point the gun at Mr. Nicholson?
17      MR. GOLDBERG: Objection to form. Asked
18 and answered, but you can answer.
19 **A   No.**
20 Q   Where did you point the gun?
21 **A   At the ground behind me.**

Page 37

1  Q   At the ground where?
2  **A   Behind me.**
3  Q   Okay. And why did you point the gun at the
4  ground behind you?
5  **A   To de-escalate the situation.**
6  Q   Okay. Is it your experience that the
7  introduction of a firearm is a good way to de-escalate
8  a situation?
9       MR. GOLDBERG: Objection. Form,
10 foundation, but you can answer.
11 **A   It did.**
12 Q   I'm asking you about your experience. Is
13 your experience that drawing a firearm is a good way to
14 de-escalate a situation?
15      MR. GOLDBERG: Objection. Form, but you
16 can answer.
17 **A   De-escalation is the outcome of a**
18 **situation. There are techniques to use to de-escalate.**
19 Q   Has Baltimore City ever trained you that
20 one de-escalation technique is to draw a firearm?
21      MR. GOLDBERG: Objection. Form. You can

Page 38

1 answer.
2 **A     They teach us to draw our firearms.**
3 Q     So that's not what I asked. Has Baltimore
4 ever taught you that drawing a firearm is a
5 de-escalation technique?
6        MR. GOLDBERG: Objection to form, but you
7 can answer.
8 **A     It's a tool.**
9 Q     Again, not what I asked. I'm not asking is
10 it a tool or if they thought you. I'm asking, has
11 Baltimore City ever trained you that drawing a firearm
12 is a de-escalation technique?
13       MR. GOLDBERG: Objection to form, but you
14 can answer.
15 **A     I want to say, yes, but it's not the --**
16 **it's a tool to use to de-escalate.**
17 Q     Okay. So you have been trained by
18 Baltimore City that, among other potential tools, that
19 drawing a firearm is a tool to de-escalate a situation.
20 Is that right?
21       MR. GOLDBERG: Objection. Form, asked and

Page 39

1 answered, but you can answer.
2 **A     Yes.**
3 Q     Prior to -- let's talk about the day this
4 happened. What were you doing that day?
5 **A     Coming home from work.**
6 Q     And where were you when you first became
7 aware of Mr. Nicholson or anybody associated with him
8 that day?
9 **A     In my vehicle parking.**
10 Q     Where were you parking?
11 **A     On the street.**
12 Q     What street?
13 **A     What's that street? What's that street?**
14 **Bellfall. Right on Bellfall.**
15 Q     And you were -- you had been at work. How
16 long had your shift been that day?
17       MR. GOLDBERG: Objection. You can answer.
18 **A     I don't think it was a full day because I**
19 **had training. I was training.**
20 Q     And what training were you attending?
21 **A     Firearms training.**

Page 40

1 Q     Okay. And what firearm were you training
2 with?
3       MR. GOLDBERG: Objection. Form,
4 foundation. You can answer.
5 **A     My service and off-duty.**
6 Q     Okay. And your off-duty is the Glock that
7 you brandished in Mr. Nicholson's presence. Is that
8 right?
9       MR. GOLDBERG: Objection. Form. You can
10 answer.
11 **A     Yes.**
12 Q     When you parked were you in a marked police
13 car?
14 **A     No.**
15 Q     At the time of this incident how were you
16 assigned? Were you on patrol or some other assignment?
17 **A     I think I was in CIT unit, so a specialized**
18 **unit.**
19 Q     And what does CIT stand for?
20 **A     Crisis Intervention Team or Crisis Response**
21 **Team.**

Page 41

1 Q     And what does that mean? What do you do in
2 CIT?
3 **A     Respond to what we call behavioral crisis.**
4 Q     Give me an example of a behavioral crisis.
5 **A     Mentally ill person having a breakdown,**
6 **psychotic breakdown.**
7 Q     Okay.
8 **A     Or -- yeah. We find them help, get them**
9 **help, take them to the hospital so they can get**
10 **evaluated.**
11 Q     And when you were coming home, I think you
12 said you were in a personal vehicle. Is that right?
13 **A     Yes.**
14 Q     Is there any indicator on the outside of
15 the vehicle that you're a police officer?
16 **A     No.**
17 Q     Did any of your clothes indicate that you
18 were a police officer?
19 **A     No.**
20 Q     Did you have a visible badge as you got out
21 of the car?

