IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JAWONE D. NICHOLSON                      :

                                         :

    v.                                   :   Civil Action No. DKC 20-3146

                                         :

BALTIMORE POLICE DEPARTMENT,             :
et al.                                   :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this civil rights action is the motion for summary judgment filed by Defendant Damond Durant.[1]  (ECF No. 71).  The issues have been briefed, and the court now rules, no hearing being deemed necessary.  Local Rule 105.6.  For the following reasons, the motion for summary judgment will be granted in part and denied in part.

**I.   Background**

    **A. Factual Summary**

On the afternoon of November 10, 2017, Plaintiff Jawone D. Nicholson was standing with a friend in the cul-de-sac behind

---

[1] Also pending are the motion to seal filed by Defendant and the motion for leave to file tangible items filed by Plaintiff Jawone D. Nicholson.  (ECF Nos. 73, 85).  Defendant moves to seal exhibit 11 to his motion for summary judgment.  (ECF No. 73).  This exhibit contains Plaintiff's medical information.  Neither Plaintiff nor anyone else has opposed the sealing of this exhibit, and the court did not rely on it in its analysis of Defendant's motion.  Thus, Defendant's motion will be granted.  Plaintiff seeks leave to file exhibits 3 and 4 to his opposition to Defendant's motion, which contain the audio files of the 911 calls, in compact disc format.  (ECF No. 85).  Plaintiff's motion will be granted.

Plaintiff's home in Howard County, waiting to be picked up for an after-school program. (ECF Nos. 71-3, at 16; 71-4, at 5, 9-10). Plaintiff was sixteen years old at the time. (ECF No. 71-4, at 18). It was a cold day; Plaintiff was wearing a hood pulled tight over his head, and his friend was wearing a face covering. (ECF No. 71-3, at 21). At some point while Plaintiff and his friend were waiting there, Defendant, a police officer for the Baltimore City Police Department, arrived home from work in his personal vehicle to his house in the same cul-de-sac. (*Id.* at 5, 12). He was in plain clothes—a black hooded sweatshirt and jeans—and he was carrying his personal firearm—which he was authorized to carry by his employer but was not his assigned service weapon—in a holster in his sweatshirt pocket. (*Id.* at 10, 12, 15). As he parked his car in front of his house, Defendant saw Plaintiff and Plaintiff's friend standing in the parking pad of a neighboring house. (*Id.* at 13). Defendant did not observe the teenagers committing any crimes. (*Id.* at 15). In their depositions, the parties presented differing versions of the events that followed.

According to Plaintiff's deposition testimony, Defendant approached Plaintiff and his friend and said, "What y'all standing here for?" (ECF No. 71-4, at 10). Plaintiff perceived Defendant to be a "regular person" in plain clothes. (*Id.* at 12). Neither Plaintiff nor his friend had any weapons on them at the time. (*Id.* at 12). The teenagers explained to Defendant that they were

"waiting for [their] transportation," and Defendant asked, "What transportation?" (*Id.* at 10). Plaintiff responded, "Why you asking so many questions?" (*Id.*). Defendant then said, "Man, y'all wasn't going to do shit," and he started walking toward them. (*Id.*). The teenagers walked toward Defendant in response, and it was at that point that Defendant pulled his weapon from the holster in his pocket and pointed it at Plaintiff's friend's stomach. (*Id.* at 10, 12). Plaintiff and his friend then "threw [their] hands up[] [and] walked away." (*Id.* at 10). They walked around a corner, and Plaintiff called his mother. (*Id.*). Defendant continued to follow the teenagers from a distance until moments later when Plaintiff's mother, grandmother, and other family members arrived on the scene. (*Id.* at 12-13). It was at that point that Defendant finally revealed his affiliation with the Baltimore City Police Department. (*Id.* at 14).

Defendant recalls some of the facts differently. He testified that he approached Plaintiff and his friend because the two were "looking around suspiciously." (ECF No. 71-3, at 13). He was concerned that they might be trespassing on his neighbor's property and that they might be about to break into or damage his neighbor's property. (*Id.* at 14, 20). Defendant observed that Plaintiff's friend had a knife clipped into his pocket. (*Id.* at 19). Defendant approached them and asked, "[D]o you live around here?" (*Id.* at 23). The two teenagers responded by "cussing [him] out." (Id. at

3

25).  Defendant said, "I don't want you guys to get in no trouble" and then turned away to leave.  (*Id.*).  At this point, Plaintiff and his friend quickly approached Defendant from behind.  (*Id.* at 27).  Believing that the two were about to attack him, Defendant drew his gun—still in the holster—from his pocket.  (*Id.*).  Defendant testified that he pointed his holstered gun at the ground and identified himself as a police officer, communicating to the teenagers, "[Y]ou don't want to do this, go ahead and leave." (*Id.* at 27-28).  The teenagers then walked away, and Defendant called the police.  When he spoke to the 911 operator, Defendant stated, "[W]hen they came up, I showed them my badge; I showed them my gun." (ECF No. 80-5).[2]

Plaintiff testified that he was traumatized from this experience: he was forced to relive the experience every day when he walked past the cul-de-sac to get to school and whenever he looked through his bedroom window to the area where the incident took place.  (ECF No. 71-4, at 15).  Plaintiff experienced—and continues to experience—sleepless nights, stomachaches, random outbursts of tears, and a fear of police.  (*Id.* at 17-18).  He began seeing a therapist shortly after the incident, and the

---

[2] He testified at deposition that he showed his badge for the first time when the family members approached. (ECF No. 71-3, at 34).

therapist recommended that he take medication, although he declined to do so. (*Id.* at 18-19).

