# EXHIBIT A

```
 1                    VOLUME I

 2          IN  THE  UNITED  STATES  DISTRICT  COURT

 3             FOR  THE  DISTRICT  OF  MARYLAND

 4   JAWONE D. NICHOLSON

 5             Plaintiff

 6       vs.                        Case No.:

 7   STATE OF MARYLAND, et al.       1:20-cv-03146 DKC

 8             Defendants

 9   _____/

10

11                    VOLUME I

12          The deposition of DAMOND DURANT was held

13   remotely via Zoom videoconference on Friday, June 24,

14   2022, commencing at 11:03 a.m., before Susan M.

15   Liebrecht, Notary Public.

16

17

18

19

20   STENOGRAPHICALLY REPORTED BY:

21   Susan M. Liebrecht, RPR
```

Case 1:20-cv-03146-DKC   Document 102-2   Filed 03/01/24   Page 3 of 63

Deposition of Damond Durant, Volume I                          Jawone D. Nicholson v. State of Maryland, et al.

Page 2

1  APPEARANCES:

2

3  ON BEHALF OF PLAINTIFF:

4  CARY J. HANSEL, ESQUIRE

5   Hansel Law, P.C.

6   2514 North Charles Street

7   Baltimore, Maryland  21218

8   Telephone:  301-461-1040

9   Email:  cary@hanselllaw.com

10

11  ON BEHALF OF DEFENDANTS:

12  STUART R. GOLDBERG, ESQUIRE

13   Baker Donelson, P.C.

14   100 Light Street, 19th Floor

15   Baltimore, Maryland 21202

16   Telephone:  410-685-1120

17   Email:  sgoldberg@bakerdonelson.com

18

19

20  ALSO PRESENT: Monica A. Carranza, Esquire

21

Page 3

1  INDEX

2  Deposition of DAMOND DURANT - Volume I

3  June 24, 2022

4

5  Examination by:                    Page

6  Mr. Hansel                         4

7

Page 4

1  PROCEEDINGS

2  Whereupon,

3  DAMOND DURANT,

4  called as a witness, having been first duly sworn to

5  tell the truth, the whole truth, and nothing but the

6  truth, was examined and testified as follows:

7  EXAMINATION BY MR. HANSEL:

8  Q     Officer, thank you for your time here

9  today.  Can you give us, please, your full name?

10  **A     Damond Tremmell Durant.**

11  Q     And spell Tremmell for me?

12  **A     T-R-E-M-M-E-L-L.**

13  Q     And do you go by any nicknames or aliases?

14  **A     No, sir.**

15  Q     All right.  I see your name on the computer

16  that was on before you got on as --

17  **A     D Rock.**

18  Q     -- D Rock.  Do you go by that?

19  **A     That's just a nickname.  That's not --**

20  **really, people don't call me that.  That was for**

21  **earlier stuff.**

Page 5

1  Q     What do you mean earlier stuff?  What was

2  that for?

3  **A     Work.**

4  Q     Okay.  So people at work call you D Rock?

5  **A     Yeah, D or Double D, just D.**

6  Q     D or Double D or D Rock.  Is that right?

7  **A     Yes.**

8  Q     So earlier when I asked you if you had any

9  nicknames, that's the kind of thing I was referring to.

10  Do you have any other nickname besides D,

11  Double D or D Rock?

12  **A     No, that's it.  That's pretty much it.**

13  Q     And tell me what you reviewed, I'm not

14  interested in conversations with your lawyer, but tell

15  me what you reviewed in preparation for your deposition

16  here.

17  **A     What I reviewed?**

18  Q     Yes, sir.  Documents, materials, video,

19  audio.  Anything you reviewed.

20  **A     Nothing.**

21  Q     Okay.  Have you ever seen any video related

1  to the events at issue in this case in your life?

2  **A      Any video?**

3  Q      Yes, sir.

4  **A      I seen what was on the news. That was**

5  **about it.**

6  Q      All right. And you watched that on the

7  news; is that correct?

8  **A      Yes, on TV.**

9  Q      And you haven't since seen any video

10 related to this case other than seeing it on TV?

11 **A      Yeah, no, sir. That's it.**

12 Q      Let me ask you now about audio. Have you

13 heard any audio related to this case?

14 **A      Just what was on the news.**

15 Q      Okay. And you saw it on the news and that

16 was it? You never saw it again?

17       MR. GOLDBERG: Objection. Form. You can

18 answer.

19 **A      Yes.**

20 Q      What about any photographs related to this

21 case? Have you ever seen any photographs related to

1  this case?

2  **A      No, sir.**

3  Q      Okay. Were you ever interviewed by

4  Internal Affairs in connection with this case?

5  **A      Yes.**

6  Q      Did Internal Affairs play you any audio or

7  video or show you any photographs?

8  **A      No, sir.**

9  Q      You have gone very dark. It looks like to

10 me there might have been a light go out in the room.

11 If you can leave that on for us, it will help the court

12 reporter to be able to interpret what you're saying.

13 **A      I turned the light off. I tried to set it**

14 **up on my computer. My computer just went to sleep. Is**

15 **that better?**

16 Q      Perfect, thank you. Yes, sir. I say that

17 because in this remote environment it's easier for the

18 court reporter if she can see your lips move because

19 every once in a while the audio is not very good. So

20 we need to be able to see you, sir. Thank you for

21 that.

1  **A      Okay. No problem.**

2  Q      Let me ask a little bit about your

3  background. What's your highest degree of educational

4  attainment?

5  **A      I graduated from high school. Went to a**

6  **trade school for a while and that was it.**

7  Q      And so I take it your highest degree of

8  educational attainment is a high school diploma? You

9  did not get any type of diploma or certificate from

10 trade school; is that correct?

11 **A      Yes, sir.**

12 Q      Where did you go to high school?

13 **A      Walbrook.**

14 Q      And what trade school did you attend, sir?

15 **A      It was called Retz back then, but I don't**

16 **know what it's called now.**

17 Q      It was called what back then?

18 **A      Retz.**

19 Q      Spell that for me.

20 **A      R-E-T-Z, Retz.**

21 Q      Okay. And what were you studying or

1  learning at trade school? What was your course of

2  study?

3  **A      Electrical, electronics.**

4  Q      And did you go directly from trade school

5  into policing or did you do other work, first?

6  **A      No, other work first.**

7  Q      Okay. Let's start with high school and

8  your graduation. Tell me about what employment you

9  have had, and I ask it that way because I don't know if

10 you worked during trade school, but tell me when you

11 graduated from high school what was your first job?

12 **A      Well, I've had a job when I was in high**

13 **school. So ninth grade was my very first job and I**

14 **have been working ever since.**

15 Q      And I understand how that works. I had to

16 get a work permit at 13 to clean up in the back of a

17 deli. I've been working ever since then.

18       So in ninth grade what did you do?

19 **A      It was a job called Greater Potato. It's**

20 **like Boardwalk Fries.**

21 Q      And where did you do that?

Page 10

1    A    It was called Mount Clare Junction at the
2    mall in Baltimore City.
3    Q    All right.  And starting from there, moving
4    up to the present time walk me through your work
5    history, please.
6    A    Well, Greater Potato, I stayed there for a
7    while.  University of Maryland Pharmacy.  From the
8    pharmacy to shipping and receiving, corrections, then
9    police.
10   Q    Okay.  Have you ever been terminated from a
11   job since after high school?  Have you ever been
12   terminated from a job?
13   A    No, sir.
14   Q    Have you ever left on threat of termination
15   or while an investigation of any type was pending?
16   A    No, sir.
17   Q    Where did you work corrections?
18   A    Maryland House of Corrections, Jessup.
19   Q    And when did you first get the corrections
20   job?
21   A    Right after the University job.

Page 11

1    Q    What year was that?
2    A    '98 or '97; '98.
3    Q    And when you say you worked corrections, I
4    understand that to mean you were a correctional
5    officer; is that correct?
6    A    Yes.
7    Q    And did you attend an academy to become a
8    correctional officer?
9    A    Yes.
10   Q    And it was an academy run by the State of
11   Maryland.  Is that right?
12   A    Yes.
13   Q    How long was that academy?
14   A    Couple months.
15   Q    And then what year did you become a police
16   officer?
17   A    '01.
18   Q    And so you were not in corrections too
19   long, '97, '98 to '01.  Is that right?  Three or four
20   years or less?
21

Page 12

1    Q    And when you became a police officer, as a
2    result of your correctional work did you have an
3    opportunity to attend an abbreviated academy?  In other
4    words, a briefer, shorter experienced officer training
5    type academy or did you attend the full length academy?
6        MR. GOLDBERG:  Objection.  Form, but you
7    can answer.
8    A    Full.
9    Q    Okay.  Thank you, sir.
10       And where did you first become a police
11   officer?
12   A    Baltimore City.
13   Q    And you have been employed as a police
14   officer for Baltimore City since 2001 continuously.  Is
15   that right?
16   A    Yes.
17   Q    So it's 2022, so I make that about, what,
18   21 years you have been working with Baltimore City.  Is
19   that right?
20   A    Yes.
21   Q    Okay.  Any retirement plans on the horizon?

Page 13

1    I ask because a lot of guys hit 20 and start thinking
2    about it.
3    A    No, they took the 20 years away.  I have to
4    do 25 years.
5    Q    Is that right?  I didn't know that.
6        So you're going to grind out, what, three
7    or four more years here; is that correct?
8    A    That depends.
9    Q    Okay.  When you were working corrections
10   did you ever have any complaints filed against you to
11   the best of your knowledge associated with on-the-job
12   conduct?
13   A    Not that I can recall, no, sir.
14   Q    What about when you were working as a
15   police officer in your 21 years here?  Have you ever
16   had any complaints filed against you about on-the-job
17   conduct?
18       MR. GOLDBERG:  Objection to form, but you
19   can answer.
20   A    I get complaints.  If you do your job you
21   get complaints.

Case 1:20-cv-03146-DKC    Document 102-2    Filed 03/01/24    Page 6 of 63

Page 14

1    Q    And why do you say that?  I do my job, I

2 don't get a lot of complaints.  I don't think I've ever

3 had any.

4        MR. GOLDBERG:  Objection.  Objection to

5 form, but you can answer.

6    Q    What do you mean by if you do your job as a

7 Baltimore City police officer you get complaints?

8        MR. GOLDBERG:  Objection to form.  You can

9 answer.

10   A    You lock up people that don't want to get

11 locked up because they did something wrong and got

12 caught.  It's different from my job to your job.

13   Q    And how does that -- how does that lead to

14 complaints?  That's what I'm trying to understand.

15       MR. GOLDBERG:  Objection.  Asked and

16 answered, form.  You can answer.

17   A    Anyone can make a complaint.  I'm not

18 really understanding what you're asking because I know

19 anyone can make a complaint about anything.

20   Q    I suppose that's true, sir, but you

21 mentioned to me that if you're doing your job as a

Page 15

1 Baltimore City police officer that you're going to get

2 complaints.  And I'm trying to understand what you mean

3 by that.

4        What about doing your job as a Baltimore

5 City police officer generates complaints?

6    A    I can't speak for other officers.

7    Q    Okay.

8    A    If you are working and the bad guy doesn't

9 want to go to jail, they'll make a complaint.

10   Q    Okay.

11   A    But the only --

12   Q    How many -- go ahead, sir.  I'm sorry.

13   A    The complaint that I know about is the

14 reason why we're here now.  That's the one I know

15 about.

16   Q    Okay.  So you're telling me in 21 years you

17 have only ever had one complaint and that was

18 associated with Jawone Nicholson?

19   A    No, no.  I don't really know or remember

20 complaints that -- well, yeah, one complaint.  Well,

21 two complaints.  This one and another complaint.

Page 16

1    Q    Okay.  So in your 21 years with Baltimore

2 City you have only ever had two complaints associated

3 with your on-the-job conduct.  Is that right?

4        MR. GOLDBERG:  Objection to form.  Asked

5 and answered, but you can answer.

6    A    That I know of, yeah.

7    Q    Okay.  And I know a little bit about

8 Mr. Nicholson's situation.  Tell me about the other

9 one.

10   A    It was an arrest being made for a domestic

11 violence suspect.

12   Q    And what happened?

13   A    He attacked us or assaulted us.

14   Q    And?

15   A    We arrested him.

16   Q    Okay.  I didn't hear anything in there that

17 might lead to a complaint.  What was the complaint

18 about?

19   A    I guess we arrested him.

20   Q    And that's it?  That's all the complaint

21 was about?  Being arrested?

Page 17

1        MR. GOLDBERG:  Objection to form, but you

2 can answer.

3    A    I guess a use of force.

4    Q    Okay.  Well, you don't have to guess.

5 You're aware that's what it was about, right?

6        MR. GOLDBERG:  Objection to form.  You can

7 answer.

8    A    Yes.

9    Q    In fact, this is a man whose jaw you broke?

10       MR. GOLDBERG:  Objection.  Form,

11 foundation.  You can answer.

12   A    I didn't know.  That's what he said.  I got

13 him medical attention.  I don't know.

14   Q    It's not just what he said, sir.  There was

15 a lawsuit, the City settled it, paid tens of thousands

16 of dollars.  Has all that slipped your mind?

17       MR. GOLDBERG:  Objection to form,

18 foundation.  You can answer.

19   A    That's what happened.

20   Q    Okay.  But did that somehow slip your mind

21 when I was asking you about it earlier?

Deposition of Damond Durant, Volume  
Case 1:20-cv-03146-DKC    Document 102-2    Filed 03/01/24    Page 7 of 63  
Jawone D. Nicholson vs. State of Maryland, et al.

Page 18

1    MR. GOLDBERG: Objection. Form,
2 foundation. You can answer.
3    **A    That was over and I tried not to think**
4 **about it because it's over.**
5    Q    All right. When I ask you questions try to
6 think about them. Because you're under oath and, you
7 know, there are, of course, consequences for people who
8 are under oath and don't think about their answers.
9    MR. GOLDBERG: I try to give leeway, Cary,
10 and I'm going to let that slide. But if you have
11 questions, you're going to ask him questions, but
12 lecturing him on the record I'm not going to allow.
13    MR. HANSEL: I've got a duty to warn the
14 man if I'm going to take action.
15    MR. GOLDBERG: That's fine.
16 BY MR. HANSEL:
17    Q    Sir, tell me about the incident where you
18 broke a man's jaw.
19    MR. GOLDBERG: Objection. Foundation,
20 form. You can answer.
21    **A    He just assaulted his girlfriend. She had**

Page 19

1 **two black eyes when I arrived. He was in there on a**
2 **couch, sitting down. Once he was told he was under**
3 **arrest, he said you're not taking me nowhere. He began**
4 **to fight. Struck him once, he complied. Got him**
5 **medical attention.**
6    Q    Did you see him assault anybody?
7    **A    He assaulted me.**
8    Q    Okay. Did you see him assault his
9 girlfriend?
10    **A    No, but that's what she said and with the**
11 **two black eyes that I saw, I'm pretty sure she didn't**
12 **do it herself.**
13    Q    Was he convicted?
14    **A    I think so.**
15    Q    And was he seated or standing when you hit
16 him?
17    MR. GOLDBERG: Objection. Form,
18 foundation. You can answer.
19    **A    No, he was trying to get away from out of**
20 **the seat he was in.**
21    Q    So he was still seated?

Page 20

1    **A    Yes.**
2    Q    Okay. And tell me how it is he attacked
3 you or assaulted you while he was seated? Let's start
4 with this. You were standing when you hit him?
5    MR. GOLDBERG: Objection. Form,
6 foundation. You can answer.
7    **A    Yes.**
8    Q    Okay. So you're standing, the man is
9 seated on a couch, you're in his place. How is it he
10 came to assault you as he was seated on a couch and you
11 were standing?
12    **A    Kicking, swinging. You can fight while**
13 **you're seated.**
14    Q    What did he do is what I'm asking?
15    **A    Yeah, kicked me, kicked my partner,**
16 **swinging, hitting us. Keeping us from arresting him.**
17 **Resisting arrest.**
18    Q    And did you give a deposition in that case?
19 That's a procedure like this, although in those days it
20 was probably in person?
21    **A    It was in person.**

Page 21

1    Q    And was there an Internal Affairs
2 investigation in that situation? I think you told me
3 there was, but was there?
4    **A    I didn't get any reprimands from that.**
5    Q    I'm sorry?
6    **A    I didn't get any reprimands from that.**
7    Q    So that's not what I'm asking. Was there
8 an investigation?
9    **A    I don't remember. I don't remember. I**
10 **remember going to the lawyer's downtown, but I don't**
11 **remember talking to anyone from my department about**
12 **that.**
13    Q    All right. The lawyers you went to, were
14 they union lawyers?
15    **A    I think they were his lawyers and a union**
16 **lawyer, yeah.**
17    Q    Okay. And who was it at the time?
18 Mr. Davey or somebody else? Who was the union lawyer,
19 if you recall? It might have been Chaz Ball, it might
20 have been --
21    **A    I don't remember.**

Deposition of Damond Durant, Volume

Case 1:20-cv-03146-DKC     Document 102-2     Filed 03/01/24     Page 8 of 63

Jawone D. Nicholson vs. State of Maryland, et al.

Page 22

Q    Don't remember, okay.

When the lawsuit came in, in that case, in the broken jaw case, your superiors were certainly aware that there was a lawsuit, right?

MR. GOLDBERG: Objection. Form, foundation. You can answer.

A    Yeah, I assume so.

Q    Well, I mean, when you had to do things for the lawsuit like give your deposition --

A    Yeah, to go down --

Q    -- you had to take off and let them know why, right?

A    No, most of the time I had to go see them when I was at work.

Q    Okay. But the point is, when you had to go see the lawyers or deal with the case while you were at work, you had to let your superiors know. They knew about it, right?

A    Yes.

Q    Okay. All right. So your superiors were certainly aware of the lawsuit associated with you

Page 23

breaking a man's jaw, right?

MR. GOLDBERG: Objection. Form, foundation. You can answer.

A    Yes.

Q    Okay. And are you aware that settlements of lawsuits like that are approved publicly in Baltimore? That there is a -- I don't want to get too far in the weeds, but there is a public process and people can look up the lawsuits that have been settled and that kind of thing.

Are you aware of that?

A    Yes.

Q    So you're aware certainly that not only were your superiors at the Police Department aware, but that officials in the City of Baltimore, the ones involved in approving that settlement, had to be aware of the lawsuit and the settlement, right?

MR. GOLDBERG: Objection to form, foundation and you can answer.

A    Yeah, I was certain that it's public record. People knew about it.

Page 24

Q    Well, I'm just saying it's common sense, right, that whoever voted to approve it must have known about it because they were voting on something, right?

MR. GOLDBERG: Objection. Form, foundation. You can answer.

MR. HANSEL: You agree with that, don't you?

MR. GOLDBERG: Renewed objection.

A    Yeah.

Q    After that lawsuit that was settled where you broke a man's jaw were you given any additional training on use of force?

MR. GOLDBERG: Objection. Form, foundation. You can answer. Also asked and answered, but you can answer.

A    Yeah. Every year.

Q    No, no, I'm sorry. Good point.

So you have annual in-service training, right?

A    Yes.

Q    And that applies to everybody in the

Page 25

Department, correct?

A    Yes.

MR. GOLDBERG: Objection. Form. You answered.

Q    So what I'm asking you, sir, is whether as a result of the City's settlement of the case involving you breaking a man's jaw, whether you had any additional training that was specific to you? Not your general in-service training that everyone does, but did you have any additional training specific to you as a result of that lawsuit?

A    No.

Q    Okay. Were you ever disciplined as a result of the facts in that lawsuit? I take it not because you told me you weren't even aware of ever speaking with Internal Affairs, but were you ever disciplined?

MR. GOLDBERG: Objection to form. Asked and answered, but you can answer.

A    No.

Q    And was there any consequence to you at all

Deposition of Damond Durant, Volume
Case 1:20-cv-03146-DKC   Document 102-2   Filed 03/01/24   Page 9 of 63
Jawone D. Nicholson v. State of Maryland, et al.

Page 26

1  as a result of your breaking a man's jaw and the City

2  paying out tens of thousands of dollars?  Any

3  consequence at all to you?

4      MR. GOLDBERG:  Objection to form, compound.

5  You can answer.

6  **A    Was there any consequence?**

7  Q    Yes, sir.  As a result of the case where

8  you broke a man's jaw, was there any consequence to you

9  at all?

10      MR. GOLDBERG:  Objection. Form. You can

11  answer.

12  **A    So, I'm sorry, I'm not understanding.  Was**

13  **there any consequence?  Did I receive any discipline**

14  **from it is what you're saying?**

15  Q    Well, I think I asked you about that.  But

16  I'm asking it more broadly.

17      Was there any consequences to you at all

18  from your employer or the City as a result of that case

19  where you broke a man's jaw and the City had to pay

20  out?  Did anything negative happen to you at all and

21  then we'll talk about it if it did?

Page 27

1      MR. GOLDBERG:  Objection. Form. You can

2  answer.

3  **A    No.**

4  Q    Okay.  You're a firearms owner; is that

5  correct?

6  **A    Yes.**

7  Q    And when we got started, you have got a

8  shirt now tucked back over your head, is that right, it

9  looks like on the screen?

10  **A    Yes.**

11  Q    And when we got started, what that shirt

12  had on it before you tucked it back over your head was

13  the red outline of a rifle.  Is that right?

14      MR. GOLDBERG:  Objection. Relevance. You

15  can answer.

16  **A    Yes.**

17  Q    Okay.  And, in fact, that was a AR-15 or

18  M16 style rifle, can't tell the difference from the

19  outline, but that was the style.  Is that right?

20      MR. GOLDBERG:  Objection. Relevance, form.

21  You can answer.

Page 28

1  **A    Yes.**

2  Q    All right.  You're laughing, sir.  Is

3  something funny?  I'm sorry.

4      MR. GOLDBERG:  Objection. Form.

5  Relevance.  You can answer.

6  **A    It's my personal -- like, I don't know what**

7  **it has to do with what's going on.**

8  Q    Well, you pulled a gun on a child in this

9  case, right?

10      MR. GOLDBERG:  Objection. Form and that is

11  argumentative.  You can answer.

12  **A    Yes, I pulled my gun out.**

13  Q    Okay.  So your relationship and interest in

14  guns is of interest to me.  That's why I ask you that

15  question, sir.

16      How many guns do you own --

17      MR. GOLDBERG:  Once again, please ask a

18  question or just ask questions, Cary.

19      MR. HANSEL:  I was responding to his

20  inquiry.

21      MR. GOLDBERG:  There's no room for response

Page 29

1  in a deposition.  Please just ask him questions.

2  Q    How many guns do you own, sir, personally?

3      MR. GOLDBERG:  Objection. Form, relevance.

4  You can answer.

5  **A    Several.**

6  Q    So put a number on that.  How many?

7      MR. GOLDBERG:  Same objection.

8  **A    Seven, several.  Probably over ten.**

9  Q    Okay.  Let's be a little bit more specific.

10      How many guns do you own?

11      MR. GOLDBERG:  Objection. Form, relevance.

12  Asked and answered, but you can answer, again.

13  **A    Probably 12, including my duty weapon, I**

14  **think.**

15  Q    Okay.  So 11 that you personally own and

16  your duty weapon.  Is that right?

17      MR. GOLDBERG:  Objection. Relevancy. You

18  can answer.

19  **A    Yeah.**

20  Q    Is that a yes, sir?  I'm sorry.

21  **A    Yes.**

Page 30

1    Q    Okay.  All right.  The gun that you pulled
2  on Jawone Nicholson in this case, was that a duty
3  weapon or a personally owned gun?
4         MR. GOLDBERG:  Objection to form.  You can
5  answer.
6    **A    It is a personal gun that I got permission**
7  **to use from the Department.  Permission to carry from**
8  **the Department.**
9    Q    What type of gun is it?
10        MR. GOLDBERG:  Objection.  Form,
11  foundation.  You can answer.
12   **A    It's a Glock 43.**
13   Q    Okay.  What caliber is it?
14        MR. GOLDBERG:  Same objection.
15   **A    9 millimeter.**
16   Q    At the time you drew the gun on Jawone
17  Nicholson, it was loaded?
18        MR. GOLDBERG:  Objection.  You can answer.
19   **A    Yes.**
20   Q    There was a round in the chamber?
21        MR. GOLDBERG:  Same objection, but you can

Page 31

1  answer.
2    **A    Yes.**
3    Q    So the gun was ready to fire?
4         MR. GOLDBERG:  Objection.  You can answer.
5    **A    Yes.**
6    Q    I always learned the rule that you never
7  point a gun at anyone you're not willing to kill.
8         Are you familiar with that rule?  Have you
9  heard that?
10        MR. GOLDBERG:  Objection.  Form, relevance.
11  You can answer.
12   **A    I don't think that's written anywhere, sir.**
13  **I'm sorry.**
14   Q    I didn't ask you if it was written
15  anywhere.  Have you ever heard that?
16        MR. GOLDBERG:  Same objection.  You can
17  answer.
18        MR. HANSEL:  Have you ever heard that
19  saying?
20   **A    It's not a belief of mine.**
21   Q    I'm not asking about your beliefs, sir.

Page 32

1  I'm asking, have you ever heard the saying, you never
2  point a gun at --
3    **A    Yeah.**
4    Q    You have heard it?
5         MR. GOLDBERG:  Same objection, though.
6    **A    Yes, I've heard it.**
7    Q    And you have heard it in the firearms
8  safety training context.  Is that right?
9         MR. GOLDBERG:  Objection.  Form,
10  foundation.  You can answer.
11   **A    Mostly on TV.**
12   Q    Okay.  And were you prepared to kill Jawone
13  Nicholson that day?  To fire your gun at him?
14        MR. GOLDBERG:  Objection.  Form,
15  foundation.  You can answer.
16   **A    No.**
17   Q    Why did you point your gun at him?
18        MR. GOLDBERG:  Objection.  Form,
19  foundation.  You can answer.
20   **A    I didn't point the gun at him.**
21   Q    You admit to me that you removed your gun

Page 33

1  and had it out.  Is that right?
2         MR. GOLDBERG:  Objection to form, but you
3  can answer.
4    **A    Yes.**
5    Q    You had it out in a location where Jawone
6  Nicholson could see it.  Is that right?
7    **A    Yes.**
8    Q    Okay.  What was your purpose in -- and
9  where was it before you removed it to where he could
10  see it?  Where did you have it on your body?
11        MR. GOLDBERG:  Objection.  Form, compound,
12  you can answer.
13   **A    In a holster.**
14   Q    And where was the holster, sir?
15   **A    In a pocket.**
16   Q    And describe your dress that day.  What
17  were you wearing?
18        MR. GOLDBERG:  Objection.  Form,
19  foundation.  And we haven't established the date that
20  we're talking about, Cary, but you can answer.
21   **A    A hoodie and some jeans.**

Case 1:20-cv-03146-DKC    Document 102-2    Filed 03/01/24    Page 11 of 62

Page 34

1   Q   Had you pulled your gun on minors on more

2 than one date in Baltimore?

3      MR. GOLDBERG: Objection. Form,

4 foundation, relevancy. You can answer.

5   **A**   **No.**

6   Q   Okay. So you know we're talking about the

7 day you pulled your gun on Jawone Nicholson, right?

8      MR. GOLDBERG: Objection. Form. You can

9 answer.

10   **A**   **I thought you were saying other than that.**

11   Q   Right. I was in the last question, but for

12 the time that we have been speaking here, the majority

13 of the time, you recognize we're talking about your

14 interaction with Jawone Nicholson, right? I'm just

15 making sure.

16      MR. GOLDBERG: Objection to form. You can

17 answer.

18   **A**   **Yes.**

19   Q   Do you recall the date on which that

20 interaction occurred?

21   **A**   **I don't remember the date. I remember**

Page 35

1 **when, but I don't remember the exact date.**

2   Q   What time of year was it?

3   **A**   **Winter. It was cold.**

4   Q   It was cold outside?

5   **A**   **Yeah.**

6   Q   Okay. And you said you withdrew your gun

7 from a holster in your product. They call it a

8 kangaroo pocket, the one in front of a hoodie. Was it

9 from that pocket or another pocket that you drew the

10 gun?

11      MR. GOLDBERG: Objection to form. You can

12 answer.

13   **A**   **Hoodie pocket.**

14   Q   And you had a holster in a hoodie pocket.

15 Is that right?

16   **A**   **Yes.**

17   Q   And was it a pocket style holster? Do you

18 know what I mean by that, first?

19   **A**   **Yes.**

20   Q   And was it a pocket style holster?

21   **A**   **Yes.**

Page 36

1   Q   And just for purposes of the record, a

2 pocket style holster is one that is actually meant to

3 be carried in a pocket, usually has a grippy surface to

4 grab the inside of the pocket as you withdraw the

5 firearm and typically doesn't have mechanisms to attach

6 it to a belt because it's supposed to live in a pocket.

7      Is that roughly right? Is that what you

8 think of as a pocket holster?

9   **A**   **Yes.**

10   Q   Okay. And on the day that you drew your

11 gun on Mr. Nicholson, you say you didn't point it at

12 him. Where was the muzzle pointed?

13      MR. GOLDBERG: Objection. Form.

14 Mischaracterizes testimony, but you can answer.

15   Q   Well, wait. Your lawyer thinks I got that

16 wrong. Did you point the gun at Mr. Nicholson?

17      MR. GOLDBERG: Objection to form. Asked

18 and answered, but you can answer.

19   **A**   **No.**

20   Q   Where did you point the gun?

21   **A**   **At the ground behind me.**

Page 37

1   Q   At the ground where?

2   **A**   **Behind me.**

3   Q   Okay. And why did you point the gun at the

4 ground behind you?

5   **A**   **To de-escalate the situation.**

6   Q   Okay. Is it your experience that the

7 introduction of a firearm is a good way to de-escalate

8 a situation?

9      MR. GOLDBERG: Objection. Form,

10 foundation, but you can answer.

11   **A**   **It did.**

12   Q   I'm asking you about your experience. Is

13 your experience that drawing a firearm is a good way to

14 de-escalate a situation?

15      MR. GOLDBERG: Objection. Form, but you

16 can answer.

17   **A**   **De-escalation is the outcome of a**

18 **situation. There are techniques to use to de-escalate.**

19   Q   Has Baltimore City ever trained you that

20 one de-escalation technique is to draw a firearm?