Page 42

1  A   Well, I had my badge on me, but.
2  Q   Visible, sir. I said visible.
3  A   No.
4  Q   So you said as you were parking is when you
5  first saw Mr. Nicholson. Tell me what you saw.
6  A   Him in the curtilage, in the parking pad,
7  of a neighbor, him and the other gentleman, looking
8  around suspiciously. Just looking back and forth,
9  looking at me.
10     Not Mr. Nicholson, but the other guy, he
11 came from around, I guess, the parking pads and he was
12 masked up, like, all you could see was his eyes and he
13 had a hoodie on, come from around to see what I was
14 doing. Then he looked at me, then looked back at
15 Mr. Nicholson, looked at me, and then came back to the
16 parking spot.
17 Q   Okay. These two people that you saw, I'm
18 looking at you here on this screen, but for purpose of
19 the record, you're a strong guy, a large guy. Is that
20 fair?
21 A   I mean, I try to keep in shape, but I don't

Page 43

1  really call myself large. I'm not --
2  Q   No, but you look like a well-muscled guy.
3  Do you work out? Let me ask it that way. Do you lift
4  weights?
5      MR. GOLDBERG: Objection. Relevance, but
6  you can answer.
7  A   Yes.
8  Q   Okay. And did you lift weights at the
9  time?
10     MR. GOLDBERG: Objection. Relevance, you
11 can answer.
12 A   Yes.
13 Q   All right. And what do you max on the
14 bench these days? Bench press?
15     MR. GOLDBERG: Same objection.
16 A   I'm not sure. I haven't done a max in a
17 while.
18 Q   The last time you maxed out, what was it?
19 A   That was years ago, maybe 315.
20 Q   315? Is that what you said? 3?
21 A   Yes.

Page 44

1  Q   Wow, okay. So you have trained with
2  weights for years to get to that level. Is that right?
3      MR. GOLDBERG: Objection. Form. You can
4  answer.
5  A   Yes.
6  Q   Okay. How long have you been training with
7  weights? Since high school or before?
8      MR. GOLDBERG: Same objection.
9  A   I mean, staying in shape, pushups and stuff
10 like that.
11 Q   Sure.
12 A   You play sports when you're young. So,
13 yeah, I guess.
14 Q   All right. And in high school what sports
15 did you play?
16 A   I didn't play for high school. I played
17 recreation.
18     MR. HANSEL: Okay.
19     MR. GOLDBERG: Counsel, I'm sorry to
20 interrupt your questioning. I really don't want to
21 interrupt. Can we go off the record just for a second?

Page 45

1      MR. HANSEL: Sure, yeah. We're off, Sue.
2      (A discussion was held off the record.)
3      (There was a brief recess taken.)
4  BY MR. HANSEL:
5  Q   We were talking about your physique.
6      At the time what did you weigh?
7      MR. GOLDBERG: Objection. Relevancy, but
8  you can answer.
9  A   I don't remember at that precise moment.
10 About 200 pounds.
11 Q   Okay. And what do you weigh today? About
12 the same? A little more or a little less?
13 A   I'm a little chubby, now.
14 Q   Time gets us all. I should have asked you
15 this earlier. How old a man are you today?
16 A   50.
17 Q   And when is your date of birth?
18 A   2/22/72.
19 Q   Did you say 2/22?
20 A   Yes, sir.
21 Q   Okay, good. And these two young men you

Page 46

1 saw as you were parking, they were substantially
2 smaller than you. Is that right? You were there at
3 200 pounds, these were thin, young men?
4      MR. GOLDBERG: Objection. Form and
5 foundation, but you can answer.
6   A   No, sir. Not at all.
7   Q   Okay. Did they look muscular to you?
8   A   They were bigger than me.
9   Q   Bigger than you. You mean taller?
10  A   Bigger and taller.
11  Q   Okay. You think they weighed more than
12 200 pounds each?
13  A   Mr. Nicholson, probably more.
14  Q   So you pulled in. Were you intimidated by
15 their size?
16  A   Intimidated?
17  Q   Yes, afraid?
18  A   They were bigger than me, so I was
19 cautious, yes.
20  Q   No, no. Were you afraid or intimidated
21 because of the size of these two boys?

Page 47

1   A   Yes.
2   Q   Okay. Now, as you were pulling in, you
3 haven't described any crimes they were engaged in. Did
4 you see them engaged in any crimes?
5   A   Not at that time.
6   Q   You haven't described any violence that
7 they were engaged in. Did you see them engaged in any
8 violence?
9   A   Sitting in my truck?
10  Q   Sure, as you pulled in, you said.
11  A   Well, when I pulled in, I just seen their
12 heads.
13  Q   Okay. So you didn't see them engaged in
14 any violence or crimes when you pulled in, right?
15  A   No.
16  Q   In the entire event did you ever see
17 Mr. Nicholson engaged in any crime?
18      MR. GOLDBERG: Objection. Form. Calls for
19 a legal conclusion, but you can answer.
20  A   Just the trespassing.
21  Q   Where was he trespassing?