**B. Procedural History**

Plaintiff filed a lawsuit in the Circuit Court for Baltimore City, naming as defendants Mr. Durant as well as the Baltimore Police Department, the Mayor and City Council of Baltimore, and the State of Maryland. The case was removed to this court on October 29, 2020. (ECF No. 1). Plaintiff filed an Amended Complaint on November 24, 2020. (ECF No. 17). The Amended Complaint contained the following claims against all four then-defendants: (I) False Arrest in violation of the Fourth Amendment to the United States Constitution, (II) False Imprisonment in violation of the Fourth Amendment, (III) Excessive Force in violation of the Fourth Amendment, (IV) False Arrest in violation of Articles 24 and 26 of the Maryland Declaration of Rights, (V) False Imprisonment in violation of Articles 24 and 26, (VI) Excessive Force in violation of Articles 24 and 26, (VII) False Arrest in violation of Maryland common law, (VIII) False Imprisonment in violation of Maryland common law, (IX) Intentional Infliction of Emotional Distress, and (X) Gross Negligence. The Amended Complaint also contained a claim for Negligent Training, Supervision, and Retention and a *Monell* claim against the State of Maryland, Baltimore Police, and Mayor and City Council of Baltimore.

All four defendants moved to dismiss on December 18, 2020. (ECF Nos. 27-28).  Defendant Durant moved to dismiss only the intentional infliction of emotional distress claim against him, and the other defendants moved to dismiss all claims against them. The court granted the latter motion to dismiss in full, dismissing all claims against the State, City, and Police Department.  (ECF Nos. 38-39).  The court denied Defendant Durant's partial motion to dismiss.

The parties engaged in discovery, and Defendant Durant moved for summary judgment on January 17, 2023.  (ECF No. 71).  Plaintiff responded in opposition, and Defendant replied.  (ECF Nos. 80, 86).

## II.  Standard of Review

A court may enter summary judgment only if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court must construe the facts that are presented in the light most favorable to the party opposing the motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of

[his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting former Fed.R.Civ.P. 56(e)). "A mere scintilla of proof . . . will not suffice to prevent summary judgment[.]" *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (citations omitted).

**III. Analysis**

**A. Section 1983 Claims**

Counts I through III of the Amended Complaint are claims brought under 42 U.S.C. § 1983 for violations of Plaintiff's rights under the Fourth Amendment to the United States Constitution. (ECF No. 17, at 10-15). Defendant argues that he is entitled to summary judgment on Plaintiff's § 1983 claims because (1) he was not acting under color of law during the events at issue in this case, and even if he was, (2) he is entitled to qualified immunity. (ECF No. 71-1, at 19-33).

**1. Color of Law**

Defendant argues that it cannot be genuinely disputed that he was not acting under color of law during his interaction with Plaintiff. (ECF No. 71-1, at 19). In order to recover under § 1983, Plaintiff must demonstrate that Defendant acted "under

color of state law" when he deprived Plaintiff of his federal rights. *See Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4ᵗʰ Cir. 2003) (citing 42 U.S.C. § 1983). It is clear that "§ 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful," *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (internal quotation marks omitted), but there is no "simple line between States and people operating outside formally governmental organizations," *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001). Indeed, "the question of what is fairly attributable to the State 'is a matter of normative judgment, and the criteria lack rigid simplicity.'" *Rossignol*, 316 F.3d at 523 (quoting *Brentwood Acad.*, 531 U.S. at 295). "[T]he ultimate resolution of whether an actor was . . . functioning under color of law is a question of law for the court." *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 344 n.7 (4ᵗʰ Cir. 2000).

The United States Court of Appeals for the Fourth Circuit has recognized that "[a]cts of police officers in the ambit of their personal, private pursuits fall outside of 42 U.S.C. § 1983," but "the lack of the outward indicia suggestive of state authority—such as being on duty, wearing a uniform, or driving a patrol car—are not alone determinative of whether a police officer is acting under color of state law." *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 872 (4ᵗʰ Cir. 1989) (internal quotation marks omitted)

8

(alteration in original).  On the other hand, identifying oneself as a police officer, while not necessarily dispositive, "generally" indicates acting in official capacity. *See McDonough v. Toles*, 476 F.Supp.3d 882, 891 (D.Minn. 2020) ("It is true that, based on all of the facts and circumstances of a case, an officer may be found not to have acted under color of law, even though the officer identified himself as a police officer. . . . But that is the exception, not the rule."). If a police officer's "purportedly private actions are linked to events which arose out of his official status, the nexus between the two can play a role in establishing that he acted under color of state law." *Rossignol*, 316 F.3d at 524.  Ultimately, "the nature of the act performed is controlling," and "[t]he act therefore must be carefully scrutinized to determine whether an officer, when either on or off duty, is acting under color of state law." *Revene*, 882 F.2d at 872.