21      MR. GOLDBERG: Objection. Form. You can

Deposition of Damond Durant, Volume I

Case 1:20-cv-03146-DKC    Document 102-2    Filed 03/01/24    Page 12 of 62

Jawone D. Nicholson vs. State of Maryland, et al.

Page 38

1  answer.

2      A    They teach us to draw our firearms.

3      Q    So that's not what I asked.  Has Baltimore

4  ever taught you that drawing a firearm is a

5  de-escalation technique?

6          MR. GOLDBERG:  Objection to form, but you

7  can answer.

8      A    It's a tool.

9      Q    Again, not what I asked.  I'm not asking is

10  it a tool or if they thought you.  I'm asking, has

11  Baltimore City ever trained you that drawing a firearm

12  is a de-escalation technique?

13          MR. GOLDBERG:  Objection to form, but you

14  can answer.

15      A    I want to say, yes, but it's not the --

16  it's a tool to use to de-escalate.

17      Q    Okay.  So you have been trained by

18  Baltimore City that, among other potential tools, that

19  drawing a firearm is a tool to de-escalate a situation.

20  Is that right?

21          MR. GOLDBERG:  Objection.  Form, asked and

Page 39

1  answered, but you can answer.

2      A    Yes.

3      Q    Prior to -- let's talk about the day this

4  happened.  What were you doing that day?

5      A    Coming home from work.

6      Q    And where were you when you first became

7  aware of Mr. Nicholson or anybody associated with him

8  that day?

9      A    In my vehicle parking.

10      Q    Where were you parking?

11      A    On the street.

12      Q    What street?

13      A    What's that street?  What's that street?

14  Bellfall.  Right on Bellfall.

15      Q    And you were -- you had been at work.  How

16  long had your shift been that day?

17          MR. GOLDBERG:  Objection.  You can answer.

18      A    I don't think it was a full day because I

19  had training.  I was training.

20      Q    And what training were you attending?

21      A    Firearms training.

Page 40

1      Q    Okay.  And what firearm were you training

2  with?

3          MR. GOLDBERG:  Objection.  Form,

4  foundation.  You can answer.

5      A    My service and off-duty.

6      Q    Okay.  And your off-duty is the Glock that

7  you brandished in Mr. Nicholson's presence.  Is that

8  right?

9          MR. GOLDBERG:  Objection.  Form.  You can

10  answer.

11      A    Yes.

12      Q    When you parked were you in a marked police

13  car?

14      A    No.

15      Q    At the time of this incident how were you

16  assigned?  Were you on patrol or some other assignment?

17      A    I think I was in CIT unit, so a specialized

18  unit.

19      Q    And what does CIT stand for?

20      A    Crisis Intervention Team or Crisis Response

21  Team.

Page 41

1      Q    And what does that mean?  What do you do in

2  CIT?

3      A    Respond to what we call behavioral crisis.

4      Q    Give me an example of a behavioral crisis.

5      A    Mentally ill person having a breakdown,

6  psychotic breakdown.

7      Q    Okay.

8      A    Or -- yeah.  We find them help, get them

9  help, take them to the hospital so they can get

10  evaluated.

11      Q    And when you were coming home, I think you

12  said you were in a personal vehicle.  Is that right?

13      A    Yes.

14      Q    Is there any indicator on the outside of

15  the vehicle that you're a police officer?

16      A    No.

17      Q    Did any of your clothes indicate that you

18  were a police officer?

19      A    No.

20      Q    Did you have a visible badge as you got out

21  of the car?

1  A    Well, I had my badge on me, but.

2  Q    Visible, sir.  I said visible.

3  A    No.

4  Q    So you said as you were parking is when you

5  first saw Mr. Nicholson.  Tell me what you saw.

6  A    Him in the curtilage, in the parking pad,

7  of a neighbor, him and the other gentleman, looking

8  around suspiciously.  Just looking back and forth,

9  looking at me.

10      Not Mr. Nicholson, but the other guy, he

11  came from around, I guess, the parking pads and he was

12  masked up, like, all you could see was his eyes and he

13  had a hoodie on, come from around to see what I was

14  doing.  Then he looked at me, then looked back at

15  Mr. Nicholson, looked at me, and then came back to the

16  parking spot.

17  Q    Okay.  These two people that you saw, I'm

18  looking at you here on this screen, but for purpose of

19  the record, you're a strong guy, a large guy.  Is that

20  fair?

21  A    I mean, I try to keep in shape, but I don't

1  really call myself large.  I'm not --

2  Q    No, but you look like a well-muscled guy.

3  Do you work out?  Let me ask it that way.  Do you lift

4  weights?

5      MR. GOLDBERG:  Objection.  Relevance, but

6  you can answer.

7  A    Yes.

8  Q    Okay.  And did you lift weights at the

9  time?

10      MR. GOLDBERG:  Objection.  Relevance, you

11  can answer.

12  A    Yes.

13  Q    All right.  And what do you max on the

14  bench these days?  Bench press?

15      MR. GOLDBERG:  Same objection.

16  A    I'm not sure.  I haven't done a max in a

17  while.

18  Q    The last time you maxed out, what was it?

19  A    That was years ago, maybe 315.

20  Q    315?  Is that what you said?  3?

21  A    Yes.

1  Q    Wow, okay.  So you have trained with

2  weights for years to get to that level.  Is that right?

3      MR. GOLDBERG:  Objection.  Form.  You can

4  answer.

5  A    Yes.

6  Q    Okay.  How long have you been training with

7  weights?  Since high school or before?

8      MR. GOLDBERG:  Same objection.

9  A    I mean, staying in shape, pushups and stuff

10  like that.

11  Q    Sure.

12  A    You play sports when you're young.  So,

13  yeah, I guess.

14  Q    All right.  And in high school what sports

15  did you play?

16  A    I didn't play for high school.  I played

17  recreation.

18      MR. HANSEL:  Okay.

19      MR. GOLDBERG:  Counsel, I'm sorry to

20  interrupt your questioning.  I really don't want to

21  interrupt.  Can we go off the record just for a second?

1      MR. HANSEL:  Sure, yeah.  We're off, Sue.

2      (A discussion was held off the record.)

3      (There was a brief recess taken.)

4  BY MR. HANSEL:

5  Q    We were talking about your physique.

6      At the time what did you weigh?

7      MR. GOLDBERG:  Objection.  Relevancy, but

8  you can answer.

9  A    I don't remember at that precise moment.

10  About 200 pounds.

11  Q    Okay.  And what do you weigh today?  About

12  the same?  A little more or a little less?

13  A    I'm a little chubby, now.

14  Q    Time gets us all.  I should have asked you

15  this earlier.  How old a man are you today?

16  A    50.

17  Q    And when is your date of birth?

18  A    2/22/72.

19  Q    Did you say 2/22?

20  A    Yes, sir.

21  Q    Okay, good.  And these two young men you

Page 46

1  saw as you were parking, they were substantially

2  smaller than you.  Is that right?  You were there at

3  200 pounds, these were thin, young men?

4          MR. GOLDBERG:  Objection.  Form and

5  foundation, but you can answer.

6      **A    No, sir.  Not at all.**

7      Q    Okay.  Did they look muscular to you?

8      **A    They were bigger than me.**

9      Q    Bigger than you.  You mean taller?

10     **A    Bigger and taller.**

11     Q    Okay.  You think they weighed more than

12  200 pounds each?

13     **A    Mr. Nicholson, probably more.**

14     Q    So you pulled in.  Were you intimidated by

15  their size?

16     **A    Intimidated?**

17     Q    Yes, afraid?

18     **A    They were bigger than me, so I was**

19  **cautious, yes.**

20     Q    No, no.  Were you afraid or intimidated

21  because of the size of these two boys?

Page 47

1      **A    Yes.**

2      Q    Okay.  Now, as you were pulling in, you

3  haven't described any crimes they were engaged in.  Did

4  you see them engaged in any crimes?

5      **A    Not at that time.**

6      Q    You haven't described any violence that

7  they were engaged in.  Did you see them engaged in any

8  violence?

9      **A    Sitting in my truck?**

10     Q    Sure, as you pulled in, you said.

11     **A    Well, when I pulled in, I just seen their**

12  **heads.**

13     Q    Okay.  So you didn't see them engaged in

14  any violence or crimes when you pulled in, right?

15     **A    No.**

16     Q    In the entire event did you ever see

17  Mr. Nicholson engaged in any crime?

18         MR. GOLDBERG:  Objection.  Form.  Calls for

19  a legal conclusion, but you can answer.

20     **A    Just the trespassing.**

21     Q    Where was he trespassing?

Page 48

1      **A    The neighbor's property in the parking.**

2      Q    What's name of the neighbor?

3          MR. GOLDBERG:  Objection to form, but you

4  can answer.

5      **A    Mark.**

6      Q    I'm sorry, what's his name?

7      **A    I think it's Mark.**

8      Q    And after you pulled in, you saw these

9  people on an empty parking pad that you think belongs

10  to Mark.  Is that right?

11         MR. GOLDBERG:  Objection.  Form,

12  foundation.  You can answer.

13     **A    No, there was a car in the parking pad they**

14  **was in.**

15     Q    Okay.  And how did you determine that they

16  didn't have Mark's permission to be there?

17         MR. GOLDBERG:  Objection.  Form,

18  foundation.  You can answer.

19     **A    I didn't know.  I just asked.**

20     Q    Who did you ask?

21     **A    Them.**

Page 49

1      Q    Okay.  You said, do you have Mark's

2  permission to be on that parking pad?  Is that what you

3  said?

4      **A    No.  I asked them --**

5      Q    Okay.  Go ahead.

6      **A    I asked them did they live in the**

7  **neighborhood.**

8      Q    Okay.  Were there any No Trespassing signs

9  on the parking pad?

10     **A    Not that I remember.**

11     Q    You understand that to be trespassing under

12  Maryland law on across what are called open fields like

13  that, not in somebody's house, but in an area like

14  that, there either has to be a sign or they have to

15  have been told not to be there.  You know that, right?

16         MR. GOLDBERG:  Objection.  Form,

17  foundation.  Calls for a legal conclusion, but you can

18  answer.

19     **A    I thought that would be curtilage.  That's**

20  **the property of the owner of the house.**

21     Q    And do you understand that there had to be

Page 50

1  a sign or they had to be asked not to be there to be

2  trespassing?

3      MR. GOLDBERG: Objection. Form,

4  foundation. Calls for a legal conclusion, asked and

5  answered, but you can answer.

6    **A**   **Just curtilage.**

7    Q   Just repeating that word, though, the

8  problem with that is, it doesn't answer my question.

9      Did you understand that in the area where

10  they were in order to be trespassing there either had

11  to be a sign or the owner would have had to tell them

12  not to be there? Are you aware of that?

13      MR. GOLDBERG: Same objection.

14    **A**   **Yes.**

15    Q   All right. And these are not foreign

16  concepts to you, are they, sir? I mean, you regularly

17  arrest people for a wide variety of crimes and it's

18  your job to know the elements of those crimes, right?

19      MR. GOLDBERG: Objection. Form. You can

20  answer.

21    **A**   **Yes.**

Page 51

1    Q   Okay. And trespassing is one of the ones

2  you know, right?

3    **A**   **Yes.**

4    Q   And so pulling up at the time and not

5  seeing any sign and not having heard the owner, who you

6  think might be named Mark, tell them not be there, you

7  didn't know if they were trespassing or not, did you?

8      MR. GOLDBERG: Objection. Form, but you

9  can answer.

10    **A**   **With that, no.**

11    Q   All right. So you said you pulled up, you

12  saw them, you were intimidated and scared.

13      Do I have that right so far?

14      MR. GOLDBERG: Objection. Asked and

15  answered. Form. You can answer.

16    **A**   **Yes.**

17    Q   They were committing no crimes, right?

18      MR. GOLDBERG: Objection. Form, asked and

19  answered. You can answer.

20    **A**   **Not at that time, no.**

21    Q   They were not engaged in any violence,

Page 52

1  correct?

2    **A**   **Not at that time, no.**

3    Q   And you were armed, right?

4    **A**   **Yes.**

5    Q   Okay. And you had not one, but multiple

6  firearms in your car, right?

7      MR. GOLDBERG: Objection. Form,

8  foundation. You can answer.

9    **A**   **No, I think I left my duty weapon at work.**

10    Q   Well, you said you hadn't been at work,

11  that you were at training. Where did you leave your

12  duty weapon?

13    **A**   **At my office.**

14    Q   Okay. So Baltimore City doesn't require

15  that you take home your duty weapon?

16    **A**   **If it's secured, then we can carry our**

17  **off-duty weapon.**

18    Q   Okay. So you think you left your duty

19  weapon at the office. You had the Glock, which was

20  your off-duty weapon, with you in the car. Is that

21  right?

Page 53

1    **A**   **Yes.**

2    Q   Did you have any other guns with you in the

3  car?

4      MR. GOLDBERG: Objection. Asked and

5  answered. Form, but you can answer.

6    **A**   **Not that I remember, no. I only had the**

7  **one.**

8    Q   And what vehicle were you driving, sir?

9      MR. GOLDBERG: Objection. Asked and

10  answered. You can answer it.

11    **A**   **My truck, my pickup truck.**

12    Q   Okay. And does the pickup truck have a

13  hard top or a soft top?

14    **A**   **Hardtop.**

15    Q   Okay. And the windows operate?

16    **A**   **Yes.**

17    Q   Is anything wrong with it mechanically?

18    **A**   **No.**

19    Q   So sitting there, seeing these two young

20  men, being, as you said, afraid and intimidated, one

21  option available to you was merely to remain seated in

Case 1:20-cv-03146-DKC     Document 102-2     Filed 03/01/24     Page 15 of 62

Page 54

1  your hardtop pickup truck with the windows up and call

2  police. Is that right? That was one option?

3  **A    It could be an option.**

4  Q    Okay. And from your vantage point you have

5  already described you could see the men, right? The

6  young men?

7  **A    Yeah, just their tops.**

8  Q    So you could have watched them in the

9  position they were in until police arrived if you were

10  intimidated and scared. Is that right?

11  MR. GOLDBERG: Objection. Form. You can

12  answer.

13  **A    That's an option.**

14  Q    Okay. And being in an operable pickup

15  truck, another option was you simply might have pulled

16  away because of your fear and intimidation and either

17  called police or not. That was an option, too, right?

18  MR. GOLDBERG: Objection. Form. You can

19  answer.

20  **A    That's an option.**

21  Q    Okay. And you're a Baltimore City police

Page 55

1  officer and this occurred in Baltimore County where you

2  live. Is that right?

3  MR. GOLDBERG: Objection. Form,

4  foundation. You can answer.

5  **A    Yes.**

6  Q    And so you knew --

7  **A    Howard County.**

8  Q    I'm sorry, Howard County. My apologies.

9  So you knew you were out of your

10  jurisdiction. Is that right?

11  **A    Yes.**

12  Q    Now, instead of remaining in the vehicle

13  and calling police from that jurisdiction or pulling

14  off as a result of your fear and intimidation, you got

15  out of the vehicle. Is that right?

16  **A    Yeah, I live there.**

17  Q    Okay. And well, so did Jawone. You're

18  shaking your head. Mr. Nicholson didn't live there?

19  Is that what you're telling me?

20  **A    He did not live in that little community,**

21  **that cul de sac. He didn't live there.**

Page 56

1  Q    Where do you understand he lived?

2  **A    Now he lives in the next little community**

3  **down the street. He didn't live in this area where I**

4  **was.**

5  Q    Down the street? If you were to walk from

6  where he was standing to his front door how many

7  minutes or seconds would it take?

8  All right. I hear somebody in the room

9  suggesting to you seven minutes, sir. I'm going to ask

10  you to make sure you're alone in the room. Can you

11  have somebody step out and then confirm that for us?

12  **A    Yes, sir.**

13  MR. GOLDBERG: And I'd like to put on the

14  record that I had no idea that a second person may be

15  in the room at any point in time.

16  MR. HANSEL: Of course not, Stuart. That's

17  fine.

18  Q    Are you alone in the room, sir?

19  **A    Yes.**

20  Q    All right. Good. Because somebody blurted

21  out seven minutes. You heard that right? Is that

Page 57

1  right, sir? I'm asking you.

2  **A    Oh, yes, I heard it.**

3  Q    Who was it who said that?

4  **A    Wife.**

5  Q    Okay. What's her name?

6  **A    Sharae Durant.**

7  Q    And does she have a middle name or initial?

8  **A    Dorell, D.**

9  Q    Are you currently married?

10  **A    Yes.**

11  Q    And how long have you been married to her?

12  **A    15; 15; 14, 15 years.**

13  Q    Have you ever initiated, either of you, any

14  lawsuits against each other to include divorce

15  proceedings?

16  **A    No.**

17  Q    Okay. So you think it would take seven

18  minutes to walk from where -- do you agree with her,

19  first of all, that it would take seven minutes?

20  **A    About.**

21  Q    To walk from where Mr. Nicholson was

Page 58

1  standing to his front door?

2  A    About.  About.

3  Q    Have you ever looked at it on Google Maps

4  at how close it is?

5  A    No.

6  Q    All right.  And what's the name of the

7  neighborhood there?

8  A    It's Bellfall Court.  I don't know.

9  Q    You don't know that the neighborhood has a

10 name or the development has a name?

11 A    I know it has a name.  I just don't

12 remember.

13 Q    Whatever the name is, it's the same

14 neighborhood or development that Mr. Nicholson lived in

15 at the time and where this parking pad where you

16 observed him, right?

17 A    Is it?  It's the same?

18 Q    I'm asking you, sir.  I'm asking you.

19 A    It's not the same neighborhood, the

20 location of houses.  He lives down the street.  Toward

21 the beginning of the, I guess, the area.

Page 59

1  Q    Is it the same development?  You said the

2  development has a name, you can't remember the name of

3  the development.  It's the same development he lives

4  in, right?

5  A    It could be.

6  Q    Not it could be.  You're aware that it is,

7  aren't you?

8         MR. GOLDBERG:  Objection.  Form.  You can

9  answer.

10 A    I guess it is, yes.

11 Q    Was there any precipitation that day?

12 A    I don't remember that.

13 Q    Was it windy?

14 A    I know it was cold.

15 Q    You don't remember whether it was windy?

16 Is that what you said?

17 A    No, I don't remember rain.  You said

18 precipitation.  I don't remember rain.  I remember it

19 being cold.

20 Q    What about wind?  Do you remember it being

21 windy?

Page 60

1  A    Yes, yes.

2  Q    And a parking pad like this one, was it

3  covered?  Did it have a roof?

4  A    Yes.

5  Q    And does it have walls on any side of it or

6  close to it?

7  A    Yes.

8  Q    Okay.  So two young men who were waiting

9  there in cold from the temperature and the wind might

10 reasonably escape the wind by stepping under the roof

11 and next to those walls, right?

12 A    Could be, yeah.

13 Q    All right.  So you pulled up, you said you

14 were scared and intimidated.

15       Was your gun in your hoodie when you pulled

16 up or did you have to place it there?  Where was it

17 while you were driving?

18 A    In my hoodie.

19 Q    Okay.  And had your gun been in your hoodie

20 since you left Baltimore City and into the County?

21 A    Yes, in my pocket in the holster.

Page 61

1  Q    And it was loaded the whole time and ready

2  to fire.  Is that right?

3  A    Yes.

4  Q    So you observed these two men.  You said

5  you were scared and intimidated.

6       What was your plan as you got out of your

7  vehicle?

8  A    I guess to check to see if my property and

9  my parking pad was okay.

10 Q    Okay.  Now you mentioned parking on the

11 street.  Do you have another car that was in your

12 parking pad?

13 A    Yes.

14 Q    And you mentioned you were in a truck.

15 What's the make and model of the truck?

16 A    RAM 1500.

17 Q    Okay.  And what year was it?

18 A    '15.

19 Q    Okay.  And what was the other vehicle that

20 you had?

21 A    Ford Escape.

Page 62

Q    And did you have anything else in your parking pad besides the Ford Escape?

A    **Motorcycle.**

Q    Okay.  Anything else?

A    **Not vehicle wise, no.**

Q    Anything else at all?

A    **Could be like a little bucket, like a little bin with debris in there, trash or something in there.**

Q    Okay.  Anything else?

A    **Or a stopper.  Like a little piece of wood so I know how far to go.**

Q    Okay.  Anything else?

A    **Not that I remember.**

Q    And did you proceed to check on your pad or did you approach the young men?

A    **No, I went straight to the car.**

Q    When you say the car, you went straight to the Escape and the motorcycle and the pad there.  Is that right?

A    **Yes.**

Page 63

Q    And what you observed when you got to your property was that everything was fine?

MR. GOLDBERG:  Objection.  Form.  You can answer.

A    **Yes.**

Q    Okay.  So you said your intent was to check your property.  You checked it.  You determined everything was fine.  So did you just go on in your house?

MR. GOLDBERG:  Objection.  Asked and answered.  You can answer.

A    **No.**

Q    At the time did you have any external video, like a Ring doorbell or anything like that?

A    **No.**

Q    Okay.  There is no camera or video in your parking pad or on the exterior of your house or building?

A    **Not mine, no.**

Q    Did your neighbors have any cameras that you're aware of that captured anything in your parking

Page 64

pad or in their parking pads on the exterior on their buildings that might have caught anything in connection with this case?

A    **Not that I'm aware of, no.**

Q    So you checked your property, everything was fine.  Tell me what you did next.

A    **Walked up to them to speak to them.**

Q    Okay.  And why did you do that instead of going on about your business?

A    **It's not a hangout spot where people normally hang out and I've never seen them before, ever.  I guess I caught myself trying to keep them out of trouble.**

Q    Oh, you were going to help the boys.  Is that right?

A    **That's what I caught myself doing.**

Q    Is that what you were thinking when you pull out your gun?  You would pull out your gun to help him?

A    **No, I pulled out my gun to stop them from attacking me.**

Page 65

Q    Oh.  Now, do you have any particular ability to read minds?  Are you a mind reader or a hypnotist or anything like that?

MR. GOLDBERG:  Objection.  Form.  And that's rather argumentative, but I'll have him answer that question.

THE WITNESS:  I actually deposed a guy once who told me he could read minds, so now I ask.

MR. GOLDBERG:  I'll allow him to answer.

A    **I don't have that ability.**

Q    Okay.  I didn't think so.  And I actually had a guy tell me he could once.

So not being able to read minds, tell me how it was that you determined before pulling your gun that these men were going to attack you?

A    **Well, because I had turned and walked away from them and they were coming up behind me.**

Q    Anything else?

A    **That's motion to attack me.**

Q    Wait, wait.  I'm asking you how you know they were going to attack you.  You said you turned and

Deposition of Damond Durant, Volume I — Jawone D. Nicholson vs. State of Maryland, et al.

Case 1:20-cv-03146-DKC   Document 102-2   Filed 03/01/24   Page 19 of 62

Page 66

1 walked away and they walked towards you.

2     Anything else?

3     A    Well, I did see the knife on the one guy

4 and why would you come up from behind when I'm clearly

5 just walking away?

6     Q    Sir, you approached them to begin with,

7 right?

8     A    Just to talk to them.

9     Q    Well, maybe they were just approaching you

10 to talk to you, right?

11        MR. GOLDBERG:  Objection.  Form.  You can

12 answer.

13     A    No, I don't think so.

14     Q    Why not?  Why don't you think so?

15     A    They were not very pleasant during the

16 conversation.

17     Q    Yet you weren't very pleasant, either, were

18 you, sir?

19        MR. GOLDBERG:  Objection to form and

20 foundation.  You can answer.

21     A    Yes, I was.

Page 67

1     Q    Wait.  You drew a gun.  You think you were

2 being pleasant when you drew a firearm?

3        MR. GOLDBERG:  Objection.  Form,

4 foundation.  You can answer.

5     A    Drawing a gun was to prevent them from

6 attacking me.

7     Q    I'm just asking you, sir --

8     A    I'm not sure how you want me to answer

9 that, but when I walked away --

10     Q    Truthfully, truthfully.  All the questions

11 I ask you I want you to answer truthfully.

12     A    I was walking away, walking away from them.

13 Like, okay, you got this, I'm leaving.  I'm walking

14 away.  Turned my back to them a few steps and I hear

15 them, what you say?  Walking up fast behind me.

16     Q    The first party to approach one or the

17 other was you approaching them, right?  You approached

18 them first.  Do I have that right?

19     A    Yes.

20     Q    All right.  Then you said this thing, I saw

21 the knife on the one guy.  You know, did you ever see

Page 68

1 either one of them with a knife in their hands?

2     A    Well, I seen it on their person.

3     Q    Sir, did you ever see either one of them

4 with a knife in their hands?  I just want to get an

5 answer to that.

6        MR. GOLDBERG:  Objection.  You asked him a

7 question, he's allowed to answer the question.  He was

8 answering.  Can you let him finish before you reask him

9 the question?

10     Q    Sure.  To clarify, let me ask you.

11        Did you ever see either one of these young

12 men with a knife in his hands?

13     A    Not in their hand.

14     Q    Okay.  Did you ever see either one of these

15 young men touch a knife with their hands during the

16 encounter?

17     A    They didn't have the knife in their hand,

18 no, sir.

19     Q    Okay.  Did either one of these men ever

20 threaten to pull a knife on you or draw a knife during

21 this encounter?

Page 69

1     A    They didn't actually say that, no.

2     Q    Okay.  Did either one of these young men

3 make any verbal reference at all to having a knife?

4     A    No.

5     Q    Mr. Nicholson didn't have any kind of knife

6 on him, did he?  Jawone Nicholson.

7     A    The other guy did.

8     Q    I hear you, but I have to get an answer to

9 whether Jawone Nicholson did.  You were there, I

10 wasn't.

11        Did you ever see Mr. Nicholson with a

12 knife?

13     A    No.

14     Q    Okay.  Let's talk about the other guy.

15        There was nothing illegal about the knife

16 you observed and the way it was carried, was there?

17        MR. GOLDBERG:  Objection.  Form.  Calls for

18 a legal conclusion, but you can answer.

19     A    I seen the clip, I seen the knife.  I

20 couldn't see if was illegal or not.

21     Q    Okay.  So you didn't have any reason to

Case 1:20-cv-03146-DKC    Document 102-2    Filed 03/01/24    Page 20 of 62

Page 70

1 believe he was illegally carrying a knife, did you?

2      MR. GOLDBERG: Same objection, but you can

3 answer.

4    A    No.

5    Q    And, in fact, you often carry a knife

6 clipped inside your pocket in very much the same way,

7 don't you?

8      MR. GOLDBERG: Objection. Form,

9 foundation. You can answer.

10    A    Yes.

11    Q    And did you have your knife on you when you

12 approached the two young men?

13      MR. GOLDBERG: Objection. You can answer.

14    A    I don't remember.

15    Q    Okay. But ordinarily you would. Is that

16 right?

17    A    Yes, I know I carry a knife at work, yeah.

18    Q    So more likely than not you also had a

19 similar knife clipped inside your pocket when you

20 approached these two young men. Is that right?

21      MR. GOLDBERG: Objection to form. Asked

Page 71

1 and answered, but you can answer.

2    A    Possibility, yes.

3    Q    Okay. And in addition to the knife you had

4 the gun. Did you have any other equipment on you?

5 Mace, S baton, taser, radio, vest? Anything like that?

6    A    I might have had my vest, but it was in a

7 bag. I didn't have it on me.

8    Q    So when you approached them you were

9 carrying a bag. Is that right?

10    A    Yes.

11    Q    And what was in the bag besides potentially

12 a vest?

13    A    Clothes. I was taking home the wash.

14 Uniform clothes.

15    Q    Anything else?

16    A    Not that I can remember.

17    Q    Okay. And when you approached them, where,

18 if anywhere, on your person or your bag was your badge?

19    A    On my person, yes.

20    Q    But where physically?

21    A    On my belt, my belt clip.

Page 72

1    Q    And with a badge on the belt clip on your

2 belt, the hoodie covered it. Is that right?

3    A    Yes.

4    Q    Okay. And so let's go back in time.

5      You get out of the car, you check your

6 property. So by the time you're approaching these two

7 young men you knew your property was fine, right?

8      MR. GOLDBERG: Objection. Form, but you

9 can answer.

10    A    Yes.

11    Q    And you knew that you had a gun on you and

12 you probably had your knife, as well. Is that right?

13      MR. GOLDBERG: Objection. Form.

14 Mischaracterizes testimony, but you can answer.

15    A    Yes.

16    Q    Okay. And tell me again why you were

17 approaching them after you knew your property was fine

18 at that moment? Tell me why.

19      MR. GOLDBERG: Objection to form. Asked

20 and answered, but you can answer.

21    A    I guess to help them, not let them break

Page 73

1 into my neighbor's property or to damage my neighbor's

2 property.

3    Q    Okay. And you said you hadn't seen them

4 commit any crime of any time type, right?

5      MR. GOLDBERG: Objection. Form. Asked and

6 answered, but you can answer.

7    A    Not at that time, no.

8    Q    Okay. So what is it about these men that

9 scared you and intimidated you and led you to believe

10 they needed your help not to break into somebody's

11 property?

12      MR. GOLDBERG: Objection. Form. Asked and

13 answered, but you can answer.

14    A    The way they came toward me when I was in

15 my car. School was out. Really no one was around.

16 They were masked up as to hide their identity or their

17 face. Just in the area that wasn't frequent. Like, no

18 one hangs out if it's really, really cold. No one

19 hangs out outside. It was just suspicious to me.

20    Q    Have you been the subject of racism in your

21 life?

Page 74

1     **A**    No. Me being racist or someone --

2     **Q**    No, sir. You're a man of color. Have you

3 been the subject of racism? Have people been racist

4 towards you is what I'm asking?

5     **A**    Sure.

6     **Q**    I would imagine they have, sir.

7        Those explanations you just gave me about

8 school being out, these young black men don't belong in

9 this area, that type of thing.

10     **A**    I didn't say anything about race.

11     **Q**    I'm sorry?

12     **A**    I didn't say anything about their race.

13     **Q**    You could see that they were black,

14 couldn't you?

15     **A**    Yeah, but you said that I said young black

16 **men. I didn't say anything about that.**

17     **Q**    You didn't have to say it. My point, you

18 could see their race immediately when you saw them,

19 right?

20     **A**    Yes.