Page 48

1   A   The neighbor's property in the parking.
2   Q   What's name of the neighbor?
3      MR. GOLDBERG: Objection to form, but you
4 can answer.
5   A   Mark.
6   Q   I'm sorry, what's his name?
7   A   I think it's Mark.
8   Q   And after you pulled in, you saw these
9 people on an empty parking pad that you think belongs
10 to Mark. Is that right?
11      MR. GOLDBERG: Objection. Form,
12 foundation. You can answer.
13  A   No, there was a car in the parking pad they
14 was in.
15  Q   Okay. And how did you determine that they
16 didn't have Mark's permission to be there?
17      MR. GOLDBERG: Objection. Form,
18 foundation. You can answer.
19  A   I didn't know. I just asked.
20  Q   Who did you ask?
21  A   Them.

Page 49

1   Q   Okay. You said, do you have Mark's
2 permission to be on that parking pad? Is that what you
3 said?
4   A   No. I asked them --
5   Q   Okay. Go ahead.
6   A   I asked them did they live in the
7 neighborhood.
8   Q   Okay. Were there any No Trespassing signs
9 on the parking pad?
10  A   Not that I remember.
11  Q   You understand that to be trespassing under
12 Maryland law on across what are called open fields like
13 that, not in somebody's house, but in an area like
14 that, there either has to be a sign or they have to
15 have been told not to be there. You know that, right?
16      MR. GOLDBERG: Objection. Form,
17 foundation. Calls for a legal conclusion, but you can
18 answer.
19  A   I thought that would be curtilage. That's
20 the property of the owner of the house.
21  Q   And do you understand that there had to be

Page 58

1  standing to his front door?
2  **A   About. About.**
3  Q   Have you ever looked at it on Google Maps
4  at how close it is?
5  **A   No.**
6  Q   All right. And what's the name of the
7  neighborhood there?
8  **A   It's Bellfall Court. I don't know.**
9  Q   You don't know that the neighborhood has a
10 name or the development has a name?
11 **A   I know it has a name. I just don't**
12 **remember.**
13 Q   Whatever the name is, it's the same
14 neighborhood or development that Mr. Nicholson lived in
15 at the time and where this parking pad where you
16 observed him, right?
17 **A   Is it? It's the same?**
18 Q   I'm asking you, sir. I'm asking you.
19 **A   It's not the same neighborhood, the**
20 **location of houses. He lives down the street. Toward**
21 **the beginning of the, I guess, the area.**

Page 59

1  Q   Is it the same development? You said the
2  development has a name, you can't remember the name of
3  the development. It's the same development he lives
4  in, right?
5  **A   It could be.**
6  Q   Not it could be. You're aware that it is,
7  aren't you?
8      MR. GOLDBERG: Objection. Form. You can
9  answer.
10 **A   I guess it is, yes.**
11 Q   Was there any precipitation that day?
12 **A   I don't remember that.**
13 Q   Was it windy?
14 **A   I know it was cold.**
15 Q   You don't remember whether it was windy?
16 Is that what you said?
17 **A   No, I don't remember rain. You said**
18 **precipitation. I don't remember rain. I remember it**
19 **being cold.**
20 Q   What about wind? Do you remember it being
21 windy?

Page 60

1  **A   Yes, yes.**
2  Q   And a parking pad like this one, was it
3  covered? Did it have a roof?
4  **A   Yes.**
5  Q   And does it have walls on any side of it or
6  close to it?
7  **A   Yes.**
8  Q   Okay. So two young men who were waiting
9  there in cold from the temperature and the wind might
10 reasonably escape the wind by stepping under the roof
11 and next to those walls, right?
12 **A   Could be, yeah.**
13 Q   All right. So you pulled up, you said you
14 were scared and intimidated.
15     Was your gun in your hoodie when you pulled
16 up or did you have to place it there? Where was it
17 while you were driving?
18 **A   In my hoodie.**
19 Q   Okay. And had your gun been in your hoodie
20 since you left Baltimore City and into the County?
21 **A   Yes, in my pocket in the holster.**

Page 61

1  Q   And it was loaded the whole time and ready
2  to fire. Is that right?
3  **A   Yes.**
4  Q   So you observed these two men. You said
5  you were scared and intimidated.
6      What was your plan as you got out of your
7  vehicle?
8  **A   I guess to check to see if my property and**
9  **my parking pad was okay.**
10 Q   Okay. Now you mentioned parking on the
11 street. Do you have another car that was in your
12 parking pad?
13 **A   Yes.**
14 Q   And you mentioned you were in a truck.
15 What's the make and model of the truck?
16 **A   RAM 1500.**
17 Q   Okay. And what year was it?
18 **A   '15.**
19 Q   Okay. And what was the other vehicle that
20 you had?
21 **A   Ford Escape.**

Deposition of Damond Durant, Volume 1

Jawone D. Nicholson vs. State of Maryland, et al.