There are several facts in dispute here that are relevant to the determination of this question.  Resolving all factual disputes in Plaintiff's favor (which results in the adoption of certain parts of Defendant's version of events), the facts most relevant to this question are as follows.  On the day of the incident, Plaintiff and his friend were standing in the cul-de-sac where Defendant's home was located when Defendant arrived home from his job as a police officer.  Defendant was dressed in plain clothes,

in his personal vehicle, off duty, and out of his employer's
jurisdiction.   Defendant approached Plaintiff and his friend,
acting on a suspicion that the pair were committing, or were about
to commit, a crime.   Defendant proceeded to question Plaintiff and
his friend, investigating their presence in an area where he
believed they did not have a right to be.   Then, Defendant walked
toward the teenagers and, after identifying himself as a police
officer (verbally and possibly by showing his badge), Defendant
pulled out his privately-owned (but department authorized) weapon
and pointed it at Plaintiff's friend.   In doing so, Defendant
indicated that Plaintiff and his friend should leave the area.
Plaintiff and his friend put their hands up and walked away.

Defendant is not entitled to a determination as a matter of
law that he was not acting under color of law when he interacted
with Plaintiff.   If a jury finds that the facts occurred as just
described (or similarly), the interaction would have resembled a
*Terry* stop that culminated in forced compliance using a show of
police authority and a weapon.[3]   While Defendant was off duty at
the time and had no authority to arrest Plaintiff in that
jurisdiction, the nature of the act itself as described above—an
interrogation and orders to comply accompanied by self-

---

[3] "*Terry* stop" refers to the Supreme Court case *Terry v. Ohio*,
392 U.S. 1, 30 (1968), in which the Court recognized that a police
officer may conduct a brief investigatory stop where the officer
has reasonable suspicion that criminal activity may be afoot.

identification as a police officer and a show of force—amounts to a performance of police duties rather than a purely personal pursuit. Thus, there are material facts in dispute that a jury must resolve before it can be determined whether Defendant acted under color of law.

### 2. Qualified Immunity

Defendant argues that even if he was acting under color of law during his interaction with Plaintiff, he is entitled to qualified immunity on Plaintiff's Fourth Amendment claims. (ECF No. 71-1, at 25). The Amended Complaint contains three claims based on violations of the Fourth Amendment: a false arrest claim, a false imprisonment claim, and an excessive force claim. The questions posed as to each claim are (1) "whether a constitutional right was violated," and if so (2) "whether the unconstitutionality of the officers' conduct was clearly established." *Thorpe v. Clarke*, 37 F.4th 926, 933 (4th Cir. 2022) (internal quotation marks omitted) (quoting *Pearson v. Callahan*, 555 U.S. 223, 227 (2009)).[4]

### a. False Arrest and False Imprisonment

The Fourth Amendment false arrest and false imprisonment claims are identical to one another in the Amended Complaint. Plaintiff does not explain how the claims differ from one another,

---

[4] Which party has the burden of proof on each question can be complicated. *See Stanton v. Elliott*, 25 F.4th 227, 233 n.5 (4th Cir. 2022).

and the parties discuss them under one analysis.  Following the parties' lead, those two claims will be treated as a single Fourth Amendment unlawful seizure claim.  *See Rogers v. Pendleton*, 249 F.3d 279, 294 (4th Cir. 2001) ("[F]alse arrest and false imprisonment claims . . . are essentially claims alleging a seizure of the person in violation of the Fourth Amendment[.]").

Plaintiff argues that he was unconstitutionally seized in two separate instances: (1) in the moment that Defendant pointed his gun at him and his friend and (2) when Defendant forced him to leave the area.  (ECF No. 80, at 18-19).  In assessing whether Defendant's actions in each instance violated Plaintiff's Fourth Amendment rights, it must be determined whether Plaintiff was seized and, if so, whether the seizure was done without legal justification.  *See United States v. Harrison*, 667 F.2d 1158, 1160 (4th Cir. 1982).

Because Defendant did not arrest Plaintiff or detain him for an extended period, Defendant's interaction with Plaintiff would, at most, be characterized as a *Terry* stop.  A law enforcement officer engages in a *Terry* stop when he "seize[s] a person for a brief investigatory stop" after "observ[ing] unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot."  *United States v. Slocumb*, 804 F.3d 677, 681 (4th Cir. 2015) (internal quotation marks omitted) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).  Law enforcement

officers do not seize individuals "merely by approaching [them] on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002).  As the Supreme Court of the United States has explained,

> Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means.  If a reasonable person would feel free to terminate the encounter, then he or she has not been seized.