21     **Q**    So don't these sort of explanations sound

Page 75

1 familiar to you? That these were people who didn't

2 belong there, that, you know, they were likely

3 criminals, that kind of thing?

4        MR. GOLDBERG: Objection. Form. Calls for

5 speculation, but you can answer.

6     **A**    No.

7     **Q**    Okay. Now, you said it was really, really

8 cold, right?

9        MR. GOLDBERG: Objection. Form. You can

10 answer.

11     **A**    Yeah, it was cold.

12     **Q**    You have worn various masks over your face

13 to protect you from the cold, haven't you?

14        MR. GOLDBERG: Objection. Form and

15 foundation. You can answer.

16     **A**    Yeah.

17     **Q**    Ski masks, neoprene masks, bandanas, right?

18        MR. GOLDBERG: Same objection. You can

19 answer.

20     **A**    Not probably a bandana, but like a Under

21 **Armour hat.**

Page 76

1     **Q**    And not just the hat, but one of those

2 things that kind of looks like a ninja mask. I think

3 they call it a balaclava or something like that. You

4 have worn one of those, right?

5     **A**    Yes.

6     **Q**    And, in fact, when you ride your motorcycle

7 sometimes you wear various sorts of masks to protect

8 you from the wind and the cold of the wind, right?

9     **A**    Just my helmet.

10     **Q**    So you're familiar on a very, very cold day

11 like this that somebody might wear a mask to stay warm,

12 to keep his face warm, right?

13     **A**    It's possible, yes.

14     **Q**    Especially on a windy day like this when

15 it's cold, very, very cold you said, right?

16        MR. GOLDBERG: Objection. Form. I believe

17 he testified that it was cold. I don't think he's ever

18 agreed that it was very, very cold, but you can answer.

19        MR. HANSEL: Well, I don't want to split

20 hairs with you, sir, but you said earlier it was very,

21 very cold, right?

Page 77

1     **A**    Yeah, it was cold.

2     **Q**    But very, very. The lawyers are worried

3 about whether it's one very or two and I want to square

4 it up.

5        Was it very, very cold?

6     **A**    It was really cold. It was cold.

7     **Q**    Okay, really cold. I'll go with that.

8        So on this day when it was really cold it

9 was quite reasonable for somebody to be wearing a mask

10 over their face for warmth, right, just as you have

11 done?

12        MR. GOLDBERG: Objection to form. You can

13 answer.

14     **A**    It's a possibility.

15     **Q**    And you said they were masked up. Jawone

16 Nicholson never had a mask on, correct?

17     **A**    He had his hoodie pulled really, really

18 **tight.**

19     **Q**    Did he have a mask on, sir?

20     **A**    I don't remember a mask. I remember him

21 having his hoodie pulled so you can only see.

1  Q    And you have already described it was
2  really cold and you agree with me it's not an
3  unreasonable reaction for somebody that doesn't have a
4  nicer hat to pull a hoodie really tight around his head
5  to keep warm if it's really cold and windy, right?
6  A    Yeah.
7  Q    And you mentioned school was out.  What
8  time of day was it?
9  A    This was, like, 11, 12:00.  It wasn't
10 normal school hours.  This was before school had let
11 out, so, like, 11, 12; 11, 12.  11, 12, maybe 1:00.
12 Q    Is it fair to say you're not quite certain
13 of the time?
14 A    Yeah.
15 Q    That's fine.  And would you rely on police
16 reports and other records for the time, if need be?
17 A    Yeah, if they have the time, yeah.
18 Q    All right.  But you mentioned school being
19 out.  It was part of your consideration when you were
20 looking at these two young men, you recognized them as
21 being school aged people, right?

1       MR. GOLDBERG:  Objection.  Form.  Compound.
2  You can answer.
3  A    Not until I approached them.
4  Q    But once you approached you could tell
5  these were minors, right?
6       MR. GOLDBERG:  Objection.  Form.  Asked and
7  answered.  You can answer.
8  A    Younger than me, yes.
9  Q    Well, not just younger than you.  Sir, I'm
10 younger than you and I've been a lawyer for 25 years.
11 I'm asking, you could recognize these were children,
12 minors, right?  Once you approached them.
13      MR. GOLDBERG:  Objection.  Form.  Asked and
14 answered.  You can answer.
15 A    When they started talking, yes.
16 Q    Okay.  And certainly it's the case, you and
17 I are men, we have been through this, a young man has a
18 change of voice at some point in his life and you could
19 tell from their voice and inflection that these were
20 young folks, minors.  Is that right?
21      MR. GOLDBERG:  Objection.  Form.  Asked and

1  answered, but you can answer.
2  A    Yes.
3  Q    Okay.  So when you approached them you
4  moved towards them, right?
5  A    That's the question?
6  Q    It is.
7  A    Yeah, I walked towards them, yes.
8  Q    And how close did you get to them before
9  you stopped?
10 A    I don't know.  I don't remember that.
11 Q    And you said you were scared and
12 intimidated.  Did you have your hand in your hoodie
13 pocket?
14 A    No, I think I was holding my bag.
15 Q    Well, you have two hands.  Did you have
16 them both holding your bag?
17 A    Yeah.
18 Q    So you had a shoulder strap, your hands
19 were up on the shoulder strap of the bag.  Is that
20 right?
21 A    It was like a trash bag, so.

1  Q    Oh, I see, all right.  So you checked your
2  property, you walked towards them.  You're a guy in
3  jeans and a black hoodie carrying a trash bag full of
4  what was probably reasonably heavy items.  Is that
5  right?
6  A    Yes.
7  Q    Okay.  And a visual observer would have
8  seen on your pocket that same or similar clip from a
9  knife, if you had it with you, that the young man had.
10 The same way you saw his, if you had your knife with
11 you, he would have seen yours.  Is that right?
12      MR. GOLDBERG:  Objection to form.  Calls
13 for speculation.  You can answer.
14 Q    That's fair.  The same way his was visible,
15 yours would have been visible if you had it with you.
16 Is that fair?
17      MR. GOLDBERG:  Objection to form, but you
18 can answer.
19 A    Yes.  If I had it on me, yes.
20 Q    And that's because the way you carry it, is
21 that little clip holds the knife at the ready in your

Page 82

1 pocket and the clip is visible exterior.  It's on the

2 outside of the pocket, right?

3 　　　　MR. GOLDBERG:  Objection.  Form,

4 foundation.  You can answer.

5 　　**A　　Yeah, it's clipped on the pocket.**

6 　　Q　　So when you approached these two young men,

7 you're a guy carrying a trash bag, it's full of

8 relatively heavy stuff, more likely than not they see a

9 knife, and you're otherwise in a black hoodie.

10 　　　　Do I have all that right?

11 　　　　MR. GOLDBERG:  Objection.  Form.  You can

12 answer.  You can answer.

13 　　**A　　Repeat that?  I'm sorry.**

14 　　Q　　Sure.  I'm trying to draw the picture of

15 what these young men might have seen as you approached.

16 　　　　I'm seeing you, you're a relatively muscled

17 guy, right?  Right?

18 　　**A　　Yes.**

19 　　Q　　You weigh 200 pounds, right?

20 　　**A　　Yes.**

21 　　Q　　You're wearing a black hoodie, right?

Page 83

1 　　**A　　Yes.**

2 　　Q　　All right.  More likely than not you have a

3 visible knife with you, right?

4 　　　　MR. GOLDBERG:  Objection.  Mischaracterizes

5 his testimony.

6 　　　　MR. HANSEL:  You said probably earlier.

7 More likely than not.  Is that fair?

8 　　　　MR. GOLDBERG:  I think he testified that it

9 was a possibility.  I don't think he said probable.

10 　　　　MR. HANSEL:  I think he said both at

11 different points, but the record will reflect that.

12 BY MR. HANSEL:

13 　　Q　　Let me just ask you, sir.  You probably had

14 your knife with you.  Is that fair?  You had been to

15 the range?  You had been working?

16 　　　　MR. GOLDBERG:  Objection.  Form.  Asked and

17 answered.  You can answer.

18 　　**A　　I probably had it on me.**

19 　　Q　　All right.  There you go.

20 　　　　So you're approaching them, you probably

21 have this knife, you're 200 pounds, you're in a black

Page 84

1 hoodie, you have no badge showing and you're carrying a

2 relatively heavy black trash bag.

3 　　　　Have I drawn the picture?  Is that what

4 they see?

5 　　**A　　Yeah.**

6 　　Q　　When you get to them you realize, of

7 course, that they're minors, right?

8 　　**A　　Yeah, once the conversation started.**

9 　　Q　　To your knowledge, had you ever seen them

10 before?

11 　　**A　　No.**

12 　　Q　　So likely they'd never seen you before.

13 Fair assumption, right?

14 　　　　MR. GOLDBERG:  Objection to form.

15 　　**A　　Yes.**

16 　　Q　　So from their perspective we're adding in,

17 they have never seen you before likely.

18 　　　　And tell me under these circumstances

19 what's the first thing you do or say when you stop

20 walking towards them?

21 　　**A　　What do I do?**

Page 85

1 　　Q　　Or say once you stopped walking towards

2 them?

3 　　**A　　I speak.**

4 　　Q　　Tell me what it was that you said.

5 　　**A　　Hey, guys, how you all doing.  How you all**

6 **doing.  Hello.  I speak.**

7 　　Q　　Anything else?

8 　　**A　　No, just speaking to them.**

9 　　Q　　Yeah, but telling me you spoke to him

10 doesn't tell me what you said.  When you approached,

11 tell me what you said as best as you remember.

12 　　**A　　Hey, guys, how you all doing.  I guess, is**

13 **this your property, do you live around here?  Meaning,**

14 **I mean, if you say yeah, I live right there.  Then I**

15 **know that's the neighbor's house and I go, okay, but**

16 **they weren't so pleasant.**

17 　　Q　　Under the circumstances if a man of your

18 description that time in his 40's approached -- do you

19 have any kids?

20 　　**A　　Yes.**

21 　　Q　　How old are your kids?

Page 86

1    MR. GOLDBERG: Objection on relevancy, but
2 you can answer.
3    A    Youngest one is 16. I have a 24-year-old
4 now and the rest are grown.
5    Q    Okay. So when this happened you had
6 children in the ranges of these young men, right? Age
7 wise, roughly.
8    A    No.
9    Q    The 24-year-old now would have been what?
10 18, 19, then?
11    A    Could have been.
12    Q    So suppose a man in his 40's, probably with
13 a visible knife, no badge, wearing a black hoodie and
14 carrying a heavy trash bag, approached your
15 16-year-old, for instance, and wanted to know where
16 your 16-year-old lived, would you want your 16-year-old
17 to tell that man where your 16-year-old lived?
18    MR. GOLDBERG: Objection to form and
19 relevancy, but you can answer.
20    A    I guess it would be why.
21    Q    I'm sorry?

Page 87

1    A    Why was he asking.
2    Q    Yeah, but you wouldn't teach your children
3 if a stranger comes up to you with a knife and a
4 garbage back and no badge to start telling him,
5 answering questions like, do you live around here, is
6 this your property, you wouldn't want your kids
7 answering those questions, would you?
8    A    I guess if it's an adult and they did live
9 around there, it would be, yes, I do live around here.
10    Q    Well, but they don't know where you live,
11 where you came from, anything else. In fact, when you
12 pulled up, you didn't park in a parking pad, you parked
13 on the street, right?
14    A    Yes.
15    Q    All right. And the people who live there
16 own parking pads, right? Including you. Including
17 your neighbor, Mark?
18    MR. GOLDBERG: Objection to form,
19 foundation. You can answer.
20    A    I parked on the street.
21    Q    Okay. So as far as these kids knew you

Page 88

1 didn't live there. You parked on the street. You walk
2 up to them with a heavy trash bag and a knife and you
3 would want your children under those circumstances to
4 tell the person if they lived in that neighborhood and
5 whether that was their property or not? Is that what
6 you're telling me?
7    MR. GOLDBERG: Objection. Form,
8 foundation. You can answer.
9    A    You said with a knife, so.
10    Q    You said you probably had a knife and that
11 it was visible.
12    A    But it wasn't in my hand. My hand was on
13 the bag. You seem like you are saying that I
14 brandished a knife and walked up on these gentlemen.
15 So I'm not understanding your question.
16    Q    Well, let's make one thing clear, then. A
17 knife clipped on a belt pocket that isn't touched is no
18 threat and no concern. Do you agree with that?
19    A    You know, as a police officer the knife is
20 there, but it's always a possibility of a threat.
21    Q    Okay. So when these young men saw you, you

Page 89

1 had a knife that was the possibility of a threat.
2    A    It was possible that I had my knife. I
3 don't remember.
4    Q    Well, you said probable, so probably you
5 had a knife and that created certainly the possibility
6 of a threat when you approached these young men, right?
7    A    Okay.
8    Q    And my question is, sir, if approached by a
9 man with a knife who parked on the street, who weighed
10 200 pounds, had no badge, was in a black hoodie and was
11 carrying a heavy trash bag, you would want your kids to
12 tell him if that was their property and if they lived
13 around there?
14    MR. GOLDBERG: Objection to form. Asked
15 and answered, but you can answer.
16    A    I'll put it like this. I wouldn't want
17 them to give the address. If they lived there, then
18 they can say, yes, I live here.
19    Q    Have you ever told your kids not to talk to
20 strangers?
21    MR. GOLDBERG: Same objections.

Deposition of Damond Durant, Volume I

Case 1:20-cv-03146-DKC    Document 102-2    Filed 03/01/24    Page 25 of 62

Jawone D. Nicholson vs. State of Maryland, et al.

Page 90

1    **A    Yes.**

2    Q    Okay.  Have you ever told your kids to let

3    you know if they're approached by a stranger?

4        MR. GOLDBERG:  Same objection.

5    **A    So you're saying that these gentlemen were**

6    **of that age not to talk to strangers and that they**

7    **couldn't take it upon themselves, they weren't old**

8    **enough or mature enough, to say whether they lived**

9    **there or not and because my point is this is --**

10    Q    Sir, I'm 48 and I have no intention of

11    telling you where I live.  There is not an age limit on

12    safety as far as I know.

13        MR. GOLDBERG:  Cary, I've been over this

14    twice.  Can we please not testify or lecture on the

15    record?  If you have a question, ask him a question.

16    Q    Sure.  Well, my question, sir, was, have

17    you ever told your children not to talk to strangers?

18        MR. GOLDBERG:  Objection.

19    **A    Yes.**

20    Q    So you approached these two juveniles.  You

21    said, is this your property, do you live around here.

Page 91

1    Tell me what happened next.

2    **A    They started cussing me out.**

3    Q    Okay.  And there is no crime in cussing you

4    out, is there?

5    **A    No, that's why I walked away.**

6    Q    And tell me exactly what they said and who

7    said it.

8    **A    Fuck you, fuck the police.  I don't care**

9    **who called the police, fuck you, get the fuck away from**

10    **me, and MF, that manner.**

11    Q    Now, at some point you told them that you

12    called the police or that you were the police.  Do you

13    remember that?

14    **A    That someone might call the police on them.**

15    Q    So let's go back and do this in order.

16        When you said, is this your property, do

17    you live around here, tell me what their response was

18    to that.

19    **A    Fuck you.**

20    Q    And then what did you say?

21    **A    I don't want you guys to get in no trouble,**

Page 92

1    so.  And again, fuck you, again.

2    Q    Okay.  And so you said, is this your

3    property, do you live around here.  They said, fuck

4    you.  And your response to fuck you was, I don't want

5    you guys to get in no trouble.  Is that right?

6    **A    Yeah, I was trying to help.  Trying to keep**

7    **people from getting in trouble.**

8    Q    And tell me how it is you thought you'd

9    help them when you approached with your knife and gun.

10    Tell me about that.

11        MR. GOLDBERG:  Objection.  Form.  You can

12    answer.

13    **A    To keep them from getting the police called**

14    **on them.**

15    Q    Why did you think they were going to get

16    the police called on them?

17    **A    To keep them from doing something that they**

18    **would regret.**

19    Q    Why did you think they were going to do

20    something they would regret?

21    **A    Just a gut feeling.**

Page 93

1    Q    Was there anybody else that you could see

2    that observed any of this?

3    **A    No.  Like I said, no one.**

4    Q    So as far as you know, you were the only

5    one that saw these gentlemen out there, right?

6        MR. GOLDBERG:  Objection.  Form.  And

7    mischaracterizes his testimony to the extent that these

8    two were also out there and they are other people of

9    each other, so.  You can answer, though.

10        MR. HANSEL:  Other than yourself and the

11    two minors, you didn't see anybody else out there, did

12    you?

13    **A    Just people walking passed, but in the**

14    **court, no, just us.**

15    Q    Okay.  And so when you told them -- and how

16    did you put it about the police?  You said somebody --

17    tell me what you said to them.  When you brought up the

18    police, tell me what you said.

19    **A    I didn't want nobody to call the police on**

20    **them.**

21    Q    Okay.  But the only person interacting with

Deposition of Damond Durant, Volume I

Case 1:20-cv-03146-DKC    Document 102-2    Filed 03/01/24    Page 26 of 62

Jawone D. Nicholson vs. State of Maryland, et al.

Page 94

1 them was you, right?

2    A    Yes.

3    Q    So when you said, I don't want anybody to

4 call the police on you, you were referring to yourself,

5 that you might call the police. Is that right?

6    A    No.

7    Q    Well, if nobody else saw them or was

8 interacting with them who else would have called the

9 police? Who were you referring to?

10    A    **That could have been anybody looking**

11 **outside.**

12    Q    Okay. So you said, I don't want anybody to

13 call the police on you. You approached them, is this

14 your property, they said, fuck you. You said, I don't

15 want anybody to call the police on you. They said,

16 fuck you, again, and fuck the police or something like

17 that. Is that right?

18    A    Yes.

19    Q    Now, did you feel that they were being

20 disrespectful?

21    A    Yes.

Page 95

1    Q    And, in particular, they were disrespecting

2 you. Is that right?

3    A    **I was the only one there.**

4    Q    That's why I thought that would be an easy

5 question. They were disrespecting you, right?

6    A    **Yes.**

7    Q    Okay. So after they said fuck you and fuck

8 the police, what did you say next?

9    A    **Okay. I said, all right. And I left.**

10    Q    Okay. Up until this point had you notified

11 them that you were a police officer?

12    A    **No, I was walking away. It wasn't no need.**

13 **It wasn't no need.**

14    Q    Up until this point had you notified them

15 that you had a firearm on you?

16    A    **There was no need to.**

17    Q    Well, don't tell me about the need. I just

18 need to make sure you didn't tell them up to this point

19 that you had a firearm. The point where you say you

20 were walking away.

21    A    No.

Page 96

1    Q    And you had not shown them at that point

2 your firearm or your badge; is that correct? The point

3 at which we're up to in the story where you turned to

4 walk away, you said.

5    A    No.

6    Q    Okay. As a police officer you're trained

7 to maintain situational awareness. Is that right?

8        MR. GOLDBERG: Objection. Form. You can

9 answer.

10    A    Yes, we try.

11    Q    And part of that is being aware of and

12 observing threats and keeping them in your line of

13 sight so you can keep yourself safe, right, and your

14 fellow officers?

15        MR. GOLDBERG: Objection. Form. You can

16 answer.

17    A    Yes, yes.

18    Q    When you turned to walk away, though, you

19 turned your back on these gentlemen. Is that right?

20    A    Yes.

21    Q    At that point you determined they were no

Page 97

1 threat or you wouldn't have turned and turned your back

2 on them knowing one had a knife in his pocket, right?

3    A    **Yes, I was leaving them alone. Giving them**

4 **what they wanted.**

5    Q    Right, but you had determined in your mind

6 they were no threat at that point, correct?

7    A    **No, no. There is still a possibility.**

8 **They still could do something, even if I turned my**

9 **back, but I just was giving them what they wanted. I**

10 **walked away.**

11    Q    You had determined they were safe enough to

12 turn your back on, obviously, right?

13    A    **I walked away.**

14    Q    But that's not the question, sir.

15        As part of your analysis in your

16 situational awareness and your training to observe and

17 keep yourself safe, before you turned your back you had

18 determined it was safe enough to do so, to turn your

19 back, right?

20        MR. GOLDBERG: Objection to form, but you

21 can answer.

Deposition of Damond Durant, Volume I          Jawone D. Nicholson vs. State of Maryland, et al.

Case 1:20-cv-03146-DKC     Document 102-2     Filed 03/01/24     Page 27 of 62

Page 98

1    A    I felt as though that I was far enough away
2  from them where I could walk away and turn my back.
3    Q    So you turned your back, you walked away.
4        How many steps did you take before
5  something else happened?
6    A    I don't remember.  It was a few steps
7  because I was walking.
8    Q    Which direction were you headed?  To your
9  car, your parking pad, your front door, somewhere else?
10   A    To the house.
11   Q    And tell me what happened next.
12   A    I heard footsteps behind me really, really
13 fast, doing some talking, so I turned and he was
14 walking towards me.
15   Q    Who is he?
16   A    I don't know his name.  The other.
17   Q    Not Mr. Nicholson?
18   A    Not Mr. Nicholson.
19   Q    All right.  When you turned back around to
20 see the two minors, one was walking towards you, but
21 Mr. Nicholson was staying where he was; is that

Page 99

1  correct?
2    A    He was behind the other guy, yes.
3    Q    But staying where he was.  Where you left
4  him.
5    A    I don't remember.  He was behind him,
6  though.  I don't know if it's where I left him, but he
7  was behind him.
8    Q    Okay.  When you say you don't remember, you
9  don't have any memory of Mr. Nicholson also moving
10 towards you when you turned around; is that correct?
11   A    Yeah, I don't.
12   Q    Okay.  And you said you heard some talking.
13 What were they saying, if you remember?
14   A    I heard them cussing at me and walking up
15 towards me really, really fast.
16   Q    Well, just one of them, right?
17        MR. GOLDBERG:  Objection to form.  You can
18 answer.
19   A    One of them was close to me.
20   Q    Okay.  So you turned around, you turned
21 around and you saw one of the two minors walking

Page 100

1  towards you.  Do you recall his name?  The one walking
2  towards you?
3    A    The other gentleman that's not here.
4    Q    Let's call him not Mr. Nicholson.  Is that
5  fair?
6    A    Not Mr. Nicholson.
7    Q    All right.  Got it.  And tell me what
8  happened next.
9    A    I reacted to the threat.  I felt
10 threatened.  Them walking up behind me when I was
11 leaving them alone.  I dropped my bag, reached for my
12 gun because I knew if I got in a fight it was going to
13 fall out and if one of them were to grab it, it
14 wouldn't have been how I hoped it would turn out.
15        So it was still in the holster.  I pointed
16 it at the ground.  Kind of saying, look, you don't want
17 to do this, go ahead and leave.  That was about it.
18 They walked off.
19   Q    So, all right, let's break that down a
20 little bit.
21        The holster is designed to stay in the

Page 101

1  pocket when you pull the gun out.  Is that right?
2  That's the theory of it.  That's how it's supposed to
3  work?
4        MR. GOLDBERG:  Objection.  Form.  You can
5  answer.
6    A    I grabbed the gun and the holster.  I never
7  pulled the gun out of the holster.
8    Q    Okay.  Is the trigger guard covered by the
9  holster?
10   A    Yes.
11   Q    So you pulled the gun out and it still had
12 this holster around it.  Is that right?
13   A    Yes.
14   Q    All right.  You certainly agree with me
15 that if the gun had fired the holster would not contain
16 the bullet?
17   A    Yes.
18   Q    Okay.  And when you removed your gun from
19 your hoodie pocket what did you say?
20   A    You don't want to do this.  I told that one
21 guy I was the police and he just stood there and looked

Case 1:20-cv-03146-DKC    Document 102-2    Filed 03/01/24    Page 28 of 62

Page 102

1  at me. I said, you don't want to do this. You don't
2  want to do this. And he just looked at me. He just
3  stopped and looked at me, looked at my hand, looked at
4  me. And then I guess Mr. Nicholson persuaded him to
5  leave.
6      Q    So you said, you don't want to do this, I'm
7  the police. Is that right?
8      A    Yeah.
9      Q    Okay. Did you raise your voice?
10     A    No.
11     Q    Just in a normal tone?
12     A    Yes.
13     Q    And you said Mr. Nicholson persuaded him to
14 leave. Tell me what Mr. Nicholson said.
15     A    Come on, man, let's go. That's about all I
16 remember.
17     Q    All right. And did the two, in fact, leave
18 or if they did something different each, tell me. What
19 did they do after Mr. Nicholson said, come on, man,
20 let's go?
21     A    Mr. Nicholson, he left first and then the

Page 103

1  other guy left behind him.
2      Q    And when you pulled the gun out of your
3  hoodie pocket how far away were you from Mr. Nicholson?
4      MR. GOLDBERG: Objection. Form. Asked and
5  answered, but you can answer.
6      A    Yeah, I don't remember that.
7      Q    You were still in the little cul de sac
8  area, right? What do you call it? A court? You were
9  still in the same court, right?
10     A    Yeah, we were still in the same court.
11     Q    And that court is small enough that two
12 cars parked across from each other can't both back out
13 at the same time, right?
14     A    I'm not sure what you're asking.
15     Q    Well, two cars on opposite parking pads
16 can't both back out at the same time. There's not
17 enough room. I'm trying to understand the size. Is
18 that right?
19     A    I mean, two cars could back out at once.
20     Q    That are right across each other? It's big
21 enough?

Page 104

1      A    Like, next to each other? Beside each
2  other?
3      Q    No, sir. Across from each other where they
4  would be backing towards each other.
5           Is the court two car lengths long or wide
6  is what I'm trying to ask? Let's do it another way.
7  Let's do it another way. I'll try to make it easier.
8           How far across is the court in the
9  direction you were walking?
10     A    How far across is the court. What court?
11 The court that I live in?
12     Q    Yes, sir, yeah. The little paved area
13 there. How wide is it? The whole paved area?
14     A    It's pretty big. It has a tree in the
15 middle, so, cars can back out. It's enough room for
16 cars to park in the middle with the tree for other cars
17 to back out. So, yes, it's pretty big.
18     Q    Do you have an estimate in feet?
19     A    No, I don't know.
20     Q    You were on the same side of the tree as
21 the young man when you pulled your gun, right?

Page 105

1      A    Yeah.
2           THE WITNESS: I'm sorry, I apologize. Can
3  we take two minutes? I have to take a phone call.
4           MR. HANSEL: Sure. Let's take make it, so
5  I've got --
6           MR. GOLDBERG: How long is the call?
7           MR. HANSEL: Let's make it seven minutes.
8  I've got 53. Let's come back at 1. Is that enough
9  time, sir?
10          THE WITNESS: Is that good?
11          MR. HANSEL: If it works for you.
12          THE WITNESS: Yeah, I just need, like,
13 three minutes.
14          MR. GOLDBERG: That's fine.
15          MR. HANSEL: Let's come back at 1. We'll
16 go off the record until 1.
17          (There was a brief recess taken.)
18 BY MR. HANSEL:
19     Q    So you mentioned the young man approaches
20 you, you pull out your gun. It's still in the holster,
21 you said. Is that right, sir? Is that a yes?

Deposition of Damond Durant, Volume I

Case 1:20-cv-03146-DKC    Document 102-2    Filed 03/01/24    Page 29 of 62

Jawone D. Nicholson vs. State of Maryland, et al.

Page 106

1    (Witness lost audio transmission.)

2    (A discussion was held off the record.)

3  BY MR. HANSEL:

4    Q    So you drew your weapon, Mr. Nicholson said

5  words to the effect of, come on, let's go, and you said

6  he left.  Is that right?

7    A    Yes.

8    Q    And which direction did he leave and where

9  did he go?

10   A    In between the carports.

11   Q    In other words, he didn't move toward the

12  public street.  He moved deeper into the community.  Is

13  that right?

14   A    No, in between the carports is the street.

15   Q    The public street or the community street?

16   A    Public street.

17   Q    And what's the name of that street where he

18  went?

19   A    Is that Oakland?  Is that Oakland Mills?  I

20  don't remember the street.  I'm sorry.

21   Q    Okay.  And he moved away from you?  Not

Page 107

1  towards you?

2    A    Yes.

3    Q    Okay.  And did he leave your line of sight

4  at some point?

5    A    No, I kind of watched him go down the

6  street.

7    Q    Okay.  And did the other young man follow

8  shortly after him?

9    A    Yes.

10   Q    Other than what you have described did you

11  say anything else to the two minors?

12   A    I'm sorry?

13   Q    Other than what you have already described,

14  up until the point where they're walking away, did you

15  say anything else to the two minors?

16   A    No.

17   Q    Did they say anything else to you?

18   A    Not that I remember, no.

19   Q    I realize more happened associated with the

20  event.  We're going to get to that.  But did you ever

21  speak directly to either of these two young men ever

Page 108

1  again after that?  Directly to them?

2    A    No.

3    Q    Did they ever speak directly to you after

4  that?  In the history of the world.

5    A    They told me that -- they told me

6  something.  Yeah, they talked to me.  I don't remember

7  what they said, but they was talking to me.

8    Q    As they were walking away or at some other

9  time?

10   A    Some other time.

11   Q    When was the other time they talked to you?

12   A    When the mother showed up.

13   Q    Okay.  And do you remember what they said

14  to you?  I think you said, no, but I want to make sure.

15   A    No, not really what they were talking to

16  me.  I don't remember.

17   Q    So we're at the point where they're walking

18  away, you're in the court there.  You have your firearm

19  out.  Did you put it away?

20       MR. GOLDBERG:  Objection to form and

21  foundation.  You can answer.

Page 109

1    A    Yes.

2    Q    And after you put your firearm away

3  standing in the court, what did you do next?

4    A    Called the police.

5    Q    And you did that on your cell phone, I take

6  it?

7    A    Yes.

8    Q    Okay.  And did you do that while you could

9  still see the gentlemen?  They were walking away, you

10  could still see them?

11   A    Yes.

12   Q    What did you say to the police?

13   A    I was giving a description of the two.

14   Q    You just called to give them a description?

15  Hi, this is an officer, I'm calling to tell you what

16  two guys look like?

17       MR. GOLDBERG:  Objection.  Form.  You can

18  answer.

19   A    No.

20   Q    Okay.  So what did you say to the police?

21   A    I was telling them about the suspicious

Case 1:20-cv-03146-DKC    Document 102-2    Filed 03/01/24    Page 30 of 62

Page 110

1 people. I think I said suspicious people. And I was

2 giving them a description and try to watch where they

3 go at so I had a good description of what they look

4 like.