Page 62

1 Q And did you have anything else in your
2 parking pad besides the Ford Escape?
3 **A Motorcycle.**
4 Q Okay. Anything else?
5 **A Not vehicle wise, no.**
6 Q Anything else at all?
7 **A Could be like a little bucket, like a**
8 **little bin with debris in there, trash or something in**
9 **there.**
10 Q Okay. Anything else?
11 **A Or a stopper. Like a little piece of wood**
12 **so I know how far to go.**
13 Q Okay. Anything else?
14 **A Not that I remember.**
15 Q And did you proceed to check on your pad or
16 did you approach the young men?
17 **A No, I went straight to the car.**
18 Q When you say the car, you went straight to
19 the Escape and the motorcycle and the pad there. Is
20 that right?
21 **A Yes.**

Page 63

1 Q And what you observed when you got to your
2 property was that everything was fine?
3 MR. GOLDBERG: Objection. Form. You can
4 answer.
5 **A Yes.**
6 Q Okay. So you said your intent was to check
7 your property. You checked it. You determined
8 everything was fine. So did you just go on in your
9 house?
10 MR. GOLDBERG: Objection. Asked and
11 answered. You can answer.
12 **A No.**
13 Q At the time did you have any external
14 video, like a Ring doorbell or anything like that?
15 **A No.**
16 Q Okay. There is no camera or video in your
17 parking pad or on the exterior of your house or
18 building?
19 **A Not mine, no.**
20 Q Did your neighbors have any cameras that
21 you're aware of that captured anything in your parking

Page 64

1 pad or in their parking pads on the exterior on their
2 buildings that might have caught anything in connection
3 with this case?
4 **A Not that I'm aware of, no.**
5 Q So you checked your property, everything
6 was fine. Tell me what you did next.
7 **A Walked up to them to speak to them.**
8 Q Okay. And why did you do that instead of
9 going on about your business?
10 **A It's not a hangout spot where people**
11 **normally hang out and I've never seen them before,**
12 **ever. I guess I caught myself trying to keep them out**
13 **of trouble.**
14 Q Oh, you were going to help the boys. Is
15 that right?
16 **A That's what I caught myself doing.**
17 Q Is that what you were thinking when you
18 pull out your gun? You would pull out your gun to help
19 him?
20 **A No, I pulled out my gun to stop them from**
21 **attacking me.**

Page 65

1 Q Oh. Now, do you have any particular
2 ability to read minds? Are you a mind reader or a
3 hypnotist or anything like that?
4 MR. GOLDBERG: Objection. Form. And
5 that's rather argumentative, but I'll have him answer
6 that question.
7 THE WITNESS: I actually deposed a guy once
8 who told me he could read minds, so now I ask.
9 MR. GOLDBERG: I'll allow him to answer.
10 **A I don't have that ability.**
11 Q Okay. I didn't think so. And I actually
12 had a guy tell me he could once.
13 So not being able to read minds, tell me
14 how it was that you determined before pulling your gun
15 that these men were going to attack you?
16 **A Well, because I had turned and walked away**
17 **from them and they were coming up behind me.**
18 Q Anything else?
19 **A That's motion to attack me.**
20 Q Wait, wait. I'm asking you how you know
21 they were going to attack you. You said you turned and

Office (410) 821-4888
CRC Salomon, Inc.
2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com - info@crcsalomon.com
Facsimile (410) 821-4889
Page: 17 (62 - 65)

Page 78

1 Q And you have already described it was
2 really cold and you agree with me it's not an
3 unreasonable reaction for somebody that doesn't have a
4 nicer hat to pull a hoodie really tight around his head
5 to keep warm if it's really cold and windy, right?
6 A Yeah.
7 Q And you mentioned school was out. What
8 time of day was it?
9 A **This was, like, 11, 12:00. It wasn't**
10 **normal school hours. This was before school had let**
11 **out, so, like, 11, 12; 11, 12. 11, 12, maybe 1:00.**
12 Q Is it fair to say you're not quite certain
13 of the time?
14 A Yeah.
15 Q That's fine. And would you rely on police
16 reports and other records for the time, if need be?
17 A **Yeah, if they have the time, yeah.**
18 Q All right. But you mentioned school being
19 out. It was part of your consideration when you were
20 looking at these two young men, you recognized them as
21 being school aged people, right?