*Id.* at 201 (citation omitted).  The Supreme Court has identified "[e]xamples of circumstances that might indicate a seizure," including:

> the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

A seizure can occur either "by means of physical force or show of authority" that "in some way restrain[s] the liberty of a citizen." *Terry*, 392 U.S. at 19 n.16.  In the absence of physical contact between the officer and the citizen, however, the citizen "must actually submit to [the officer's] show of authority" for the show of authority alone to constitute a seizure.  *United States*

*v. Cloud*, 994 F.3d 233, 242 (4th Cir. 2021); *see also California v. Hodari D.*, 499 U.S. 621, 626 (1991).

Defendant did not seize Plaintiff simply by approaching him and asking questions. At issue is whether Plaintiff was seized when Defendant pulled out his weapon—a "show of authority." Assuming the sequence of events happened as previously described— Defendant identified himself as police, pulled out his weapon, and directed Plaintiff to leave—a reasonable person under those circumstances would not have felt "free to terminate the encounter" once the gun was pulled out. It is not particularly relevant whether Defendant pointed the gun at the ground or at Plaintiff's friend. As the Supreme Court has said, an officer's mere "display of a weapon" can indicate that a seizure occurred. Evidence in the record would support a conclusion that Defendant sought the teenagers' subordination to his show of force when he pulled out his weapon; thus, Defendant "induce[d] [Plaintiff's] cooperation by coercive means" in that moment. Additionally, Plaintiff submitted to Defendant's show of authority by putting his hands up and walking away, as Defendant directed him to do. Therefore, Defendant is not entitled to a determination as a matter of law that there was no seizure in the moment that he brandished his firearm.

The next question is whether such a seizure would have been legally justified. In order for a *Terry* stop to be legally

14

permissible, an officer "must have a particularized and objective basis for suspecting the particular person stopped" "is, or is about to be, engaged in criminal activity"—also known as "reasonable articulable suspicion." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981).  Here, Defendant has not identified any particularized or objective reasons for suspecting that Plaintiff and his friend were engaged in criminal activity.  In his deposition, he stated that he merely observed the two teenagers standing and looking around the cul-de-sac "suspiciously," and he admitted that he did not observe them commit any crimes.  (ECF No. 71-3, at 13, 15).  He noted that he found it suspicious that Plaintiff was wearing a hood pulled tight over his head and that Plaintiff's friend was wearing a face covering, but he also stated that it was "really cold" that day and admitted that it might have been reasonable for someone to wear a hood or face mask for warmth. (*Id.* at 21-22).  When asked, "Why did you think they were going to do something they would regret?", Defendant responded, "Just a gut feeling."  (*Id.* at 25).  An officer's "inchoate and unparticularized suspicion or 'hunch'" does not suffice as reasonable articulable suspicion.  *Terry*, 392 U.S. at 27. Defendant has not demonstrated as a matter of law that he had reasonable articulable suspicion that Plaintiff was engaged or about to engage in criminal activity at the time of the encounter.

Moreover, these rules are clearly established, both by the Supreme Court and the Fourth Circuit. As previously noted, the Supreme Court has recognized that an officer's "display of a weapon" can indicate that a seizure occurred. *See Mendenhall*, 446 U.S. at 554. Additionally, Defendant's purported reasons for being suspicious of Plaintiff are far less objective and reasonable than other cases where the Fourth Circuit determined that there was no reasonable articulable suspicion. *See, e.g.*, *United States v. Massenburg*, 654 F.3d 480, 488-91 (4th Cir. 2011) (holding that there was no reasonable articulable suspicion based on a plaintiff's presence in a high-crime area shortly after reports of gunfire nearby, nervous behavior, and hesitance to submit to a pat-down); *United States v. Sprinkle*, 106 F.3d 613, 617-19 (4th Cir. 1997) (holding that there was no reasonable articulable suspicion where a plaintiff entered the car of a person who was known to the officers as having recently completed a prison sentence for narcotics violations and made hand movements consistent with a covert exchange). Thus, Defendant is not entitled to qualified immunity on Plaintiff's claim that Defendant unlawfully seized him when he approached him, asked him questions, and then brandished his weapon.

Plaintiff also argues that he was seized when Defendant ordered that he and his friend leave the area.[5]  As previously stated, a seizure occurs when a reasonable person would not "feel free to terminate the encounter" with the police officer. Plaintiff is, in essence, arguing that he was seized because Defendant *forced* him to terminate the encounter, which seems to be a contradictory concept.[6]  Plaintiff contends that he was deprived of his "liberty" to "remain in a public place of his choice." (ECF No. 80, at 19).  He does not, however, cite any Fourth Amendment case law in support of this contention; he only cites cases discussing a person's "liberty" interests under the Due Process Clause of the Fourteenth Amendment.  *See, e.g.*, *City of Chicago v. Morales*, 527 U.S. 41, 53 (1999) ("[T]he freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment.").

---

[5] It is unclear whether any evidence in the record supports a finding that Defendant verbally ordered Plaintiff and his friend to leave the area or whether the evidence at most shows that he implied that they should leave with his body language and withdrawal of the weapon.  Whether he communicated it implicitly or explicitly does not impact the following analysis.