5     Q    And did you ask the police to respond?

6     A    Yes.

7     Q    Why?

8     A    Because I felt they was going to attack me

9 in the first place before I gave out the call. Before

10 I gave the call.

11     Q    So did you tell the police on the phone

12 when you called that they were going to attack you?

13     A    I'm not sure. I'm not sure. I think I did

14 because it was such -- I don't remember that.

15     Q    Have you listened to the call that you

16 made?

17     A    No.

18     Q    And the event was over and you were safe

19 when they were walking away, right?

20        MR. GOLDBERG: Objection. Form. You can

21 answer.

Page 111

1     A    Yeah.

2     Q    Okay. And what did you expect the police

3 to do when they came? You said you wanted them to

4 come. What did you anticipate that they would do?

5        MR. GOLDBERG: Objection. Form. Calls for

6 speculation, but you can answer.

7     A    Find out who they were.

8     Q    Why did you want the police to find out who

9 they were?

10     A    Because of the potential attack. The

11 attack on me.

12     Q    Okay. Any other reason?

13     A    Not that I can remember, no.

14     Q    You never swore out any charges against the

15 two, did you?

16     A    No.

17     Q    And as a police officer you know you can go

18 to the Commissioner in Maryland and swear out charges

19 if you want to, right?

20     A    Yes.

21     Q    Okay. Did you ask the police officers who

Page 112

1 responded to charge them with any crimes?

2     A    No.

3     Q    Okay. And, in fact, they had not committed

4 any crimes in your presence, had they?

5        MR. GOLDBERG: Objection. Form. Asking

6 the witness to state a legal conclusion, but you can

7 answer.

8     A    No.

9     Q    And when the police officers arrived --

10 first of all, were you relieved when the police

11 officers arrived?

12     A    Yes.

13     Q    All right. Is it fair to say that there is

14 a camaraderie amongst police officers that you felt

15 these were friendly faces when they got there?

16        MR. GOLDBERG: Objection. Form,

17 foundation. You can answer.

18     A    They were the police. I didn't know them.

19     Q    Well, but you're the police, they're the

20 police. Do you feel that there is a camaraderie there?

21        MR. GOLDBERG: Objection to form. You can

Page 113

1 answer.

2     A    I felt I understood where they stood, but

3 no camaraderie. I didn't know them.

4     Q    Well, but that's not quite what I mean.

5        You have referred to other officers, even

6 ones you don't know as brothers or sisters, brother

7 officers, sister officers, things like that, right?

8        MR. GOLDBERG: Objection. Form,

9 foundation. You can answer.

10     A    That's what they say. I mean, I didn't

11 feel any attachment to them.

12     Q    Not to them individually. I just mean as

13 police officers. Didn't you feel that these were

14 fellow brother police officers and wasn't that

15 comforting to you when they arrived?

16        MR. GOLDBERG: Objection. Form,

17 foundation. Asked and answered, but you can answer.

18     A    I felt good that they were there so they

19 can sort through the situation.

20     Q    Okay. And did you want them to have a full

21 and complete and accurate understanding of what had

Page 114

1  happened?

2      A    Yes.

3      Q    Were you truthful with them in describing

4  what had happened?

5      A    Yes.  To the best of my ability, yes.

6      Q    And did you explain, for instance, that the

7  young men had said, fuck you and fuck the police?

8  Those sorts of things?

9      A    I'm not sure if I did that.  I don't

10  recall.

11      Q    Well, but in your quest to be truthful,

12  honest and accurate, the way you have described it,

13  that was almost all these young men said, was cussing.

14  So you would have had to have explained that, right?

15          MR. GOLDBERG:  Objection.  Form.  You can

16  answer.

17      A    I just don't remember exactly what I said.

18      Q    But if you were being honest and accurate,

19  according to the version you have given today, you

20  would have told those officers that these young men

21  cussed at you, right?

Page 115

1      A    Yes.

2      Q    That they disrespected you, right?

3      A    Yes.

4      Q    That they said, fuck you, right?

5      A    Yeah, I would have told them what happened.

6      Q    Yeah, and that was part of what you have

7  told me today happened.  Was that they said, fuck you,

8  right?

9      A    Yes.

10      Q    And you told me earlier, I was making some

11  notes, they said, fuck the police.  You told those

12  officers that arrived that these kids said, fuck you

13  and fuck the police, right?

14      A    Yes.

15      Q    You told me earlier you heard them say

16  mother fucker.  You told the cops that arrived, the

17  police officers that arrived, that these young men said

18  mother fucker in your presence, didn't you?

19          MR. GOLDBERG:  Objection.  Form.  Asked and

20  answered, but you can answer.

21      A    Yeah, they was cussing a lot.

Page 116

1      Q    Okay, but you made that clear to the

2  officers who arrived.  So they had a full picture,

3  right?

4      A    Yes.

5      Q    And you have told me that what caused you

6  to draw your gun was one of them, not Mr. Nicholson,

7  one of them, approaching you quickly from behind when

8  you had your back turned, right?

9      A    Yes.

10      Q    Okay.  And you realize as a police officer

11  that when other police officers arrive you need to be

12  able to justify doing something like drawing a gun,

13  right?

14          MR. GOLDBERG:  Objection.  Form.  Calls for

15  a legal conclusion, but you can answer.

16      A    Yes.

17      Q    And so it was important to you to

18  communicate that after you turned your back and you

19  were walking away that not Mr. Nicholson, but one of

20  them approached you very quickly from behind.  You told

21  that to the officers who responded, right?

Page 117

1          MR. GOLDBERG:  Objection.  Form.  And

2  objection to the characterization that it, quote,

3  wasn't Nicholson, as I believe the witness testified

4  that he didn't know exactly which one it was such that

5  it could have been Nicholson.

6          MR. HANSEL:  Well, let's clear that up,

7  first.

8      Q    You agree with me the one who approached

9  you was not Nicholson, right?

10      A    Yes.

11      Q    Okay.  So when the one who wasn't Nicholson

12  quickly approached you from behind and that was the

13  justification for drawing your firearm, you told the

14  officers who arrived about that, right?

15      A    Yes.

16      Q    And it was important that you tell them

17  that, along with the fact that these young men had been

18  cussing you out, so that you could explain and justify

19  your having drawn a firearm.  Those were important

20  things for you to say, right?

21      A    Yes.

Case 1:20-cv-03146-DKC    Document 102-2    Filed 03/01/24    Page 32 of 62

Page 118

1    Q    And those obviously would have been
2  important things to go into the police report, right?
3    A    It would have, yeah.
4    Q    Okay.  And you said you didn't know these
5  officers other than that they were fellow officers and
6  that you were relieved when they got there.
7        Do you feel that they treated you fairly?
8    A    No.
9    Q    Okay.  Do you feel that they handled the
10  situation appropriately?
11    A    No.
12    Q    To your knowledge, did they know -- you
13  said you didn't know them.  Did they have any knowledge
14  of you in advance as far as you know?
15    A    Well, I told the dispatch I was a police
16  officer.
17    Q    So when they arrived, they identified you
18  as a police officer and you identified yourself.  Is
19  that right?
20    A    Yes.
21    Q    And other than that, do you know if they

Page 119

1  had any prior knowledge of you?
2    A    No.
3    Q    Okay.  And do you know if they had any
4  prior knowledge of the two young men or a relationship
5  or anything like that?
6        MR. GOLDBERG:  Objection.  Form, but you
7  can answer.
8    A    I don't know.
9    Q    And you said you don't think they treated
10  you fairly.  Why is that?
11    A    They took my information and never gave me
12  hers.
13    Q    Never gave you whose?
14    A    Jawone's or his mother's or the other
15  juvenile that was involved.
16    Q    And you think you had a right to know who
17  they were?
18    A    Yes.
19    Q    Why?
20    A    They gave them my information.
21    Q    But you're a police officer.  You're a

Page 120

1  public employee, right?
2    A    Yes.
3    Q    And you were exercising your police powers
4  when this happened, right?
5    A    No, I was walking away.
6    Q    No, no.  When you pulled your gun you were
7  exercising your police powers, weren't you?
8    A    No, I think --
9    Q    That was just on your own?  That was on
10  your own volition?
11    A    That was stopping them from attacking me.
12    Q    Okay.  And how do you know that the
13  officers gave your information to The Nicholsons?
14    A    Because they asked me for my ID.
15    Q    But how do you know they give it to
16  The Nicholsons, your information?
17    A    Oh, I saw him give it to her.
18    Q    Your ID?
19    A    No, when he was writing it down and gave it
20  to her.
21    Q    He looked at your ID, wrote something on a

Page 121

1  piece of paper and handed it to Jawone Nicholson's mom;
2  is that correct?
3    A    Yes.
4    Q    Okay.  Other than giving your information
5  to The Nicholsons and not giving you their information,
6  is there anything else you think the responding
7  officers did that was improper, inappropriate or
8  unfair?
9    A    That was it.
10    Q    Okay.  And tell me now, why did you want
11  Jawone's information and his mother's information?
12    A    To possibly press charges if I needed to,
13  but I really didn't want to.
14    Q    Well, you later learned their information,
15  right?
16    A    Yes.
17    Q    And you didn't press charges then, did you?
18    A    No.
19    Q    And there was nothing stopping you, was
20  there?
21    A    No.

Case 1:20-cv-03146-DKC    Document 102-2    Filed 03/01/24    Page 33 of 62

Page 122

1  Q   Okay. So you didn't need it to press

2  charges because when you learned it you didn't, right?

3  **A   No, I didn't.**

4  Q   Okay. So now I'm back to my question.

5     Why did you want their information?

6  **A   At the time it was from the attack.**

7  Q   What attack?

8  **A   The attack on me at the original location.**

9  Q   My goodness. I didn't hear you describe an

10 attack. You're going to have to tell me about that.

11 What attack?

12 **A   The attack when my back was turned and they**

13 **walked up on me. The potential attack.**

14 Q   Wait. That's very different. Are we

15 talking about -- are you telling me they attacked you

16 or are you telling me somebody walked up quickly behind

17 you?

18 **A   That's what I would call a potential**

19 **attack.**

20 Q   But I didn't hear you say potential

21 earlier. You said the attack. You agree with me they

Page 123

1  never attacked you. Let's be clear.

2     MR. GOLDBERG: Objection to form, but you

3  can answer.

4     MR. HANSEL: Did they ever attack you?

5     MR. GOLDBERG: Objection to form. You can

6  answer.

7     MR. HANSEL: Go ahead, sir.

8     THE WITNESS: No assault.

9  Q   Okay. All right. So there was no assault.

10 That's what you said?

11    MR. GOLDBERG: Objection to form. Calls

12 for a legal conclusion. You can answer.

13 **A   Yes.**

14 Q   So when did you first see Jawone's mother?

15 Before or after the police arrived?

16 **A   Before.**

17 Q   So other than Jawone Nicholson and the

18 young man who was not Mr. Nicholson and yourself, the

19 first person that you could identify that you saw on

20 the scene was Jawone Nicholson's mother.

21 Do I have that right?

Page 124

1  **A   I'm not sure. It was a crowd of people**

2  **that came out of the airway.**

3  Q   Can you identify any of those people?

4  **A   That I know who they are now?**

5  Q   Sure.

6  **A   Just the mother. And maybe grandmother.**

7  **She was in court.**

8  Q   Okay. So the crowd of people constituted

9  two people?

10 **A   No, it was more than two people.**

11 Q   How many was it?

12 **A   I'm not sure, but it was more than two**

13 **people. One, two, plus Mr. Nicholson, the other guy.**

14 **There was another female.**

15 Q   Okay. One, two, plus Mr. Nicholson and the

16 other female is four. Any more than four?

17 **A   And the other gentleman.**

18 Q   Not Mr. Nicholson?

19 **A   Not Mr. Nicholson.**

20 Q   So that's five. Is that the whole crowd?

21 **A   That I can remember, yeah.**

Page 125

1  Q   So now let's identify them. There are the

2  two minors that you dealt with initially, plus three

3  people. One of the three people was Jawone's mother

4  you came to understand. Is that right?

5  **A   Yes.**

6  Q   One of the three people was Jawone's

7  grandmother that you came to understand. Is that

8  right?

9  **A   Yes.**

10 Q   Who was the other of the three people?

11 **A   It was a female.**

12 Q   Did you understand that third female to be

13 associated with Jawone's family in some way?

14 **A   Yes.**

15 Q   Okay. So those three family members, or

16 people associated with the family, came out before the

17 police arrived; is that correct?

18 **A   Yes.**

19 Q   Did you speak to them?

20 **A   No. I just advised them that I was the**

21 **police.**

Page 126

1  Q    Well, that sounds like speech.  Did you say
2  that out loud, verbally?
3  A    Yes.
4  Q    So these three women came and you said, I'm
5  the police.  Is that right?
6      MR. GOLDBERG:  Objection to form,
7  relevancy.  You can answer.
8  A    Yes.
9  Q    When you were telling people you were the
10 police, did you explain that you were a Baltimore City
11 officer out of your jurisdiction or not?
12 A    Yeah, I told them I was Baltimore City
13 police.
14 Q    Okay.  And when you said that to these
15 three women as they arrived, first, did they look
16 worried, concerned, that kind of thing?
17 A    Well, I guess, what he told -- yes.
18 Q    Sure.  You would be worried and concerned
19 if somebody drew a firearm out of a hoodie and your
20 children were nearby, right?
21     MR. GOLDBERG:  Objection to form.  You can

Page 127

1  answer.
2  A    Repeat the question?  I'm sorry.
3  Q    Sure, yeah.  If these had been your
4  children and they had some interaction and had a
5  firearm drawn out of a hoodie pocket in their presence,
6  you would be worried and concerned, wouldn't you?
7      MR. GOLDBERG:  Objection to form.  You can
8  answer.
9  A    Yes.
10 Q    So it was understandable that these women
11 were worried and concerned about Mr. Nicholson, right?
12 A    Yes.
13 Q    Okay.  All right.  And you said that you
14 were with Baltimore City Police and what did any of
15 them say?  What did they do or say?
16 A    I don't remember.
17 Q    Okay.  Do you remember anything at all that
18 any of three of them said at any point in the history
19 of the world?
20     MR. GOLDBERG:  Objection.  Form, relevancy.
21 You can answer.

Page 128

1  A    I don't remember.  I guess it was like
2  you're Baltimore City?  What does that mean?
3  Q    Yeah.
4  A    Baltimore City Police and I showed them my
5  badge.
6  Q    Okay.  Now, when you showed those three
7  women your badge that was the first time that you
8  showed anybody your badge during the encounter, right?
9  A    Yes.
10 Q    Okay.  And tell me what happened next.
11 A    Waited for the police to come.
12 Q    Okay.  Do you recall any further
13 discussions back and forth with either something you
14 said or something they said or something the young men
15 said as everyone was waiting for the police?
16 A    No, it was a bunch of yelling.
17 Q    Okay.  But do you recall any of the words
18 spoken?
19 A    Just that what I said.
20 Q    And you were pretty heated yourself during
21 times in this encounter, right?

Page 129

1  A    Heated?
2  Q    Yeah, upset, angry, mad.
3  A    No, I was just waiting for the police.  I
4  was just hoping the police would come and solve this or
5  find a solution to this problem.
6  Q    Once the mother, the grandmother and
7  another woman you understood to be family of
8  Mr. Nicholson arrived so quickly on the scene, you
9  understood that they did live in the area at that
10 point, right?
11 A    Yes, they lived down the street.
12 Q    And once you gathered from the quick
13 response of these three women that Mr. Nicholson lived
14 in the area did you call the police and tell them,
15 never mind, no need to respond?
16     MR. GOLDBERG:  Objection, form.  You can
17 answer.
18     MR. HANSEL:  Did you do that, sir?
19 A    No.
20 Q    Why not?
21 A    I didn't.

Deposition of Damond Durant, Volume 1                    Jawone D. Nicholson vs. State of Maryland, et al.

Case 1:20-cv-03146-DKC    Document 102-2    Filed 03/01/24    Page 35 of 62

Page 130

1    Q    But why?  You were worried these guys

2    didn't live in the neighborhood, you obviously

3    determined they did, why would you still want the

4    police to come?

5        A    Well, I didn't determine that they lived

6    anywhere.  I was waiting for the police to come to sort

7    that out.

8        Q    If they didn't live nearby, how did you

9    imagine the mom, the grandmother and the other woman

10    got there so quickly?

11        MR. GOLDBERG:  Objection.  Form.  Calls for

12    speculation.  You can answer.

13        A    They came from out of the airway.

14        Q    Yeah.

15        A    So they lived pretty close, I guess.  In

16    that little area that they live in.

17        Q    Right.  And so once you determined that, my

18    question is, why didn't you cancel the call to the

19    police?

20        A    Oh, they was still yelling that she had the

21    police come.  She called the police, as well.

Page 131

1    Q    No, no.  I'm asking about your call, sir.

2    You're responsible for your call, somebody can ask her

3    about hers.

4        Your call, why didn't you cancel your call

5    to the police when you determined that they all lived

6    nearby?

7        A    No, I still wanted them to come.

8        Q    Why?

9        A    It wasn't resolved.  It wasn't resolved.  I

10    still wanted them to come.

11        Q    What wasn't resolved?  That you determined

12    they lived nearby, you said they committed no crimes.

13        MR. GOLDBERG:  Objection.  Form.

14    Mischaracterizes his testimony.  I don't think he ever

15    said he committed no crimes.

16        Q    Let's shore that up.

17        Mr. Nicholson never committed a crime in

18    your presence, did he?

19        MR. GOLDBERG:  Objection.  Form.

20        MR. HANSEL:  Go ahead, sir.

21        THE WITNESS:  I can answer?

Page 132

1        MR. HANSEL:  Yeah, please.

2        MR. GOLDBERG:  Yes.

3        A    No, he didn't commit a crime in my

4    presence.

5        Q    Right.  And the other man, not

6    Mr. Nicholson, never committed any crimes in your

7    presence, did he?

8        MR. GOLDBERG:  Objection.  Form.  Calls for

9    a legal conclusion.  You can answer.

10        A    No.

11        Q    And the mother never committed any crimes

12    in your presence, did she?

13        MR. GOLDBERG:  Objection.  Relevance.  You

14    can answer.

15        A    No.

16        Q    And the grandmother never committed any

17    crimes in your presence, did she?

18        MR. GOLDBERG:  Objection.  Relevance.  You

19    can answer.

20        A    No.

21        Q    And the other woman associated with the

Page 133

1    family never committed any crimes in your presence, did

2    she?

3        MR. GOLDBERG:  Objection.  Relevance.  You

4    can answer.

5        A    No.

6        Q    Okay.  Back to my question.

7        Nobody committed any crimes in your

8    presence, you determined they lived nearby.  What was

9    left unresolved?  Why did you still want the police to

10    respond?

11        A    They were still upset, angry.  I did not

12    know who they were.  They were going to attack me.  I

13    wanted information so I could know.

14        Q    They were going to attack you?  Is that

15    right?  You're smiling, but that's what you said, isn't

16    it?

17        A    Yes.

18        Q    So these three women, the grandmother, the

19    mom, the other woman, at that point they knew you had a

20    gun, right?

21        A    I'm not sure.  I assume.

Deposition of Damond Durant, Volume I

Case 1:20-cv-03146-DKC    Document 102-2    Filed 03/01/24    Page 36 of 62

Jawone L. Nicholson vs. State of Maryland, et al.

Page 134

1    Q    So you're seriously telling me that these
2   three women, the mom and the grandmother, were going to
3   attack you.  The 200-pound guy with a gun.  I want to
4   make sure that's really what was going through your
5   head.  Is that what you're telling me?
6        A    No, that's not.  The guys that were going
7   to attack me were still on the scene.
8        Q    Okay.  And did you think they were going to
9   attack you in front of their mom and grandmother after
10  they knew you had a gun?
11       A    I'm not sure.  I don't know what they was
12  going to do.
13       Q    Okay.  I mean, you're laughing.  It would
14  be ridiculous if they attacked you in that
15  circumstance, wouldn't it?
16       A    I've seen worse, but I don't know what they
17  was going to do.  So I was out of jurisdiction, let the
18  police come and handle it.
19       Q    All right.  Other than what we have already
20  talked about did anything take place verbally,
21  physically, between you and any of these other people

Page 135

1   before the police arrived?
2        A    No.
3        Q    When the police arrived tell me what
4   happened.
5        A    They approached, asked who had the gun.  I
6   identified myself, told them I had the gun.  They took
7   the gun.  They talked to me, they took information from
8   me.  They talked to the other party and decided that
9   nothing was going to be done, I guess.  Gave me back my
10  gun, sent me on my way.  Sent them on their way.
11       Q    Do you think their decision that nothing
12  was going to be done was appropriate?  You said there
13  were no crimes committed.  That's why I'm asking.
14            MR. GOLDBERG:  Objection to form, but you
15  can answer.
16       Q    Actually, that's true.  You didn't say
17  there were not crimes committed.  You said the other
18  people didn't commit any crimes.
19            Do you think the officers acted
20  appropriately in sending everybody on their way?
21       A    No, I think they could have done more, but

Page 136

1   I am not there, how they handle their district.
2        Q    All right.  And what more do you think they
3   could have done?  What is it you wanted them to do
4   more?
5        A    An even exchange of information.
6        Q    And you were very -- you were very focused
7   on learning these people's information.  Their names
8   and addresses.  Is that right?
9            MR. GOLDBERG:  Objection.  Form.  You can
10  answer.
11       A    So they -- yes, he gave them mine.
12       Q    Okay.
13       A    It just didn't seem --
14       Q    But I'm still confused.  Because once you
15  learned it you didn't swear out any charges.  So it
16  wasn't for the purpose of swearing out charges.
17            Why was it so important to you to get their
18  information?
19       A    So I could swear out charges, but I changed
20  my mind to swear out charges.
21       Q    Why did you change your mind?

Page 137

1        A    I just changed my mind.
2        Q    Now, you described to me they didn't commit
3   any crime in your presence.  What charge were you going
4   to swear out?
5            MR. GOLDBERG:  Objection.  Form.  You can
6   answer.
7        A    The attack.
8        Q    What attack?  Are we back to --
9        A    Yes.
10       Q    Okay.  You're not telling me you were
11  attacked, are you?  Did anybody ever lay a hand on you
12  during this incident?
13       A    No assault.
14       Q    Anybody ever touch you with anything
15  connected to their body?
16       A    No assault.
17       Q    Okay.  You keep saying the attack.  You
18  were not attacked.  I might use the word assault.  I
19  want to understand something.
20            Do you claim you were attacked?
21       A    I was going to be attacked if I --

Deposition of Damond Durant, Volume 1
Jawone D. Nicholson vs. State of Maryland, et al.

Case 1:20-cv-03146-DKC    Document 102-2    Filed 03/01/24    Page 37 of 62

Page 138

1    Q    No, no.  Not going to be, not mind reader
2  stuff.  Sir, I'm asking, were you attacked, yes or no?
3    A    **No, they did not attack me.**
4    Q    Okay.  All right.
5    A    **They did not proceed with the attack.**
6    Q    Now, the police arrived, talked to you,
7  talked to them.  Did you see Mr. Nicholson give a
8  written statement?  He gave one.  Did you see him do
9  that?
10    A    **I didn't see Mr. Nicholson write or say**
11  **anything.**
12    Q    Okay.  Tell me what happened next.  You
13  said you described everything that happened the same
14  way you described it to me, right?
15    A    **Yeah, that's when they sent us on our way.**
16  **That was the end.**
17    Q    Before they sent you on your way you told
18  the police everything that happened the same way you
19  told me, right?  Is that right?
20    A    **Yes.**
21    Q    Okay.  And you certainly didn't lie to the

Page 139

1  police, did you?
2    A    **No.**
3    Q    Okay.  When you say they sent you on your
4  way, where did you go?
5    A    **Home.**
6    Q    Did you return to your vehicle?
7    A    **No, I went in the house.**
8    Q    Okay.  And was there anybody home when you
9  got in the house?
10    A    **I think my wife was.**
11    Q    And I assume you discussed what happened
12  with your wife?
13    A    **Yes.**
14    Q    Had she seen any part of it?
15    A    **No, she was there.  She came outside, she**
16  **was there.**
17    Q    Okay.  So let's come to that in a minute.
18         Was anybody else home other than your wife
19  during this incident?
20    A    **Father-in-law and my daughter.**
21    Q    And you gave me some ages earlier, but I

Page 140

1  didn't have it.  Tell me who was who.
2         At the time of this incident what was the
3  age of your daughter?
4    A    **What year was that?**
5    Q    Was she a teenager?  Let's do it roughly.
6  I'm just trying to get a rough idea.
7    A    **She was not a teenager.**
8    Q    Okay.  Younger or older than teenage?
9    A    **Younger.**
10    Q    That's all I need for now.  So you said
11  your wife came outside.  We're going to get to that in
12  a minute.
13         To your knowledge, did your father-in-law
14  see anything associated with this incident?  Or did he
15  just hear about it from you later and your wife later?
16    A    **I think he just heard it.  I don't remember**
17  **him being on the scene, no.**
18    Q    To your knowledge, did your daughter, who
19  you said was home, hear anything or see anything
20  related to this incident?
21    A    **No.**

Page 141

1    Q    Now you said your wife came out, though.
2  Is that right?
3    A    **Yes.**
4    Q    At what point in time did she come outside?
5    A    **She came out when it was almost over.**
6         MR. GOLDBERG:  Hey, Counsel?
7         MR. HANSEL:  Yes.
8         MR. GOLDBERG:  My AirPods are going to die
9  and it might funk with the audio.  I don't need to
10  stop, but I'm going to try to figure this out while
11  we're doing this.
12         MR. HANSEL:  That's okay.  And if an
13  objection comes late as a result, we'll recognize it.
14         MR. GOLDBERG:  I appreciate that.
15         MR. HANSEL:  Yeah, no problem.
16  BY MR. HANSEL:
17    Q    Did your wife come out before or after the
18  police arrived?
19    A    **After.**
20    Q    Did she come out before or after the police
21  left?

Deposition of Damond Durant, Volume I

Case 1:20-cv-03146-DKC    Document 102-2    Filed 03/01/24    Page 38 of 62

Jawone L. Nicholson vs. State of Maryland, et al.

Page 142

1  A    She came out after they arrived.

2  Q    Okay.  After they arrived, but before they

3 left.  They were still there when she came out.  Is

4 that what you're telling me?

5  A    Yes.

6  Q    Okay.  And I take it by that point the two

7 parties had been separated by the police and the

8 Nicholson group was in one area and you were in

9 another; is that correct?

10  A    Yes.

11  Q    And your wife likely approached you, not

12 them; is that correct?

13  A    Yes.

14  Q    All right.  Had she seen anything until she

15 came outside related to the incident?

16  A    No.

17  Q    And you asked her that and she confirmed

18 that to you at some point in time.  It might not have

19 been right then, but at some point.  Is that right?

20  A    Yes.

21  Q    And so she is not a witness to anything

Page 143

1 that transpired between you and Mr. Nicholson or his

2 mother or his grandmother or the other woman or the man

3 who was not Mr. Nicholson.  Do you agree with that?

4  A    Yes.

5  Q    Have you seen -- I asked you earlier what

6 you looked at to prepare for today.  Do you recall

7 that?

8  A    Yes.

9  Q    And have you ever, in the history of the

10 world, seen any of the police reports that were taken

11 in connection with this matter?

12  A    No.

13  Q    So I'm showing you, let's see, let me get

14 to the top here.  So I'm showing you, do you see a

15 document on your screen titled Howard County Police

16 Department Incident Report?

17  A    Yes.  That's really, really tiny.

18  Q    Okay.  Let's see, I can zoom it a little on

19 my end and you may need to zoom in a little on your

20 end, as well.  Is that bigger?  I've zoomed in.

21  A    Okay.

Page 144

1  Q    Does it appear bigger on your screen, sir?

2  A    Yes.

3      MR. HANSEL:  Okay.

4      MR. GOLDBERG:  Counsel, is this the one

5 that was produced in discovery?  I believe it was.

6      MR. HANSEL:  I'm sure we both produced it

7 one way or the other.  I'm sure it was because I'm not

8 aware of there being any more than one Howard County

9 Police Department Incident Report, so I'll put it that

10 way.

11      MR. GOLDBERG:  Okay.

12 BY MR. HANSEL:

13  Q    So there is a date and a time associated

14 with it.  Do you see that, sir?

15  A    Yes.

16  Q    And then there is a victim listed as Jawone

17 Nicholson.  Do you see that, sir?

18  A    Yes.

19  Q    If we scan on down, there is an individual

20 listed as IO.  Do you know what that stands for?

21  A    No.

Page 145

1  Q    Okay.  And it has your name.  Do you see

2 that?

3  A    Yes.

4  Q    It has your weight here as 230.  Is that

5 about what you weighed at the time?

6  A    That was the time I took that driver's

7 license picture.

8  Q    And your height is five, eleven.  You're

9 almost six feet tall.  Is that right?

10  A    Not quite six feet, but yes.

11  Q    And looking at this report, earlier we were

12 struggling for the date and time and stuff like that,

13 but does this refresh your recollection that it was

14 Friday, November 10, 2017 that these incidents

15 happened?

16  A    Yes.

17  Q    Okay.  And there is a time listed here as

18 15:44.  Not everybody on a jury is familiar with

19 military time.  Can you translate that for us?  What's

20 15:44 in civilian time for lack of a better term?