Page 79

1 MR. GOLDBERG: Objection. Form. Compound.
2 You can answer.
3 A **Not until I approached them.**
4 Q But once you approached you could tell
5 these were minors, right?
6 MR. GOLDBERG: Objection. Form. Asked and
7 answered. You can answer.
8 A **Younger than me, yes.**
9 Q Well, not just younger than you. Sir, I'm
10 younger than you and I've been a lawyer for 25 years.
11 I'm asking, you could recognize these were children,
12 minors, right? Once you approached them.
13 MR. GOLDBERG: Objection. Form. Asked and
14 answered. You can answer.
15 A **When they started talking, yes.**
16 Q Okay. And certainly it's the case, you and
17 I are men, we have been through this, a young man has a
18 change of voice at some point in his life and you could
19 tell from their voice and inflection that these were
20 young folks, minors. Is that right?
21 MR. GOLDBERG: Objection. Form. Asked and

Page 80

1 answered, but you can answer.
2 A Yes.
3 Q Okay. So when you approached them you
4 moved towards them, right?
5 A **That's the question?**
6 Q It is.
7 A **Yeah, I walked towards them, yes.**
8 Q And how close did you get to them before
9 you stopped?
10 A **I don't know. I don't remember that.**
11 Q And you said you were scared and
12 intimidated. Did you have your hand in your hoodie
13 pocket?
14 A **No, I think I was holding my bag.**
15 Q Well, you have two hands. Did you have
16 them both holding your bag?
17 A **Yeah.**
18 Q So you had a shoulder strap, your hands
19 were up on the shoulder strap of the bag. Is that
20 right?
21 A **It was like a trash bag, so.**

Page 81

1 Q Oh, I see, all right. So you checked your
2 property, you walked towards them. You're a guy in
3 jeans and a black hoodie carrying a trash bag full of
4 what was probably reasonably heavy items. Is that
5 right?
6 A Yes.
7 Q Okay. And a visual observer would have
8 seen on your pocket that same or similar clip from a
9 knife, if you had it with you, that the young man had.
10 The same way you saw his, if you had your knife with
11 you, he would have seen yours. Is that right?
12 MR. GOLDBERG: Objection to form. Calls
13 for speculation. You can answer.
14 Q That's fair. The same way his was visible,
15 yours would have been visible if you had it with you.
16 Is that fair?
17 MR. GOLDBERG: Objection to form, but you
18 can answer.
19 A **Yes. If I had it on me, yes.**
20 Q And that's because the way you carry it, is
21 that little clip holds the knife at the ready in your

Page 82

1 pocket and the clip is visible exterior. It's on the
2 outside of the pocket, right?
3     MR. GOLDBERG: Objection. Form,
4 foundation. You can answer.
5  A    Yeah, it's clipped on the pocket.
6  Q    So when you approached these two young men,
7 you're a guy carrying a trash bag, it's full of
8 relatively heavy stuff, more likely than not they see a
9 knife, and you're otherwise in a black hoodie.
10     Do I have all that right?
11     MR. GOLDBERG: Objection. Form. You can
12 answer. You can answer.
13  A    Repeat that? I'm sorry.
14  Q    Sure. I'm trying to draw the picture of
15 what these young men might have seen as you approached.
16     I'm seeing you, you're a relatively muscled
17 guy, right? Right?
18  A    Yes.
19  Q    You weigh 200 pounds, right?
20  A    Yes.
21  Q    You're wearing a black hoodie, right?

Page 83

1  A    Yes.
2  Q    All right. More likely than not you have a
3 visible knife with you, right?
4     MR. GOLDBERG: Objection. Mischaracterizes
5 his testimony.
6     MR. HANSEL: You said probably earlier.
7 More likely than not. Is that fair?
8     MR. GOLDBERG: I think he testified that it
9 was a possibility. I don't think he said probable.
10     MR. HANSEL: I think he said both at
11 different points, but the record will reflect that.
12 BY MR. HANSEL:
13  Q    Let me just ask you, sir. You probably had
14 your knife with you. Is that fair? You had been to
15 the range? You had been working?
16     MR. GOLDBERG: Objection. Form. Asked and
17 answered. You can answer.
18  A    I probably had it on me.
19  Q    All right. There you go.
20     So you're approaching them, you probably
21 have this knife, you're 200 pounds, you're in a black

Page 84

1 hoodie, you have no badge showing and you're carrying a
2 relatively heavy black trash bag.
3     Have I drawn the picture? Is that what
4 they see?
5  A    Yeah.
6  Q    When you get to them you realize, of
7 course, that they're minors, right?
8  A    Yeah, once the conversation started.
9  Q    To your knowledge, had you ever seen them
10 before?
11  A    No.
12  Q    So likely they'd never seen you before.
13 Fair assumption, right?
14     MR. GOLDBERG: Objection to form.
15  A    Yes.
16  Q    So from their perspective we're adding in,
17 they have never seen you before likely.
18     And tell me under these circumstances
19 what's the first thing you do or say when you stop
20 walking towards them?
21  A    What do I do?