[6] The Supreme Court has, in other cases, articulated the seizure standard as a question of whether "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  *Mendenhall*, 446 U.S. at 554.  Again, Plaintiff's argument that he was seized because he was *forced* to leave is seemingly contradictory.

The Fourth Circuit has not recognized a police officer's use of force to compel a person to leave an area as a seizure under the Fourth Amendment.   Other circuits have considered this question.   The Sixth Circuit has held that "Fourth Amendment jurisprudence suggests a person is seized not only when a reasonable person would not feel free to leave an encounter with police, but also when a reasonable person would not feel free to *remain* somewhere, by virtue of some official action."   *Bennett v. City of Eastpointe*, 410 F.3d 810, 834 (6th Cir. 2005).   The Second Circuit, on the other hand, has held that a person who was ordered to leave a premises and escorted out by police was not seized because he was "free to go anywhere else that he desired."   *Sheppard v. Beerman*, 18 F.3d 147, 153 (2d Cir. 1994).   The Second Circuit reaffirmed this position in a subsequent case, explaining,

> Police officers frequently order persons to leave public areas: crime scenes, accident sites, dangerous construction venues, anticipated flood or fire paths, parade routes, areas of public disorder, etc.   A person may feel obliged to obey such an order. Indeed, police may take a person by the elbow or employ comparable guiding force short of actual restraint to ensure obedience with a departure order.   Our precedent does not view such police conduct, without more, as a seizure under the Fourth Amendment as long as the person is otherwise free to go where he wishes.

*Salmon v. Blesser*, 802 F.3d 249, 253 (2d Cir. 2015).   The Seventh Circuit considered this question but ultimately decided that even

though it was unclear that a command by a police officer to leave a premises, coupled with an arrest threat, did *not* constitute an unlawful seizure, it was also not clear that it *did*; therefore, the police officer was entitled to qualified immunity. *Kernats v. O'Sullivan*, 35 F.3d 1171, 1181 (7th Cir. 1994).

The Seventh Circuit's reasoning in *Kernats* is persuasive, and the same conclusion is appropriate in the present case. Fourth Circuit case law does not clearly establish that Defendant's order to Plaintiff to leave the area constituted a seizure. The existence of conflicting case law in other circuits is far from sufficient to establish this issue clearly in this circuit. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999) ("[I]f a right is recognized in some other circuit, but not in this one, an official will ordinarily retain the immunity defense." (internal quotation marks omitted) (alteration in original)). Thus, Defendant is entitled to qualified immunity on Plaintiff's claim that Defendant unlawfully seized him when he ordered him to leave.

### b. Excessive Force

Plaintiff's Fourth Amendment excessive force claim is that Defendant used excessive force by brandishing his weapon, despite the fact that Plaintiff did not pose any threat to Defendant's or any other person's safety. Defendant argues that he is entitled to qualified immunity on this claim.

19

The question whether police officers used excessive force "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "[T]he question is whether the officers' actions [we]re 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

An officer may, under certain circumstances, draw his weapon as a "justified safety precaution" during a *Terry* stop. *See United States v. Manbeck*, 744 F.2d 360, 377 (4th Cir. 1984), *cert. denied*, 469 U.S. 1217 (1985). The Fourth Circuit has referred to police officers "approaching a suspect with drawn weapons" as an "extraordinary measure[]" that may be justified "as a reasonable means of neutralizing potential danger to police and innocent bystanders." *United States v. Taylor*, 857 F.2d 210, 214 (4th Cir. 1988). Generally, the Fourth Circuit has recognized that it is reasonable for police officers to draw their weapons on a person when they have reason to believe that the person is armed or otherwise dangerous, that the person is engaged in criminal activity, or that some other threat to the officers' safety is present due to the nature of the interaction. *See, e.g., Bellotte*

20

*v. Edwards*, 629 F.3d 415, 426 (4th Cir. 2011) (holding that it was reasonable for officers to draw their weapons when executing a search of a child's bedroom where they suspected child pornography was located because "the officers had good reason to fear for their own safety upon entering an unsecured room"); *Taft v. Vines*, 83 F.3d 681, 684 (4th Cir. 1996) (en banc) (adopting the dissenting opinion of the panel, 70 F.3d 304, 320 (4th Cir. 1995), that it was reasonable for officers to point their weapons at children exiting a vehicle because they had reason to believe that an occupant of the vehicle was an armed and dangerous murder suspect); *Foote v. Dunagan*, 33 F.3d 445, 448 (4th Cir. 1994) (holding that it was reasonable for an officer to draw his weapon during a *Terry* stop of a truck driver who the 911 dispatcher had said "was wanted in connection with an assault and was armed and dangerous"); *United States v. Sinclair*, 983 F.2d 598, 602-03 (4th Cir. 1993) (holding that it was reasonable to draw weapons when stopping suspected drug traffickers).