21  A    3:44 in the afternoon.

Page 146

1    Q    So earlier when you said this was after
2  school, looking at this, is it fair to say this would
3  have happened around 3, 3:30, 3:44, sometime in that
4  range?
5    A    I mean, that's what time they put.  I'm not
6  sure.
7    Q    Okay.  But you wouldn't dispute the police
8  report, would you?
9    A    I mean, that's what they wrote there.
10  They're sworn to what they wrote.
11    Q    Right, but I'm saying, you don't think
12  they're wrong, do you?
13    A    I think it was a little earlier than that,
14  but I wasn't sure.
15    Q    And then here is Mr. Nicholson's
16  information.  They've got his age as 16 years old.
17  That's certainly consistent with the man you spoke
18  with, right?
19    A    That's how old he was at the time?
20    Q    Yeah, in other words, that's consistent
21  with your observation.  You told me he was obviously

Page 147

1  school age when you spoke to him.  Being 16, that's
2  consistent with your observation?
3    A    No, no.  I thought he was a lot older than
4  that.
5    Q    Well, he can't be a lot older than that and
6  still be school age.  You got 16, 17 and 18 before
7  you're done, right?
8        MR. GOLDBERG: Objection. Form.  You can
9  answer.
10    A    I mean, people finish school at whatever
11  age they finish school.  I thought he was a lot older
12  than that.
13    Q    And the officers who responded here are
14  listed as Weir, Fowler, Garrison, Bendu and Kurty.
15        Do you know any of those officers?
16    A    No, sir.
17    Q    Okay.  Have you ever had any communications
18  with them since this day?
19    A    No.
20    Q    And they say they went to the parking lot
21  of the 9200 block of Bellfall Court.

Page 148

1        Do you see that?
2    A    Yes.
3    Q    And then here it says that PFC Weir,
4  W-E-I-R, met with you, D. Durant.
5        Do you see that, sir?
6    A    Yes.
7    Q    And he describes his meeting with you and
8  what you said and then down here at the bottom there
9  was also a meeting with Mr. Nicholson.
10        Do you see that?
11    A    Yes.
12    Q    But between those two, do you see he's
13  describing what you advised him on the scene?
14    A    Okay.
15    Q    And I want to go through this list that you
16  advised him.  You told him you were an off-duty
17  Baltimore City police officer.
18        You agree with that.  Is that right?
19    A    Yes.
20    Q    It says that you told him that at
21  approximately 15:44 you were parking your vehicle on

Page 149

1  Bellfall Court.
2        With this document to refresh your
3  recollection, do you now agree that that was the time
4  you gave him?  The approximately time?
5    A    I still thought it was a little earlier,
6  but that's what -- because if it happened then, you
7  can't have the same time as it -- I just thought it was
8  a little earlier.
9    Q    Okay.  And then at the point in time when
10  you're approaching the two people, it says you
11  approached and asked if they lived in the area.
12        Do you see that?
13    A    Yes.
14    Q    And then what the officer wrote that you
15  told him was that the subjects replied that they lived
16  around.
17        Do you see that?
18    A    I see it.
19    Q    But you told me they said, fuck you, right?
20    A    Yeah.
21    Q    And you told me you told the officer

1  that they said, fuck you, right?

2      A    Yeah.

3      Q    Now, where did the officer get this

4  information?  Remember, this is what you told him.

5      A    No, that's what he --

6      Q    D. Durant advised of the following.

7          Did you, in fact, tell the officer on that

8  day that two men --

9      A    No, I remember telling him --

10     Q    I'm sorry, sir.  Let me just finish so the

11  court reporter's hands don't break trying to type.

12          Isn't it true that you told PFC Weir on the

13  day in question that when you asked the subjects if

14  they lived in the area that they replied they lived

15  around?

16     A    That's not what they told me, no.

17     Q    Isn't it true that that's what you told

18  Weir?

19     A    That's not what I told him.  I told him

20  that they cussed me out.  They didn't tell me where

21  they live at.

1      Q    Did they ever tell you they lived around?

2      A    I don't remember that.

3      Q    All right.  You think Weir just made this

4  up?

5          MR. GOLDBERG:  Objection.  Form.  You can

6  answer.

7      A    I don't know where he got it from.

8      Q    Okay.  The next thing, it says that you

9  asked the subjects why they were standing in the

10  carport.  And again, you told me they said, fuck you,

11  mother fucker, but here Weir says you told him that

12  they said they were waiting for a bus.

13          Do you see that?

14     A    Yes.

15     Q    Okay.  Did you tell Weir that they said

16  they were waiting for a bus?

17     A    I think I did tell Weir they said they was

18  waiting for a bus.

19     Q    Okay.  And there is nothing in here, in

20  fact, in your whole description to Weir about them

21  cussing ever.  No fuck you, no mother fucker, no fuck

1  the police.  None of that's in here, is it?

2      A    No, I don't see it.

3      Q    Okay.  But you claim you told Weir all

4  that?

5      A    Yes.

6      Q    And you think, what?  Weir just left it out

7  on purpose?

8          MR. GOLDBERG:  Objection.  Form.  Asked and

9  answered.  You can answer.

10     A    Yeah, I don't know what Weir did.

11     Q    And earlier when you were telling me what

12  you said to the people -- what the people said after

13  you asked if they lived in the area, you didn't admit

14  earlier to them telling you they lived around, did you?

15          MR. GOLDBERG:  Objection.  Form.  You can

16  answer.

17     A    Repeat the question?

18     Q    Yeah, when I first asked you in this

19  deposition, sir, what response they gave to you when

20  you asked if they lived in the area you neglected to

21  tell me that they said they lived around, right?

1          MR. GOLDBERG:  Objection.  Form.  You can

2  answer.

3      A    They cussed me out and I don't remember

4  them saying they lived around.  They just cussed me out

5  and that's why I walked away.

6      Q    And then earlier when you talked about

7  asking them why they were standing in the carport, you

8  told me, again, that they just cussed you out.  Not

9  that they were waiting for a bus, right?

10          MR. GOLDBERG:  Objection to form.  You can

11  answer.

12     A    Yeah, I told you that they cussed me out.

13     Q    Why is it that you think that Weir got this

14  so wildly wrong if you didn't tell him that they said

15  they lived around and you didn't tell him they said

16  they were waiting for a bus, but instead you said they

17  just cussed me out?

18          MR. GOLDBERG:  Objection.  Form.  You can

19  answer.

20     A    How long ago was this?  This was a long

21  time ago.

Case 1:20-cv-03146-DKC    Document 102-2    Filed 03/01/24    Page 41 of 62

Page 154

1    Q    No, sir.  Officer Weir made these notes the

2  same day.  November, 2017.  It wasn't a long time ago

3  for him when he made these notes.

4    A    And I'm reading it, like you said, the

5  stuff that I don't remember I'm reading, and I do

6  remember them saying they was waiting for a bus in the

7  garage.  Or in the carport.

8    Q    So they did say that.

9    A    It didn't make any sense.

10   Q    Why didn't you tell me that before when I

11  asked you what they said in this deposition?

12       MR. GOLDBERG:  Objection.  Form.  Asked and

13  answered.  You can answer.

14   A    I didn't recall it at the time.

15   Q    Okay.

16   A    Reading it, I do remember.

17   Q    All right.  So when you asked if they lived

18  in the area, they didn't cuss you out, they said they

19  lived around, right?

20   A    They cussed me out.

21   Q    Did they tell you they lived around?

Page 155

1    A    I don't remember that.

2        MR. GOLDBERG:  Objection.  Form.  Asked and

3  answered.  You can answer.

4    Q    Say again, sir?

5    A    I don't remember that part, but they cussed

6  me out.

7    Q    And when you asked why they were standing

8  in the carport you do remember now them telling you

9  they were waiting for a bus, right?

10   A    Yes.

11   Q    It says here, not that they said, fuck you,

12  mother fucker, or any of that, it says here, the

13  subjects then asked him why he was asking them

14  questions.

15       Do you remember now them asking why you

16  were asking questions?

17   A    That they asked me why I was asking them

18  questions?

19   Q    Yes, sir.  That's what you told Officer

20  Weir.  Officer Weir says you told him --

21   A    That's what Weir wrote.

Page 156

1    Q    -- the subjects then asked him why he was

2  asking them questions.

3        Do you see that?

4    A    Yes, I see that.

5    Q    You don't think Officer Weir made that up,

6  do you?

7    A    He could have assumed that in his report on

8  what I was saying.

9    Q    Well, let's look at it, though.  It doesn't

10  say any assumptions were made.  It says:  PFC Weir met

11  with D. Durant who advised of the following.

12       And one of the things Weir says you advised

13  him is that these young men, one 16 years of age, asked

14  you why you are asking them questions.

15       So did you tell Weir that or not?

16   A    I think I answered that earlier.

17   Q    I don't think so, but we don't have to have

18  that debate.  Did you tell Weir that or not?

19   A    I don't remember telling him that.

20   Q    Okay.  Do you deny that you said that?

21   A    No, I don't deny it.  I just don't remember

Page 157

1  telling him.

2    Q    And, in fact, you don't deny saying any of

3  the things that Weir wrote down, do you?

4    A    I remember the bus.

5    Q    Okay.  And here it says you told these

6  young men if they remain in the area you or somebody

7  else may call the police.

8        You remember saying that, right?

9    A    I remember saying that somebody might call

10  the police.

11   Q    And then here Officer Weir says you told

12  Officer Weir that you removed your concealed firearm

13  from its holster.

14       Do you see that?

15   A    Yes, I see it.

16   Q    That's contrary to what you told me earlier

17  today, right?

18   A    It was still in the holster.

19   Q    What's written here that Officer Weir has

20  that you said is contrary to what you told me earlier

21  today, correct?

Deposition of Damond Durant, Volume I

Case 1:20-cv-03146-DKC    Document 102-2    Filed 03/01/24    Page 42 of 62

Jawone L. Nicholson vs. State of Maryland, et al.

Page 158

1    MR. GOLDBERG: Objection to form. You can
2  answer.
3    **A    Yes, that's not what happened.**
4    Q    Okay. So do you think Officer Weir just
5  made this up?
6    MR. GOLDBERG: Objection. Form. You can
7  answer.
8    **A    I guess that's what he took from it, but**
9  **that's not what happened.**
10    Q    It says here you did not have time to
11  identify yourself as a police officer.
12    You told me earlier that when the mother
13  and grandmother came out you did identify yourself to
14  them, right?
15    **A    Yes.**
16    Q    And then looking through the report it says
17  that you declined to make a voluntary written
18  statement.
19    Do you see that?
20    **A    Yes.**
21    Q    And Mr. Nicholson, though, the 16-year-old

Page 159

1  boy -- I'm sorry, you're laughing, sir? Was that
2  funny?
3    **A    I'm just reading.**
4    Q    Yeah, tell me what was funny. I see you
5  laughing.
6    MR. GOLDBERG: Objection. Form.
7    **A    I didn't see him or hear him give a**
8  **statement.**
9    Q    Tell me what was funny, though. I'm trying
10  to understand what you're laughing at.
11    **A    That's just what I was laughing at.**
12    Q    What?
13    **A    That I didn't see him do any of that.**
14    Q    Why is that funny?
15    **A    It's just my humor, I guess. I don't know.**
16  **That's just -- I didn't see him.**
17    Q    All right. So it says here the 16-year-old
18  completed a voluntary written statement and you
19  refused.
20    Do you see that?
21    **A    Uh-huh.**

Page 160

1    Q    Is that a yes?
2    **A    Yes.**
3    Q    Okay. I'll represent to you that no
4  written statement that was given to this department was
5  ever produced to me, so I believe this to be accurate.
6    Is it accurate that you refused to give a
7  written statement?
8    **A    Yeah, I didn't want to give a statement.**
9  **It wasn't -- I didn't. No, I didn't.**
10    Q    Why is it that you didn't want to give a
11  voluntary written statement?
12    **A    Because I told them what happened and the**
13  **officers, it's just a report, you don't have to give a**
14  **written statement if you don't want to. And I was**
15  **like, well, I gave you, you know, what I said happened**
16  **and that was it.**
17    Q    They asked you to give a written statement,
18  though, right?
19    MR. GOLDBERG: Objection. Form. Asked and
20  answered. You can answer.
21    **A    They said I could. They didn't say I had**

Page 161

1  to.
2    Q    No, no. I'm not asking if they said that
3  you had to, but they said they would appreciate it.
4  They wanted you to give a written statement, right?
5    MR. GOLDBERG: Objection. Asked and
6  answered. You can answer.
7    **A    I'm answering the question. They said I**
8  **could if I wanted to.**
9    Q    Okay. And tell me why you declined. I'm
10  trying to understand why you refused.
11    MR. GOLDBERG: Objection. Form. Asked and
12  answered. You can answer.
13    **A    Because I told them what happened.**
14    Q    Okay. But why not also give a written
15  statement so that you could put it in your own words?
16    MR. GOLDBERG: Objection. Form. Asked and
17  answered. You can answer.
18    **A    I can't answer that. I don't know why. I**
19  **really don't.**
20    Q    Earlier you told me about that you told the
21  police about all these -- earlier you told me that you

Page 162

1 told the police that these young men had cussed. We

2 have agreed that that doesn't appear anywhere in their

3 synopsis of what you said.

4     Do you think they left that out on purpose?

5     MR. GOLDBERG: Objection. Form. Asked and

6 answered. You can answer. Calls for speculation. You

7 can answer.

8     **A**   **I don't know why they left it out.**

9     Q   Now, Mr. Nicholson's description of some of

10 the discussion is remarkably similar to yours.

11 Remember, you told the officer you asked if they live

12 in the area and Mr. Nicholson also said you asked if he

13 lived in the area.

14     Do you see that?

15     **A**   **Yes.**

16     Q   Remember, you told the officer that

17 Mr. Nicholson asked you why you were asking questions.

18 And here Mr. Nicholson said the same thing to the

19 officer.

20     Do you see that?

21     **A**   **Yes, I see it.**

Page 163

1     Q   And the two of you were separated when you

2 were talking to the police, right?

3     MR. GOLDBERG: Objection. Form. Asked and

4 answered. You can answer.

5     **A**   **Yes.**

6     Q   And so the fact that those two details

7 match exactly between your two statements would

8 suggest, to me anyway, that they're likely true since

9 you both said those things at the time.

10     Do you agree with that?

11     MR. GOLDBERG: Objection. Form. Calls for

12 speculation, but you can answer.

13     **A**   **Yes.**

14     Q   It says here that PFC Weir provided the

15 case number both to you and to Mr. Nicholson's mother.

16     Do you see that?

17     **A**   **I see it.**

18     Q   Is that a lie?

19     MR. GOLDBERG: Objection. Form. You can

20 answer.

21     **A**   **Yes.**

Page 164

1     Q   Okay. So in other words, that didn't

2 happen? He didn't give you the case number?

3     **A**   **No, I got the case number.**

4     Q   Okay. Well, I said, is that a lie and you

5 said, yes, meaning it's a lie.

6     **A**   **Oh, no. I thought you were saying did I**

7 **get it.**

8     Q   Okay. Let's clarify it.

9     PFC Weir gave you the case number

10 associated with the case. Is that right?

11     **A**   **Yes.**

12     Q   And using that case number you certainly

13 could have requested the police report. Is that right?

14     **A**   **Yes.**

15     Q   And from the police report you would have

16 been able to ascertain the names of the people

17 involved. We've looked at it here and their names and

18 addresses are throughout, right?

19     **A**   **Yes.**

20     Q   Did you ever request the police report?

21     **A**   **No.**

Page 165

1     Q   Okay. Why not?

2     **A**   **I didn't.**

3     Q   I'm sorry?

4     **A**   **I didn't.**

5     Q   Yeah, you said that. So I'm asking why you

6 didn't.

7     **A**   **I just didn't.**

8     Q   But do you know why? Can you give me any

9 reason why?

10     **A**   **No, I just didn't.**

11     MR. HANSEL: So I've got 2:00. Let's go

12 off the record for a brief discussion. I'm imagining

13 folks may be getting hungry.

14     (A discussion was held off the record.)

15     (There was a brief recess taken.)

16     MR. HANSEL: We're back on the record.

17     Officer Durant has asked for an

18 accommodation, which we're happy to grant, which is

19 we're going to continue the deposition until Thursday,

20 the 30th at 9 A.M. If that becomes an issue for

21 anybody we can be flexible in the future. And the

Deposition of Damond Durant, Volume I

Case 1:20-cv-03146-DKC    Document 102-2    Filed 03/01/24    Page 44 of 62

Jawone D. Nicholson vs. State of Maryland, et al.

1 parties have agreed we're going to jointly seek a
2 60-day extension of the discovery deadline so nobody
3 gets jammed up in any way by the extension.
4        Stuart, did I have all that right?
5        MR. GOLDBERG:  That's all correct.
6        MR. HANSEL:  All right.  Fantastic.  And
7 then with that understanding we can go off the record
8 today.  Officer, I'll thank you for your time.  We're
9 leaving the depo open pursuant to our agreement.
10        THE WITNESS:  Thank you.
11        (Deposition was suspended at 2:28 p.m.)
12
13
14
15
16
17
18
19
20
21

1        CERTIFICATE OF DEPONENT
2
3        I hereby certify that I have read and
4 examined the foregoing transcript, and the same is a
5 true and accurate record of the testimony given by me.
6
7        Any additions or corrections that I feel are
8 necessary will be made on the Errata Sheet.
9
10
11
12        _____
13        DAMOND DURANT
14
15
16        _____
17        Date
18
19 (If needed, make additional copies of the Errata Sheet
20 on the next page or use a blank piece of paper.)
21

1        ERRATA SHEET
2 Case: Nicholson vs. State of Maryland, et al.
3 Witness: DAMOND DURANT (Volume I)      Date: 6/24/2022
4 PAGE/LINE      SHOULD READ      REASON FOR CHANGE
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____

1 State of Maryland SS:
2        I, SUSAN M. LIEBRECHT, a Notary Public of the
3 State of Maryland, Carroll County, do hereby certify
4 that the within-named witness personally appeared
5 before me at the time and place herein set out, and
6 after having been duly sworn by me, according to law,
7 was examined by counsel.
8        I further certify that the examination was
9 recorded stenographically by me and this transcript is
10 a true record of the proceedings.
11        I further certify that I am not of counsel to
12 any of the parties, nor in any way interested in the
13 outcome of this action.
14        As witness my hand and notarial seal this
15 12th day of July, 2022.
16
17        _____
18        Susan M. Liebrecht, RPR
        Notary Public
19 My Commission Expires:
20 September 8, 2025
21

Case 1:20-cv-03146-DKC    Document 102-2    Filed 03/01/24    Page 45 of 62

Deposition of Damond Durant, Volume I                                    Jawone D. Nicholson vs. State of Maryland, et al.

### WORD INDEX

**< 0 >**
**01**  11:*17, 19*

**< 1 >**
**1**  105:*8, 15, 16*
**1:00**  78:*11*
**1:20-cv-03146**
  1:*7*
**10**  145:*14*
**100**  2:*14*
**11**  29:*15*  78:*9,
11*
**11:03**  1:*14*
**12**  29:*13*  78:*11*
**12:00**  78:*9*
**12th**  169:*15*
**13**  9:*16*
**14**  57:*12*
**15**  57:*12*  61:*18*
**15:44**  145:*18,
20*  148:*21*
**1500**  61:*16*
**16**  86:*3*  146:*16*
  147:*1, 6*  156:*13*
**16-year-old**
  86:*15, 16, 17*
  158:*21*  159:*17*
**17**  147:*6*
**18**  86:*10*  147:*6*
**19**  86:*10*
**19th**  2:*14*

**< 2 >**
**2/22**  45:*19*
**2/22/72**  45:*18*
**2:00**  165:*11*
**2:28**  166:*11*
**20**  13:*1, 3*
**200**  45:*10*  46:*3,
12*  82:*19*  83:*21*
  89:*10*
**2001**  12:*14*
**200-pound**
  134:*3*
**2017**  145:*14*
  154:*2*
**2022**  1:*14*  3:*3*

**12:17**  169:*15*
**2025**  169:*20*
**21**  12:*18*  13:*15*
  15:*16*  16:*1*
**21202**  2:*15*
**21218**  2:*7*
**230**  145:*4*
**24**  1:*13*  3:*3*
**24-year-old**
  86:*3, 9*
**25**  13:*4*  79:*10*
**2514**  2:*6*

**< 3 >**
**3**  43:*20*  146:*3*
**3:30**  146:*3*
**3:44**  145:*21*
  146:*3*
**301-461-1040**
  2:*8*
**30th**  165:*20*
**315**  43:*19, 20*

**< 4 >**
**4**  3:*6*
**40's**  85:*18*
  86:*12*
**410-685-1120**
  2:*16*
**43**  30:*12*
**48**  90:*10*

**< 5 >**
**50**  45:*16*
**53**  105:*8*

**< 6 >**
**6/24/2022**  168:*3*
**60-day**  166:*2*

**< 8 >**
**8**  169:*20*

**< 9 >**
**9**  30:*15*  165:*20*
**9200**  147:*21*
**97**  11:*2, 19*
**98**  11:*2, 19*

**< A >**

**a.m**  1:*14*
  165:*20*
**abbreviated**
  12:*3*
**ability**  65:*2, 10*
  114:*5*
**able**  7:*12, 20*
  65:*13*  116:*12*
  164:*16*
**academy**  11:*7,
10, 13*  12:*3, 5*
**accommodation**
  165:*18*
**accurate**
  113:*21*  114:*12,
18*  160:*5, 6*
  167:*5*
**acted**  135:*19*
**action**  18:*14*
  169:*13*
**adding**  84:*16*
**addition**  71:*3*
**additional**
  24:*11*  25:*8, 10*
  167:*19*
**additions**  167:*7*
**address**  89:*17*
**addresses**
  136:*8*  164:*18*
**admit**  32:*21*
  152:*13*
**adult**  87:*8*
**advance**  118:*14*
**advised**  125:*20*
  148:*13, 16*
  150:*6*  156:*11,
12*
**Affairs**  7:*4, 6*
  21:*1*  25:*16*
**afraid**  46:*17,
20*  53:*20*
**afternoon**
  145:*21*
**Age**  86:*6*  90:*6,
11*  140:*3*
  146:*16*  147:*1, 6,
11*  156:*13*
**aged**  78:*21*
**ages**  139:*21*

**ago**  43:*19*
  153:*20, 21*
  154:*2*
**agree**  24:*6*
  57:*18*  78:*2*
  88:*18*  101:*14*
  117:*8*  122:*21*
  143:*3*  148:*18*
  149:*3*  163:*10*
**agreed**  76:*18*
  162:*2*  166:*1*
**agreement**
  166:*9*
**ahead**  15:*12*
  49:*5*  100:*17*
  123:*7*  131:*20*
**AirPods**  141:*8*
**airway**  124:*2*
  130:*13*
**al**  1:*7*  168:*2*
**aliases**  4:*13*
**allow**  18:*12*
  65:*9*
**allowed**  68:*7*
**analysis**  97:*15*
**angry**  129:*2*
  133:*11*
**annual**  24:*18*
**answer**  6:*18*
  12:*7*  13:*19*
  14:*5, 9, 16*  16:*5*
  17:*2, 7, 11, 18*
  18:*2, 20*  19:*18*
  20:*6*  22:*6*  23:*3,
19*  24:*5, 14, 15*
  25:*19*  26:*5, 11*
  27:*2, 15, 21*
  28:*5, 11*  29:*4,
12, 18*  30:*5, 11,
18*  31:*1, 4, 11,
17*  32:*10, 15, 19*
  33:*3, 12, 20*
  34:*4, 9, 17*
  35:*12*  36:*14, 18*
  37:*10, 16*  38:*1,
7, 14*  39:*1, 17*
  40:*4, 10*  43:*6,
11*  44:*4*  45:*8*
  46:*5*  47:*19*
  48:*4, 12, 18*

**49:*18*  50:*5, 8,
20*  51:*9, 15, 19*
  52:*8*  53:*5, 10*
  54:*12, 19*  55:*4*
  59:*9*  63:*4, 11*
  65:*5, 9*  66:*12,
20*  67:*4, 8, 11*
  68:*5, 7*  69:*8, 18*
  70:*3, 9, 13*  71:*1*
  72:*9, 14, 20*
  73:*6, 13*  75:*5,
10, 15, 19*  76:*18*
  77:*13*  79:*2, 7,
14*  80:*1*  81:*13,
18*  82:*4, 12*
  83:*17*  86:*2, 19*
  87:*19*  88:*8*
  89:*15*  92:*12*
  93:*9*  96:*9, 16*
  97:*21*  99:*18*
  101:*5*  103:*5*
  108:*21*  109:*18*
  110:*21*  111:*6*
  112:*7, 17*  113:*1,
9, 17*  114:*16*
  115:*20*  116:*15*
  119:*7*  123:*3, 6,
12*  126:*7*  127:*1,
8, 21*  129:*17*
  130:*12*  131:*21*
  132:*9, 14, 19*
  133:*4*  135:*15*
  136:*10*  137:*6*
  147:*9*  151:*6*
  152:*9, 16*  153:*2,
11, 19*  154:*13*
  155:*3*  158:*2, 7*
  160:*20*  161:*6,
12, 17, 18*  162:*6,
7*  163:*4, 12, 20*
**answered**  14:*16*
  16:*5*  24:*14*
  25:*4, 19*  29:*12*
  36:*18*  39:*1*
  50:*5*  51:*15, 19*
  53:*5, 10*  63:*11*
  71:*1*  72:*20*
  73:*6, 13*  79:*7,
14*  80:*1*  83:*17*
  89:*15*  103:*5*

Deposition of Damond Durant, Volume I
Case 1:20-cv-03146-DKC    Document 102-2    Filed 03/01/24    Page 46 of 62
Jawone D. Nicholson vs. State of Maryland, et al.

113:*17* 115:*20*
152:9 154:*13*
155:*3* 156:*16*
160:*20* 161:*6,
12, 17* 162:*6*
163:*4*
**answering** 68:*8*
87:5, 7 161:7
**answers** 18:*8*
**anticipate** 111:*4*
**anybody** 19:*6*
39:7 93:*1, 11*
94:*3, 10, 12, 15*
128:8 137:*11,
14* 139:8, 18
165:*21*
**anyway** 163:8
**apologies** 55:8
**apologize** 105:2
**appear** 144:*1*
162:2
**APPEARANCE
S** 2:*1*
**appeared** 169:*4*
**applies** 24:*21*
**appreciate**
141:*14* 161:*3*
**approach** 62:*16*
67:*16*
**approached**
66:6 67:*17*
70:*12, 20* 71:8,
17 79:*3, 4, 12*
80:*3* 82:6, *15*
85:*10, 18* 86:*14*
89:6, 8 90:*3, 20*
92:9 94:*13*
116:*20* 117:8,
12 135:5
142:*11* 149:*11*
**approaches**
105:*19*
**approaching**
66:9 67:*17*
72:6, 17 83:20
116:7 149:*10*
**appropriate**
135:*12*
**appropriately**

118:*10* 135:*20*
**approve** 24:2
**approved** 23:6
**approving**
23:*16*
**approximately**
148:*21* 149:*4*
**AR-15** 27:*17*
**area** 49:*13*
50:9 56:*3*
58:*21* 73:*17*
74:9 103:8
104:*12, 13*
129:9, *14*
130:*16* 142:8
149:*11* 150:*14*
152:*13, 20*
154:*18* 157:6
162:*12, 13*
**argumentative**
28:*11* 65:5
**armed** 52:*3*
**Armour** 75:*21*
**arrest** 16:*10*
19:*3* 20:*17*
50:*17*
**arrested** 16:*15,
19, 21*
**arresting** 20:*16*
**arrive** 116:*11*
**arrived** 19:*1*
54:9 112:9, *11*
113:*15* 115:*12,
16, 17* 116:2
117:*14* 118:*17*
123:*15* 125:*17*
126:*15* 129:8
135:*1, 3* 138:6
141:*18* 142:*1, 2*
**ascertain**
164:*16*
**asked** 5:8
14:*15* 16:*4*
24:*14* 25:*18*
26:*15* 29:*12*
36:*17* 38:*3, 9,
21* 45:*14* 48:*19*
49:4, 6 50:*1, 4*
51:*14, 18* 53:*4,
9* 63:*10* 68:6

70:*21* 72:*19*
73:5, *12* 79:*6,
13, 21* 83:*16*
89:*14* 103:*4*
113:*17* 115:*19*
120:*14* 135:5
142:*17* 143:5
149:*11* 150:*13*
151:9 152:8, *13,
18, 20* 154:*11,
12, 17* 155:2, 7,
13, 17* 156:*1, 13*
160:*17, 19*
161:5, *11, 16*
162:5, *11, 12, 17*
163:*3* 165:*17*
**asking** 14:*18*
17:*21* 20:*14*
21:7 25:5
26:*16* 31:*21*
32:*1* 37:*12*
38:9, *10* 57:*1*
58:*18* 65:*20*
67:7 74:*4*
79:*11* 87:*1*
103:*14* 112:5
131:*1* 135:*13*
138:2 153:7
155:*13, 15, 16,
17* 156:2, *14*
161:2 162:*17*
165:5
**assault** 19:*6, 8*
20:*10* 123:8, *9*
137:*13, 16, 18*
**assaulted** 16:*13*
18:*21* 19:7
20:*3*
**assigned** 40:*16*
**assignment**
40:*16*
**associated**
13:*11* 15:*18*
16:2 22:*21*
39:7 107:*19*
125:*13, 16*
132:*21* 140:*14*
144:*13* 164:*10*
**assume** 22:7

133:*21* 139:*11*
**assumed** 156:7
**assumption**
84:*13*
**assumptions**
156:*10*
**attach** 36:5
**attachment**
113:*11*
**attack** 65:*15,
19, 21* 110:8, *12*
111:*10, 11*
122:6, 7, 8, *10,
11, 12, 13, 19, 21*
123:*4* 133:*12,
14* 134:3, 7, 9
137:7, 8, *17*
138:3, 5
**attacked** 16:*13*
20:2 122:*15*
123:*1* 134:*14*
137:*11, 18, 20,
21* 138:2
**attacking** 64:*21*
67:6 120:*11*
**attainment** 8:*4,
8*
**attend** 8:*14*
11:7 12:3, 5
**attending** 39:*20*
**attention** 17:*13*
19:5
**audio** 5:*19*
6:*12, 13* 7:6, *19*
106:*1* 141:9
**available** 53:*21*
**aware** 17:5
22:*4, 21* 23:5,
11, 13, 14, 16
25:*15* 39:7
50:*12* 59:6
63:*21* 64:*4*
96:*11* 144:8
**awareness** 96:7
97:*16*