Page 85

1  Q    Or say once you stopped walking towards
2 them?
3  A    I speak.
4  Q    Tell me what it was that you said.
5  A    **Hey, guys, how you all doing. How you all**
6 **doing. Hello. I speak.**
7  Q    Anything else?
8  A    **No, just speaking to them.**
9  Q    Yeah, but telling me you spoke to him
10 doesn't tell me what you said. When you approached,
11 tell me what you said as best as you remember.
12  A    **Hey, guys, how you all doing. I guess, is**
13 **this your property, do you live around here? Meaning,**
14 **I mean, if you say yeah, I live right there. Then I**
15 **know that's the neighbor's house and I go, okay, but**
16 **they weren't so pleasant.**
17  Q    Under the circumstances if a man of your
18 description that time in his 40's approached -- do you
19 have any kids?
20  A    Yes.
21  Q    How old are your kids?

Page 90

1  A   Yes.
2  Q   Okay. Have you ever told your kids to let
3 you know if they're approached by a stranger?
4      MR. GOLDBERG: Same objection.
5  A   So you're saying that these gentlemen were
6 of that age not to talk to strangers and that they
7 couldn't take it upon themselves, they weren't old
8 enough or mature enough, to say whether they lived
9 there or not and because my point is this is --
10 Q   Sir, I'm 48 and I have no intention of
11 telling you where I live. There is not an age limit on
12 safety as far as I know.
13     MR. GOLDBERG: Cary, I've been over this
14 twice. Can we please not testify or lecture on the
15 record? If you have a question, ask him a question.
16 Q   Sure. Well, my question, sir, was, have
17 you ever told your children not to talk to strangers?
18     MR. GOLDBERG: Objection.
19 A   Yes.
20 Q   So you approached these two juveniles. You
21 said, is this your property, do you live around here.

Page 91

1 Tell me what happened next.
2  A   They started cussing me out.
3  Q   Okay. And there is no crime in cussing you
4 out, is there?
5  A   No, that's why I walked away.
6  Q   And tell me exactly what they said and who
7 said it.
8  A   Fuck you, fuck the police. I don't care
9 who called the police, fuck you, get the fuck away from
10 me, and MF, that manner.
11 Q   Now, at some point you told them that you
12 called the police or that you were the police. Do you
13 remember that?
14 A   That someone might call the police on them.
15 Q   So let's go back and do this in order.
16     When you said, is this your property, do
17 you live around here, tell me what their response was
18 to that.
19 A   Fuck you.
20 Q   And then what did you say?
21 A   I don't want you guys to get in no trouble,

Page 92

1 so. And again, fuck you, again.
2  Q   Okay. And so you said, is this your
3 property, do you live around here. They said, fuck
4 you. And your response to fuck you was, I don't want
5 you guys to get in no trouble. Is that right?
6  A   Yeah, I was trying to help. Trying to keep
7 people from getting in trouble.
8  Q   And tell me how it is you thought you'd
9 help them when you approached with your knife and gun.
10 Tell me about that.
11     MR. GOLDBERG: Objection. Form. You can
12 answer.
13 A   To keep them from getting the police called
14 on them.
15 Q   Why did you think they were going to get
16 the police called on them?
17 A   To keep them from doing something that they
18 would regret.
19 Q   Why did you think they were going to do
20 something they would regret?
21 A   Just a gut feeling.

Page 93

1  Q   Was there anybody else that you could see
2 that observed any of this?
3  A   No. Like I said, no one.
4  Q   So as far as you know, you were the only
5 one that saw these gentlemen out there, right?
6      MR. GOLDBERG: Objection. Form. And
7 mischaracterizes his testimony to the extent that these
8 two were also out there and they are other people of
9 each other, so. You can answer, though.
10     MR. HANSEL: Other than yourself and the
11 two minors, you didn't see anybody else out there, did
12 you?
13 A   Just people walking passed, but in the
14 court, no, just us.
15 Q   Okay. And so when you told them -- and how
16 did you put it about the police? You said somebody --
17 tell me what you said to them. When you brought up the
18 police, tell me what you said.
19 A   I didn't want nobody to call the police on
20 them.
21 Q   Okay. But the only person interacting with

Page 94

1 them was you, right?
2  A   Yes.
3  Q   So when you said, I don't want anybody to
4 call the police on you, you were referring to yourself,
5 that you might call the police. Is that right?
6  A   No.
7  Q   Well, if nobody else saw them or was
8 interacting with them who else would have called the
9 police? Who were you referring to?
10  A   **That could have been anybody looking**
11 **outside.**
12  Q   Okay. So you said, I don't want anybody to
13 call the police on you. You approached them, is this
14 your property, they said, fuck you. You said, I don't
15 want anybody to call the police on you. They said,
16 fuck you, again, and fuck the police or something like
17 that. Is that right?
18  A   Yes.
19  Q   Now, did you feel that they were being
20 disrespectful?
21  A   Yes.