There are several disputed facts that bear significantly on this analysis.  For the purposes of this motion, however, all disputes of facts must be resolved in Plaintiff's favor.  Thus, assuming that Plaintiff and his friend were unarmed and only approached Defendant as he approached them, Plaintiff posed no threat to Defendant's or anyone else's safety.  Under those facts, "the severity of the crime at issue" was nonexistent because

Plaintiff and his friend had not committed any crimes; the teenagers did not "pose[] an immediate threat to the safety of the officer[] or others"; and they were not "actively resisting arrest or attempting to evade arrest by flight."  Thus, there was no objective reason to justify Defendant's drawing of his weapon.

This conclusion is well-supported by Supreme Court and Fourth Circuit precedents, which uniformly require at least some minimal level of justification for officers to draw their weapons during an interaction with a civilian.  This case is somewhat comparable to *Turmon v. Jordan*, 405 F.3d 202 (4th Cir. 2005), in which the Fourth Circuit determined a police officer was not entitled to qualified immunity on an excessive force claim for pointing a gun in a person's face, pulling the person from his hotel room, and handcuffing him.  *Id.* at 207-08.  The court explained,

> First, "the severity of the crime" cannot be taken into account because there was no crime. Of course, [the defendant police officer] Jordan claims that he reasonably believed that arson or some other crime was being committed, but the facts do not support a reasonable suspicion that criminal activity was afoot. This weighs heavily in [the plaintiff] Turmon's favor.  Second, there is no evidence that Turmon "pose[d] an immediate threat to the safety of [Deputy Jordan] or others." Third, Turmon did not "actively resist[ detention] or attempt to evade [detention] by flight."  To the contrary, all of the relevant evidence indicates that Turmon was compliant and non-threatening.  When Turmon opened the [hotel room] door, and Jordan pointed the gun at his face, Turmon raised his hands and offered no resistance.

22

> Even Jordan acknowledges that Turmon was completely passive and caused no trouble as he was being handled and handcuffed. Accordingly, we conclude that "the facts alleged show [that Jordan's] conduct violated a constitutional right," namely the Fourth Amendment right to be free from a seizure carried out by the use of excessive force.

*Id.* (citations omitted).   Thus, Defendant is not entitled to qualified immunity on Plaintiff's excessive force claim at this juncture.

**B. Maryland Constitutional Claims**

Plaintiff brings false arrest, false imprisonment, and excessive force claims under Articles 24 and 26 of the Maryland Declaration of Rights that are identical to his Fourth Amendment claims.  (ECF No. 17, at 15-21).  Article 24 is interpreted *in pari materia* with the Fourteenth Amendment to the United States Constitution, and Article 26 is interpreted *in pari materia* with the Fourth Amendment.  *See Canaj, Inc. v. Baker & Div. Phase III*, 391 Md. 374, 424 (2006); *Carter v. State*, 367 Md. 447, 458 (2002). There is one important difference, however, between how the state and federal provisions are applied: state public officials who are alleged to have violated the Maryland Declaration of Rights are not entitled to qualified immunity.  *Okwa v. Harper*, 360 Md. 161, 201 (2000).

As an initial matter, summary judgment must be granted in favor of Defendant on the portion of Plaintiff's excessive force

claim that invokes Article 24, which is the functional equivalent of the federal Due Process Clause.  The Supreme Court held in *Graham v. Connor*, 490 U.S. 386 (1989), that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a [Fourteenth Amendment] 'substantive due process' approach." *Id.* at 395.  Thus, that claim can only be brought under Article 26—the Fourth Amendment equivalent—and not Article 24.  *See Barnes v. Montgomery Cnty., Md.*, 798 F.Supp.2d 688, 700 (D.Md. 2011) (holding the same). Summary judgment will be denied, however, on Plaintiff's Article 26 excessive force claim for the same reasons that summary judgment was denied on his Fourth Amendment excessive force claim.

The earlier analysis of Plaintiff's Fourth Amendment false arrest/imprisonment claim also applies to Plaintiff's false arrest/imprisonment claim under Articles 24 and 26, except the analysis regarding qualified immunity.[7]  Thus, summary judgment will be denied on Plaintiff's claim that Defendant violated his state constitutional rights when Defendant seized him by brandishing a weapon.  Summary judgment will be granted on Plaintiff's claim that Defendant seized Plaintiff in violation of

---

[7] The parties do not differentiate between the application of Article 24 and Article 26 to Plaintiff's unlawful seizure claim.

the Maryland Declaration of Rights by ordering him to leave the area. Although Defendant is not entitled to qualified immunity on the state constitutional claim, Plaintiff has not identified any Maryland case law that supports his position that a seizure occurs when a police officer compels a person to leave an area in which the person wishes to remain. Decisions of the United States Supreme Court are persuasive authority for Maryland courts' interpretations of Articles 24 and 26, *see Att'y Gen. of Md. v. Waldron*, 289 Md. 683, 705 (1981), but a few inconsistent federal circuit court holdings are not. Absent any Supreme Court or Maryland case law establishing that an order to leave an area by a police officer can constitute a seizure, Plaintiff's claim cannot survive summary judgment.