**< B >**
**back** 8:*15, 17*
9:*16* 27:8, *12*
42:8, *14, 15*

67:*14* 72:*4*
87:*4* 91:*15*
96:*19* 97:*1, 9,
12, 17, 19* 98:*2,
3, 19* 103:*12, 16,
19* 104:*15, 17*
105:8, *15* 116:*8,
18* 122:*4, 12*
128:*13* 133:*6*
135:9 137:8
165:*16*
**background** 8:*3*
**backing** 104:*4*
**bad** 15:*8*
**badge** 41:*20*
42:*1* 71:*18*
72:*1* 84:*1*
86:*13* 87:*4*
89:*10* 96:*2*
128:5, 7, 8
**bag** 71:7, 9, *11,
18* 80:*14, 16, 19,
21* 81:*3* 82:7
84:2 86:*14*
88:2, *13* 89:*11*
100:*11*
**Baker** 2:*13*
**balaclava** 76:*3*
**Ball** 21:*19*
**Baltimore** 2:7,
15 10:2 12:*12,
14, 18* 14:7
15:*1, 4* 16:*1*
23:7, *15* 34:2
37:*19* 38:*3, 11,
18* 52:*14* 54:*21*
55:*1* 60:*20*
126:*10, 12*
127:*14* 128:2, *4*
148:*17*
**bandana** 75:*20*
**bandanas** 75:*17*
**baton** 71:5
**began** 19:*3*
**beginning** 58:*21*
**BEHALF** 2:*3,
11*
**behavioral** 41:*3,
4*

Deposition of Damond Durant, Volume I

Case 1:20-cv-03146-DKC     Document 102-2     Filed 03/01/24     Page 47 of 62

Jawone D. Nicholson vs. State of Maryland, et al.

belief 31:*20*
beliefs 31:*21*
believe 70:*1*
73:*9* 76:*16*
117:*3* 144:*5*
160:*5*
Bellfall 39:*14*
58:*8* 147:*21*
149:*1*
belong 74:*8*
75:*2*
belongs 48:*9*
belt 36:*6*
71:*21* 72:*1, 2*
88:*17*
bench 43:*14*
Bendu 147:*14*
best 13:*11*
85:*11* 114:*5*
better 7:*15*
145:*20*
big 103:*20*
104:*14, 17*
bigger 46:*8, 9,*
*10, 18* 143:*20*
144:*1*
bin 62:*8*
birth 45:*17*
bit 8:*2* 16:*7*
29:*9* 100:*20*
black 19:*1, 11*
74:*8, 13, 15*
81:*3* 82:*9, 21*
83:*21* 84:*2*
86:*13* 89:*10*
blank 167:*20*
block 147:*21*
blurted 56:*20*
Boardwalk 9:*20*
body 33:*10*
137:*15*
bottom 148:*8*
boy 159:*1*
boys 46:*21*
64:*14*
brandished
40:*7* 88:*14*
break 72:*21*
73:*10* 100:*19*
150:*11*

breakdown
41:*5, 6*
breaking 23:*1*
25:*7* 26:*1*
brief 45:*3*
105:*17* 165:*12,*
*15*
briefer 12:*4*
broadly 26:*16*
broke 17:*9*
18:*18* 24:*11*
26:*8, 19*
broken 22:*3*
brother 113:*6,*
*14*
brothers 113:*6*
brought 93:*17*
bucket 62:*7*
building 63:*18*
buildings 64:*2*
bullet 101:*16*
bunch 128:*16*
bus 151:*12, 16,*
*18* 153:*9, 16*
154:*6* 155:*9*
157:*4*
business 64:*9*

< C >
caliber 30:*13*
call 4:*20* 5:*4*
35:*7* 41:*3* 43:*1*
54:*1* 76:*3*
91:*14* 93:*19*
94:*4, 5, 13, 15*
100:*4* 103:*8*
105:*3, 6* 110:*9,*
*10, 15* 122:*18*
129:*14* 130:*18*
131:*1, 2, 4*
157:*7, 9*
called 4:*4* 8:*15,*
*16, 17* 9:*19*
10:*1* 49:*12*
54:*17* 91:*9, 12*
92:*13, 16* 94:*8*
109:*4, 14*
110:*12* 130:*21*
calling 55:*13*
109:*15*

Calls 47:*18*
49:*17* 50:*4*
69:*17* 75:*4*
81:*12* 111:*5*
116:*14* 123:*11*
130:*11* 132:*8*
162:*6* 163:*11*
camaraderie
112:*14, 20*
113:*3*
camera 63:*16*
cameras 63:*20*
cancel 130:*18*
131:*4*
captured 63:*21*
car 40:*13*
41:*21* 48:*13*
52:*6, 20* 53:*3*
61:*11* 62:*17, 18*
72:*5* 73:*15*
98:*9* 104:*5*
care 91:*8*
carport 151:*10*
153:*7* 154:*7*
155:*8*
carports
106:*10, 14*
Carranza 2:*20*
carried 36:*3*
69:*16*
Carroll 169:*3*
carry 30:*7*
52:*16* 70:*5, 17*
81:*20*
carrying 70:*1*
71:*9* 81:*3* 82:*7*
84:*1* 86:*14*
89:*11*
cars 103:*12, 15,*
*19* 104:*15, 16*
CARY 2:*4*
18:*9* 28:*18*
33:*20* 90:*13*
cary@hanselllaw
.com 2:*9*
Case 1:*6* 6:*1,*
*10, 13, 21* 7:*1, 4*
20:*18* 22:*2, 3,*
*16* 25:*6* 26:*7,*
*18* 28:*9* 30:*2*

64:*3* 79:*16*
163:*15* 164:*2, 3,*
*9, 10, 12* 168:*2*
caught 14:*12*
64:*2, 12, 16*
caused 116:*5*
cautious 46:*19*
cell 109:*5*
certain 23:*20*
78:*12*
certainly 22:*3,*
*21* 23:*13* 79:*16*
89:*5* 101:*14*
138:*21* 146:*17*
164:*12*
certificate 8:*9*
167:*1*
certify 167:*3*
169:*3, 8, 11*
chamber 30:*20*
change 79:*18*
136:*21* 168:*4*
changed 136:*19*
137:*1*
characterization
117:*2*
charge 112:*1*
137:*3*
charges 111:*14,*
*18* 121:*12, 17*
122:*2* 136:*15,*
*16, 19, 20*
Charles 2:*6*
Chaz 21:*19*
check 61:*8*
62:*15* 63:*6*
72:*5*
checked 63:*7*
64:*5* 81:*1*
child 28:*8*
children 79:*11*
86:*6* 87:*2* 88:*3*
90:*17* 126:*20*
127:*4*
chubby 45:*13*
circumstance
134:*15*
circumstances
84:*18* 85:*17*
88:*3*

CIT 40:*17, 19*
41:*2*
City 10:*2*
12:*12, 14, 18*
14:*7* 15:*1, 5*
16:*2* 17:*15*
23:*15* 26:*1, 18,*
*19* 37:*19* 38:*11,*
*18* 52:*14* 54:*21*
60:*20* 126:*10,*
*12* 127:*14*
128:*2, 4* 148:*17*
City's 25:*6*
civilian 145:*20*
claim 137:*20*
152:*3*
Clare 10:*1*
clarify 68:*10*
164:*8*
clean 9:*16*
clear 88:*16*
116:*1* 117:*6*
123:*1*
clearly 66:*4*
clip 69:*19*
71:*21* 72:*1*
81:*8, 21* 82:*1*
clipped 70:*6,*
*19* 82:*5* 88:*17*
close 58:*4* 60:*6*
80:*8* 99:*19*
130:*15*
clothes 41:*17*
71:*13, 14*
cold 35:*3, 4*
59:*14, 19* 60:*9*
73:*18* 75:*8, 11,*
*13* 76:*8, 10, 15,*
*17, 18, 21* 77:*1,*
*5, 6, 7, 8* 78:*2, 5*
color 74:*2*
come 42:*13*
66:*4* 102:*15, 19*
105:*8, 15* 106:*5*
111:*4* 128:*11*
129:*4* 130:*4, 6,*
*21* 131:*7, 10*
134:*18* 139:*17*
141:*4, 17, 20*

Office (410) 821-4888
CRC Salomon, Inc.

2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com - info@crcsalomon.com

Facsimile (410) 821-4889
Page: 3

Case 1:20-cv-03146-DKC    Document 102-2    Filed 03/01/24    Page 48 of 62

Deposition of Damond Durant, Volume I                                    Jawone D. Nicholson vs. State of Maryland, et al.

comes 87:3
141:13
comforting
113:15
Coming 39:5
41:11 65:17
commencing
1:14
Commission
169:19
Commissioner
111:18
commit 73:4
132:3 135:18
137:2
committed
112:3 131:12,
15, 17 132:6, 11,
16 133:1, 7
135:13, 17
committing
51:17
common 24:1
communicate
116:18
communications
147:17
community
55:20 56:2
106:12, 15
complaint
14:17, 19 15:9,
13, 17, 20, 21
16:17, 20
complaints
13:10, 16, 20, 21
14:2, 7, 14 15:2,
5, 20, 21 16:2
complete 113:21
completed
159:18
complied 19:4
compound 26:4
33:11 79:1
computer 4:15
7:14
concealed
157:12
concepts 50:16
concern 88:18

concerned
126:16, 18
127:6, 11
conclusion
47:19 49:17
50:4 69:18
112:6 116:15
123:12 132:9
conduct 13:12,
17 16:3
confirm 56:11
confirmed
142:17
confused 136:14
connected
137:15
connection 7:4
64:2 143:11
consequence
25:21 26:3, 6, 8,
13
consequences
18:7 26:17
consideration
78:19
consistent
146:17, 20
147:2
constituted
124:8
contain 101:15
context 32:8
continue 165:19
continuously
12:14
contrary
157:16, 20
conversation
66:16 84:8
conversations
5:14
convicted 19:13
copies 167:19
cops 115:16
correct 6:7
8:10 11:5 13:7
25:1 27:5 52:1
77:16 96:2
97:6 99:1, 10
121:2 125:17

142:9, 12
157:21 166:5
correctional
11:4, 8 12:2
corrections
10:8, 17, 18, 19
11:3, 18 13:9
167:7
couch 19:2
20:9, 10
Counsel 44:19
141:6 144:4
169:7, 11
County 55:1, 7,
8 60:20 143:15
144:8 169:3
Couple 11:14
course 9:1
18:7 56:16
84:7
COURT 1:2
7:11, 18 58:8
93:14 103:8, 9,
10, 11 104:5, 8,
10, 11 108:18
109:3 124:7
147:21 149:1
150:11
covered 60:3
72:2 101:8
created 89:5
crime 47:17
73:4 91:3
131:17 132:3
137:3
crimes 47:3, 4,
14 50:17, 18
51:17 112:1, 4
131:12, 15
132:6, 11, 17
133:1, 7 135:13,
17, 18
criminals 75:3
Crisis 40:20
41:3, 4
crowd 124:1, 8,
20
cul 55:21 103:7
currently 57:9

curtilage 42:6
49:19 50:6
cuss 154:18
cussed 114:21
150:20 153:3, 4,
8, 12, 17 154:20
155:5 162:1
cussing 91:2, 3
99:14 114:13
115:21 117:18
151:21

< D >
damage 73:1
DAMOND
1:12 3:2 4:3,
10 167:13
168:3
dark 7:9
date 33:19
34:2, 19, 21
35:1 45:17
144:13 145:12
167:17 168:3
daughter
139:20 140:3,
18
Davey 21:18
day 32:13
33:16 34:7
36:10 39:3, 4, 8,
16, 18 59:11
76:10, 14 77:8
78:8 147:18
150:8, 13 154:2
169:15
days 20:19
43:14
de 55:21 103:7
deadline 166:2
deal 22:16
dealt 125:2
debate 156:18
debris 62:8
decided 135:8
decision 135:11
declined 158:17
161:9
deeper 106:12

de-escalate
37:5, 7, 14, 18
38:16, 19
De-escalation
37:17, 20 38:5,
12
Defendants 1:8
2:11
degree 8:3, 7
deli 9:17
deny 156:20, 21
157:2
department
21:11 23:14
25:1 30:7, 8
143:16 144:9
160:4
depends 13:8
depo 166:9
DEPONENT
167:1
deposed 65:7
deposition 1:12
3:2 5:15 20:18
22:9 29:1
152:19 154:11
165:19 166:11
describe 33:16
122:9
described 47:3,
6 54:5 78:1
107:10, 13
114:12 137:2
138:13, 14
describes 148:7
describing
114:3 148:13
description
85:18 109:13,
14 110:2, 3
151:20 162:9
designed 100:21
details 163:6
determine
48:15 130:5
determined
63:7 65:14
96:21 97:5, 11,
18 130:3, 17
131:5, 11 133:8

development 58:10, 14 59:1, 2, 3
die 141:8
difference 27:18
different 14:12 83:11 102:18 122:14
diploma 8:8, 9
direction 98:8 104:9 106:8
directly 9:4 107:21 108:1, 3
discipline 26:13
disciplined 25:13, 17
discovery 144:5 166:2
discussed 139:11
discussion 45:2 106:2 162:10 165:12, 14
discussions 128:13
dispatch 118:15
dispute 146:7
disrespected 115:2
disrespectful 94:20
disrespecting 95:1, 5
DISTRICT 1:2, 3 136:1
divorce 57:14
DKC 1:7
document 143:15 149:2
Documents 5:18
doing 14:21 15:4 39:4 42:14 64:16 85:5, 6, 12 92:17 98:13 116:12 141:11
dollars 17:16 26:2
domestic 16:10
Donelson 2:13

door 56:6 58:1 98:9
doorbell 63:14
Dorell 57:8
Double 5:5, 6, 11
downtown 21:10
draw 37:20 38:2 68:20 82:14 116:6
drawing 37:13 38:4, 11, 19 67:5 116:12 117:13
drawn 84:3 117:19 127:5
dress 33:16
drew 30:16 35:9 36:10 67:1, 2 106:4 126:19
driver's 145:6
driving 53:8 60:17
dropped 100:11
duly 4:4 169:6
DURANT 1:12 3:2 4:3, 10 57:6 148:4 150:6 156:11 165:17 167:13 168:3
duty 18:13 29:13, 16 30:2 52:9, 12, 15, 18

< E >
earlier 4:21 5:1, 8 17:21 45:15 76:20 83:6 115:10, 15 122:21 139:21 143:5 145:11 146:1, 13 149:5, 8 152:11, 14 153:6 156:16 157:16, 20 158:12 161:20, 21

easier 7:17 104:7
easy 95:4
educational 8:3, 8
effect 106:5
either 49:14 50:10 54:16 57:13 66:17 68:1, 3, 11, 14, 19 69:2 107:21 128:13
Electrical 9:3
electronics 9:3
elements 50:18
eleven 145:8
Email 2:9, 17
employed 12:13
employee 120:1
employer 26:18
employment 9:8
empty 48:9
encounter 68:16, 21 128:8, 21
engaged 47:3, 4, 7, 13, 17 51:21
entire 47:16
environment 7:17
equipment 71:4
Errata 167:8, 19 168:1
escape 60:10 61:21 62:2, 19
Especially 76:14
ESQUIRE 2:4, 12, 20
established 33:19
estimate 104:18
et 1:7 168:2
evaluated 41:10
event 47:16 107:20 110:18
events 6:1
everybody 24:21 135:20 145:18
exact 35:1

exactly 91:6 114:17 117:4 163:7
Examination 3:5 4:7 169:8
examined 4:6 167:4 169:7
example 41:4
exchange 136:5
exercising 120:3, 7
expect 111:2
experience 37:6, 12, 13
experienced 12:4
Expires 169:19
explain 114:6 117:18 126:10
explained 114:14
explanations 74:7, 21
extension 166:2, 3
extent 93:7
exterior 63:17 64:1 82:1
external 63:13
eyes 19:1, 11 42:12

< F >
face 73:17 75:12 76:12 77:10
faces 112:15
fact 17:9 27:17 70:5 76:6 87:11 102:17 112:3 117:17 150:7 151:20 157:2 163:6
facts 25:14
fair 42:20 78:12 81:14, 16 83:7, 14 84:13 100:5 112:13 146:2

fairly 118:7 119:10
fall 100:13
familiar 31:8 75:1 76:10 145:18
family 125:13, 15, 16 129:7 133:1
Fantastic 166:6
far 23:8 51:13 62:12 87:21 90:12 93:4 98:1 103:3 104:8, 10 118:14
fast 67:15 98:13 99:15
Father-in-law 139:20 140:13
fear 54:16 55:14
feel 94:19 112:20 113:11, 13 118:7, 9 167:7
feeling 92:21
feet 104:18 145:9, 10
fellow 96:14 113:14 118:5
felt 98:1 100:9 110:8 112:14 113:2, 18
female 124:14, 16 125:11, 12
fields 49:12
fight 19:4 20:12 100:12
figure 141:10
filed 13:10, 16
find 41:8 111:7, 8 129:5
fine 18:15 56:17 63:2, 8 64:6 72:7, 17 78:15 105:14
finish 68:8 147:10, 11 150:10

**fire** 31:*3* 32:*13* 61:*2*
**firearm** 36:*5* 37:*7, 13, 20* 38:*4, 11, 19* 40:*1* 67:*2* 95:*15, 19* 96:*2* 108:*18* 109:*2* 117:*13, 19* 126:*19* 127:*5* 157:*12*
**firearms** 27:*4* 32:*7* 38:*2* 39:*21* 52:*6*
**fired** 101:*15*
**first** 4:*4* 9:*5, 6, 11, 13* 10:*19* 12:*10* 35:*18* 39:*6* 42:*5* 57:*19* 67:*16, 18* 84:*19* 102:*21* 110:*9* 112:*10* 117:*7* 123:*14, 19* 126:*15* 128:*7* 152:*18*
**five** 124:*20* 145:*8*
**flexible** 165:*21*
**Floor** 2:*14*
**focused** 136:*6*
**folks** 79:*20* 165:*13*
**follow** 107:*7*
**following** 150:*6* 156:*11*
**follows** 4:*6*
**footsteps** 98:*12*
**force** 17:*3* 24:*12*
**Ford** 61:*21* 62:*2*
**foregoing** 167:*4*
**foreign** 50:*15*
**Form** 6:*17* 12:*6* 13:*18* 14:*5, 8, 16* 16:*4* 17:*1, 6, 10, 17* 18:*1, 20* 19:*17* 20:*5* 22:*5* 23:*2, 18* 24:*4, 13*

25:*3, 18* 26:*4, 10* 27:*1, 20* 28:*4, 10* 29:*3, 11* 30:*4, 10* 31:*10* 32:*9, 14, 18* 33:*2, 11, 18* 34:*3, 8, 16* 35:*11* 36:*13, 17* 37:*9, 15, 21* 38:*6, 13, 21* 40:*3, 9* 44:*3* 46:*4* 47:*18* 48:*3, 11, 17* 49:*16* 50:*3, 19* 51:*8, 15, 18* 52:*7* 53:*5, 9* 54:*11, 18* 55:*3* 59:*8* 63:*3* 65:*4* 66:*11, 19* 67:*3* 69:*17* 70:*8, 21* 72:*8, 13, 19* 73:*5, 12* 75:*4, 9, 14* 76:*16* 77:*12* 79:*1, 6, 13, 21* 81:*12, 17* 82:*3, 11* 83:*16* 84:*14* 86:*18* 87:*18* 88:*7* 89:*14* 92:*11* 93:*6* 96:*8, 15* 97:*20* 99:*17* 101:*4* 103:*4* 108:*20* 109:*17* 110:*20* 111:*5* 112:*5, 16, 21* 113:*8, 16* 114:*15* 115:*19* 116:*14* 117:*1* 119:*6* 123:*2, 5, 11* 126:*6, 21* 127:*7, 20* 129:*16* 130:*11* 131:*13, 19* 132:*8* 135:*14* 136:*9* 137:*5* 147:*8* 151:*5* 152:*8, 15* 153:*1, 10, 18* 154:*12* 155:*2* 158:*1, 6* 159:*6* 160:*19* 161:*11, 16*

162:*5* 163:*3, 11, 19*
**forth** 42:*8* 128:*13*
**foundation** 17:*11, 18* 18:*2, 19* 19:*18* 20:*6* 22:*6* 23:*3, 19* 24:*5, 14* 30:*11* 32:*10, 15, 19* 33:*19* 34:*4* 37:*10* 40:*4* 46:*5* 48:*12, 18* 49:*17* 50:*4* 52:*8* 55:*4* 66:*20* 67:*4* 70:*9* 75:*15* 82:*4* 87:*19* 88:*8* 108:*21* 112:*17* 113:*9, 17*
**four** 11:*19* 13:*7* 124:*16*
**Fowler** 147:*14*
**frequent** 73:*17*
**Friday** 1:*13* 145:*14*
**friendly** 112:*15*
**Fries** 9:*20*
**front** 35:*8* 56:*6* 58:*1* 98:*9* 134:*9*
**Fuck** 91:*8, 9, 19* 92:*1, 3, 4* 94:*14, 16* 95:*7* 114:*7* 115:*4, 7, 11, 12, 13* 149:*19* 150:*1* 151:*10, 21* 155:*11*
**fucker** 115:*16, 18* 151:*11, 21* 155:*12*
**full** 4:*9* 12:*5, 8* 39:*18* 81:*3* 82:*7* 113:*20* 116:*2*
**funk** 141:*9*
**funny** 28:*3* 159:*2, 4, 9, 14*

**further** 128:*12* 169:*8, 11*
**future** 165:*21*

**< G >**
**garage** 154:*7*
**garbage** 87:*4*
**Garrison** 147:*14*
**gathered** 129:*12*
**general** 25:*9*
**generates** 15:*5*
**gentleman** 42:*7* 100:*3* 124:*17*
**gentlemen** 88:*14* 90:*5* 93:*5* 96:*19* 109:*9*
**getting** 92:*7, 13* 165:*13*
**girlfriend** 18:*21* 19:*9*
**give** 4:*9* 18:*9* 20:*18* 22:*9* 41:*4* 89:*17* 109:*14* 120:*15, 17* 138:*7* 159:*7* 160:*6, 8, 10, 13, 17* 161:*4, 14* 164:*2* 165:*8*
**given** 24:*11* 114:*19* 160:*4* 167:*5*
**Giving** 97:*3, 9* 109:*13* 110:*2* 121:*4, 5*
**Glock** 30:*12* 40:*6* 52:*19*
**go** 4:*13, 18* 7:*10* 8:*12* 9:*4* 15:*9, 12* 22:*10, 13, 15* 44:*21* 49:*5* 62:*12* 63:*8* 72:*4* 77:*7* 83:*19* 85:*15* 91:*15* 100:*17* 102:*15, 20* 105:*16* 106:*5, 9* 107:*5* 110:*3* 111:*17* 118:*2*

123:*7* 131:*20* 139:*4* 148:*15* 165:*11* 166:*7*
**going** 13:*6* 15:*1* 18:*10, 11, 12, 14* 21:*10* 28:*7* 56:*9* 64:*9, 14* 65:*15, 21* 92:*15, 19* 100:*12* 107:*20* 110:*8, 12* 122:*10* 133:*12, 14* 134:*2, 4, 6, 8, 12, 17* 135:*9, 12* 137:*3, 21* 138:*1* 140:*11* 141:*8, 10* 165:*19* 166:*1*
**GOLDBERG** 2:*12* 6:*17* 12:*6* 13:*18* 14:*4, 8, 15* 16:*4* 17:*1, 6, 10, 17* 18:*1, 9, 15, 19* 19:*17* 20:*5* 22:*5* 23:*2, 18* 24:*4, 8, 13* 25:*3, 18* 26:*4, 10* 27:*1, 14, 20* 28:*4, 10, 17, 21* 29:*3, 7, 11, 17* 30:*4, 10, 14, 18, 21* 31:*4, 10, 16* 32:*5, 9, 14, 18* 33:*2, 11, 18* 34:*3, 8, 16* 35:*11* 36:*13, 17* 37:*9, 15, 21* 38:*6, 13, 21* 39:*17* 40:*3, 9* 43:*5, 10, 15* 44:*3, 8, 19* 45:*7* 46:*4* 47:*18* 48:*3, 11, 17* 49:*16* 50:*3, 13, 19* 51:*8, 14, 18* 52:*7* 53:*4, 9* 54:*11, 18* 55:*3* 56:*13* 59:*8* 63:*3, 10* 65:*4, 9* 66:*11, 19* 67:*3*

Office (410) 821-4888
CRC Salomon, Inc.
2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com · info@crcsalomon.com
Facsimile (410) 821-4889
Page: 6

68:6  69:17
70:2, 8, 13, 21
72:8, 13, 19
73:5, 12  75:4, 9,
14, 18  76:16
77:12  79:1, 6,
13, 21  81:12, 17
82:3, 11  83:4, 8,
16  84:14  86:1,
18  87:18  88:7
89:14, 21  90:4,
13, 18  92:11
93:6  96:8, 15
97:20  99:17
101:4  103:4
105:6, 14
108:20  109:17
110:20  111:5
112:5, 16, 21
113:8, 16
114:15  115:19
116:14  117:1
119:6  123:2, 5,
11  126:6, 21
127:7, 20
129:16  130:11
131:13, 19
132:2, 8, 13, 18
133:3  135:14
136:9  137:5
141:6, 8, 14
144:4, 11  147:8
151:5  152:8, 15
153:1, 10, 18
154:12  155:2
158:1, 6  159:6
160:19  161:5,
11, 16  162:5
163:3, 11, 19
166:5
**good**  7:19
24:17  37:7, 13
45:21  56:20
105:10  110:3
113:18
**goodness**  122:9
**Google**  58:3
**grab**  36:4
100:13

**grabbed**  101:6
**grade**  9:13, 18
**graduated**  8:5
9:11
**graduation**  9:8
**grandmother**
124:6  125:7
129:6  130:9
132:16  133:18
134:2, 9  143:2
158:13
**grant**  165:18
**Greater**  9:19
10:6
**grind**  13:6
**grippy**  36:3
**ground**  36:21
37:1, 4  100:16
**group**  142:8
**grown**  86:4
**guard**  101:8
**guess**  16:19
17:3, 4  42:11
44:13  58:21
59:10  61:8
64:12  72:21
85:12  86:20
87:8  102:4
126:17  128:1
130:15  135:9
158:8  159:15
**gun**  28:8, 12
30:1, 3, 6, 9, 16
31:3, 7  32:2, 13,
17, 20, 21  34:1,
7  35:6, 10
36:11, 16, 20
37:3  60:15, 19
64:18, 20  65:14
67:1, 5  71:4
72:11  92:9
100:12  101:1, 6,
7, 11, 15, 18
103:2  104:21
105:20  116:6,
12  120:6
133:20  134:3,
10  135:5, 6, 7,
10

**guns**  28:14, 16
29:2, 10  53:2
**gut**  92:21
**guy**  15:8  42:10,
19  43:2  65:7,
12  66:3  67:21
69:7, 14  81:2
82:7, 17  99:2
101:21  103:1
124:13  134:3
**guys**  13:1  85:5,
12  91:21  92:5
109:16  130:1
134:6

**< H >**
**hairs**  76:20
**hand**  68:13, 17
80:12  88:12
102:3  137:11
169:14
**handed**  121:1
**handle**  134:18
136:1
**handled**  118:9
**hands**  68:1, 4,
12, 15  80:15, 18
150:11
**hang**  64:11
**hangout**  64:10
**hangs**  73:18, 19
**HANSEL**  2:4,
5  3:6  4:7
18:13, 16  24:6
28:19  31:18
44:18  45:1, 4
56:16  76:19
83:6, 10, 12
93:10  105:4, 7,
11, 15, 18  106:3
117:6  123:4, 7
129:18  131:20
132:1  141:7, 12,
15, 16  144:3, 6,
12  165:11, 16
166:6
**happen**  26:20
164:2
**happened**
16:12  17:19

39:4  86:5  91:1
98:5, 11  100:8
107:19  114:1, 4
115:5, 7  120:4
128:10  135:4
138:12, 13, 18
139:11  145:15
146:3  149:6
158:3, 9  160:12,
15  161:13
**happy**  165:18
**hard**  53:13
**Hardtop**  53:14
54:1
**hat**  75:21  76:1
78:4
**head**  27:8, 12
55:18  78:4
134:5
**headed**  98:8
**heads**  47:12
**hear**  16:16
56:8  67:14
69:8  122:9, 20
140:15, 19
159:7
**heard**  6:13
31:9, 15, 18
32:1, 4, 6, 7
51:5  56:21
57:2  98:12
99:12, 14
115:15  140:16
**heated**  128:20
129:1
**heavy**  81:4
82:8  84:2
86:14  88:2
89:11
**height**  145:8
**held**  1:12  45:2
106:2  165:14
**Hello**  85:6
**helmet**  76:9
**help**  7:11  41:8,
9  64:14, 18
72:21  73:10
92:6, 9
**Hey**  85:5, 12

141:6
**Hi**  109:15
**hide**  73:16
**high**  8:5, 8, 12
9:7, 11, 12
10:11  44:7, 14,
16
**highest**  8:3, 7
**history**  10:5
108:4  127:18
143:9
**hit**  13:1  19:15
20:4
**hitting**  20:16
**holding**  80:14,
16
**holds**  81:21
**holster**  33:13,
14  35:7, 14, 17,
20  36:2, 8
60:21  100:15,
21  101:6, 7, 9,
12, 15  105:20
157:13, 18
**home**  39:5
41:11  52:15
71:13  139:5, 8,
18  140:19
**honest**  114:12,
18
**hoodie**  33:21
35:8, 13, 14
42:13  60:15, 18,
19  72:2  77:17,
21  78:4  80:12
81:3  82:9, 21
84:1  86:13
89:10  101:19
103:3  126:19
127:5
**hoped**  100:14
**hoping**  129:4
**horizon**  12:21
**hospital**  41:9
**hours**  78:10
**House**  10:18
49:13, 20  63:9,
17  85:15  98:10
139:7, 9
**houses**  58:20

Deposition of Damond Durant, Volume I
Case 1:20-cv-03146-DKC    Document 102-2    Filed 03/01/24    Page 52 of 62
Jawone D. Nicholson vs. State of Maryland, et al.