Page 95

1  Q   And, in particular, they were disrespecting
2 you. Is that right?
3  A   **I was the only one there.**
4  Q   That's why I thought that would be an easy
5 question. They were disrespecting you, right?
6  A   Yes.
7  Q   Okay. So after they said fuck you and fuck
8 the police, what did you say next?
9  A   **Okay. I said, all right. And I left.**
10  Q   Okay. Up until this point had you notified
11 them that you were a police officer?
12  A   **No, I was walking away. It wasn't no need.**
13 **It wasn't no need.**
14  Q   Up until this point had you notified them
15 that you had a firearm on you?
16  A   **There was no need to.**
17  Q   Well, don't tell me about the need. I just
18 need to make sure you didn't tell them up to this point
19 that you had a firearm. The point where you say you
20 were walking away.
21  A   No.

Page 96

1  Q   And you had not shown them at that point
2 your firearm or your badge; is that correct? The point
3 at which we're up to in the story where you turned to
4 walk away, you said.
5  A   No.
6  Q   Okay. As a police officer you're trained
7 to maintain situational awareness. Is that right?
8      MR. GOLDBERG: Objection. Form. You can
9 answer.
10  A   Yes, we try.
11  Q   And part of that is being aware of and
12 observing threats and keeping them in your line of
13 sight so you can keep yourself safe, right, and your
14 fellow officers?
15      MR. GOLDBERG: Objection. Form. You can
16 answer.
17  A   Yes, yes.
18  Q   When you turned to walk away, though, you
19 turned your back on these gentlemen. Is that right?
20  A   Yes.
21  Q   At that point you determined they were no

Page 97

1 threat or you wouldn't have turned and turned your back
2 on them knowing one had a knife in his pocket, right?
3  A   **Yes, I was leaving them alone. Giving them**
4 **what they wanted.**
5  Q   Right, but you had determined in your mind
6 they were no threat at that point, correct?
7  A   **No, no. There is still a possibility.**
8 **They still could do something, even if I turned my**
9 **back, but I just was giving them what they wanted. I**
10 **walked away.**
11  Q   You had determined they were safe enough to
12 turn your back on, obviously, right?
13  A   **I walked away.**
14  Q   But that's not the question, sir.
15      As part of your analysis in your
16 situational awareness and your training to observe and
17 keep yourself safe, before you turned your back you had
18 determined it was safe enough to do so, to turn your
19 back, right?
20      MR. GOLDBERG: Objection to form, but you
21 can answer.

Page 98

1  A    I felt as though that I was far enough away
2  from them where I could walk away and turn my back.
3  Q    So you turned your back, you walked away.
4       How many steps did you take before
5  something else happened?
6  A    I don't remember. It was a few steps
7  because I was walking.
8  Q    Which direction were you headed? To your
9  car, your parking pad, your front door, somewhere else?
10 A    To the house.
11 Q    And tell me what happened next.
12 A    I heard footsteps behind me really, really
13 fast, doing some talking, so I turned and he was
14 walking towards me.
15 Q    Who is he?
16 A    I don't know his name. The other.
17 Q    Not Mr. Nicholson?
18 A    Not Mr. Nicholson.
19 Q    All right. When you turned back around to
20 see the two minors, one was walking towards you, but
21 Mr. Nicholson was staying where he was; is that

Page 99

1  correct?
2  A    He was behind the other guy, yes.
3  Q    But staying where he was. Where you left
4  him.
5  A    I don't remember. He was behind him,
6  though. I don't know if it's where I left him, but he
7  was behind him.
8  Q    Okay. When you say you don't remember, you
9  don't have any memory of Mr. Nicholson also moving
10 towards you when you turned around; is that correct?
11 A    Yeah, I don't.
12 Q    Okay. And you said you heard some talking.
13 What were they saying, if you remember?
14 A    I heard them cussing at me and walking up
15 towards me really, really fast.
16 Q    Well, just one of them, right?
17      MR. GOLDBERG: Objection to form. You can
18 answer.
19 A    One of them was close to me.
20 Q    Okay. So you turned around, you turned
21 around and you saw one of the two minors walking

Page 100

1  towards you. Do you recall his name? The one walking
2  towards you?
3  A    The other gentleman that's not here.
4  Q    Let's call him not Mr. Nicholson. Is that
5  fair?
6  A    Not Mr. Nicholson.
7  Q    All right. Got it. And tell me what
8  happened next.
9  A    I reacted to the threat. I felt
10 threatened. Them walking up behind me when I was
11 leaving them alone. I dropped my bag, reached for my
12 gun because I knew if I got in a fight it was going to
13 fall out and if one of them were to grab it, it
14 wouldn't have been how I hoped it would turn out.
15      So it was still in the holster. I pointed
16 it at the ground. Kind of saying, look, you don't want
17 to do this, go ahead and leave. That was about it.
18 They walked off.
19 Q    So, all right, let's break that down a
20 little bit.
21      The holster is designed to stay in the