**C. Maryland Tort Claims**

**1.   False Arrest and False Imprisonment**

Plaintiff also brings false arrest and false imprisonment claims under Maryland common law. (ECF No. 17, at 21-24). The elements of false arrest and false imprisonment are identical under Maryland law: "1) the deprivation of the liberty of another; 2) without consent; and 3) without legal justification." *Heron v. Strader*, 361 Md. 258, 264 (2000). To constitute the requisite deprivation of liberty, "there must be some direct restraint of the person," which may come in the form of "[a]ny exercise of force, or threat of force, by which in fact the other person is

deprived of his liberty, compelled to remain where he does not wish to remain, or to go where he does not wish to go." *Mason v. Wrightson*, 205 Md. 481, 487 (1954).

Generally, the tort of false arrest or imprisonment "requires some sort of volitional conduct that continually prevents the plaintiff from moving from his or her current space." *Gray v. Kern*, 124 F.Supp.3d 600, 615 (D.Md. 2015), *aff'd in part, vacated in part sub nom. Gray by Gray v. Kern*, 702 F.App'x 132 (4th Cir. 2017); *see also Restatement (Second) of Torts* § 35 (Am. L. Inst. 1965) ("(1) An actor is subject to liability to another for false imprisonment if (a) he acts intending to *confine the other or a third person within boundaries fixed by the actor*, and (b) his act directly or indirectly results in such a confinement of the other, and (c) the other is conscious of the confinement or is harmed by it." (emphasis added)). Often, in cases challenging police officer conduct, this requirement is easily satisfied by the occurrence of a custodial arrest. *See Gray*, 124 F.Supp.3d at 615. "In cases, however, not involving an arrest or a detention, a hallmark of false imprisonment is a continuing action on the part of the tortfeasor that restrains the movement of the plaintiff." *Id.*

Here, it is undisputed that Defendant did not detain or arrest Plaintiff, nor did he confine him to a fixed area or intend to restrain his movement. To the contrary, the parties agree that Defendant intended that Plaintiff generally move away from the

26

area, and Defendant did not direct Plaintiff to go anywhere in particular.  Because there was no "arrest" or "imprisonment," judgment in favor of Defendant is appropriate on Plaintiff's common law false arrest and false imprisonment claims.  *See id.* (granting summary judgment on false imprisonment claim in favor of police officer who shot the plaintiff because the officer "took no further action to confine him to the [area and], in fact, took steps to enable his removal from the building"); *see also Smith v. Comair, Inc.*, 134 F.3d 254, 259-60 (4th Cir. 1998) (affirming summary judgment in favor of police officer on Kentucky false imprisonment claim, citing language identical to the previously quoted language from *Mason v. Wrightson*, because the officer "grabbed [the plaintiff's] arms only momentarily and nonforcefully" and then helped him board a flight to another city); *id.* ("False imprisonment results only if 'the restraint be a total one, rather than a mere obstruction of the right to go where the plaintiff pleases.'" (quoting *W. Page Keeton et al.*, *Prosser and Keeton on the Law of Torts* § 11, at 47 (5th ed. 1984)).

### 2.   Intentional Infliction of Emotional Distress

Defendant argues that Plaintiff cannot prove the elements of an intentional infliction of emotional distress claim.  (ECF No. 71-1, at 36-39).  In order to succeed on such a claim, a plaintiff must demonstrate that the defendant engaged in (1) intentional or reckless conduct (2) that is extreme or outrageous (3) and caused

(4) the plaintiff's severe emotional distress.  *See Caldor, Inc. v. Bowden*, 330 Md. 632, 641-42 (1993).  Maryland courts have "made it clear that liability for the tort of intentional infliction of emotional distress should be imposed sparingly, and 'its balm reserved for those wounds that are truly severe and incapable of healing themselves.'"  *Id.* at 642.  Indeed, the tort is "rarely viable" in Maryland.  *McPherson v. Balt. Police Dep't*, 494 F.Supp.3d 269, 286 (D.Md. 2020).  To meet the "extreme and outrageous" element, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Harris v. Jones*, 281 Md. 560, 567 (1977) (quoting *Restatement (Second) of Torts* § 46 cmt. d (Am. L. Inst. 1965)).  To be considered "severe emotional distress," the plaintiff must "show that he suffered a severely disabling emotional response to the defendant's conduct" that "no reasonable man could be expected to endure."  *Id.* at 570-71.

Here, even resolving all factual disputes in Plaintiff's favor, there is insufficient evidence in support of the intentional infliction of emotional distress claim to allow it to go to trial. The parties agree that Defendant did not point his gun directly at Plaintiff—he either pointed it at Plaintiff's friend or at the ground—and, assuming the gun was pointed at Plaintiff's friend, it was in that position for a few moments at most.  More egregious