Howard  55:7, 8
143:15  144:8
humor  159:15
hungry  165:13
hypnotist  65:3

< I >
ID  120:14, 18,
21
idea  56:14
140:6
identified
118:17, 18
135:6
identify  123:19
124:3  125:1
158:11, 13
identity  73:16
ill  41:5
illegal  69:15, 20
illegally  70:1
imagine  74:6
130:9
imagining
165:12
immediately
74:18
important
116:17  117:16,
19  118:2
136:17
improper  121:7
inappropriate
121:7
incident  18:17
40:15  137:12
139:19  140:2,
14, 20  142:15
143:16  144:9
incidents  145:14
include  57:14
including  29:13
87:16
INDEX  3:1
indicate  41:17
indicator  41:14
individual
144:19
individually

113:12
inflection  79:19
information
119:11, 20
120:13, 16
121:4, 5, 11, 14
122:5  133:13
135:7  136:5, 7,
18  146:16
150:4
initial  57:7
initially  125:2
initiated  57:13
inquiry  28:20
in-service
24:18  25:9
inside  36:4
70:6, 19
instance  86:15
114:6
intent  63:6
intention  90:10
interacting
93:21  94:8
interaction
34:14, 20  127:4
interest  28:13,
14
interested  5:14
169:12
Internal  7:4, 6
21:1  25:16
interpret  7:12
interrupt  44:20,
21
Intervention
40:20
interviewed  7:3
intimidated
46:14, 16, 20
51:12  53:20
54:10  60:14
61:5  73:9
80:12
intimidation
54:16  55:14
introduction
37:7
investigation
10:15  21:2, 8

involved  23:16
119:15  164:17
involving  25:6
IO  144:20
issue  6:1
165:20
items  81:4
its  157:13

< J >
jail  15:9
jammed  166:3
jaw  17:9  18:18
22:3  23:1
24:11  25:7
26:1, 8, 19
JAWONE  1:4
15:18  30:2, 16
32:12  33:5
34:7, 14  55:17
69:6, 9  77:15
121:1  123:17,
20  144:16
Jawone's
119:14  121:11
123:14  125:3, 6,
13
jeans  33:21
81:3
Jessup  10:18
job  9:11, 12, 13,
19  10:11, 12, 20,
21  13:20  14:1,
6, 12, 21  15:4
50:18
jointly  166:1
July  169:15
Junction  10:1
June  1:13  3:3
jurisdiction
55:10, 13
126:11  134:17
jury  145:18
justification
117:13
justify  116:12
117:18
juvenile  119:15
juveniles  90:20

< K >
kangaroo  35:8
keep  42:21
64:12  76:12
78:5  92:6, 13,
17  96:13  97:17
137:17
Keeping  20:16
96:12
kicked  20:15
Kicking  20:12
kids  85:19, 21
87:6, 21  89:11,
19  90:2  115:12
kill  31:7  32:12
kind  5:9  23:10
69:5  75:3  76:2
100:16  107:5
126:16
knew  22:17
23:21  55:6, 9
72:7, 11, 17
87:21  100:12
133:19  134:10
knife  66:3
67:21  68:1, 4,
12, 15, 17, 20
69:3, 5, 12, 15,
19  70:1, 5, 11,
17, 19  71:3
72:12  81:9, 10,
21  82:9  83:3,
14, 21  86:13
87:3  88:2, 9, 10,
14, 17, 19  89:1,
2, 5, 9  92:9
97:2
know  8:16  9:9
13:5  14:18
15:13, 14, 19
16:6, 7  17:12,
13  18:7  22:11,
17  28:6  34:6
35:18  48:19
49:15  50:18
51:2, 7  58:8, 9,
11  59:14  62:12
65:20  67:21
70:17  75:2

80:10  85:15
86:15  87:10
88:19  90:3, 12
93:4  98:16
99:6  104:19
111:17  112:18
113:3, 6  117:4
118:4, 12, 13, 14,
21  119:3, 8, 16
120:12, 15
124:4  133:12,
13  134:11, 16
144:20  147:15
151:7  152:10
159:15  160:15
161:18  162:8
165:8
knowing  97:2
knowledge
13:11  84:9
118:12, 13
119:1, 4  140:13,
18
known  24:2
Kurty  147:14

< L >
lack  145:20
large  42:19
43:1
late  141:13
laughing  28:2
134:13  159:1, 5,
10, 11
Law  2:5  49:12
169:6
lawsuit  17:15
22:2, 4, 9, 21
23:17  24:10
25:11, 14
lawsuits  23:6, 9
57:14
lawyer  5:14
21:16, 18  36:15
79:10
lawyers  21:13,
14, 15  22:16
77:2
lawyer's  21:10
lay  137:11

Office (410) 821-4888
CRC Salomon, Inc.
2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com - info@crcsalomon.com
Facsimile (410) 821-4889
Page: 8

lead 14:*13*
16:*17*
learned 31:6
121:*14* 122:2
136:*15*
learning 9:*1*
136:*7*
leave 7:*11*
52:*11* 100:*17*
102:*5, 14, 17*
106:*8* 107:*3*
leaving 67:*13*
97:*3* 100:*11*
166:*9*
lecture 90:*14*
lecturing 18:*12*
led 73:9
leeway 18:9
left 10:*14* 52:*9,*
*18* 60:*20* 95:*9*
99:*3, 6* 102:*21*
103:*1* 106:6
133:*9* 141:*21*
142:*3* 152:6
162:*4, 8*
legal 47:*19*
49:*17* 50:*4*
69:*18* 112:6
116:*15* 123:*12*
132:*9*
length 12:*5*
lengths 104:*5*
level 44:2
license 145:7
lie 138:*21*
163:*18* 164:*4, 5*
Liebrecht 1:*15,*
*21* 169:*2, 17*
life 6:*1* 73:*21*
79:*18*
lift 43:*3, 8*
Light 2:*14*
7:*10, 13*
limit 90:*11*
line 96:*12*
107:*3*
lips 7:*18*
list 148:*15*

listed 144:*16,*
*20* 145:*17*
147:*14*
listened 110:*15*
little 8:2 16:7
29:*9* 45:*12, 13*
55:*20* 56:2
62:*7, 8, 11*
81:*21* 100:*20*
103:*7* 104:*12*
130:*16* 143:*18,*
*19* 146:*13*
149:*5, 8*
live 36:6 49:6
55:*2, 16, 18, 20,*
*21* 56:*3* 85:*13,*
*14* 87:*5, 8, 9, 10,*
*15* 88:*1* 89:*18*
90:*11, 21* 91:*17*
92:*3* 104:*11*
129:*9* 130:*2, 8,*
*16* 150:*21*
162:*11*
lived 56:*1*
58:*14* 86:*16, 17*
88:*4* 89:*12, 17*
90:*8* 129:*11, 13*
130:*5, 15* 131:*5,*
*12* 133:*8*
149:*11, 15*
150:*14* 151:*1*
152:*13, 14, 20,*
*21* 153:*4, 15*
154:*17, 19, 21*
162:*13*
lives 56:2
58:*20* 59:*3*
loaded 30:*17*
61:*1*
location 33:*5*
58:*20* 122:*8*
lock 14:*10*
locked 14:*11*
long 11:*13, 19*
39:*16* 44:6
57:*11* 104:*5*
105:*6* 153:*20*
154:2
look 23:*9* 43:2
46:*7* 100:*16*

109:*16* 110:*3*
126:*15* 156:*9*
looked 42:*14,*
*15* 58:*3* 101:*21*
102:*2, 3* 120:*21*
143:6 164:*17*
looking 42:*7, 8,*
*9, 18* 78:*20*
94:*10* 145:*11*
146:2 158:*16*
looks 7:*9* 27:*9*
76:2
lost 106:*1*
lot 13:*1* 14:2
115:*21* 147:*3, 5,*
*11, 20*
loud 126:2

< M >
M16 27:*18*
Mace 71:*5*
mad 129:2
maintain 96:7
majority 34:*12*
making 34:*15*
115:*10*
mall 10:2
man 17:*9*
18:*14* 20:*8*
45:*15* 74:2
79:*17* 81:*9*
85:*17* 86:*12, 17*
89:*9* 102:*15, 19*
104:*21* 105:*19*
107:*7* 123:*18*
132:*5* 143:2
146:*17*
manner 91:*10*
man's 18:*18*
23:*1* 24:*11*
25:*7* 26:*1, 8, 19*
Maps 58:*3*
Mark 48:*5, 7,*
*10* 51:6 87:*17*
marked 40:*12*
Mark's 48:*16*
49:*1*
married 57:*9,*
*11*

MARYLAND
1:*3, 7* 2:*7, 15*
10:*7, 18* 11:*11*
49:*12* 111:*18*
168:2 169:*1, 3*
mask 76:*2, 11*
77:*9, 16, 19, 20*
masked 42:*12*
73:*16* 77:*15*
masks 75:*12,*
*17* 76:*7*
match 163:7
materials 5:*18*
matter 143:*11*
mature 90:*8*
max 43:*13, 16*
maxed 43:*18*
mean 5:*1* 11:*4*
14:6 15:2 22:*8*
35:*18* 41:*1*
42:*21* 44:*9*
46:*9* 50:*16*
85:*14* 103:*19*
113:*4, 10, 12*
128:2 134:*13*
146:*5, 9* 147:*10*
Meaning 85:*13*
164:*5*
meant 36:2
mechanically
53:*17*
mechanisms
36:*5*
medical 17:*13*
19:*5*
meeting 148:*7,*
*9*
members
125:*15*
memory 99:*9*
men 45:*21*
46:*3* 53:*20*
54:*5, 6* 60:*8*
61:*4* 62:*16*
65:*15* 68:*12, 15,*
*19* 69:2 70:*12,*
*20* 72:*7* 73:*8*
74:*8, 16* 78:*20*
79:*17* 82:*6, 15*
86:6 88:*21*

89:6 107:*21*
114:*7, 13, 20*
115:*17* 117:*17*
119:*4* 128:*14*
150:*8* 156:*13*
157:6 162:*1*
Mentally 41:*5*
mentioned
14:*21* 61:*10, 14*
78:*7, 18* 105:*19*
merely 53:*21*
met 148:*4*
156:*10*
MF 91:*10*
middle 57:*7*
104:*15, 16*
military 145:*19*
millimeter
30:*15*
Mills 106:*19*
mind 17:*16, 20*
65:*2* 97:*5*
129:*15* 136:*20,*
*21* 137:*1* 138:*1*
minds 65:*2, 8,*
*13*
mine 31:*20*
63:*19* 136:*11*
minors 34:*1*
79:*5, 12, 20*
84:*7* 93:*11*
98:*20* 99:*21*
107:*11, 15*
125:2
minute 139:*17*
140:*12*
minutes 56:*7, 9,*
*21* 57:*18, 19*
105:*3, 7, 13*

Mischaracterizes
36:*14* 72:*14*
83:*4* 93:*7*
131:*14*
model 61:*15*
mom 121:*1*
130:*9* 133:*19*
134:*2, 9*
moment 45:*9*

72:18
**Monica** 2:20
**months** 11:14
**mother** 108:12
115:16, 18
123:14, 20
124:6 125:3
129:6 132:11
143:2 151:11,
21 155:12
158:12 163:15
**mother's**
119:14 121:11
**motion** 65:19
**Motorcycle**
62:3, 19 76:6
**Mount** 10:1
**move** 7:18
106:11
**moved** 80:4
106:12, 21
**moving** 10:3
99:9
**multiple** 52:5
**muscled** 82:16
**muscular** 46:7
**muzzle** 36:12

< N >
**name** 4:9, 15
48:2, 6 57:5, 7
58:6, 10, 11, 13
59:2 98:16
100:1 106:17
145:1
**named** 51:6
**names** 136:7
164:16, 17
**nearby** 126:20
130:8 131:6, 12
133:8
**necessary** 167:8
**need** 7:20
78:16 95:12, 13,
16, 17, 18
105:12 116:11
122:1 129:15
140:10 141:9
143:19

**needed** 73:10
121:12 167:19
**negative** 26:20
**neglected**
152:20
**neighbor** 42:7
48:2 87:17
**neighborhood**
49:7 58:7, 9, 14,
19 88:4 130:2
**neighbors** 63:20
**neighbor's** 48:1
73:1 85:15
**neoprene** 75:17
**never** 6:16
31:6 32:1
64:11 77:16
84:12, 17 101:6
111:14 119:11,
13 123:1
129:15 131:17
132:6, 11, 16
133:1
**news** 6:4, 7, 14,
15
**nicer** 78:4
**NICHOLSON**
1:4 15:18 30:2,
17 32:13 33:6
34:7, 14 36:11,
16 39:7 42:5,
10, 15 46:13
47:17 55:18
57:21 58:14
69:5, 6, 9, 11
77:16 98:17, 18,
21 99:9 100:4,
6 102:4, 13, 14,
19, 21 103:3
106:4 116:6, 19
117:3, 5, 9, 11
123:17, 18
124:13, 15, 18,
19 127:11
129:8, 13
131:17 132:6
138:7, 10 142:8
143:1, 3 144:17
148:9 158:21

162:12, 17, 18
168:2
**Nicholsons**
120:13, 16
121:5
**Nicholson's**
16:8 40:7
121:1 123:20
146:15 162:9
163:15
**nickname** 4:19
5:10
**nicknames** 4:13
5:9
**ninja** 76:2
**ninth** 9:13, 18
**normal** 78:10
102:11
**normally** 64:11
**North** 2:6
**notarial** 169:14
**Notary** 1:15
169:2, 18
**notes** 115:11
154:1, 3
**notified** 95:10,
14
**November**
145:14 154:2
**number** 29:6
163:15 164:2, 3,
9, 12

< O >
**Oakland** 106:19
**oath** 18:6, 8
**Objection** 6:17
12:6 13:18
14:4, 8, 15 16:4
17:1, 6, 10, 17
18:1, 19 19:17
20:5 22:5 23:2,
18 24:4, 8, 13
25:3, 18 26:4,
10 27:1, 14, 20
28:4, 10 29:3, 7,
11, 17 30:4, 10,
14, 18, 21 31:4,
10, 16 32:5, 9,
14, 18 33:2, 11,

18 34:3, 8, 16
35:11 36:13, 17
37:9, 15, 21
38:6, 13, 21
39:17 40:3, 9
43:5, 10, 15
44:3, 8 45:7
46:4 47:18
48:3, 11, 17
49:16 50:3, 13,
19 51:8, 14, 18
52:7 53:4, 9
54:11, 18 55:3
59:8 63:3, 10
65:4 66:11, 19
67:3 68:6
69:17 70:2, 8,
13, 21 72:8, 13,
19 73:5, 12
75:4, 9, 14, 18
76:16 77:12
79:1, 6, 13, 21
81:12, 17 82:3,
11 83:4, 16
84:14 86:1, 18
87:18 88:7
89:14 90:4, 18
92:11 93:6
96:8, 15 97:20
99:17 101:4
103:4 108:20
109:17 110:20
111:5 112:5, 16,
21 113:8, 16
114:15 115:19
116:14 117:1, 2
119:6 123:2, 5,
11 126:6, 21
127:7, 20
129:16 130:11
131:13, 19
132:8, 13, 18
133:3 135:14
136:9 137:5
141:13 147:8
151:5 152:8, 15
153:1, 10, 18
154:12 155:2
158:1, 6 159:6
160:19 161:5,

11, 16 162:5
163:3, 11, 19
**objections** 89:21
**observation**
146:21 147:2
**observe** 97:16
**observed** 58:16
61:4 63:1
69:16 93:2
**observer** 81:7
**observing** 96:12
**obviously** 97:12
118:1 130:2
146:21
**occurred** 34:20
55:1
**off-duty** 40:5, 6
52:17, 20
148:16
**office** 52:13, 19
**Officer** 4:8
11:5, 8, 16 12:1,
4, 11, 14 13:15
14:7 15:1, 5
41:15, 18 55:1
88:19 95:11
96:6 109:15
111:17 116:10
118:16, 18
119:21 126:11
148:17 149:14,
21 150:3, 7
154:1 155:19,
20 156:5
157:11, 12, 19
158:4, 11
162:11, 16, 19
165:17 166:8
**officers** 15:6
96:14 111:21
112:9, 11, 14
113:5, 7, 13, 14
114:20 115:12,
17 116:2, 11, 21
117:14 118:5
120:13 121:7
135:19 147:13,
15 160:13
**officials** 23:15

Office (410) 821-4888
CRC Salomon, Inc.
2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com · info@crcsalomon.com
Facsimile (410) 821-4889
Page: 10

Deposition of Damond Durant, Volume I

Case 1:20-cv-03146-DKC   Document 102-2   Filed 03/01/24   Page 55 of 62

Jawone D. Nicholson vs. State of Maryland, et al.

**Oh** 57:2 64:14
65:1 81:1
120:17 130:20
164:6
**Okay** 5:4, 21
6:15 7:3 8:1,
21 9:7 10:10
12:9, 21 13:9
15:7, 10, 16
16:1, 7, 16 17:4,
20 19:8 20:2, 8
21:17 22:1, 15,
20 23:5 25:13
27:4, 17 28:13
29:9, 15 30:1,
13 32:12 33:8
34:6 35:6
36:10 37:3, 6
38:17 40:1, 6
41:7 42:17
43:8 44:1, 6, 18
45:11, 21 46:7,
11 47:2, 13
48:15 49:1, 5, 8
51:1 52:5, 14,
18 53:12, 15
54:4, 14, 21
55:17 57:5, 17
60:8, 19 61:9,
10, 17, 19 62:4,
10, 13 63:6, 16
64:8 65:11
67:13 68:14, 19
69:2, 14, 21
70:15 71:3, 17
72:4, 16 73:3, 8
75:7 77:7
79:16 80:3
81:7 85:15
86:5 87:21
88:21 89:7
90:2 91:3 92:2
93:15, 21 94:12
95:7, 9, 10 96:6
99:8, 12, 20
101:8, 18 102:9
106:21 107:3, 7
108:13 109:8,
20 111:2, 12, 21
112:3 113:20

116:1, 10
117:11 118:4, 9
119:3 120:12
121:4, 10 122:1,
4 123:9 124:8,
15 125:15
126:14 127:13,
17 128:6, 10, 12,
17 133:6 134:8,
13 136:12
137:10, 17
138:4, 12, 21
139:3, 8, 17
140:8 141:12
142:2, 6 143:18,
21 144:3, 11
145:1, 17 146:7
147:17 148:14
149:9, 21 151:8,
15, 19 152:3
154:15 156:20
157:5 158:4
160:3 161:9, 14
164:1, 4, 8
165:1
**old** 45:15
85:21 90:7
146:16, 19
**older** 140:8
147:3, 5, 11
**once** 7:19 19:2,
4 28:17 65:7,
12 79:4, 12
84:8 85:1
103:19 129:6,
12 130:17
136:14
**ones** 23:15
51:1 113:6
**on-the-job**
13:11, 16 16:3
**open** 49:12
166:9
**operable** 54:14
**operate** 53:15
**opportunity**
12:3
**opposite** 103:15

**option** 53:21
54:2, 3, 13, 15,
17, 20
**order** 50:10
91:15
**ordinarily** 70:15
**original** 122:8
**outcome** 37:17
169:13
**outline** 27:13,
19
**outside** 35:4
41:14 73:19
82:2 94:11
139:15 140:11
141:4 142:15
**owned** 30:3
**owner** 27:4
49:20 50:11
51:5

**< P >**
**P.C** 2:5, 13
**p.m** 166:11
**pad** 42:6 48:9,
13 49:2, 9
58:15 60:2
61:9, 12 62:2,
15, 19 63:17
64:1 87:12
98:9
**pads** 42:11
64:1 87:16
103:15
**Page** 3:5
167:20
**PAGE/LINE**
168:4
**paid** 17:15
**paper** 121:1
167:20
**park** 87:12
104:16
**parked** 40:12
87:12, 20 88:1
89:9 103:12
**parking** 39:9,
10 42:4, 6, 11,
16 46:1 48:1, 9,
13 49:2, 9

58:15 60:2
61:9, 10, 12
62:2 63:17, 21
64:1 87:12, 16
98:9 103:15
147:20 148:21
**part** 78:19
96:11 97:15
115:6 139:14
155:5
**particular** 65:1
95:1
**parties** 142:7
166:1 169:12
**partner** 20:15
**party** 67:16
135:8
**passed** 93:13
**patrol** 40:16
**paved** 104:12,
13
**pay** 26:19
**paying** 26:2
**pending** 10:15
**people** 4:20
5:4 14:10 18:7
23:9, 21 42:17
48:9 50:17
64:10 74:3
75:1 78:21
87:15 92:7
93:8, 13 110:1
124:1, 3, 8, 9, 10,
13 125:3, 6, 10,
16 126:9
134:21 135:18
147:10 149:10
152:12 164:16
**people's** 136:7
**Perfect** 7:16
**permission**
30:6, 7 48:16
49:2
**permit** 9:16
**person** 20:20,
21 41:5 56:14
68:2 71:18, 19
88:4 93:21
123:19

**personal** 28:6
30:6 41:12
**personally** 29:2,
15 30:3 169:4
**perspective**
84:16
**persuaded**
102:4, 13
**PFC** 148:3
150:12 156:10
163:14 164:9
**Pharmacy** 10:7,
8
**phone** 105:3
109:5 110:11
**photographs**
6:20, 21 7:7
**physically**
71:20 134:21
**physique** 45:5
**pickup** 53:11,
12 54:1, 14
**picture** 82:14
84:3 116:2
145:7
**piece** 62:11
121:1 167:20
**place** 20:9
60:16 110:9
134:20 169:5
**Plaintiff** 1:5
2:3
**plan** 61:6
**plans** 12:21
**play** 7:6 44:12,
15, 16
**played** 44:16
**pleasant** 66:15,
17 67:2 85:16
**please** 4:9
10:5 28:17
29:1 90:14
132:1
**plus** 124:13, 15
125:2
**pocket** 33:15
35:8, 9, 13, 14,
17, 20 36:2, 3, 4,
6, 8 60:21 70:6,
19 80:13 81:8

Office (410) 821-4888
CRC Salomon, Inc.

2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com • info@crcsalomon.com

Facsimile (410) 821-4889
Page: 11

82:*1, 2, 5*  88:*17*
97:2  101:*1, 19*
103:*3*  127:5
**point**  22:*15*
24:*17*  31:7
32:2, *17, 20*
36:*11, 16, 20*
37:*3*  54:4
56:*15*  74:*17*
79:*18*  90:9
91:*11*  95:*10, 14,
18, 19*  96:*1, 2,
21*  97:6  107:*4,
14*  108:*17*
127:*18*  129:*10*
133:*19*  141:*4*
142:6, *18, 19*
149:9
**pointed**  36:*12*
100:*15*
**points**  83:*11*
**police**  10:9
11:*15*  12:*1, 10,
13*  13:*15*  14:7
15:*1, 5*  23:*14*
40:*12*  41:*15, 18*
54:2, *9, 17, 21*
55:*13*  78:*15*
88:*19*  91:8, *9,
12, 14*  92:*13, 16*
93:*16, 18, 19*
94:4, *5, 9, 13, 15,
16*  95:8, *11*
96:6  101:*21*
102:7  109:*4, 12,
20*  110:*5, 11*
111:2, *8, 17, 21*
112:9, *10, 14, 18,
19, 20*  113:*13,
14*  114:7
115:*11, 13, 17*
116:*10, 11*
118:2, *15, 18*
119:*21*  120:*3, 7*
123:*15*  125:*17,
21*  126:5, *10, 13*
127:*14*  128:4,
*11, 15*  129:*3, 4,
14*  130:4, *6, 19,
21*  131:5  133:9

134:*18*  135:*1, 3*
138:6, *18*  139:*1*
141:*18, 20*
142:7  143:*10,
15*  144:9  146:7
148:*17*  152:*1*
157:7, *10*
158:*11*  161:*21*
162:*1*  163:*2*
164:*13, 15, 20*
**policing**  9:5
**position**  54:9
**Possibility**  71:2
77:*14*  83:9
88:*20*  89:*1, 5*
97:7
**possible**  76:*13*
89:2
**possibly**  121:*12*
**Potato**  9:*19*
10:6
**potential**  38:*18*
111:*10*  122:*13,
18, 20*
**potentially**
71:*11*
**pounds**  45:*10*
46:3, *12*  82:*19*
83:*21*  89:*10*
**powers**  120:*3, 7*
**precipitation**
59:*11, 18*
**precise**  45:9
**preparation**
5:*15*
**prepare**  143:6
**prepared**  32:*12*
**presence**  40:7
112:4  115:*18*
127:5  131:*18*
132:4, *7, 12, 17*
133:*1, 8*  137:*3*
**PRESENT**
2:*20*  10:4
**press**  43:*14*
121:*12, 17*
122:*1*
**pretty**  5:*12*
19:*11*  104:*14,*

17  128:*20*
130:*15*
**prevent**  67:5
**Prior**  39:*3*
119:*1, 4*
**probable**  83:9
89:*4*
**probably**  20:*20*
29:8, *13*  46:*13*
72:*12*  75:*20*
81:*4*  83:6, *13,
18, 20*  86:*12*
88:*10*  89:*4*
**problem**  8:*1*
50:8  129:5
141:*15*
**procedure**
20:*19*
**proceed**  62:*15*
138:5

**PROCEEDINGS**
4:*1*  57:*15*
169:*10*
**process**  23:8
**produced**  144:*5,
6*  160:*5*
**product**  35:7
**property**  48:*1*
49:*20*  61:8
63:*2, 7*  64:5
72:6, *7, 17*  73:*1,
2, 11*  81:2
85:*13*  87:6
88:5  89:*12*
90:*21*  91:*16*
92:3  94:*14*
**protect**  75:*13*
76:7
**provided**  163:*14*
**psychotic**  41:6
**Public**  1:*15*
23:8, *20*  106:*12,
15, 16*  120:*1*
169:2, *18*
**publicly**  23:6
**pull**  64:*18*
68:*20*  78:4
101:*1*  105:*20*

**pulled**  28:8, *12*
30:*1*  34:*1, 7*
46:*14*  47:*10, 11,
14*  48:8  51:*11*
54:*15*  60:*13, 15*
64:*20*  77:*17, 21*
87:*12*  101:7, *11*
103:2  104:*21*
120:6
**pulling**  47:2
51:*4*  55:*13*
65:*14*
**purpose**  33:8
42:*18*  136:*16*
152:7  162:*4*
**purposes**  36:*1*
**pursuant**  166:9
**pushups**  44:9
**put**  29:6  56:*13*
89:*16*  93:*16*
108:*19*  109:2
144:9  146:5
161:*15*

**< Q >**
**quest**  114:*11*
**question**  28:*15,
18*  34:*11*  50:8
65:6  68:7, *9*
80:5  88:*15*
89:8  90:*15, 16*
95:5  97:*14*
122:4  127:2
130:*18*  133:6
150:*13*  152:*17*
161:7
**questioning**
44:*20*
**questions**  18:5,
*11*  28:*18*  29:*1*
67:*10*  87:5, *7*
155:*14, 16, 18*
156:2, *14*
162:*17*
**quick**  129:*12*
**quickly**  116:7,
*20*  117:*12*
122:*16*  129:8
130:*10*

**quite**  77:9
78:*12*  113:*4*
145:*10*
**quote**  117:2

**< R >**
**race**  74:*10, 12,
18*
**racism**  73:*20*
74:*3*
**racist**  74:*1, 3*
**radio**  71:5
**rain**  59:*17, 18*
**raise**  102:9
**RAM**  61:*16*
**range**  83:*15*
146:*4*
**ranges**  86:6
**reached**  100:*11*
**reacted**  100:9
**reaction**  78:*3*
**read**  65:2, *8, 13*
167:*3*  168:*4*
**reader**  65:2
138:*1*
**reading**  154:*4,
5, 16*  159:*3*
**ready**  31:*3*
61:*1*  81:*21*
**realize**  84:6
107:*19*  116:*10*
**really**  4:*20*
14:*18*  15:*19*
43:*1*  44:*20*
73:*15, 18*  75:7
77:6, *7, 8, 17*
78:2, *4, 5*  98:*12*
99:*15*  108:*15*
121:*13*  134:*4*
143:*17*  161:*19*
**reask**  68:8
**reason**  15:*14*
69:*21*  111:*12*
165:9  168:*4*
**reasonable**  77:9
**reasonably**
60:*10*  81:*4*
**recall**  13:*13*
21:*19*  34:*19*
100:*1*  114:*10*

Deposition of Damond Durant, Volume I

Case 1:20-cv-03346-DKC   Document 102-2   Filed 03/01/24   Page 57 of 62

Jawone D. Nicholson vs. State of Maryland, et al.