Page 101

1  pocket when you pull the gun out. Is that right?
2  That's the theory of it. That's how it's supposed to
3  work?
4       MR. GOLDBERG: Objection. Form. You can
5  answer.
6  A    I grabbed the gun and the holster. I never
7  pulled the gun out of the holster.
8  Q    Okay. Is the trigger guard covered by the
9  holster?
10 A    Yes.
11 Q    So you pulled the gun out and it still had
12 this holster around it. Is that right?
13 A    Yes.
14 Q    All right. You certainly agree with me
15 that if the gun had fired the holster would not contain
16 the bullet?
17 A    Yes.
18 Q    Okay. And when you removed your gun from
19 your hoodie pocket what did you say?
20 A    You don't want to do this. I told that one
21 guy I was the police and he just stood there and looked

Deposition of Damond Durant, Volume 1

Jawone D. Nicholson vs. State of Maryland, et al.

Page 102

1 at me. I said, you don't want to do this. You don't
2 want to do this. And he just looked at me. He just
3 stopped and looked at me, looked at my hand, looked at
4 me. And then I guess Mr. Nicholson persuaded him to
5 leave.
6  Q    So you said, you don't want to do this, I'm
7 the police. Is that right?
8  A    Yeah.
9  Q    Okay. Did you raise your voice?
10  A    No.
11  Q    Just in a normal tone?
12  A    Yes.
13  Q    And you said Mr. Nicholson persuaded him to
14 leave. Tell me what Mr. Nicholson said.
15  A    Come on, man, let's go. That's about all I
16 remember.
17  Q    All right. And did the two, in fact, leave
18 or if they did something different each, tell me. What
19 did they do after Mr. Nicholson said, come on, man,
20 let's go?
21  A    Mr. Nicholson, he left first and then the

Page 103

1 other guy left behind him.
2  Q    And when you pulled the gun out of your
3 hoodie pocket how far away were you from Mr. Nicholson?
4        MR. GOLDBERG: Objection. Form. Asked and
5 answered, but you can answer.
6  A    Yeah, I don't remember that.
7  Q    You were still in the little cul de sac
8 area, right? What do you call it? A court? You were
9 still in the same court, right?
10  A    Yeah, we were still in the same court.
11  Q    And that court is small enough that two
12 cars parked across from each other can't both back out
13 at the same time, right?
14  A    I'm not sure what you're asking.
15  Q    Well, two cars on opposite parking pads
16 can't both back out at the same time. There's not
17 enough room. I'm trying to understand the size. Is
18 that right?
19  A    I mean, two cars could back out at once.
20  Q    That are right across each other? It's big
21 enough?

Page 104

1  A    Like, next to each other? Beside each
2 other?
3  Q    No, sir. Across from each other where they
4 would be backing towards each other.
5        Is the court two car lengths long or wide
6 is what I'm trying to ask? Let's do it another way.
7 Let's do it another way. I'll try to make it easier.
8        How far across is the court in the
9 direction you were walking?
10  A    How far across is the court. What court?
11 The court that I live in?
12  Q    Yes, sir, yeah. The little paved area
13 there. How wide is it? The whole paved area?
14  A    It's pretty big. It has a tree in the
15 middle, so, cars can back out. It's enough room for
16 cars to park in the middle with the tree for other cars
17 to back out. So, yes, it's pretty big.
18  Q    Do you have an estimate in feet?
19  A    No, I don't know.
20  Q    You were on the same side of the tree as
21 the young man when you pulled your gun, right?

Page 105

1  A    Yeah.
2        THE WITNESS: I'm sorry, I apologize. Can
3 we take two minutes? I have to take a phone call.
4        MR. HANSEL: Sure. Let's take make it, so
5 I've got --
6        MR. GOLDBERG: How long is the call?
7        MR. HANSEL: Let's make it seven minutes.
8 I've got 53. Let's come back at 1. Is that enough
9 time, sir?
10        THE WITNESS: Is that good?
11        MR. HANSEL: If it works for you.
12        THE WITNESS: Yeah, I just need, like,
13 three minutes.
14        MR. GOLDBERG: That's fine.
15        MR. HANSEL: Let's come back at 1. We'll
16 go off the record until 1.
17        (There was a brief recess taken.)
18 BY MR. HANSEL:
19  Q    So you mentioned the young man approaches
20 you, you pull out your gun. It's still in the holster,
21 you said. Is that right, sir? Is that a yes?

Office (410) 821-4888
CRC Salomon, Inc.

2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com - info@crcsalomon.com

Facsimile (410) 821-4889
Page: 27 (102 - 105)