conduct by police officers has been held not extreme or outrageous enough.  In *Williams v. Prince George's County*, 112 Md.App. 526 (1996), the court determined that although the plaintiff claimed that a police officer pointed a gun at him for several minutes, then ordered him onto the ground, put a knee on his back, and accused him of having stolen the car he was driving, "as a matter of law, there was nothing that the arresting officers did that could be characterized as so outrageous in character and so extreme in degree as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 535, 556 (internal quotation marks omitted).  In *Branch v. McGeeney*, 123 Md.App. 330 (1998), the court determined that there was "no evidence presented of the type of extreme and outrageous conduct necessary to survive summary judgment on this tort claim," although there was evidence presented that police officers put a nine-year-old girl in a police car in handcuffs for throwing acorns at a building, told her she was "going to jail," told her and her mother to "shut up," and made racial remarks.  *Id.* at 338, 342-45, 351-52.  And in *Morgan v. Prince George's County, Md.*, No. 09-cv-1584-AW, 2010 WL 2891700, at *12 (D.Md. July 20, 2010), the court stated that a police officer's punch to a woman's face, which caused her nose to bleed, did "not appear to meet the Court's standard for extreme and outrageous conduct." *Id.* at *1, 12.  The officer was responding to reports of an argument between the woman

and her husband, and he had ordered the woman to sit on her sofa while he questioned her.  She attempted to stand up when she felt the onset of an asthma attack, and the officer forced her back down, then punched her on her third attempt to stand.  *Id.* at *1.

Even if Defendant's conduct here met the standard for extreme and outrageous, Plaintiff has not come forward with sufficient evidence of severe emotional distress that he has experienced as a result of this incident.  The only evidence in the record of Plaintiff's emotional distress is his own testimony and the testimony of his mother about how the incident affected him.  He and his mother testified that he experienced sleepless nights, stomachaches, random outbursts of tears, and a fear of police.  They also testified that Plaintiff saw a therapist for some time after the incident.  Maryland courts have required more "evidentiary particulars" of *severe* and *disabling* emotional distress than the difficulties Plaintiff describes.  *See, e.g.*, *Harris*, 281 Md. at 572 (determining that evidence that the plaintiff was "shaken up," felt "like going into a hole [to] hide" out of humiliation, and saw a physician to treat his "nerves" was not severe enough); *Morgan*, 2010 WL 2891700, at *12 (determining that the plaintiff's "claims that she suffers from depression and Post Traumatic Stress Disorder (PTSD), is unable to sleep regularly without medication, and has a dark area around her nose as a result of [the defendant's] alleged attack on her" were "too conclusory

to meet the very high standard of severe emotional distress" and "not sufficient to demonstrate a *severely* disabling emotional response"); *Caldor, Inc.*, 330 Md. at 642-44 (determining that evidence that the plaintiff "was distraught and worried," "was hurt a lot," "felt ashamed," "tended not to socialize as much as before," "kept to himself," and "did not trust others very readily" was insufficient to constitute a "severely disabling emotional response that hindered his ability to carry out his daily activities").

Although the evidence viewed most favorably to Plaintiff suggests that Defendant acted wholly without justification in brandishing a weapon in the presence of two teenagers and that Plaintiff was significantly impacted by this encounter, it does not rise to the exceedingly high level of severity that is required for these kinds of claims.  Thus, there is legally insufficient evidence to preclude summary judgment in Defendant's favor on Plaintiff's intentional infliction of emotional distress claim.

### 3.   Gross Negligence

Finally, Plaintiff claims that Defendant was grossly negligent during the incident.  (ECF No. 17, at 25-27).  Defendant argues that he is entitled to summary judgment on this claim because he acted reasonably under the circumstances.  (ECF No. 71-1, at 40-42).  Gross negligence is "an intentional failure to perform a manifest duty in reckless disregard of the consequences

as affecting the life or property of another[] [that] implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Liscombe v. Potomac Edison Co.*, 303 Md. 619, 635 (1985) (internal quotation marks omitted). Maryland courts have held that when a gross negligence claim is brought against a police officer based on a claim of excessive use of force, the "objective reasonableness" standard as articulated in *Graham v. Connor*, 490 U.S. 386 (1989), controls. *See Stutzman v. Krenik*, 350 F.Supp.3d 366, 383 (D.Md. 2018) (citing *Richardson v. McGriff*, 361 Md. 437, 453 (2000) and *Torbit v. Balt. City Police Dep't*, 231 Md.App. 573, 593 (2017)). As previously discussed, this standard is "whether the officers' actions [we]re 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397.

Because summary judgment will be denied on Plaintiff's excessive force claims, applying the same standard to his gross negligence claim necessitates a denial of summary judgment on that claim as well.

**IV.  Conclusion**

For the foregoing reasons, Defendant's motion for summary judgment will be granted in part and denied in part. Specifically, summary judgement will be granted in favor of Defendant and against Plaintiff on Counts I, II, IV, and V to the extent Plaintiff claims

he was unlawfully seized by being forced to leave the area; Count VI to the extent it invokes Article 24 of the Maryland Declaration of Rights; and Counts VII, VIII, and IX.  Defendant's motion will be denied as to Counts I, II, IV, and V to the extent Plaintiff claims he was unlawfully seized when Defendant brandished his weapon; as to Count VI to the extent it invokes Article 26 of the Maryland Declaration of Rights; and as to Counts III and X.  A separate order will follow.

_____/s/_____

DEBORAH K. CHASANOW<br>
United States District Judge