128:*12, 17*
143:*6* 154:*14*
**receive** 26:*13*
**receiving** 10:*8*
**recess** 45:*3*
105:*17* 165:*15*
**recognize** 34:*13*
79:*11* 141:*13*
**recognized**
78:*20*
**recollection**
145:*13* 149:*3*
**record** 18:*12*
23:*21* 36:*1*
42:*19* 44:*21*
45:*2* 56:*14*
83:*11* 90:*15*
105:*16* 106:*2*
165:*12, 14, 16*
166:*7* 167:*5*
169:*10*
**recorded** 169:*9*
**records** 78:*16*
**recreation**
44:*17*
**red** 27:*13*
**reference** 69:*3*
**referred** 113:*5*
**referring** 5:*9*
94:*4, 9*
**reflect** 83:*11*
**refresh** 145:*13*
149:*2*
**refused** 159:*19*
160:*6* 161:*10*
**regret** 92:*18, 20*
**regularly** 50:*16*
**related** 5:*21*
6:*10, 13, 20, 21*
140:*20* 142:*15*
**relationship**
28:*13* 119:*4*
**relatively** 82:*8,*
*16* 84:*2*
**Relevance**
27:*14, 20* 28:*5*
29:*3, 11* 31:*10*
43:*5, 10* 132:*13,*
*18* 133:*3*

**Relevancy**
29:*17* 34:*4*
45:*7* 86:*1, 19*
126:*7* 127:*20*
**relieved** 112:*10*
118:*6*
**rely** 78:*15*
**remain** 53:*21*
157:*6*
**remaining**
55:*12*
**remarkably**
162:*10*
**remember**
15:*19* 21:*9, 10,*
*11, 21* 22:*1*
34:*21* 35:*1*
45:*9* 49:*10*
53:*6* 58:*12*
59:*2, 12, 15, 17,*
*18, 20* 62:*14*
70:*14* 71:*16*
77:*20* 80:*10*
85:*11* 89:*3*
91:*13* 98:*6*
99:*5, 8, 13*
102:*16* 103:*6*
106:*20* 107:*18*
108:*6, 13, 16*
110:*14* 111:*13*
114:*17* 124:*21*
127:*16, 17*
128:*1* 140:*16*
150:*4, 9* 151:*2*
153:*3* 154:*5, 6,*
*16* 155:*1, 5, 8,*
*15* 156:*19, 21*
157:*4, 8, 9*
162:*11, 16*
**remote** 7:*17*
**remotely** 1:*13*
**removed** 32:*21*
33:*9* 101:*18*
157:*12*
**Renewed** 24:*8*
**Repeat** 82:*13*
127:*2* 152:*17*
**repeating** 50:*7*
**replied** 149:*15*
150:*14*

**report** 118:*2*
143:*16* 144:*9*
145:*11* 146:*8*
156:*7* 158:*16*
160:*13* 164:*13,*
*15, 20*
**REPORTED**
1:*20*
**reporter** 7:*12,*
*18*
**reporter's**
150:*11*
**reports** 78:*16*
143:*10*
**represent** 160:*3*
**reprimands**
21:*4, 6*
**request** 164:*20*
**requested**
164:*13*
**require** 52:*14*
**Resisting** 20:*17*
**resolved** 131:*9,*
*11*
**Respond** 41:*3*
110:*5* 129:*15*
133:*10*
**responded**
112:*1* 116:*21*
147:*13*
**responding**
28:*19* 121:*6*
**response** 28:*21*
40:*20* 91:*17*
92:*4* 129:*13*
152:*19*
**responsible**
131:*2*
**rest** 86:*4*
**result** 12:*2*
25:*6, 11, 14*
26:*1, 7, 18*
55:*14* 141:*13*
**retirement**
12:*21*
**return** 139:*6*
**Retz** 8:*15, 18,*
*20*
**R-E-T-Z** 8:*20*

**reviewed** 5:*13,*
*15, 17, 19*
**ride** 76:*6*
**ridiculous**
134:*14*
**rifle** 27:*13, 18*
**right** 4:*15* 5:*6*
6:*6* 10:*3, 21*
11:*11, 19* 12:*15,*
*19* 13:*5* 16:*3*
17:*5* 18:*5*
21:*13* 22:*4, 12,*
*18, 20* 23:*1, 17*
24:*2, 3, 19* 27:*8,*
*13, 19* 28:*2, 9*
29:*16* 30:*1*
32:*8* 33:*1, 6*
34:*7, 11, 14*
35:*15* 36:*7*
38:*20* 39:*14*
40:*8* 41:*12*
43:*13* 44:*2, 14*
46:*2* 47:*14*
48:*10* 49:*15*
50:*15, 18* 51:*2,*
*11, 13, 17* 52:*3,*
*6, 21* 54:*2, 5, 10,*
*17* 55:*2, 10, 15*
56:*8, 20, 21*
57:*1* 58:*6, 16*
59:*4* 60:*11, 13*
61:*2* 62:*20*
64:*15* 66:*7, 10*
67:*17, 18, 20*
70:*16, 20* 71:*9*
72:*2, 7, 12* 73:*4*
74:*19* 75:*8, 17*
76:*4, 8, 12, 15,*
*21* 77:*10* 78:*5,*
*18, 21* 79:*5, 12,*
*20* 80:*4, 20*
81:*1, 5, 11* 82:*2,*
*10, 17, 19, 21*
83:*2, 3, 19* 84:*7,*
*13* 85:*14* 86:*6*
87:*13, 15, 16*
89:*6* 92:*5* 93:*5*
94:*1, 5, 17* 95:*2,*
*5, 9* 96:*7, 13, 19*
97:*2, 5, 12, 19*

98:*19* 99:*16*
100:*7, 19* 101:*1,*
*12, 14* 102:*7, 17*
103:*8, 9, 13, 18,*
*20* 104:*21*
105:*21* 106:*6,*
*13* 110:*19*
111:*19* 112:*13*
113:*7* 114:*14,*
*21* 115:*2, 4, 8,*
*13* 116:*3, 8, 13,*
*21* 117:*9, 14, 20*
118:*2, 19*
119:*16* 120:*1, 4*
121:*15* 122:*2*
123:*9, 21* 125:*4,*
*8* 126:*5, 20*
127:*11, 13*
128:*8, 21*
129:*10* 130:*17*
132:*5* 133:*15,*
*20* 134:*19*
136:*2, 8* 138:*4,*
*14, 19* 141:*2*
142:*14, 19*
145:*9* 146:*11,*
*18* 147:*7*
148:*18* 149:*19*
150:*1* 151:*3*
152:*21* 153:*9*
154:*17, 19*
155:*9* 157:*8, 17*
158:*14* 159:*17*
160:*18* 161:*4*
163:*2* 164:*10,*
*13, 18* 166:*4, 6*
**Ring** 63:*14*
**Rock** 4:*17, 18*
5:*4, 6, 11*
**roof** 60:*3, 10*
**room** 7:*10*
28:*21* 56:*8, 10,*
*15, 18* 103:*17*
104:*15*
**rough** 140:*6*
**roughly** 36:*7*
86:*7* 140:*5*
**round** 30:*20*
**RPR** 1:*21*

Office (410) 821-4888
CRC Salomon, Inc.

2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com - info@crcsalomon.com

Facsimile (410) 821-4889
Page: 13

169:*17*
**rule** 31:*6, 8*
**run** 11:*10*

**< S >**
**sac** 55:*21*
103:*7*
**safe** 96:*13*
97:*11, 17, 18*
110:*18*
**safety** 32:*8*
90:*12*
**saw** 6:*15, 16*
19:*11* 42:*5, 17*
46:*1* 48:*8*
51:*12* 67:*20*
74:*18* 81:*10*
88:*21* 93:*5*
94:*7* 99:*21*
120:*17* 123:*19*
**saying** 7:*12*
24:*1* 26:*14*
31:*19* 32:*1*
34:*10* 88:*13*
90:*5* 99:*13*
100:*16* 137:*17*
146:*11* 153:*4*
154:*6* 156:*8*
157:*2, 8, 9*
164:*6*
**says** 148:*3, 20*
149:*10* 151:*8,*
*11* 155:*11, 12,*
*20* 156:*10, 12*
157:*5, 11*
158:*10, 16*
159:*17* 163:*14*
**scan** 144:*19*
**scared** 51:*12*
54:*10* 60:*14*
61:*5* 73:*9*
80:*11*
**scene** 123:*20*
129:*8* 134:*7*
140:*17* 148:*13*
**school** 8:*5, 6, 8,*
*10, 12, 14* 9:*1, 4,*
*7, 10, 11, 13*
10:*11* 44:*7, 14,*
*16* 73:*15* 74:*8*

78:*7, 10, 18, 21*
146:*2* 147:*1, 6,*
*10, 11*
**screen** 27:*9*
42:*18* 143:*15*
144:*1*
**seal** 169:*14*
**seat** 19:*20*
**seated** 19:*15,*
*21* 20:*3, 9, 10,*
*13* 53:*21*
**second** 44:*21*
56:*14*
**seconds** 56:*7*
**secured** 52:*16*
**see** 4:*15* 7:*18,*
*20* 19:*6, 8*
22:*13, 16* 33:*6,*
*10* 42:*12, 13*
47:*4, 7, 13, 16*
54:*5* 61:*8* 66:*3*
67:*21* 68:*3, 11,*
*14* 69:*11, 20*
74:*13, 18* 77:*21*
81:*1* 82:*8* 84:*4*
93:*1, 11* 98:*20*
109:*9, 10*
123:*14* 138:*7, 8,*
*10* 140:*14, 19*
143:*13, 14, 18*
144:*14, 17*
145:*1* 148:*1, 5,*
*10, 12* 149:*12,*
*17, 18* 151:*13*
152:*2* 156:*3, 4*
157:*14, 15*
158:*19* 159:*4, 7,*
*13, 16, 20*
162:*14, 20, 21*
163:*16, 17*
**seeing** 6:*10*
51:*5* 53:*19*
82:*16*
**seek** 166:*1*
**seen** 5:*21* 6:*4,*
*9, 21* 47:*11*
64:*11* 68:*2*
69:*19* 73:*3*
81:*8, 11* 82:*15*
84:*9, 12, 17*

134:*16* 139:*14*
142:*14* 143:*5,*
*10*
**sending** 135:*20*
**sense** 24:*1*
154:*9*
**sent** 135:*10*
138:*15, 17*
139:*3*
**separated**
142:*7* 163:*1*
**September**
169:*20*
**seriously** 134:*1*
**service** 40:*5*
**set** 7:*13* 169:*5*
**settled** 17:*15*
23:*9* 24:*10*
**settlement**
23:*16, 17* 25:*6*
**settlements** 23:*5*
**Seven** 29:*8*
56:*9, 21* 57:*17,*
*19* 105:*7*
**sgoldberg@bake**
**rdonelson.com**
2:*17*
**shaking** 55:*18*
**shape** 42:*21*
44:*9*
**Sharae** 57:*6*
**Sheet** 167:*8, 19*
168:*1*
**shift** 39:*16*
**shipping** 10:*8*
**shirt** 27:*8, 11*
**shore** 131:*16*
**shorter** 12:*4*
**shortly** 107:*8*
**shoulder** 80:*18,*
*19*
**show** 7:*7*
**showed** 108:*12*
128:*4, 6, 8*
**showing** 84:*1*
143:*13, 14*
**shown** 96:*1*
**side** 60:*5*
104:*20*

**sight** 96:*13*
107:*3*
**sign** 49:*14*
50:*1, 11* 51:*5*
**signs** 49:*8*
**similar** 70:*19*
81:*8* 162:*10*
**simply** 54:*15*
**sir** 4:*14* 5:*18*
6:*3, 11* 7:*2, 8,*
*16, 20* 8:*11, 14*
10:*13, 16* 12:*9*
13:*13* 14:*20*
15:*12* 17:*14*
18:*17* 25:*5*
26:*7* 28:*2, 15*
29:*2, 20* 31:*12,*
*21* 33:*14* 42:*2*
45:*20* 46:*6*
50:*16* 53:*8*
56:*9, 12, 18*
57:*1* 58:*18*
66:*6, 18* 67:*7*
68:*3, 18* 74:*2, 6*
76:*20* 77:*19*
79:*9* 83:*13*
89:*8* 90:*10, 16*
97:*14* 104:*3, 12*
105:*9, 21* 123:*7*
129:*18* 131:*1,*
*20* 138:*2* 144:*1,*
*14, 17* 147:*16*
148:*5* 150:*10*
152:*19* 154:*1*
155:*4, 19* 159:*1*
**sister** 113:*7*
**sisters** 113:*6*
**sitting** 19:*2*
47:*9* 53:*19*
**situation** 16:*8*
21:*2* 37:*5, 8, 14,*
*18* 38:*19*
113:*19* 118:*10*
**situational** 96:*7*
97:*16*
**six** 145:*9, 10*
**size** 46:*15, 21*
103:*17*
**Ski** 75:*17*

**sleep** 7:*14*
**slide** 18:*10*
**slip** 17:*20*
**slipped** 17:*16*
**small** 103:*11*
**smaller** 46:*2*
**smiling** 133:*15*
**soft** 53:*13*
**solution** 129:*5*
**solve** 129:*4*
**somebody**
21:*18* 56:*8, 11,*
*20* 76:*11* 77:*9*
78:*3* 93:*16*
122:*16* 126:*19*
131:*2* 157:*6, 9*
**somebody's**
49:*13* 73:*10*
**sorry** 15:*12*
21:*5* 24:*17*
26:*12* 28:*3*
29:*20* 31:*13*
44:*19* 48:*6*
55:*8* 74:*11*
82:*13* 86:*21*
105:*2* 106:*20*
107:*12* 127:*2*
150:*10* 159:*1*
165:*3*
**sort** 74:*21*
113:*19* 130:*6*
**sorts** 76:*7*
114:*8*
**sound** 74:*21*
**sounds** 126:*1*
**speak** 15:*6*
64:*7* 85:*3, 6*
107:*21* 108:*3*
125:*19*
**speaking** 25:*16*
34:*12* 85:*8*
**specialized**
40:*17*
**specific** 25:*8,*
*10* 29:*9*
**speculation**
75:*5* 81:*13*
111:*6* 130:*12*
162:*6* 163:*12*

Deposition of Damond Durant, Volume I — Jawone D. Nicholson vs. State of Maryland, et al.

Case 1:20-cv-03146-DKC     Document 102-2     Filed 03/01/24     Page 59 of 62

speech 126:*1*
spell 4:*11* 8:*19*
split 76:*19*
spoke 85:*9*
146:*17* 147:*1*
spoken 128:*18*
sports 44:*12, 14*
spot 42:*16*
64:*10*
square 77:*3*
SS 169:*1*
stand 40:*19*
standing 19:*15*
20:*4, 8, 11* 56:*6*
58:*1* 109:*3*
151:*9* 153:*7*
155:*7*
stands 144:*20*
start 9:*7* 13:*1*
20:*3* 87:*4*
started 27:*7, 11*
79:*15* 84:*8*
91:*2*
starting 10:*3*
STATE 1:*7*
11:*10* 112:*6*
168:*2* 169:*1, 3*
statement
138:*8* 158:*18*
159:*8, 18* 160:*4,
7, 8, 11, 14, 17*
161:*4, 15*
statements
163:*7*
STATES 1:*2*
stay 76:*11*
100:*21*
stayed 10:*6*
staying 44:*9*
98:*21* 99:*3*
STENOGRAPH
ICALLY 1:*20*
169:*9*
step 56:*11*
stepping 60:*10*
steps 67:*14*
98:*4, 6*
stood 101:*21*
113:*2*

stop 64:*20*
84:*19* 141:*10*
stopped 80:*9*
85:*1* 102:*3*
stopper 62:*11*
stopping
120:*11* 121:*19*
story 96:*3*
straight 62:*17,
18*
stranger 87:*3*
90:*3*
strangers 89:*20*
90:*6, 17*
strap 80:*18, 19*
Street 2:*6, 14*
39:*11, 12, 13*
56:*3, 5* 58:*20*
61:*11* 87:*13, 20*
88:*1* 89:*9*
106:*12, 14, 15,
16, 17, 20* 107:*6*
129:*11*
strong 42:*19*
Struck 19:*4*
struggling
145:*12*
STUART 2:*12*
56:*16* 166:*4*
study 9:*2*
studying 8:*21*
stuff 4:*21* 5:*1*
44:*9* 82:*8*
138:*2* 145:*12*
154:*5*
style 27:*18, 19*
35:*17, 20* 36:*2*
subject 73:*20*
74:*3*
subjects 149:*15*
150:*13* 151:*9*
155:*13* 156:*1*
substantially
46:*1*
Sue 45:*1*
suggest 163:*8*
suggesting 56:*9*
superiors 22:*3,
17, 20* 23:*14*

suppose 14:*20*
86:*12*
supposed 36:*6*
101:*2*
sure 19:*11*
34:*15* 43:*16*
44:*11* 45:*1*
47:*10* 56:*10*
67:*8* 68:*10*
74:*5* 82:*14*
90:*16* 95:*18*
103:*14* 105:*4*
108:*14* 110:*13*
114:*9* 124:*1, 5,
12* 126:*18*
127:*3* 133:*21*
134:*4, 11* 144:*6,
7* 146:*6, 14*
surface 36:*3*
Susan 1:*14, 21*
169:*2, 17*
suspect 16:*11*
suspended
166:*11*
suspicious
73:*19* 109:*21*
110:*1*
suspiciously
42:*8*
swear 111:*18*
136:*15, 19, 20*
137:*4*
swearing 136:*16*
swinging 20:*12,
16*
swore 111:*14*
sworn 4:*4*
146:*10* 169:*6*
synopsis 162:*3*

< T >
take 8:*7* 18:*14*
22:*11* 25:*14*
41:*9* 52:*15*
56:*7* 57:*17, 19*
90:*7* 98:*4*
105:*3, 4* 109:*5*
134:*20* 142:*6*

taken 45:*3*
105:*17* 143:*10*
165:*15*
talk 26:*21*
39:*3* 66:*8, 10*
69:*14* 89:*19*
90:*6, 17*
talked 108:*6,
11* 134:*20*
135:*7, 8* 138:*6,
7* 153:*6*
talking 21:*11*
33:*20* 34:*6, 13*
45:*5* 79:*15*
98:*13* 99:*12*
108:*7, 15*
122:*15* 163:*2*
tall 145:*9*
taller 46:*9, 10*
taser 71:*5*
taught 38:*4*
teach 38:*2* 87:*2*
Team 40:*20, 21*
technique
37:*20* 38:*5, 12*
techniques
37:*18*
teenage 140:*8*
teenager 140:*5,
7*
Telephone 2:*8,
16*
tell 4:*5* 5:*13,
14* 9:*8, 10* 16:*8*
18:*17* 20:*2*
27:*18* 42:*5*
50:*11* 51:*6*
64:*6* 65:*12, 13*
72:*16, 18* 79:*4,
19* 84:*18* 85:*4,
10, 11* 86:*17*
88:*4* 89:*12*
91:*1, 6, 17* 92:*8,
10* 93:*17, 18*
95:*17, 18* 98:*11*
100:*7* 102:*14,
18* 109:*15*
110:*11* 117:*16*
121:*10* 122:*10*
128:*10* 129:*14*

135:*3* 138:*12*
140:*1* 150:*7, 20*
151:*1, 15, 17*
152:*21* 153:*14,
15* 154:*10, 21*
156:*15, 18*
159:*4, 9* 161:*9*
telling 15:*16*
55:*19* 85:*9*
87:*4* 88:*6*
90:*11* 109:*21*
122:*15, 16*
126:*9* 134:*1, 5*
137:*10* 142:*4*
150:*9* 152:*11,
14* 155:*8*
156:*19* 157:*1*
temperature
60:*9*
ten 29:*8*
tens 17:*15* 26:*2*
term 145:*20*
terminated
10:*10, 12*
termination
10:*14*
testified 4:*6*
76:*17* 83:*8*
117:*3*
testify 90:*14*
testimony
36:*14* 72:*14*
83:*5* 93:*7*
131:*14* 167:*5*
thank 4:*8* 7:*16,
20* 12:*9* 166:*8,
10*
theory 101:*2*
thin 46:*3*
thing 5:*9*
23:*10* 67:*20*
74:*9* 75:*3*
84:*19* 88:*16*
126:*16* 151:*8*
162:*18*
things 22:*8*
76:*2* 113:*7*
114:*8* 117:*20*
118:*2* 156:*12*
157:*3* 163:*9*

Deposition of Damond Durant, Volume I

Case 1:20-cv-03146-DKC    Document 102-2    Filed 03/01/24    Page 60 of 62

Jawone D. Nicholson vs. State of Maryland, et al.

**think** 14:2
18:3, 6, 8  19:14
21:2, 15  26:15
29:14  31:12
36:8  39:18
40:17  41:11
46:11  48:7, 9
51:6  52:9, 18
57:17  65:11
66:13, 14  67:1
76:2, 17  80:14
83:8, 9, 10
92:15, 19
108:14  110:1,
13  119:9, 16
120:8  121:6
131:14  134:8
135:11, 19, 21
136:2  139:10
140:16  146:11,
13  151:3, 17
152:6  153:13
156:5, 16, 17
158:4  162:4
**thinking** 13:1
64:17
**thinks** 36:15
**third** 125:12
**thought** 34:10
38:10  49:19
92:8  95:4
147:3, 11  149:5,
7  164:6
**thousands**
17:15  26:2
**threat** 10:14
88:18, 20  89:1,
6  97:1, 6  100:9
**threaten** 68:20
**threatened**
100:10
**threats** 96:12
**Three** 11:19
13:6  105:13
125:2, 3, 6, 10,
15  126:4, 15
127:18  128:6
129:13  133:18
134:2

**Thursday**
165:19
**tight** 77:18
78:4
**time** 4:8  10:4
21:17  22:13
30:16  34:12, 13
35:2  40:15
43:9, 18  45:6,
14  47:5  51:4,
20  52:2  56:15
58:15  61:1
63:13  72:4, 6
73:4, 7  78:8, 13,
16, 17  85:18
103:13, 16
105:9  108:9, 10,
11  122:6  128:7
140:2  141:4
142:18  144:13
145:5, 6, 12, 17,
19, 20  146:5, 19
149:3, 4, 7, 9
153:21  154:2,
14  158:10
163:9  166:8
169:5
**times** 128:21
**tiny** 143:17
**titled** 143:15
**today** 4:9
45:11, 15
114:19  115:7
143:6  157:17,
21  166:8
**told** 19:2  21:2
25:15  49:15
65:8  89:19
90:2, 17  91:11
93:15  101:20
108:5  114:20
115:5, 7, 10, 11,
15, 16  116:5, 20
117:13  118:15
126:12, 17
135:6  138:17,
19  146:21
148:16, 20
149:15, 19, 21
150:4, 12, 16, 17,

19  151:10, 11
152:3  153:8, 12
155:19, 20
157:5, 11, 16, 20
158:12  160:12
161:13, 20, 21
162:1, 11, 16
**tone** 102:11
**tool** 38:8, 10,
16, 19
**tools** 38:18
**top** 53:13
143:14
**tops** 54:7
**touch** 68:15
137:14
**touched** 88:17
**trade** 8:6, 10,
14  9:1, 4, 10
**trained** 37:19
38:11, 17  44:1
96:6
**training** 12:4
24:12, 18  25:8,
9, 10  32:8
39:19, 20, 21
40:1  44:6
52:11  97:16
**transcript**
167:4  169:9
**translate** 145:19
**transmission**
106:1
**transpired**
143:1
**trash** 62:8
80:21  81:3
82:7  84:2
86:14  88:2
89:11
**treated** 118:7
119:9
**tree** 104:14, 16,
20
**Tremmell** 4:10,
11
**T-R-E-M-M-E-
L-L** 4:12
**trespassing**
47:20, 21  49:8,

11  50:2, 10
51:1, 7
**tried** 7:13  18:3
**trigger** 101:8
**trouble** 64:13
91:21  92:5, 7
**truck** 47:9
53:11, 12  54:1,
15  61:14, 15
**true** 14:20
135:16  150:12,
17  163:8  167:5
169:10
**truth** 4:5, 6
**truthful** 114:3,
11
**Truthfully**
67:10, 11
**try** 18:5, 9
42:21  96:10
104:7  110:2
141:10
**trying** 14:14
15:2  19:19
64:12  82:14
92:6  103:17
104:6  140:6
150:11  159:9
161:10
**tucked** 27:8, 12
**turn** 97:12, 18
98:2  100:14
**turned** 7:13
65:16, 21  67:14
96:3, 18, 19
97:1, 8, 17  98:3,
13, 19  99:10, 20
116:8, 18
122:12
**TV** 6:8, 10
32:11
**twice** 90:14
**two** 15:21  16:2
19:1, 11  42:17
45:21  46:21
53:19  60:8
61:4  70:12, 20
72:6  77:3
78:20  80:15
82:6  90:20

93:8, 11  98:20
99:21  102:17
103:11, 15, 19
104:5  105:3
107:11, 15, 21
109:13, 16
111:15  119:4
124:9, 10, 12, 13,
15  125:2  142:6
148:12  149:10
150:8  163:1, 6,
7
**type** 8:9  10:15
12:5  30:9  73:4
74:9  150:11
**typically** 36:5

< U >
**Uh-huh** 159:21
**understand**
9:15  11:4
14:14  15:2
49:11, 21  50:9
56:1  103:17
125:4, 7, 12
137:19  159:10
161:10
**understandable**
127:10
**understanding**
14:18  26:12
88:15  113:21
166:7
**understood**
113:2  129:7, 9
**unfair** 121:8
**Uniform** 71:14
**union** 21:14, 15,
18
**unit** 40:17, 18
**UNITED** 1:2
**University** 10:7,
21
**unreasonable**
78:3
**unresolved**
133:9
**upset** 129:2
133:11

use 17:3 24:12
30:7 37:18
38:16 137:18
167:20
usually 36:3

< V >
vantage 54:4
variety 50:17
various 75:12
76:7
vehicle 39:9
41:12, 15 53:8
55:12, 15 61:7,
19 62:5 139:6
148:21
verbal 69:3
verbally 126:2
134:20
version 114:19
vest 71:5, 6, 12
victim 144:16
video 5:18, 21
6:2, 9 7:7
63:14, 16
videoconference
1:13
violence 16:11
47:6, 8, 14
51:21
visible 41:20
42:2 81:14, 15
82:1 83:3
86:13 88:11
visual 81:7
voice 79:18, 19
102:9
volition 120:10
VOLUME 1:1,
11 3:2 168:3
voluntary
158:17 159:18
160:11
voted 24:2
voting 24:3
vs 1:6 168:2

< W >

wait 36:15
65:20 67:1
122:14
Waited 128:11
waiting 60:8
128:15 129:3
130:6 151:12,
16, 18 153:9, 16
154:6 155:9
Walbrook 8:13
walk 10:4 56:5
57:18, 21 88:1
96:4, 18 98:2
Walked 64:7
65:16 66:1
67:9 80:7 81:2
88:14 91:5
97:10, 13 98:3
100:18 122:13,
16 153:5
walking 66:5
67:12, 13, 15
84:20 85:1
93:13 95:12, 20
98:7, 14, 20
99:14, 21 100:1,
10 104:9
107:14 108:8,
17 109:9
110:19 116:19
120:5
walls 60:5, 11
want 14:10
15:9 23:7
38:15 44:20
67:8, 11 68:4
76:19 77:3
86:16 87:6
88:3 89:11, 16
91:21 92:4
93:19 94:3, 12,
15 100:16
101:20 102:1, 2,
6 108:14 111:8,
19 113:20
121:10, 13
122:5 130:3
133:9 134:3
137:19 148:15
160:8, 10, 14

wanted 86:15
97:4, 9 111:3
131:7, 10
133:13 136:3
161:4, 8
warm 76:11, 12
78:5
warmth 77:10
warn 18:13
wash 71:13
watch 110:2
watched 6:6
54:8 107:5
way 9:9 37:7,
13 43:3 69:16
70:6 73:14
81:10, 14, 20
104:6, 7 114:12
125:13 135:10,
20 138:14, 15,
17, 18 139:4
144:7, 10 166:3
169:12
weapon 29:13,
16 30:3 52:9,
12, 15, 17, 19, 20
106:4
wear 76:7, 11
wearing 33:17
77:9 82:21
86:13
weeds 23:8
weigh 45:6, 11
82:19
weighed 46:11
89:9 145:5
weight 145:4
weights 43:4, 8
44:2, 7
Weir 147:14
148:3 150:12,
18 151:3, 11, 15,
17, 20 152:3, 6,
10 153:13
154:1 155:20,
21 156:5, 10, 12,
15, 18 157:3, 11,
12, 19 158:4
163:14 164:9
W-E-I-R 148:4

Well 9:12 10:6
15:20 17:4
22:8 24:1
26:15 28:8
36:15 42:1
47:11 52:10
55:17 65:16
66:3, 9 68:2
72:12 76:19
79:9 80:15
87:10 88:16
89:4 90:16
94:7 95:17
99:16 103:15
112:19 113:4
114:11 117:6
118:15 121:14
126:1, 17 130:5,
21 143:20
147:5 156:9
160:15 164:4
well-muscled
43:2
went 7:14 8:5
21:13 62:17, 18
106:18 139:7
147:20
we're 15:14
33:20 34:6, 13
45:1 84:16
96:3 107:20
108:17 140:11
141:11 165:16,
18, 19 166:1, 8
We've 164:17
wide 50:17
104:5, 13
Wife 57:4
139:10, 12, 18
140:11, 15
141:1, 17
142:11
wildly 153:14
willing 31:7
wind 59:20
60:9, 10 76:8
windows 53:15
54:1

windy 59:13,
15, 21 76:14
78:5
Winter 35:3
wise 62:5 86:7
withdraw 36:4
withdrew 35:6
within-named
169:4
witness 4:4
65:7 105:2, 10,
12 106:1 112:6
117:3 123:8
131:21 142:21
166:10 168:3
169:4, 14
woman 129:7
130:9 132:21
133:19 143:2
women 126:4,
15 127:10
128:7 129:13
133:18 134:2
wood 62:11
word 50:7
137:18
words 12:4
106:5, 11
128:17 146:20
161:15 164:1
Work 5:3, 4
9:5, 6, 16 10:4,
17 12:2 22:14,
17 39:5, 15
43:3 52:9, 10
70:17 101:3
worked 9:10
11:3
working 9:14,
17 12:18 13:9,
14 15:8 83:15
works 9:15
105:11
world 108:4
127:19 143:10
worn 75:12
76:4
worried 77:2
126:16, 18

Office (410) 821-4888
CRC Salomon, Inc.
2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com - info@crcsalomon.com
Facsimile (410) 821-4889
Page: 17

127:6, 11  130:1
worse  134:16
Wow  44:1
write  138:10
writing  120:19
written  31:12,
14  138:8
157:19  158:17
159:18  160:4, 7,
11, 14, 17  161:4,
14
wrong  14:11
36:16  53:17
146:12  153:14
wrote  120:21
146:9, 10
149:14  155:21
157:3

< Y >
Yeah  5:5  6:11
15:20  16:6
20:15  21:16
22:7, 10  23:20
24:9, 16  29:19
32:3  35:5  41:8
44:13  45:1
54:7  55:16
60:12  70:17
74:15  75:11, 16
77:1  78:6, 14,
17  80:7, 17
82:5  84:5, 8
85:9, 14  87:2
92:6  99:11
102:8  103:6, 10
104:12  105:1,
12  108:6  111:1
115:5, 6, 21
118:3  124:21
126:12  127:3
128:3  129:2
130:14  132:1
138:15  141:15
146:20  149:20
150:2  152:10,
18  153:12
159:4  160:8
165:5

year  11:1, 15
24:16  35:2
61:17  140:4
years  11:20
12:18  13:3, 4, 7,
15  15:16  16:1
43:19  44:2
57:12  79:10
146:16  156:13
yelling  128:16
130:20
young  44:12
45:21  46:3
53:19  54:6
60:8  62:16
68:11, 15  69:2
70:12, 20  72:7
74:8, 15  78:20
79:17, 20  81:9
82:6, 15  86:6
88:21  89:6
104:21  105:19
107:7, 21  114:7,
13, 20  115:17
117:17  119:4
123:18  128:14
156:13  157:6
162:1
Younger  79:8,
9, 10  140:8, 9
Youngest  86:3

< Z >
Zoom  1:13
143:18, 19
zoomed  143:20