# EXHIBIT B

Deposition of Damond Durant, Volume 2

Case 1:20-cv-03146-DKC    Document 102-3    Filed 03/01/24    Page 2 of 56

Jawone D. Nicholson vs. State of Maryland, et al.

1                         VOLUME II

2              IN THE UNITED STATES DISTRICT COURT

3                FOR THE DISTRICT OF MARYLAND

4    JAWONE D. NICHOLSON

5                   Plaintiff

6        vs.                        Case No.:

7    STATE OF MARYLAND, et al.        1:20-cv-03146 DKC

8                   Defendants

9    _____/

10

11                         VOLUME II

12              The continued deposition of DAMOND DURANT

13   was held remotely via Zoom videoconference on Thursday,

14   June 30, 2022, commencing at 9:23 a.m., before

15   Susan M. Liebrecht, Notary Public.

16

17

18

19

20   STENOGRAPHICALLY REPORTED BY:

21   Susan M. Liebrecht, RPR

Page 171

1  APPEARANCES:

2

3  ON BEHALF OF PLAINTIFF:

4  CARY J. HANSEL, ESQUIRE

5    Hansel Law, P.C.

6    2514 North Charles Street

7    Baltimore, Maryland  21218

8    Telephone:  301-461-1040

9    Email:  cary@hanselllaw.com

10

11  ON BEHALF OF DEFENDANTS:

12  STUART R. GOLDBERG, ESQUIRE

13    Baker Donelson, P.C.

14    100 Light Street, 19th Floor

15    Baltimore, Maryland 21202

16    Telephone:  410-685-1120

17    Email:  sgoldberg@bakerdonelson.com

18

19

20  ALSO PRESENT: Monica A. Carranza, Esquire

21

Page 172

1              INDEX

2    Deposition of DAMOND DURANT - Volume II

3              June 30, 2022

4

5  Examination by:                    Page

6  Mr. Hansel                    173, 314

7  Mr. Goldberg                    295

8

9

10

11

12

13

14

15

16

17

18

19

20

21

Page 173

1              PROCEEDINGS

2  Whereupon,

3              DAMOND DURANT,

4  called as a witness, having been first duly sworn to

5  tell the truth, the whole truth, and nothing but the

6  truth, was examined and testified as follows:

7        EXAMINATION BY MR. HANSEL:

8     Q    Officer, thank you for your time here

9  today.  My goal is going to be efficiently use our time

10  here together to the greatest extent possible.

11        Let me step back into our questioning a

12  little bit and ask you when the police ran the firearm

13  that you had on you that day, it was reported back that

14  there was no information on an owner.  I say that

15  because I've heard the radio communications.

16        Were you the purchaser of that firearm?

17     A    Yes, sir.

18     Q    And where did you live when you purchased

19  it?  What state?  That's all I need.

20     A    Maryland.

21     Q    And how recently had you purchased it as of

Page 174

1  the time of these events?

2     A    I don't remember the exact date.  I don't

3  remember the exact date.

4     Q    Sure, but was it, say, a week before, a

5  month before, years before?  Give me just a rough idea.

6     A    Could have been maybe a month before, a

7  month or two, maybe.

8     Q    And did you purchase it from a federally

9  licensed firearms dealer?

10     A    Yes.

11     Q    And which one?

12        MR. GOLDBERG:  I'm just going to jump in.

13  If it would be granted, I would just object to the

14  entire line of questioning on the basis of relevancy

15  and that way I don't have to interrupt your questions.

16        MR. HANSEL:  Sure, I'll recognize a

17  continuing objection.

18        MR. GOLDBERG:  Thank you.

19     Q    Which dealer did you buy it from,

20  Mr. Durant?  Officer?

21     A    I think it was Worth-A-Shot.

1  Q   Say again?

2  A   **Worth-A-Shot.**

3  Q   Worth-A-Shot, got it.

4      And where are they located?

5  A   **Like, Glen Burnie.**

6  Q   Okay. Do you have any idea why it didn't

7  come back as registered to anybody when they ran it?

8  A   **No, sir.**

9  Q   Okay. All right. Stepping back into the

10 events of the day, I think you described your

11 interaction with the young men that were there and

12 their family members who showed up and the police

13 officers.

14     Tell me what happened when those

15 interactions were over. What did you do next?

16 A   **I went home.**

17 Q   Okay. And when you say you went home, you

18 were already near your house. You went into your

19 house? Is that what you mean?

20 A   **Yes.**

21 Q   And what did you do the rest of the day?

1  A   **I kind of worried about the situation.**

2  Q   Okay. Why?

3  A   **Worried about my vehicle, worried about**

4  **just anything that might happen after this.**

5  Q   Okay. And tell me what thoughts came to

6  your mind when you say you were worried about things

7  that might happen after.

8  A   **Something being done to my vehicle.**

9  Q   Okay. Go ahead.

10 A   **Knowing where I live at. Just kept**

11 **thinking. Couldn't sleep. Just kept replaying,**

12 **thinking, thinking, thinking, thinking something might**

13 **happen.**

14 Q   All right. And did you call your

15 department to report these events?

16 A   **I think I did.**

17 Q   Who did you speak with?

18 A   **My sergeant at the time was Sgt. Thomas**

19 **Smith.**

20 Q   And where was Sgt. Thomas Smith stationed

21 or assigned?

1  A   **CIT.**

2  Q   Okay. And where was that physically in the

3  City?

4  A   **3500 Northern Parkway.**

5  Q   All right. And were you and Sgt. Smith

6  close?

7  A   **What do you mean close?**

8  Q   Were you friendly?

9  A   **I mean, he was my sergeant. We get along.**

10 Q   Okay. Did you ever see each other outside

11 of work?

12 A   **We didn't hang out, if that's what you're**

13 **asking. Like, I go over his house, he go over my house**

14 **and we hang out, no.**

15 Q   Has he ever been to your house?

16 A   **No.**

17 Q   Have you ever been to his house?

18 A   **No.**

19 Q   Okay. Have you ever seen him outside of

20 work?

21 A   **At a bull roast once.**

1  Q   Okay. Anywhere else?

2  A   **I don't remember any other activity.**

3  Q   Al right. Tell me about the bull roast.

4  A   **It was a bull roast. What are you -- it**

5  **was a bull roast. Like, you get together.**

6  Q   Who put it on?

7  A   **It was a departmental bull roast.**

8  Q   Okay. And how many people were there,

9  approximately?

10 A   **I couldn't tell you. It was a lot of**

11 **people.**

12 Q   And tell me what your conversation was with

13 Sgt. Smith. What did you discuss?

14 A   **I really don't remember.**

15 Q   Well, you said you were worried. Did you

16 have him send any officers?

17 A   **Say it again?**

18 Q   Did you ask that he send any officers?

19 A   **To send someone?**

20     MR. GOLDBERG: Objection to form, but you

21 can answer.

Page 179

1   Q    Yeah, did you ask that he send any police?

2   A    No.  No.  Well, that day or at the bull

3   roast?

4   Q    The day you called him, I'm sorry.  The day

5   of the event you went to your house and you called

6   Sgt. Thomas Smith, right?

7   A    No, I didn't ask him to send police.

8   Q    Did you tell him you needed any help or

9   assistance of any kind?

10  A    I don't remember saying I needed help.

11  Q    Okay.  Or assistance of any kind?

12  A    I don't remember asking for any help, no.

13  Q    Did he say he was going to send out any

14  investigators to look into the incident?

15  A    I don't remember that.

16  Q    Did he tell you he was going to open a case

17  with Internal Affairs?

18  A    No.

19  Q    Did he tell you to file any type of report?

20  Like a use of force report or anything like that?

21  A    No.

Page 180

1   Q    Okay.  Did you ever fill out any type of

2   report with your department?  A use of force report or

3   anything else?

4   A    No.

5   Q    Why not?

6   A    It wasn't a use of force.

7   Q    Isn't drawing your firearm and brandishing

8   it, doesn't that ordinarily require a use of force

9   report with the Baltimore City Police Department?

10       MR. GOLDBERG:  Objection to form.  Calls

11  for a legal conclusion.  You can answer.

12  A    Pointing the weapon is the use of force.

13  Q    Okay.  And you said you withdrew it and

14  held it at the low ready.  I think that's what you told

15  the officer.  Is that right?

16       MR. GOLDBERG:  Objection.  Asked and

17  answered.  You can answer.

18       THE WITNESS:  Answer?

19       MR. HANSEL:  Please.

20       MR. GOLDBERG:  You can answer.

21  A    No, I had it behind my back.  I did not

Page 181

1   point it and it was still in the holster.

2   Q    When you drew it out of the pocket it was

3   in front of you, right?

4   A    The pocket?

5   Q    The gun and the pocket were in front of you

6   when you drew it?

7   A    It was in my front pocket.

8   Q    Okay.  And therefore at the moment the gun

9   cleared the pocket the gun was in front of you, right?

10  A    The gun was in my front pocket.  Never

11  pointed it.  Held it down by my side behind me.

12  Q    Okay.  So when it first cleared your pocket

13  it would have been in front of your body, right?

14       MR. GOLDBERG:  Objection.  Asked and

15  answered, but you can answer.

16  A    Yeah, it was in the front pocket of my

17  hoodie.

18  Q    And you're telling me you then put it all

19  the way behind your back where the boys couldn't see it

20  once it was back there?

21       MR. GOLDBERG:  Objection.  Asked and

Page 182

1   answered.  You can answer.

2   A    I pulled it out of my pocket and it went

3   straight to my side behind my leg.

4   Q    Okay.  But you didn't put it behind your

5   back.  You say you put it down by your side by your

6   leg.  Is that right?

7        MR. GOLDBERG:  Objection.  Form.  Asked and

8   answered.  You can answer.

9   A    Pulled it out of my pocket, put it down by

10  my side.

11  Q    Okay.  All right.  And you told me earlier

12  you pulled it out so that they would, I think you said

13  you wanted them to calm down or you were worried about

14  them and you were trying to de-escalate, right?

15       MR. GOLDBERG:  Objection.  Form.  Asked and

16  answered, but you can answer.

17  A    Yes.

18  Q    And that would only work if they saw the

19  gun, right?

20       MR. GOLDBERG:  Objection.  Calls for

21  speculation, but you can answer.

Page 183

1  A    Yes.

2  Q    Okay.  And so when you pulled it out you

3  intended for the young men to see the gun, right?

4  A    Yes.

5  Q    Okay.  And we can deduce, using our powers

6  of observation and logic, that they did, in fact, see

7  the gun because they were able to report to their

8  mother that there was a gun involved and she was able

9  to call the police about it, right?

10      MR. GOLDBERG:  Objection.  Form.  Asked and

11  answered.  You can answer.

12  A    She's the mother of both?

13  Q    Sir, I'm sorry.  Today is not your day to

14  ask me questions.  It's the other way around.

15      We can deduce that they saw the gun because

16  one or both of them told Erica Hamlet there was a gun

17  and she called the police about it, right?

18      MR. GOLDBERG:  Objection.  Form.  Asked and

19  answered.  Calls for speculation, but you can answer.

20  A    Yes.

21  Q    So when you called Sgt. Smith, what did

Page 184

1  Sgt. Smith say about what happened?

2      MR. GOLDBERG:  Objection.  Form.  You can

3  answer.

4  A    I don't remember what he said.

5  Q    Okay.

6  A    I guess he'll see me tomorrow.  The next

7  day.

8  Q    Anything else?

9  A    Not that I remember, no.

10  Q    Other than Sgt. Smith did you discuss this

11  encounter with anybody else?

12  A    At work?

13  Q    No, that day.  I'm sorry.  The day of the

14  encounter, other than Sgt. Smith, did you discuss the

15  event with anybody else?

16  A    Wife.

17  Q    Anybody else?

18  A    Maybe my father-in-law.

19  Q    And tell me, what's your father-in-law's

20  name?

21  A    Maurice Bobbitt.

Page 185

1  Q    And was he there at the house at the time?

2  I can't remember if you said so or not before, I

3  apologize.

4  A    Yeah, he was home.

5  Q    Okay.  Tell me what you said to your

6  father-in-law.

7  A    The same thing about what happened.

8  Q    Okay.  And what did he say to you?

9  A    He asked me was I okay.

10  Q    Anything else?

11  A    Nothing really, no.

12  Q    Did your wife, your father-in-law or

13  Sgt. Smith ever tell you you shouldn't have drawn a

14  gun?

15  A    No.

16  Q    Did anybody with the Baltimore Police

17  Department ever tell you you shouldn't have drawn your

18  gun?

19  A    No.

20  Q    Have we now discussed everything that

21  happened that day related to this incident?  The day of

Page 186

1  the incident?

2  A    I think so.

3  Q    Okay.  Tell me what happened the next day

4  in relation to this incident.

5      MR. GOLDBERG:  Objection to form, but you

6  can answer.

7  A    I went to work.

8  Q    Okay.  And tell me what happened at work in

9  relation to this incident.

10      MR. GOLDBERG:  Objection.  Foundation and

11  form, but you can answer.

12  A    I'm not sure if that was the day that I

13  received the complaint or I don't know if it was that

14  day or the day after.

15  Q    All right.  Was receiving the complaint the

16  next thing that happened after the day of the incident

17  that was related to the incident?

18  A    Yeah, I received a complaint.

19  Q    Okay.  And when did you -- tell me what

20  kind of complaint you received.  What was it?

21  A    I don't know what kind of complaint it was.

Page 187

1  It just said a complaint was filed against me and I
2  would have to see Internal.
3      Q    Okay.  And who did you talk to about that?
4      A    It begin with an F.  I can't remember the
5  officer's name.  It begin with an F and I think he
6  retired.  I'm not sure.
7      Q    And was he an Internal Affairs officer?
8      A    Yes.
9      Q    Or she?  Was it a male?
10     A    It was a male.
11     Q    Okay.  And what did that person say to you?
12     A    It's a complaint and that's all I remember.
13     Q    Okay.  And did they say, don't worry about
14  it, no big deal, don't sweat it.  I'm sure you were
15  concerned, right?
16          Let's start there.  You were concerned when
17  you got the complaint, weren't you?
18          MR. GOLDBERG:  Objection.  Form,
19  foundation.  You can answer.
20     A    I mean, any complaint you get concerned,
21  but I didn't do anything, so.

Page 188

1      Q    So to this day you think you didn't do
2  anything wrong.  Is that right?
3      A    Yes.
4      Q    Okay.  And you stand by your actions the
5  day you pulled the gun on these boys one hundred
6  percent.  Is that right?
7      A    Yes.
8      Q    Okay.  And so you got a complaint.  Tell me
9  what happened next in relation to this incident.
10     A    What is that?  They made a court date.  The
11  peace order.
12     Q    Okay.  How did you become aware of a peace
13  order filing?
14     A    It comes in the mail.
15     Q    So you got something in the mail that said
16  there was a peace order.  Tell me about that.
17     A    Peace order.  They send you a lawyer, call
18  a lawyer, and you go to court.
19     Q    Okay.  Who was your lawyer?
20     A    Shoot.  It was an FOP lawyer.
21     Q    So the Fraternal Order of Police paid for

Page 189

1  your lawyer to represent you in the peace order
2  proceeding.  Is that right?
3      A    Yes.
4      Q    And do you recall who it was?
5      A    I forget his name.
6      Q    Can you describe him to me?
7      A    Black male, short, smaller guy.
8      Q    Okay.  Was his name Chaz Ball?
9      A    Yes.
10     Q    It's a small world that we work in.
11          So Mr. Ball went with you to the peace
12  order hearing.  Is that right?
13     A    Yes.
14     Q    Tell me what happened at the hearing.  I'm
15  not asking you what Mr. Ball said to you off the
16  record, but on the record at the hearing, tell me what
17  happened.
18     A    The end part or --
19     Q    The whole thing.  Tell me, was there a
20  judge there, were you there, was anybody there for
21  Mr. Nicholson.  Tell me exactly what happened.  You

Page 190

1  went to a hearing.  Tell me what happened.
2      A    There was a judge there, I was there,
3  Mr. Nicholson was there, his mom, his grandmother, my
4  wife.  The FOP -- I mean, the Internal Affairs officer
5  was there.
6          The judge was more concerned about her
7  having a miscarriage and what she made for dinner,
8  something she cooked, than what was going on.
9      Q    Who is her in that sentence?  You said the
10  judge --
11     A    The mother.
12     Q    I'm sorry?
13     A    The mother.
14     Q    Okay.  How did the miscarriage come up?
15  Tell me about that.
16     A    It was on her Facebook page she showed him.
17     Q    Okay.  So you think the judge was concerned
18  about dinner and a miscarriage.  Tell me what happened
19  next.
20     A    The ending?  Because that went on -- oh,
21  he --

Page 191

1  Q    I want to understand, sir, your entire
2  recollection of the peace order hearing that you
3  attended in person.  You said there was a judge there,
4  you described the attendees and you said the judge was
5  worried about Ms. Hamlet's miscarriage and what she had
6  for dinner.
7        I'm imagining a lot more happened because
8  I've been to these proceedings and I know what the
9  issues are and there is a recording of this one.
10       Have you heard the recording or seen the
11 transcript of this event of the peace order?
12 A    No, just the peace order that I got.  I
13 didn't hear what happened in court.
14 Q    You were in court, weren't you, for a
15 hearing?
16 A    Yeah, you said did I hear the recording of
17 it.  I didn't hear the recording.
18 Q    Okay.  So now tell me what you saw and
19 heard when you were in court other than what we have
20 already discussed.
21 A    She got to ask me questions.  She tried to

Page 192

1  compare me to her son.
2  Q    Okay.  Anything else?
3  A    Most of her questions weren't relevant or
4  wasn't good questions to me.  And the judge ruled that
5  I was the aggressor for whatever reason.
6  Q    And you think the judge was wrong there?
7  A    I think the judge didn't take the time to
8  actually listen to the case.  He wasn't concerned about
9  the case.  Because if you looking at her Facebook,
10 looking at what she cooks and her miscarriage or
11 whatever, that has nothing to do with what happened.  I
12 don't think he was really listening or into the case,
13 no.
14 Q    Do you recall anything else from that
15 hearing?
16 A    That's about what I can remember.
17 Q    After the peace order was issued did you
18 ever enter the common areas around 9105 Helaine Hamlet
19 Way?
20 A    No.  What's the common area?  The street
21 that runs pass it or -- never near the house.

Page 193

1  Q    Did you ever enter the grounds of 9105
2  Helaine Hamlet Way after the peace order was entered?
3  A    No.
4  Q    What about the yard?
5  A    No.
6  Q    Did you ever run or request to be run the
7  names of Erica Hamlet or her mother or Mr. Nicholson or
8  any of the participants of this day through any police
9  database?
10 A    No.
11 Q    Tell me, I see you're wearing a police
12 instructor shirt.  Is that right?  First of all, do I
13 have that right?
14 A    Yes, sir.
15 Q    I'm sorry?
16 A    Yes, sir.
17      MR. HANSEL:  Okay.  All right.  Give me
18 just a second.  Let me pull something up I want to
19 share with you.
20 Q    Can you see the screen here that I've
21 attempted to share, sir?

Page 194

1  A    Yes.
2  Q    And what I see here is a lesson plan about
3  Use of Force and Fair and Impartial Policing
4  Integration.
5      Do you see that?
6  A    Uh-huh.
7  Q    Is that yes?
8  A    Yes.
9  Q    Okay.  And it says here it was prepared by
10 a detective and Officer Damond Durant.
11      Do you see that?
12      MR. GOLDBERG:  Cary, was this produced in
13 discovery?
14      MR. HANSEL:  It's on the Internet.  I don't
15 think it was requested in discovery.
16      MR. GOLDBERG:  Well, if it's a document
17 you're relying upon in a deposition proceeding it
18 certainly was and I would just object to the line of
19 questioning on the basis of a document that hasn't been
20 produced in discovery.  It also is irrelevant whether
21 it's publicly available as the Federal Rules

Page 195

1  specifically require production of any materials that

2  you would rely upon if they're requested in discovery.

3      MR. HANSEL: I don't think you requested

4  it, but you've got your objection on the record and we

5  can figure that out later. I can certainly e-mail you

6  a copy or Officer Durant can provide it. He prepared

7  it.

8  BY MR. HANSEL:

9      Q    Officer Durant, did you prepare this?

10     **A    Me and Officer Disimone? Yes.**

11     Q    And obviously you have seen this before?

12     **A    Yes.**

13     Q    Obviously you have a copy of it?

14     **A    I can get a copy.**

15     Q    Well, you prepared it. You had a copy at

16  one point, didn't you?

17         MR. GOLDBERG: Objection. Form. Asked and

18  answered.

19     **A    Yes. Yes.**

20     Q    When you say you can get a copy, you can go

21  right on the website and look at it just like me,

Page 196

1  right?

2      **A    Yeah.**

3      Q    All right. So looking at your shirt,

4  looking at this lesson plan, am I right that the

5  Baltimore City Police Department has you training other

6  officers?

7          MR. GOLDBERG: Objection. Form. You can

8  answer.

9      **A    Yes.**

10     Q    And is one of the things the Baltimore City

11  Police Department has you training other officers about

12  the use of force?

13     **A    Yes.**

14     Q    And, in fact, not just the use of force,

15  but the Baltimore City Police Department has you

16  training other officers about fair and impartial police

17  policing. Is that right?

18         MR. GOLDBERG: Objection. Form. Also,

19  mischaracterization of the document if it's in

20  reference to the document as you, intentionally or

21  otherwise, left off the word policing integration,

Page 197

1  which isn't defined. So vagueness, as well, but you

2  can answer.

3      **A    Yes.**

4      Q    Okay. In other words, the police

5  department has you training other officers about fair

6  and impartial policing, correct?

7          MR. GOLDBERG: Objection. Form. You can

8  answer.

9      **A    Yes.**

10     Q    And, in fact, they have you training other

11  officers about the use of force and fair and impartial

12  policing, even during the pendency of this case, right?

13  Because I noticed that the date on this document is

14  June 17, 2021. Is that right?

15     **A    Yes.**

16     Q    Okay. What other things does the Baltimore

17  City Police Department have you training officers

18  about?

19     **A    I'm an in-service instructor.**

20     Q    So tell me all the things you train about.

21     **A    Policies, defense tactics.**

Page 198

1      Q    Okay. Under methods and techniques on this

2  training here that you authored, one of the things that

3  is discussed are attempts to de-escalate.

4          Do you see that?

5      **A    Yes.**

6      Q    Okay. So the Baltimore City Police

7  Department has you training other officers about how to

8  de-escalate situations. Is that right?

9      **A    Yes.**

10     Q    And do you think you're the right man for

11  that job?

12         MR. GOLDBERG: Objection. Form.

13  Argumentative, but you can answer.

14     **A    I think so.**

15     Q    And here, part of the training is that

16  force should only be used if it is necessary,

17  reasonable and proportional.

18         Do you see that?

19     **A    Yes.**

20     Q    Do you agree with that standard? That

21  force should only be used if it is necessary,

Deposition of Damond Durant, Volume 2

Case 1:20-cv-03146-DKC   Document 102-3   Filed 03/01/24   Page 10 of 56

Jawone D. Nicholson vs. State of Maryland, et al.

1 reasonable and proportional?

2 **A   Yes.**

3 Q   Here on the fourth page, you wrote that

4 students should attempt to deploy de-escalation,

5 respond with a proportionate force option and may

6 potentially withdraw their training pistol, point it at

7 the subject, if justified, and give appropriate verbal

8 commands.

9 Do you see that?

10 **A   I see it.**

11 Q   Now, it says here, if justified.  What

12 would justify drawing your weapon?

13 MR. GOLDBERG:  Objection, but you can

14 answer.

15 **A   Several things.  A lot of things would**

16 **justify pointing a weapon.**

17 Q   I asked about drawing.  What types of --

18 what categories of subject actions would justify

19 drawing your weapon?

20 MR. GOLDBERG:  Objection.  You can answer.

21 **A   If the suspect has a gun, if it's being**

1 **attacked, knife.  Just the circumstances.  It's a lot.**

2 **If the person has some type of skill level.  It's a lot**

3 **of things.**

4 Q   Neither of these young men had or drew a

5 gun, correct?

6 MR. GOLDBERG:  Objection.  Form.  You can

7 answer.

8 **A   No.**

9 Q   In other words, they did not draw a gun,

10 did they?

11 MR. GOLDBERG:  Objection.  Form.  Asked and

12 answered, but you can answer.

13 **A   No.**

14 Q   Okay.  Neither of these young men drew a

15 knife, did they?

16 **A   No.**

17 Q   Okay.  You weren't aware that either of

18 these young men had any special skills, karate or

19 something like that, were you?

20 **A   No, I couldn't tell.**

21 Q   Now, in connection with this training about

1 use of force and de-escalation and fair and impartial

2 policing, you listed yourself here has a subject matter

3 expert.

4 Do you see that?

5 **A   I see it.**

6 Q   Do you believe that you are a subject

7 matter expert in those areas?

8 MR. GOLDBERG:  Objection.  Form, but you

9 can answer.

10 **A   Yes.**

11 Q   So let's go back into the peace order

12 hearing.  Have you told me everything you recall about

13 the peace order hearing?  I think the answer was, yes,

14 but have you told me everything you recall?

15 **A   That I recall, yes.**

16 Q   Okay.  And the peace order was ultimately

17 granted, right?  You understood that?

18 **A   Yes.**

19 Q   And the judge found not only that you were

20 the aggressor or threat, but that you might be in the

21 future.  Is that right?

1 MR. GOLDBERG:  Objection to form.

2 Foundation.  You can answer.

3 **A   He just wanted me to stay away from them or**

4 **we were to stay away from each other.  I don't know if**

5 **I was a future threat.**

6 Q   And tell me when was the next time you saw

7 them after the public hearing on the peace order?

8 **A   With you on Zoom.**

9 Q   And what was the occasion?

10 **A   I think it was a hearing.  Some type of**

11 **hearing.**

12 Q   What kind of hearing?

13 **A   I'm not sure what the hearing was called.**

14 **I guess it was -- I don't know what the hearing was**

15 **called.  But it was specific.  I know it wasn't a**

16 **deposition like this one, but it was -- I don't know**

17 **what it was called.**

18 Q   Was it a hearing in this case?  Was it

19 legislative testimony?  What was it?

20 **A   It was a hearing in this case.**

21 Q   Okay.  And do you recall what the subject

Office (410) 821-4888
CRC Salomon, Inc.

2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com - info@crcsalomon.com

Facsimile (410) 821-4889
Page: 9 (199 - 202)

Page 203

1  matter was?

2     A     The situation.

3     Q     Okay.  Other than that have you ever seen

4  Jawone Nicholson since the peace order hearing?

5     A     No.

6     Q     Other than any Zoom hearings in this case

7  have you ever seen Erica Hamlet since the peace order

8  hearing?

9     A     No.

10    Q     After the peace order, what was your next

11 involvement in any issues arising out of this incident?

12          MR. GOLDBERG:  Objection.  Form, but you

13 can answer.

14    A     This.

15    Q     What do you mean this?

16    A     This deposition now.

17    Q     Okay.  Nobody ever contacted or

18 communicated with you in connection with the incident

19 with Jawone Nicholson from the peace order hearing

20 until these couple of days of depositions.  Is that

21 right?

Page 204

1     A     The lawyer said it was coming up.  That was

2  about it.

3          MR. GOLDBERG:  I would object on the basis

4  that obviously he's not asking about attorney/client

5  communications.

6     Q     None of my questions are meant to elicit

7  what your lawyers told you.

8          Other than what we have already talked

9  about have we already discussed everything that

10 happened in connection with the incident with Jawone

11 Nicholson up to the lawsuit that we're here today to

12 talk about?

13    A     This is the last thing, yeah.

14    Q     But I'm not asking what the last thing was.

15 I'm starting at the peace order and I'm ending at the

16 events related to this lawsuit.

17          Did anything happen in between in

18 connection with your interaction with Jawone Nicholson?

19          MR. GOLDBERG:  Objection to form.  You can

20 answer.

21    A     Me dealing with them?  No, I have had no

Page 205

1  dealing with them.

2     Q     I'm not asking about your dealings

3  specifically with Mr. Nicholson or Ms. Hamlet.  I'm

4  saying arising out of that incident, did anything at

5  all happen between the peace order and the litigation

6  that we're here to talk about today?

7          MR. GOLDBERG:  Objection to form, but you

8  can answer.

9     A     The dismissal.

10    Q     What do you mean the dismissal?

11    A     The case was dismissed because it was

12 overdue or something like that.

13    Q     When you say the case, what are you

14 referring to?

15    A     The actions between me and Ms. Nichols

16 (sic).

17    Q     Okay.  Was there an Internal Affairs

18 complaint filed?  You already said there was.

19    A     Yes.

20    Q     Okay.  Did you give a statement to Internal

21 Affairs?

Page 206

1          MR. GOLDBERG:  Objection to form.  Asked

2  and answered, but you can answer.

3     A     Yes.  I think I did, yeah.

4     Q     Okay.  It was a recorded statement?

5     A     Yeah, they're pretty much all recorded, I

6  think.

7     Q     And your lawyer was present with you?

8     A     Yes.

9     Q     Was that also Mr. Ball?  The same man, Chaz

10 Ball, that was with you at the peace order hearing?

11    A     No.

12    Q     All right.  Who was it that was with you at

13 the Internal Affairs hearing?

14    A     I forget his name, but it wasn't Mr. Ball.

15    Q     All right.  Can you describe him to me?

16 Was he a white guy?

17    A     Yes, white male.

18    Q     All right.  And so I'm going to take a shot

19 that his last name was Davey.  Is that right?

20    A     I think it was Mr. Davey.  I think it was

21 him.

Deposition of Damond Durant, Volume 2       Jawone L. Nicholson vs. State of Maryland, et al.

Case 1:20-cv-03146-DKC     Document 102-3     Filed 03/01/24     Page 12 of 56

Page 207

Q    All right.  And who was it that interviewed you for Internal Affairs?  What officer?

A    **The same officer that was, I guess, heading the case.**

Q    Okay.  Between the time when the officer told you that there had been a complaint and you'd need to talk to Internal Affairs and the interview with that officer, what else happened in connection with the Internal Affairs complaint?

MR. GOLDBERG:  Objection.  Form, foundation.  And depending on the answer -- you can answer.

MR. HANSEL:  Don't tell me anything your lawyer said.

MR. GOLDBERG:  Thanks.

A    **What happened?**

Q    Yeah, sure.  Were you asked to produce any documents?  Did anybody talk to you?  Did you talk to anybody or did you have to submit any reports?  Was your firearm examined?  Did anybody come to your house?  Were there any photographs taken?  Video, audio?

Page 208

What happened in between the time the man told you that you were going to be interviewed and when you were actually interviewed in connection with the Internal Affairs event?

A    **Nothing.**

Q    Okay.  And how close to the incident were you interviewed?  Days, weeks, months?  How close?

A    **I would say weeks.  A week, I think.**

Q    So a week to, let's say, three weeks?  Is that fair?

A    **That's fair.**

Q    Okay.  And so let's say clearly within a month of the incident you had given your Internal Affairs interview.  Is that right?

A    **Yes.**

Q    What did you next hear from Internal Affairs?  You gave your interview within a month.  You said you didn't hear anything from when they first talked to you until the interview.

What did you hear after the interview?

A    **Nothing, pretty much.**

Page 209

Q    Okay.  You told me earlier it was dismissed.  That the Internal Affairs charges were dismissed.  Did you ever receive notice of the charges?

In other words, Internal Affairs interviews you and then the ordinary process would include you getting some notice that you might be charged and an opportunity to have a trial board.  Those types of things.

Did you ever receive any notice of those charges?

A    **Yeah, I received that letter.**

Q    Okay.  You got a letter and it said you were being charged with violations of the Department's rules.  Is that right?

MR. GOLDBERG:  Objection to form and foundation, but you can answer.

A    **I don't remember verbatim what it said. But I received a letter saying that I would have to -- I can refer to my lawyer or that, but I know I was charged.  I found out later that I was charged with not saying that I was a police, but I did.  So I don't know**

Page 210

**where that charge come from.**

Q    All right.  Other than not identifying yourself were there any other charges against you?

A    **Yes, that's the one that I remember.**

Q    So you don't remember any other charges other than failure to identify.  Is that right?

A    **That's the one that I remember because I didn't agree with it.**

Q    Okay.  And you obviously got that charge sometime before it was dismissed, right?  That's kind of obvious.  There had to be something to dismiss; is that correct?

A    **I really wasn't kept up to date with it.  I found out stuff on my own.  The dismissal I found out on my own.  I wasn't really given any information about that.  I found out that that was a case that was dismissed.**

Q    All right.  But the charges, themselves, this is obvious, but I'm just trying to establish the timeline, you were charged before it was dismissed, right?  Had to be.  See my point?

Deposition of Damond Durant, Volume 2

Jawone D. Nicholson vs. State of Maryland, et al.

1 **A Yes.**

2 Q Okay.  And how did you -- when you were

3 charged, other than your lawyer or anybody from your

4 lawyer's office, who did you discuss those charges

5 with?

6 **A I didn't discuss them with nobody.**

7 Q Well, we know that's not right.  You

8 discussed them with Internal Affairs, didn't you?

9  MR. GOLDBERG: Objection.  Form.  You can

10 answer.

11 **A I guess they would have to send me the**

12 **letter and notify me of the charges.**

13 Q Sure.  And you didn't talk to your sergeant

14 or your captain or anybody from Internal Affairs at all

15 about the charges?

16 **A I don't remember.  I don't remember.**

17 Q Did you talk to any fellow officers about

18 the charges?

19 **A Being as though that I got them or what do**

20 **you mean?**

21 Q Anything at all about them after you

1 received them.

2 **A I guess I talked to a couple people saying**

3 **this is what they charged me with and that was about**

4 **it.**

5 Q So who did you talk to about that?

6 **A Probably who I was working with.  Probably.**

7 **I would assume I did.**

8 Q Okay.  And when you say who you were

9 working with, tell me who that is.

10 **A Officer Constantino.**

11 Q And what is Officer Constantino's full

12 name?

13 **A What is his first name?  I forget his first**

14 **name.  We call each other by last name a lot.**

15 Q Okay.  And is that a male or a female?  I

16 take it a male by that, but I want to confirm.

17 **A Male.**

18 Q Okay.  And is Officer Constantino still

19 employed?

20 **A Yes, he's still at the same unit.**

21 Q Is Constantino with a C or a K?

1 **A C.**

2 Q And is the unit he's with the CIT Unit at

3 the address you gave earlier?

4 **A Yes.**

5 Q Okay.  Who else did you discuss with

6 charges with?

7 **A That would be it or Sgt. Smith.**

8 Q Okay.  Tell me what you said to Sgt. Smith.

9 **A Same thing I said to Constantino.**

10 Q Anything else?

11 **A Not that I remember.**

12 Q Other than your attorneys did you discuss

13 the charges with anybody else other than what we have

14 already talked about?

15 **A Not that I remember.**

16 Q Okay.  Did you do anything to investigate,

17 get witnesses, check for Ring doorbell cameras or

18 anything else to gather evidence related to the

19 incident?

20 **A No.**

21 Q Other than -- and you said you learned the

1 case was dismissed on your own.  How did you learn

2 that?

3 **A How did I figure that out?**

4 Q It was in the Baltimore Sun.  Did you

5 happen to read it there?

6 **A No, I didn't read the paper.  I think it**

7 **was word of mouth, but I forget who I talked to.**

8 Q Okay.  Did you ever get any documentation

9 confirming that it was dismissed?  Anything like that?

10 **A No. I don't remember that.  Just heard.**

11 Q Okay.  What was your understanding of why

12 the case was dismissed?

13 **A Time.**

14 Q Okay.  In other words, the Department had

15 waited too long to issue the charges more than the

16 one-year limitation?  Was that your understanding?

17 **A Yes.**

18 Q Do you know why they waited so long?

19 **A I didn't have anything to do with that.**

20 **Don't know.**

21 Q In other words, you've told me that you

Office (410) 821-4888   2201 Old Court Road, Baltimore, MD 21208   Facsimile (410) 821-4889

CRC Salomon, Inc.   www.crcsalomon.com - info@crcsalomon.com   Page: 12 (211 - 214)

Deposition of Damond Durant, Volume 2

Case 1:20-cv-03146-DKC    Document 102-3    Filed 03/01/24    Page 14 of 56

Jawone D. Nicholson vs. State of Maryland, et al.

1 were interviewed within a week. I can tell you that

2 Ms. Hamlet was pretty, as you might imagine from your

3 interactions with her, pretty eager to follow up, as

4 well, provided everything that was asked of her in a

5 timely manner.

6      Do you have any knowledge of at all as to

7 why the Department waited until after the deadline to

8 charge you?

9      MR. GOLDBERG: Objection. Form. Asked and

10 answered. You can answer.

11   A    No.

12   Q    This one-year deadline is pretty common

13 knowledge in the Department, right?

14      MR. GOLDBERG: Objection. Form. Calls for

15 speculation. You can answer.

16   A    I would assume.

17   Q    Yeah. And in particular, in Internal

18 Affairs, I mean, they're aware of it as far as you

19 know. Is that right?

20      MR. GOLDBERG: Objection. Form. You can

21 answer.

1   A    They should be.

2   Q    Yeah. Did anybody ever explain to you why

3 they waited?

4      MR. GOLDBERG: Objection. Form. Asked and

5 answered. You can answer.

6   A    No.

7   Q    Did you ever ask anybody to wait or ask

8 anybody to drop the charges or tell anybody they should

9 be dropped or abandoned with the Department?

10      MR. GOLDBERG: Objection. Form. Asked and

11 answered. You can answer.

12   A    No.

13   Q    Why not? If you didn't agree with the

14 charges and if today you stand a hundred percent by

15 everything you did, why didn't you ask the charges be

16 dropped or abandoned or the like?

17      MR. GOLDBERG: Objection. Form. You can

18 answer.

19   A    It's their investigation. I just didn't.

20   Q    All right. Did anybody ever tell you they

21 were looking out for you, going to take care of you,

1 going to make sure this went away? Anything like that?

2      MR. GOLDBERG: Objection. Form. Asked and

3 answered. You can answer.

4   A    No.

5   Q    Other than -- and the one officer, tell me

6 again, you had to guess at least at the officer's name,

7 tell me again what the name was that had the case for

8 Internal Affairs?

9      MR. GOLDBERG: Objection. Form. Asked and

10 answered. You can answer.

11   A    It begin with an F. I guess it's a Spanish

12 name. It begin with an F.

13   Q    Okay. Then, not out of disrespect, but

14 simply because it's all I have, I'm going to refer to

15 him as Officer F. Officer F was a male. Is that

16 right?

17   A    Yes.

18   Q    And Officer F was, it sounds like, of

19 Spanish extraction, is that right, to your eye?

20      MR. GOLDBERG: Objection. Form, but you

21 can answer.

1   A    Yeah.

2   Q    And did he have a Spanish or Hispanic

3 sounding name?

4   A    Yeah, I thought it was Spanish, though.

5   Q    Okay. I'm asking because I'm trying to

6 narrow down who it might be.

7      When you say Spanish, do you mean folks who

8 come from somewhere south of Texas or are you telling

9 me you thought the man was from Spain, the country?

10      MR. GOLDBERG: Objection. Form.

11 Relevance. You can answer.

12   A    Spanish as in, I guess -- I don't know

13 where he's from, but Spanish meaning Latino, I guess.

14   Q    Okay. That's fine. That was the

15 distinction I was looking for. He's probably from

16 Baltimore, right, given that he works for the

17 Department.

18      Does that person still work for the

19 Department?

20   A    I'm not sure. I thought he retired. I'm

21 not sure.

Deposition of Damond Durant, Volume 2      Jawone D. Nicholson vs. State of Maryland, et al.

Case 1:20-cv-03146-DKC    Document 102-3    Filed 03/01/24    Page 15 of 56

Page 219

1   Q   Okay. Do you know if that person was

2 facing any discipline or other issues when Officer F

3 retired?

4   **A   No, I don't know.**

5   Q   Other than Officer F did you ever have any

6 communication with anybody else in Internal Affairs

7 related to these incidents?

8     MR. GOLDBERG: Objection. Form. Asked and

9 answered. You can answer.

10   **A   No, just Officer F.**

11   Q   Okay. Was there an Internal Affairs

12 complaint against you in connection with the lawsuit

13 that the City settled where you broke somebody's jaw?

14 Did that give rise to an Internal Affairs complaint?

15   **A   Can you -- did that have an Internal**

16 **Affairs complaint?**

17   Q   Yes, sir.

18   **A   Yes.**

19   Q   And what was the outcome of the Internal

20 Affairs complaint in that other case?

21   **A   Departmental or?**

Page 220

1   Q   Well, so there was a lawsuit. That was

2 settled in 2014. The City agreed to pay about $55,000.

3     I'm asking about the outcome of the

4 Internal Affairs complaint which is separate from the

5 lawsuit.

6   **A   I didn't receive any punishment or**

7 **reprimand from that.**

8   Q   Okay. But were there any violations found?

9     MR. GOLDBERG: Objection. Form. Asked and

10 answered.

11   **A   I didn't receive any reprimands from that,**

12 **so.**

13   Q   But do you know whether any violations were

14 found? So, for instance, it might have been found that

15 you violated the rules, but there was a decision not to

16 reprimand you.

17   **A   Oh, I don't know about that part.**

18   Q   Okay. The Baltimore Sun, when the charges

19 were dismissed in June of 2019, the Internal Affairs

20 charges in this case, when the court threw them out,

21 the Baltimore Sun reported that they telephoned you and

Page 221

1 you declined to comment. That phone call would have

2 been probably on June 16th or 17th, somewhere in

3 that range, of 2019.

4     And, you know, who knows. I'm just reading

5 it from the paper. You know, I haven't -- it's not

6 like I have a recording of it or anything, but is that

7 how you found out that the court had ruled to dismiss

8 the charges because of the one-year limitation when the

9 Baltimore Sun called you?

10   **A   No, I did not speak to them.**

11   Q   Okay. Well, it says you declined to

12 comment. Did you get a call from them, if you recall?

13   **A   Yeah, they called and I just had nothing to**

14 **say.**

15   Q   All right. But I'm just wondering. Did

16 they say something like, you know, we're calling for

17 comment because the charges were dismissed?

18     In other words, let me ask you this. By

19 the time they called did you already know what the

20 outcome was of that hearing?

21   **A   I don't remember the time between the call**

Page 222

1 **and -- I don't know if it was after or before. I don't**

2 **know.**

3   Q   And certainly by the time you hung up with

4 the Baltimore Sun, on or before, because their article

5 ran on -- hang on, I'll get you a date. Their article

6 ran in June of 2019. It looks like June 17th. On or

7 before the article in the Baltimore Sun you knew about

8 it because you either learned about it when the Sun

9 called you or you learned about it prior. Is that

10 fair?

11     MR. GOLDBERG: Objection. Form. Asked and

12 answered, but you can answer.

13   **A   It could be fair, yes.**

14   Q   When you were sued for breaking the man's

15 jaw, who represented you? Was it a FOP lawyer or a

16 lawyer for the City? Do you recall?

17   **A   I assume it was an FOP lawyer.**

18   Q   But you didn't pay for your lawyer then,

19 did you?

20     MR. GOLDBERG: Objection. Form. Asked and

21 answered.

Deposition of Damond Durant, Volume 2

Case 1:20-cv-03146-DKC    Document 102-3    Filed 03/01/24    Page 16 of 56

Jawone D. Nicholson vs. State of Maryland, et al.

Page 223

1  Q    You were provided a lawyer. Is that right?

2  A    Yes.

3  Q    All right. And the same question for this

4  case. You were provided a lawyer for this case, as

5  well. Is that right?

6       MR. GOLDBERG: Objection. Form.

7  Relevance. You can answer.

8  A    Yes.

9  Q    Okay. And tell me what social media you

10 have.

11      MR. GOLDBERG: Objection. Form.

12 Foundation. You can answer.

13 A    Just Facebook.

14 Q    What about Twitter?

15      MR. GOLDBERG: Objection. Form. Asked and

16 answered. You can answer.

17 A    No.

18 Q    And what about Instagram? Do you have an

19 Instagram account?

20      MR. GOLDBERG: Objection. Form. Asked and

21 answered. You can answer.

Page 224

1  A    No.

2  Q    What about LinkedIn? Are you on LinkedIn?

3       MR. GOLDBERG: Objection. Form. Asked and

4  answered. You can answer.

5  A    No.

6  Q    You're obviously paid by Baltimore City.

7  Is that right?

8  A    Yes.

9  Q    And you're aware, of course, that your

10 salary is public as a police officer? You're a public

11 employee, in other words?

12 A    Yes.

13 Q    So there is a website called BPD Watch that

14 had your salary in 2021 as north of 90,000; is that

15 correct?

16      MR. GOLDBERG: Objection. Relevance, but

17 you can answer.

18 A    Yes.

19 Q    And they had your overtime in 2021 as north

20 of 16,000, such that your total pay was over, they have

21 it as, 107 and change, but let's call it over a

Page 225

1  100,000; is that correct?

2  A    If that's what they had.

3  Q    Okay. But you don't dispute that. In

4  other words, that in 2021, and, in fact, in 2020, you

5  made over $100,000 from the Baltimore City Police

6  Department, correct?

7       MR. GOLDBERG: Objection to relevancy, but

8  you can answer.

9  A    Yes.

10 Q    All right. And what do you call your -- do

11 you like the term sequence number or badge number or ID

12 number? What do you call your number that's assigned

13 by the Department?

14 A    I have both.

15 Q    Okay. What's your sequence number?

16 A    Henry, meaning H, 167.

17 Q    And what's your ID number or badge number,

18 whatever you call it?

19 A    Badge number is 3511.

20 Q    3-5-1-1. Is that right?

21 A    Yep.

Page 226

1  Q    Okay. Other than the nicknames we talked

2  about previously, have you ever been known by any other

3  names other than Damond T. Durant?

4       MR. GOLDBERG: Objection. Form. Asked and

5  answered. You can answer.

6  A    Yeah, you asked me that the first day if I

7  had nicknames.

8  Q    I said other than those. Have you ever

9  been known by any other names?

10 A    No, sir.

11 Q    Let's talk about other lawsuits.

12      Have you ever been a party to another

13 lawsuit?

14 A    Party to another lawsuit?

15 Q    Yeah.

16 A    My son.

17 Q    I'm sorry, your son?

18 A    Yes.

19 Q    Tell me about your son.

20 A    He's my son.

21 Q    You said you have been a party to a lawsuit

Deposition of Damond Durant, Volume 2

Case 1:20-cv-03146-DKC    Document 102-3    Filed 03/01/24    Page 17 of 56

Jawone D. Nicholson vs. State of Maryland, et al.

Page 227

1 with him. Is that right?

2    A    Yes.

3    Q    Okay. Tell me about that lawsuit. What

4 did it involve?

5    A    Money.

6    Q    And what were the facts? Who sued who?

7 Let's start there. Did you sue or did your son sue?

8        MR. GOLDBERG: Objection to relevancy, but

9 you can answer.

10    A    Son sued me.

11    Q    Okay. About what?

12    A    Money.

13    Q    Why did your son sue you for money? What

14 was his claim?

15        MR. GOLDBERG: Same objection.

16    A    Inheritance.

17    Q    Okay. And you're still alive. Where did

18 the inheritance come from? What was at issue?

19        MR. GOLDBERG: Same objection.

20    A    His grandmother.

21    Q    So your mother passed away and there was a

Page 228

1 dispute between you and your son over inheritance; is

2 that correct?

3        MR. GOLDBERG: Same objection.

4    A    No, his mother's mother. Not my mother.

5    Q    Oh, I apologize. His maternal grandmother.

6 Okay, got it.

7        And is his mother still with us?

8    A    No.

9    Q    Okay. So when his mother's mother died did

10 she have a will?

11        MR. GOLDBERG: Objection. Relevance. You

12 can answer.

13    A    I think so, yeah.

14    Q    Okay. And how did he come to sue you over

15 an inheritance? Tell me what happened.

16        MR. GOLDBERG: Same objection.

17    A    He didn't think he got his money.

18    Q    All right. And did you sue him back? Was

19 there a countersuit?

20        MR. GOLDBERG: Same objection.

21    A    No.

Page 229

1    Q    Okay. And how did that case resolve?

2        MR. GOLDBERG: Same objection.

3    A    He was awarded money.

4    Q    Okay. How much?

5        MR. GOLDBERG: Same objection.

6    A    300,000.

7    Q    So the courts determined that you had taken

8 $300,000 that was due to your son from his maternal

9 grandmother. Is that right?

10        MR. GOLDBERG: Same objection.

11    A    No, they awarded him. That wasn't the

12 original amount from the money left to him. That was

13 not the amount.

14    Q    Okay. The award was against you, right?

15        MR. GOLDBERG: Same objection.

16    A    Yeah, he got money.

17    Q    Okay. Did you say, yes, the award was

18 against you?

19    A    Yes.

20    Q    Okay. And the award was in the amount of

21 300,000, roughly. Is that right? Or was that exact?

Page 230

1    A    Roughly.

2    Q    And it was money that you had taken from

3 the estate. Is that right?

4        MR. GOLDBERG: Objection. Relevance. You

5 can answer.

6    A    No, I didn't take $300,000 from him.

7    Q    No, sir. From the estate. You got money

8 from the estate and the court later determined it was

9 due to your son, correct?

10        MR. GOLDBERG: Objection. Form.

11 Foundation. Relevance. You can answer.

12    A    I'm not sure if you saying $300,000 from

13 him or --

14    Q    You keep saying from him. You got money

15 from the estate of your wife's mother. Is that right?

16        MR. GOLDBERG: Objection. Form. Asked and

17 answered. You can answer.

18    A    No, I'm only married now. I've only been

19 married once.

20    Q    I'm sorry, that was from your son's mother?

21        MR. GOLDBERG: Same objection.

Page 231

1    A    Yes.

2    Q    And the court determined that money should

3  have gone to your son, right?

4        MR. GOLDBERG:  Same objection.

5    A    I don't know what the court determined

6  because I never got a chance to go to court.

7    Q    Well, you told me that there was a judgment

8  awarded against you in favor of your son for 300,000,

9  right?

10   A    Yes.

11       MR. GOLDBERG:  Objection.  Form, and I

12 don't think that he's testified that it was against

13 him.  I think he's actually specifically rebuffed that

14 part of your question each time.

15       MR. HANSEL:  I don't think so.

16   Q    The award was against you, right?

17   A    Meaning, they taking money from me?

18   Q    Where did the money come from -- did your

19 son get money out of the lawsuit?  Did money go to your

20 son?

21   A    He's getting money.

Page 232

1    Q    Okay.  And it's this approximate 300,000

2  that we're talking about.  Is that right?

3    A    Yes.

4    Q    Okay.  Where is the money coming from that

5  he's getting?

6    A    My check.

7    Q    Right.  So the money is coming from you to

8  your son, right?

9    A    Yes.

10   Q    Okay.  And you got the money from the

11 estate of your son's mother.  Is that right?

12       MR. GOLDBERG:  Objection.  Form.  Asked and

13 answered.  You can answer.

14   A    He received money from his grandmother, but

15 he received his money from his grandmother.

16   Q    I'm asking about the check you're supposed

17 to write him.  Why are you supposed to write him a

18 $300,000 check to the best of your understanding?

19       MR. GOLDBERG:  Objection to form.  You can

20 answer.

21   A    The judge -- I guess the judge settled with

Page 233

1  him.  It didn't get to go to court.  I don't know

2  exactly, but they awarded him that money.  I didn't get

3  to go to court.  I didn't go to court, so I didn't hear

4  or they didn't hear my side or any other but his side.

5    Q    Well, you had a lawyer in the case, right?

6        MR. GOLDBERG:  Objection.  Form.  You can

7  answer.

8    A    No, sir.

9    Q    All right.  And did you file any papers in

10 the case?

11       MR. GOLDBERG:  Objection.  Form.  You can

12 answer.

13   A    No, sir.

14   Q    All right.  And so back to my original

15 question.  I'm just trying to understand how this

16 happened.

17       How did you get money from the estate of

18 your son's mother?  How did you get the money to begin

19 with?

20       MR. GOLDBERG:  Objection to relevancy, but

21 you can answer.

Page 234

1    A    He was a minor.

2    Q    What's your son's birth date?

3        MR. GOLDBERG:  Objection.  Form.

4  Relevancy.  And I'm not necessarily directing my client

5  not to answer, but if he doesn't want -- I would

6  understand if he doesn't want to put his son's birth

7  date on the record.

8        MR. HANSEL:  What year was your son born?

9        MR. GOLDBERG:  Thank you.

10   A    When was he born.  I know, I sound like a

11 bad father.  I'm getting his birthday mixed with my

12 birthday.

13   Q    Just give a year.  What year was your son

14 born?

15   A    I think '90's.

16   Q    Within the '90's?  Do you know what year he

17 was born?

18   A    No.

19   Q    Okay.  Was it mid '90's, early 90's,

20 late '90's?

21   A    Probably mid 90's.

Deposition of Damond Durant, Volume 2
Case 1:20-cv-03146-DKC    Document 102-3    Filed 03/01/24    Page 19 of 56
Jawone D. Nicholson vs. State of Maryland, et al.

Page 235

1    Q    And when did his mother pass?

2    A    **I don't know exactly about that.**

3    Q    What year?

4    A    **Don't remember.**

5    Q    Okay.  So even if your son was born in '99,

6    ten years after '99 would have been '09, another eight

7    years would have been 2017.  So even if he was born

8    in '99 you agree with me he would have been 18 by the

9    year 2017, right?

10    MR. GOLDBERG:  Objection to relevance, but

11    you can answer.

12    A    **Yes.**

13    Q    Is that right?

14    MR. GOLDBERG:  Same objection.

15    A    **Yes, okay.**

16    Q    So we can agree that your son was not a

17    minor as of 2017.  Is that correct, sir?

18    MR. GOLDBERG:  Same objection.  You can

19    answer.

20    A    **The reason why they gave the money to me,**

21    **because he was a minor.  That's what I remember.**

Page 236

1    Q    And who gave you this money?

2    MR. GOLDBERG:  Same objection.  You can

3    answer.

4    A    **The lawyer.**

5    Q    What lawyer?

6    A    **I guess her --**

7    MR. GOLDBERG:  Same objection.  Cary, would

8    are you grant me a continuing relevancy objection as to

9    this entire line of questioning?

10    MR. HANSEL:  Sure, no problem.

11    MR. GOLDBERG:  Thanks.

12    THE WITNESS:  I'm ready.

13    Q    Yeah.  So who gave you the money?

14    A    **Her lawyer, the grandmother's lawyer.**

15    Q    Well, was she -- had she passed when you

16    got the money?

17    A    **Yeah, it was a will.**

18    Q    Okay.  So it was a lawyer for her estate,

19    you think, gave you money?

20    A    **Yes.**

21    Q    And did you understand you needed to keep

Page 237

1    it in trust for your son and use it for his benefit?

2    A    **Yes.**

3    Q    Okay.  And then when he turned 18 you

4    refused to give him the money.  Is that right?

5    A    **No.**

6    Q    So when he turned 18 you handed it over?

7    A    **No, he was going through the money.**

8    Q    He was what?

9    A    **Going through the money.**

10    Q    No, sir.  When he turned 18 did you give

11    him the money or did you keep it?

12    A    **No, I didn't keep it.  I gave him money.**

13    Q    All of it.  Not money, not some money.

14    When he turned 18 did you give him all of this money or

15    not?

16    A    **No, because he was using the money during**

17    **the time and we fought about it all the way up until --**

18    Q    Whose account was it in on his 18th

19    birthday?

20    A    **Mine.**

21    Q    Okay.  Whose account was it in on his

Page 238

1    19th birthday?

2    A    **Mine.**

3    Q    Okay.  And it's still in your account,

4    right?

5    A    **What do you mean?**

6    Q    The money.  Have you given him the 300,000?

7    A    **No, that's coming out of my check.**

8    Q    Right.  And it's coming out of your check

9    because he has to collect it that way because you spent

10    the money.  Isn't that right?

11    A    **No.**

12    Q    Okay.  So you still have the money sitting

13    around somewhere that you could give him, but you're

14    making him get it out of your check.  Is that right?

15    A    **No.**

16    Q    Well, explain that to me.  Where is the

17    money?

18    A    **He spent it.**

19    Q    Okay.  How did he spend it if it was in

20    your account?

21    A    **It was his money.  He would ask for money**

Page 239

1  and I would give it to him.

2  Q    So you gave your son, while he was a minor,

3  a total of $300,000?

4  A    No, that's not the original amount.  No.

5  Q    What's the original amount?

6  A    The original amount was, like, 60-some;

7  60,000.

8  Q    Okay.  Why did the court rule that you owed

9  him 300,000?

10  A    I wasn't there.  I don't know.

11  Q    Okay.  So you're telling me you gave your

12  son 60,000 while he was still a minor out of your

13  account to just let him spend.  $60,000.  Is that

14  right?

15  A    Pretty much.

16  Q    Okay.  What did he spend $60,000 on while

17  he was a minor?

18  A    He would buy clothes, he bought a couple --

19  he bought cars.

20  Q    Okay.  So you let your son, a minor, buy

21  clothes and cars in the amount of $60,000.  Do I have

Page 240

1  that right?

2  A    I don't know what it came to, but he spent

3  that money.

4  Q    And how many cars did he buy while he was a

5  minor with this $60,000?

6  A    He probably had three cars.

7  Q    Three cars.  And what was the most

8  expensive one?  The make and model.

9  A    I don't remember.

10  Q    All right.  Were any of them fancy?

11  A    No, not really.

12  Q    Were they used cars?

13  A    Yeah.

14  Q    Okay.  Did any of them cost, say, more than

15  $5,000?

16  A    Don't know.

17  Q    So how did he spend $60,000 on three, not

18  fancy used cars and clothes before his 18th birthday?

19  Explain that to me.

20  A    I can't.

21  Q    Okay.  What other lawsuits have you been

Page 241

1  involved in?

2      MR. GOLDBERG:  Cary, would this be a good

3  time to request, like, a five-minute break?

4      MR. HANSEL:  Yeah, sure.  No problem.

5  First, let's go off the record and then we'll see how

6  long people need a break.  I always like to include the

7  court reporter.

8      MR. GOLDBERG:  Good call.

9      THE REPORTER:  Thank you.

10      MR. HANSEL:  So we'll go off.

11      (A discussion was held off the record.)

12      (There was a brief recess taken.)

13      MR. HANSEL:  We'll go back on the record,

14  then.

15  BY MR. HANSEL:

16      Q    Officer, we have talked a little bit about

17  the case with your son.  Tell me about other lawsuits

18  you have been a party to.

19      A    Which one do you want to know about?  I'm

20  not sure.

21      Q    Yeah, well, let's just make a list.  How

Page 242

1  many lawsuits have you been a party to?

2      A    I think that's it.  I'm not sure.

3      Q    Okay.  Well, wait a minute.  Let's think

4  about this.  We have talked about the one where you

5  broke a man's jaw.  We have talked about the one with

6  your son.  You're obviously a party to the current

7  lawsuit with Jawone Nicholson.

8      Have you ever been a party to any other

9  lawsuits other than those three?

10      A    They're the ones that I remember.

11      Q    Okay.  So as far as you remember you

12  haven't been party to any other lawsuits besides those

13  three.  Is that right?

14      A    They're the ones that I remember.  Is there

15  a particular one you have that will maybe jog my

16  memory?  I'm not sure.

17      Q    Sir, I'm just seeing you're willing to --

18  I'm just trying to determine what you're willing to

19  tell me here without me having to pull up documents.

20      Are there any other lawsuits you have ever

21  been a party to besides the three we have talked about?

Page 243

1    A    I don't know because what is relevant to

2  me.  I'm not sure.

3    Q    I'm not asking you what's relevant.  Have

4  you ever been a party to any other lawsuits other than

5  the three we have already talked about?

6    A    Just, like, car accidents.

7    Q    All right.  How many of those?

8    A    There is a workers' comp.  One recently

9  that I was in a car accident on 95.  That's what I

10 remember.

11   Q    Okay.  Any other lawsuits besides car

12 accident and workers' comp?  And other than what we

13 have already talked about.

14   A    I don't know.

15   Q    So is your answer, no, nothing else?

16   A    That I remember, no.

17   Q    Okay.  Have you ever filed bankruptcy

18 proceedings in the United States District Court,

19 bankruptcy court for Maryland?

20   A    Yeah, I didn't think that was a lawsuit.

21   Q    Okay.  And in the bankruptcy your main debt

Page 244

1  that you were seeking to avoid was the judgment in

2  favor of your son.  Is that right?

3    A    Main debt?  No, there was a bunch of them.

4    Q    All right.  Well, let's see if I can share

5  my screen again.

6        All right.  And I'm showing you, sir, a

7  case text search for Durant versus Durant, also known

8  as In Re: Durant.  And this is an opinion by Judge

9  Harner, who is a U.S. Bankruptcy judge.

10       You recognize this as related to your case,

11 right?  Here under relevant background, it says:

12 Damond Durant, Sr. and Sharae Durant filed this

13 Chapter 7 bankruptcy on July 28, 2017.  The debtors

14 listed approximately 452,000 in debt.

15       Do you see all that?

16   A    Uh-huh.

17   Q    Is that a yes, sir?

18   A    Yes.

19   Q    And you recognize this opinion as being an

20 opinion in your bankruptcy case, right?

21       MR. GOLDBERG:  I'm going to levy a couple

Page 245

1  of objections without trying to speak too much, Cary.

2  The first is, I would levy the same evidentiary

3  objection as to your reliance on a document not

4  produced in discovery, and, relevance.  And if you

5  would grant me a continuing objection as to relevancy,

6  I won't have to object on each question as such.

7        MR. HANSEL:  Yeah, sure.

8        MR. GOLDBERG:  And obviously, you just

9  continue to ask your question.

10       MR. HANSEL:  No problem.

11 BY MR. HANSEL:

12   Q    Officer, you recognize this as an opinion

13 by the bankruptcy court in your bankruptcy case, right?

14   A    Yes, you said it's my bankruptcy, yes.

15   Q    All right.  And it says here that you and

16 your wife listed approximately 452,000 in debt and then

17 the court says:  The overwhelming majority of this debt

18 relates to a single judgment entered against the

19 defendant.

20       And that refers to the judgment entered

21 against you by your son.  Is that right?

Page 246

1    A    That's what it says.

2    Q    Okay.  And you agree with that, don't you?

3    A    Yes, that's what it says.

4    Q    No, but it's true, though, that the

5  overwhelming majority of the debt relates to the single

6  judgment entered against you in favor of your son?

7    A    Yes.

8    Q    Right.  In other words, the bankruptcy was

9  over 452,000 and you told me you thought the judgment

10 in favor of your son was 300, so the vast majority of

11 it involves the issue with your son, right?

12   A    Yes.

13   Q    Okay.  And earlier you said you thought the

14 inheritance was about 60,000.  The court here says it

15 was 75,803.83 and for that the court is citing

16 transcripts of the state court hearings.

17       Does this refresh your recollection that

18 the amount left to your son was actually 75,803.83?

19   A    Yeah, I said it was around 60.  That's the

20 amount that was totaled because it came in separate

21 checks.

Deposition of Damond Durant, Volume 2

Case 1:20-cv-03146-DKC    Document 102-3    Filed 03/01/24    Page 22 of 56

Jawone D. Nicholson vs. State of Maryland, et al.

Page 247

1    Q    And it says here that when your son turned
2    21 years old that you gave him a hundred dollars and
3    then told him the rest of the money was gone and he
4    should do whatever he needed to do.
5        Is that what happened?
6    A    I don't remember that part.
7    Q    Okay.  Did you give him a hundred dollars
8    when he turned 21?
9    A    I gave him money all the time.
10   Q    All right.  Is this your Facebook page?  Do
11   you recognize it here?  It says Damond Durant?
12   A    Yeah, that's me.
13   Q    Is there any chance this you on this bike
14   here?
15   A    No, sir.
16       MR. GOLDBERG:  I'm going to levy the same
17   objection as before as to the discovery and same
18   relevancy objection, if you grant it for me, Cary.
19       MR. HANSEL:  No problem.
20       MR. GOLDBERG:  Thanks.
21   Q    I just was wondering.  Is this you on this

Page 248

1    bike?  I couldn't hear your answer.
2    A    No, that's not me.
3    Q    But you certainly have a motorcycle, right?
4    A    Yes.
5    Q    What kind of motorcycle do you have?
6    A    A sport bike.  That's it right there.
7    Q    Okay.  So you have GSX-R K8 1000.  Is that
8    right?
9    A    Yes.
10   Q    And what did that bike cost you?
11   A    I'm going to say 14.
12   Q    $14,000?
13   A    Uh-huh.
14   Q    Is that a yes?
15   A    Yes.
16   Q    And you had, at the time of these events
17   anyway, a pickup truck, also.  Is that right?
18   A    Did I have a pickup truck.  I think I
19   had -- I think I had my -- I had a Yukon, I think, at
20   that time.
21   Q    Okay.  What did the Yukon cost you?

Page 249

1    A    I guess it was in the 30's.
2    Q    Okay.  And what other vehicles did you have
3    at the time of the incident with Mr. Nicholson?
4    A    Mr. Nicholson I had a pickup truck.
5    Q    Okay.  That was an F-150, I think?
6    A    No, that was a RAM 1500.
7    Q    Okay.  What did that cost you, you think?
8    A    The RAM?
9    Q    Yes.
10   A    27, 30's, I think.
11   Q    So now we have talked about the broken jaw
12   case, the case with your son, the case with
13   Mr. Nicholson, the bankruptcy case.  You mentioned comp
14   and car accidents.  We're going to get into those.
15       What other lawsuits have you ever been a
16   party to?
17   A    That's about it that I can remember.
18   Q    Okay.  The judge in the bankruptcy court
19   quotes some findings that the Circuit Court judge made
20   here, and these are cited to the Circuit Court
21   transcript.  You see the Circuit Court judge said that

Page 250

1    your conduct was reprehensible.
2        Do you see that?
3    A    What case is this?
4    Q    This is the bankruptcy court quoting the
5    Circuit Court judge in the case brought by your son.
6    And the Baltimore City Circuit Court judge said your
7    conduct was reprehensible.
8        Do you see that?
9    A    I see it.
10   Q    And then the Circuit Court judge also said
11   the fact that the Defendant made repeated statements to
12   the Plaintiff, that's your son, knowing full well that
13   they were false, that he couldn't touch the money while
14   he was spending it on himself, clearly shows, by clear
15   and convincing evidence, there was actual malice that
16   you knew what you were doing.  That you knew exactly
17   what you were doing.
18       Do you see that?
19   A    I see it.
20   Q    Okay.  And you're certainly aware of these
21   rulings by the Circuit Court, aren't you?

Deposition of Damond Durant, Volume 2                                          Jawone L. Nicholson vs. State of Maryland, et al.

Case 1:20-cv-03146-DKC     Document 102-3     Filed 03/01/24     Page 23 of 56

Page 251

1    A    No, sir.

2    Q    And you are aware of the Circuit Court

3  proceedings when they happened, right?

4    A    No, sir.

5    Q    Did you ever challenge the Circuit Court

6  proceedings based on the theory that you weren't aware

7  of them?

8    A    I did not because I was told that it

9  couldn't reverse.  But I never was in court.  I got

10  served with a court notice the day of or the day

11  before, so I wasn't able to get in court.  I never was

12  present.

13    Q    Did you ask for time off to go?

14    A    For time off?  From work?

15    Q    Yeah.

16    A    No.

17    Q    Okay.  And the majority of that award,

18  227,000, was in punitive damages.

19        Do you see that?

20    A    Yeah, I see it.

21    Q    Okay.  And then to try to avoid paying your

Page 252

1  son that money, you filed this bankruptcy.  Is that

2  right?

3        MR. GOLDBERG: Objection.  Form.  You can

4  answer.

5    A    Well, he was getting money before the

6  bankruptcy.

7    Q    Right.  And to try to avoid paying him the

8  rest of it you filed the bankruptcy.  Is that right?

9        MR. GOLDBERG: Objection.  Form.  You can

10  answer.

11    A    Yeah, I filed bankruptcy.

12    Q    What other lawsuits have you been a party

13  to that we haven't already talked about?

14    A    Like I said, just the ones that I

15  mentioned.  That's the ones that come to mind.

16    Q    Okay.  Let's talk about, you said there

17  were car accidents.  Tell me about the car accidents.

18    A    A car hit me on 95.  A truck hit me on 95.

19  But that's in progress now.  Workers' comp, a kid drove

20  off course.  That just ended.  They are the two.

21    Q    Anything else?

Page 253

1    A    No, they're the ones that come across that

2  I remember.

3    Q    When you say a kid -- you said a kid came

4  across.  Tell me about that.

5    A    Off course.  That was a student went off

6  course.

7    Q    What do you mean went off course?  In other

8  words, tell me what you mean by that.

9    A    Meaning he drove off course.  Off of the

10  street into the grass.

11    Q    Okay.  And he struck you with a car?

12    A    No, I was a passenger in the car.

13    Q    Okay.  All right.  And were you on duty at

14  that time?

15    A    Yes.

16    Q    And so that was the comp claim.  Is that

17  right?

18    A    Yes, sir.

19    Q    Okay.  Have you ever been involved in any

20  other lawsuits other than what we have now talked

21  about?

Page 254

1    A    That I can remember.  Because I didn't

2  think the bankruptcy was a suit.  So, what I can

3  remember.

4    Q    Okay.  And what about criminal charges?

5  Have you ever been charged with a crime?

6    A    No.

7    Q    Have you ever been charged with a crime in

8  Virginia?

9    A    I'm not sure what you're talking about,

10  sir.

11    Q    Well, it took you a long time to answer

12  that.  I could answer you immediately.  I've never been

13  charged with a crime in Virginia.  Why did it take you

14  so long to answer?

15    A    Because you're -- obviously, I guess, you

16  know something.  I don't remember anything in Virginia.

17  I've never been committed of a crime.  I wouldn't be a

18  police officer if I was committed of a crime.

19    Q    I'm not sure what committed of a crime

20  means.  I think you mean convicted, but set that aside

21  for a minute because it's not what I'm asking.

1    Have you ever been charged with a crime

2  anywhere?  Let's start there and then I'm going to ask

3  in Virginia.

4    **A    Not that I remember, no.**

5    Q    Have you ever been charged with a crime in

6  the State of Virginia?

7    **A    I don't remember.  Is it a vehicle or**

8  **something?  I'm not sure.  But I don't remember**

9  **committing a crime in Virginia.**

10   Q    Sir, I'm not asking if you committed a

11  crime, sir.  I'm asking, have you ever been charged

12  with a crime in Virginia?

13        MR. GOLDBERG:  Objection.  Form.  Asked and

14  answered.  He's testified he doesn't remember.

15        MR. HANSEL:  If he says that clearly under

16  oath, then we'll --

17        MR. GOLDBERG:  I think he said it pretty

18  clearly, but you can answer.

19   Q    Go ahead.  Have you ever been charged with

20  a crime in Virginia?

21   **A    I don't remember.**

1    Q    Okay.  What did you mean when you said

2  maybe with a vehicle or something or you made some

3  reference to a vehicle or something?

4    **A    I was asking.  Because charged with a crime**

5  **in a violation?  I don't know what you mean.**

6    Q    Okay.  Have you ever had any type of legal

7  issue in Virginia at all?

8    **A    No.**

9    Q    What were you thinking about when you said

10  maybe with a vehicle or something?

11   **A    Like, I was speculating, trying to see what**

12  **you were wanting me to answer because I don't remember**

13  **anything in Virginia.**

14        MR. HANSEL:  All right.  Give me just a

15  second.  I'm going to share my screen here.

16   Q    You're familiar with Case Search, right?

17  Maryland Case Search?

18   **A    Yes.**

19   Q    You have used that before, haven't you?

20   **A    Yes.**

21   Q    All right.  So when I put Damond Durant

1  into Maryland Case Search I pulled up the results here.

2  There are 268 items come up.

3        Can you see this all on your screen?

4    **A    Yes.**

5    Q    And looking at these cases there is one

6  here, Damond T. Durant.  It's a contract case from

7  2017.  LCS Financial Services versus Damond T. Durant.

8        Do you see that, sir?

9    **A    Yeah.  Yeah, I see what you got.**

10   Q    And it listed an address of Gresham Wary,

11  Baltimore.

12        Do you see that?

13   **A    No.  Oh, yes, Gresham Way?**

14   Q    Yeah.  It says Wary, but it's certainly

15  supposed to say Way.

16        You agree with me this is you that's

17  involved in this case, right?

18        MR. GOLDBERG:  Same objection as to the

19  other exhibits and a request to continuing relevancy

20  objection as to this line of questioning.

21        MR. HANSEL:  Sure, I'll recognize it.

1    Q    You agree that this is you, right, sir?

2    **A    Can you scroll up for me?**

3    Q    Yeah, sure.  I can't go up higher.  I can

4  go down.  So the Defendant is Damond T. Durant at 2704

5  Gresham Way.

6        Have you ever lived at 2704 Gresham way?

7    **A    Hello?**

8    Q    Yes, sir.  Have you ever lived at 2704

9  Gresham way?

10   **A    Yes.**

11   Q    And so you agree with me that the Damond T.

12  Durant of 2704 Gresham Way that's referenced here on

13  Case Search in connection with this lawsuit, is you,

14  right?

15   **A    No.  My son has the same exact name.**

16   Q    Okay.

17   **A    No.**

18   Q    Do you think your son, in 2017, was sued by

19  LCS Financial Services Corporation?

20   **A    I don't remember this or -- I don't**

21  **remember what this.**

Deposition of Damond Durant, Volume 2

Case 1:20-cv-03146-DKC    Document 102-3    Filed 03/01/24    Page 25 of 56

Jawone D. Nicholson vs. State of Maryland, et al.

Page 259

1  Q    He would have been barely 18.

2  A    Yeah.  No, then yes, that's me.

3  Q    Okay.  So this is at least one lawsuit that

4  we didn't talk about earlier.  Tell me about this case.

5  A    I couldn't because I have no idea what this

6  is.

7  Q    And you don't know what LCS Financial

8  Services is?

9  A    I guess it's a company.

10  Q    Do you know what they do?

11  A    No.

12  Q    Okay.  Going back to the 200-plus cases

13  here where you're listed, you're listed as a party in a

14  civil case called State of Maryland versus Eubanks.

15      What can you tell me about that?

16  A    Mr. Eubanks broke into my vehicle, stole

17  property.

18  Q    Okay.  And you sued him?

19  A    No, I didn't sue him.  He was being placed

20  under arrest.  They was looking for him.  I didn't sue

21  anybody.

Page 260

1  Q    All right.  And he was ordered to pay some

2  restitution, I take it, then, based on your

3  description?  Is that right?

4  A    I didn't receive anything.  He was just

5  being arrested.

6  Q    Do you know if he was ordered to pay any

7  restitution?

8  A    No, no.

9      MR. GOLDBERG:  Counsel, rather than me

10  having to renew the relevancy objection on all of the

11  Maryland Judiciary Case Search files you bring up, I'm

12  going to levy that objection if you grant it.

13      MR. HANSEL:  No problem.  I'll recognize a

14  continuing objection there.  No problem.

15      MR. GOLDBERG:  Thank you.

16  BY MR. HANSEL:

17  Q    Have you ever lived at Fulton Avenue?

18  A    Yes, sir.  Born and raised.

19  Q    Okay.  And is your date of birth 2/22/1972?

20  A    Yes, sir.

21  Q    So there is a Damond Tremmell Durant,

Page 261

1  address listed on Fulton Avenue, date of birth, same as

2  yours, who had a traffic violation in, it looks like,

3  year 2000 on Case Search.

4      Do you see that?

5  A    Okay.

6  Q    Tell me what that was about.  It says you

7  got a PBJ.  You hired a defense attorney, Marsden

8  Coates.

9  A    It was a traffic.

10  Q    So were you driving on a suspended license?

11  A    That's what it says.

12  Q    Okay.  How had your licensed come to be

13  suspended?

14  A    I don't remember that.

15  Q    And you were certainly charged with driving

16  on a suspended license.  Is that right?

17  A    Yep, that's what it's saying.

18  Q    And you had to hire a lawyer for that.  Is

19  that right?

20  A    Yes.

21  Q    And you paid court costs of 105 and a fine

Page 262

1  of 305.  Is that right?

2  A    That's what it says, yes.

3  Q    And you pled guilty.  In other words, you

4  don't dispute that you were driving on a suspended

5  license, do you?  You plead guilty, right?

6  A    Yeah, if the license was suspended it was

7  suspended, yes.

8      THE REPORTER:  Excuse me, Cary.  You just

9  said 305.  Did you mean 3-5-0?

10      MR. HANSEL:  I did.  Let's clear that up.

11  BY MR. HANSEL:

12  Q    Officer Durant, apparently I may have

13  misspoken.

14      You agree with me you were fined and paid

15  $350 in connection with your guilty plea for a driving

16  on a suspended license?

17  A    Yes.

18      THE REPORTER:  Thank you.

19  Q    Okay.  Now, earlier when I asked you if you

20  had ever been charged with anything, you said, no.  And

21  here you had a defense attorney, you had a hearing, you

Page 263

1   entered a plea, you paid over $450.

2        Why didn't you mention this earlier when I

3   asked?

4        A    Because what I remember is what I remember.

5   That was when?

6        Q    December of 2000.

7        A    That's a long time ago.  And it's traffic,

8   so I'm not sure if that count for as that's what you

9   were talking about.

10       Q    Have you ever been charged with any

11  violation of law in the history of the world other than

12  what we have already spoken about?

13       A    Of course, because it's right there.

14       Q    But now we have spoken about this one.

15       Other than what we have spoken about now,

16  have you ever been charged with any violation of law in

17  the history of the world?

18       A    Probably, yeah, I would assume so because

19  you have it all right there.

20       Q    All right.  Now, tell me about your other

21  criminal charges in the history of the world or any

Page 264

1   violations of law.

2        MR. GOLDBERG:  Objection.  Form.  You can

3   answer.

4        A    Yeah, I don't remember every little thing.

5        Q    Tell me anything else you remember.

6        A    What I just told you.

7        Q    So the truth of the matter is, sir, you're

8   just not going to admit anything until I pull up the

9   document.  Is that right?

10       MR. GOLDBERG:  Objection to form.  And I

11  don't think my client has declined to answer any of

12  your questions.  If it's not to your satisfaction, then

13  you can ask him more questions, Cary, but the

14  argumentation is unnecessary.

15       MR. HANSEL:  Well, I'm just trying to

16  understand his answers.

17       Q    Is that the approach you're taking, sir?

18  You're going to tell me you don't remember until I pull

19  it up?

20       MR. GOLDBERG:  Objection.  Form.

21  Argumentative.  You can answer.

Page 265

1        A    No, that's not -- no.

2        Q    Okay.  All right.  So did you ever have a

3   Pennsylvania Avenue address in Upper Marlboro?

4        A    No.

5        Q    Okay.  Do you know anything about a

6   foreclosure case?  Did you ever own property there?

7        A    In Upper Marlboro?

8        Q    Let's just say on any Pennsylvania Avenue

9   anywhere.  They have Upper Marlboro, but sometimes it

10  might be right outside.

11       A    Never lived in Upper Marlboro, no.

12       Q    Did you ever own any property on a

13  Pennsylvania Avenue?

14       A    No.

15       Q    Okay.  There is a foreclosure case called

16  Fischer versus Durant filed in '08.  And it's against

17  Damond T. Durant.

18       What do you know about that case?

19       A    I lost my home.

20       Q    What home did you lose?

21       A    That was in Randallstown or Woodlawn.

Page 266

1        Q    On what street was the home in Randallstown

2   or Woodlawn?

3        A    I don't remember.  To really be honest, I

4   don't remember.  I really don't remember.

5        Q    Okay.

6        A    But Baltimore.

7        Q    Okay.  So tell me about what happened.

8        A    I lost my home.

9        Q    Under what circumstances?  How did you come

10  to lose your home?

11       A    Not knowing about buying a home, they gave

12  me what is called an adjustable mortgage rate and it

13  kept going up and up and up and up and up where I

14  couldn't afford the home.

15       Q    Did you spend some of your son's

16  inheritance money trying to keep that home?

17       A    No, I had my own money.

18       MR. GOLDBERG:  Objection to form.  You can

19  answer.

20       Q    Well, you didn't have enough.  You got

21  foreclosed on, right?

Deposition of Damond Durant, Volume 2

Case 1:20-cv-03146-DKC    Document 102-3    Filed 03/01/24    Page 27 of 56

Jawone L. Nicholson vs. State of Maryland, et al.

Page 267

1    A    Well, if -- I probably would still have the
2  home if I spent his money.
3    Q    All right. So when I asked you earlier
4  about cases you have been involved in, you didn't
5  mention this one until I pulled it up. Is there a
6  reason?
7        MR. GOLDBERG: Objection to form. You can
8  answer.
9    A    No, there is no reason.
10    Q    Okay. You're not here to tell me you
11  forgot having a home foreclosed and losing a home. You
12  didn't forget that, did you?
13        MR. GOLDBERG: Objection to form. You can
14  answer.
15    A    No, and I wasn't brought up on charges for
16  that.
17    Q    Okay. Yeah, but I asked you about
18  lawsuits, also, of which you were a party and you
19  didn't bring this up. You remember those questions,
20  don't you, sir?
21        MR. GOLDBERG: Objection to form and

Page 268

1  foundation. You can answer.
2    A    That I was charged. That's what I remember
3  you saying. That I was charged.
4    Q    You don't recall me asking you what
5  lawsuits you were a party to and going through the
6  broken jaw case, the case with your son, this case, the
7  car accidents, the comp case?
8        You don't remember that, sir? And I said,
9  repeatedly, is that everything and you said, yes. And
10  now I'm -- and then we have looked at the bankruptcy,
11  which was another one. That wasn't a criminal case.
12        And now, sir, I'm asking you, is there any
13  reason why you didn't tell me about the foreclosure
14  when we were going through those other cases?
15    A    It's not a criminal case. You said
16  criminal or charges. That's me losing my home. Not a
17  case.
18    Q    Sir, we have talked about both, but let me
19  be clear. In the whole history of the world, other
20  than what we have already talked about now, have you
21  ever been a party to any civil or criminal case? Civil

Page 269

1  includes any type of civil proceeding at all. Other
2  than what we already talked about.
3    A    Yes.
4    Q    Okay. What others?
5    A    The one you just mentioned about me losing
6  my home.
7    Q    Right. So now we have talked about that.
8        Other than what we already talked about,
9  have you ever been a party to any civil or criminal
10  cases?
11    A    Let me see what I can remember. No, that's
12  what I can remember.
13    Q    All right. What is Wittstadt versus
14  Durant?
15    A    I don't know. I don't know. What's
16  Wittstadt?
17    Q    How many foreclosures have you had?
18    A    One.
19    Q    Okay. All right. Have you ever lived at
20  4985 Columbia Road, Number 203?
21    A    Say that address again?

Page 270

1    Q    4985 Columbia Road.
2    A    I think so, yes.
3    Q    So I'm now pulling up a lawsuit that is
4  Gates Hudson & Associates versus Sharae Durant, it says
5  here, et al. And the other person listed is Damond
6  Durant, with that address that you have identified as
7  your own.
8        Do you agree with me that you are one of
9  the defendants in the lawsuit Gates Hudson &
10  Associates, Inc. versus Durant?
11    A    Yes.
12    Q    Okay. It says here this was a failure to
13  pay rent case. Were you sued for failure to pay rent?
14    A    If that's what it says, then, yes.
15    Q    Okay. And there is someone here listed as
16  Milan Lewis. Did you get a lawyer named Milan Lewis?
17    A    No, that's my son.
18    Q    How many sons do you have?
19    A    Well, before I was married my wife had
20  three sons and I had one son and we have a daughter.
21    Q    And what?

Deposition of Damond Durant, Volume 2

Case 1:20-cv-03146-DKC    Document 102-3    Filed 03/01/24    Page 28 of 56

Jawone L. Nicholson vs. State of Maryland, et al.

Page 271

1    A    And we now have a daughter.  We have a
2  daughter.
3    Q    All right.  So did you ever adopt your
4  wife's sons?
5    A    Not legally.  Not paper.
6    Q    That's fine.  I get it.  And sometimes the
7  real world is different.  I appreciate that, sir.
8        And so Mr. Lewis, then, Milan Lewis,
9  biologically, is that your wife's son, but not yours
10 biologically?
11   A    Yes.
12   Q    Now, earlier when I asked you about
13 lawsuits you had been a party to, civil cases, anything
14 in the whole history of the world, why is it you didn't
15 mention this failure to pay rent case?
16   A    Didn't remember.
17   Q    Okay.  Now, other than what we have already
18 talked about, including this failure to pay rent case,
19 in the whole history of the world have you ever been a
20 party to any criminal or civil proceedings of any type?
21   A    All right.  You keep asking me the same

Page 272

1  question and the things that I think that you want to
2  know, I don't know if they're cases.  So I don't
3  remember.  I don't know.  Because it's a lot of things
4  and this could be things that are over with or a long
5  time ago.  I'm not sure what you're asking me.  Because
6  I said yes to that question.
7    Q    So, sir, when I say in the whole history of
8  the world, I hope you understand that includes things
9  that happened a long time ago, because the whole
10 history of the world is quite long, and it's quite
11 longer than your history or mine.  So that means in
12 your entire life.
13       In your entire life, sir, other than what
14 we have already talked about, have there ever been any
15 criminal or civil proceedings in which you have been a
16 party other than what we have already talked about?
17   A    Yes.
18   Q    List them.
19   A    I don't remember all of them.
20   Q    List any of them.
21   A    The ones that we just talked about.

Page 273

1    Q    No, I said other than what we have already
2  talked about.  And you said, yes.  So now I'm asking,
3  what do you recall other than what we have talked
4  about?
5    A    Just the ones that you brought up.
6    Q    Okay.  So, in other words, you don't recall
7  any that we haven't already talked about; is that
8  correct?
9    A    Yes.
10   Q    All right.  And I have to ask you again,
11 sir, is it your intention not to list any of these
12 until I actually pull up the documents?  Is that your
13 approach here today?
14   A    No.  Not at all.
15   Q    All right.  Now, you can see the Case
16 Search list here online, right?  You can see this?
17   A    Yes.
18   Q    Okay.  I'm going to point out to you, sir,
19 that there are one, two, three, four, five, six, seven
20 lines which, if you follow them over, say FTPR, and
21 involve Gates Hudson & Associates versus you and your

Page 274

1  wife.
2        Do you see those?  And we can go through
3  each one if you need to, but do you see that there are
4  seven of those?
5    A    Yes.
6    Q    Okay.  And, sir, I'm going to represent to
7  you, you may know this, that FTPR stands for failure to
8  pay rent.
9        Do you agree with me, looking at this, that
10 there were seven different cases, you'll see they all
11 have different case numbers and different dates, that
12 there were seven different cases filed against you for
13 failure to pay rent by Gates Hudson & Associates?
14   A    Yes, I see it.  Yes.
15   Q    All right.  Now, is there any reason why
16 you didn't mention the other six of these cases a
17 minute ago when I asked you about civil cases in the
18 history of the world and that kind of thing?
19   A    I didn't know it was that many and I didn't
20 know that's what you were talking about.
21   Q    Okay.

Case 1:20-cv-03146-DKC    Document 102-3    Filed 03/01/24    Page 29 of 56

Page 275

1    A    And I don't remember actually going to

2  court for any of these.

3    Q    So, I didn't ask you if you went to court.

4  I asked you if there were any cases filed, right?

5         I'm going to show you, sir, a case called

6  Comptroller of Maryland versus your wife and you're

7  also a defendant.

8         Do you see this, sir?

9    A    Okay.

10   Q    And this is a case that was filed against

11 you by the State of Maryland involving a state tax

12 lien.

13        Do you see that?

14   A    I see it.

15   Q    And it looks like you had failed to pay

16 your taxes to the tune of almost $1,900; $1,889.09.

17        Do you see that, sir?

18   A    I see it.

19   Q    Now, earlier when I asked you about civil

20 proceedings, is there some reason why you didn't

21 mention this one?

Page 276

1    A    Didn't know anything about it.

2    Q    You didn't know about this?  You didn't

3  know that there was a tax lien for $1,889.09?

4    A    No, sir.

5    Q    Well, it's listed as closed.  Did you ever

6  pay off that tax lien?

7    A    No, sir.

8    Q    We mentioned earlier the case in which you

9  broke a man's jaw and I want to show you, I'm pulling

10 up a case called Jon Black, dash, Thaxton,

11 T-H-A-X-T-O-N, versus Damond Durant, et al.  And

12 Mr. Thaxton was represented by a lawyer named Michael

13 Taylor and you were represented by a lawyer named Peter

14 Sheehan.  And there was also a defendant named Alan

15 Neita.

16        Alan Neita is a fellow officer.  Is that

17 right?

18   A    Yes.

19   Q    Looking at this, given who the lawyers are,

20 the timing, the fact that this fellow officer was

21 involved, do you agree with me that this was the case

Page 277

1  involving the broken jaw?

2    A    Yes.

3    Q    And then looking at this, do you agree with

4  me that the man whose jaw you broke was a man named

5  Jon, J-O-N, Black, dash, Thaxton, T-H-A-X-T-O-N?

6    A    Yes.

7    Q    And his case was filed in March of 2014.

8         Do you agree with that?

9    A    Yes.

10   Q    And then the settlement came, it says

11 disposition date here, February, 2015.  So that case

12 was around for roughly a year before it was settled; is

13 that correct?

14   A    Yes.

15   Q    And so, certainly when the events here in

16 this case happened it was after the City had settled

17 with Mr. Black-Thaxton.  Is that right?

18   A    Say that again?

19   Q    When your interaction with Mr. Nicholson

20 happened, it was after the City had settled with

21 Mr. Black-Thaxton in your other case, right?

Page 278

1    A    Black-Thaxton was way before Mr. Nicholson.

2    Q    Right.  And the settlement, what I'm

3  getting at, is the City paid that settlement before you

4  had an interaction with Nicholson.  Is that right?

5    A    Yes.

6    Q    Okay, got it.  And were you ever

7  disciplined by the City for what happened with

8  Mr. Black-Thaxton?

9    A    No.

10   Q    There is case here a case against a Durant

11 Tremmell -- I'm sorry, a Damond Tremmell Durant, Sr.

12 that is Janice Montgomery versus you.

13        Do you see that?

14   A    Yes.

15   Q    Okay.  And you agree with me that's you?

16 You were also a party to that lawsuit, right?  You're

17 listed here as the defendant?

18   A    I am Damond Durant, Tremmell, Sr.

19   Q    Okay.  And when I earlier asked you, I

20 think seven or eight times, about whether you had been

21 a party to any civil proceedings in the history of the

Page 279

1  world, why is it that you didn't mention this one?

2      A    I don't remember it.  I don't remember.

3      Q    Now, you don't remember being -- you don't

4  remember a paternity suit being filed against you for

5  your son?

6      A    That was -- yes, I remember that was for

7  child support.

8      Q    Yeah, and you paid child support for many

9  years, didn't you?

10     A    Yeah.

11     Q    And you're telling me you didn't remember a

12 case that resulted in your paying child support for

13 many years?  Is that what you're telling me?

14         MR. GOLDBERG: Objection.  Form.  You can

15 answer.

16     A    Yeah, I didn't remember it.  I mean,

17 because it was what it was.  I paid child support.

18 Everybody pays child support.

19     Q    But this wasn't just a case where you paid

20 child support.  You tried to avoid it, right?  There

21 was a back and forth fight about it.  Right?

Page 280

1      A    No.

2      Q    Okay.  Was there a fight over custody in

3  this case?

4      A    No, I didn't fight over custody.

5      Q    Okay.  It says here that the sole legal and

6  physical custody of your son was awarded to his mother.

7  Is that right?

8      A    His grandmother.

9      Q    What's that?

10     A    Grandmother.

11     Q    I'm sorry, his grandmother.

12         And that's what ended your child support

13 obligation.  Is that right?

14     A    No, I paid all the way up until he was 18.

15     Q    Did your son ever live with you?  Damond

16 Durant?

17     A    Yes.

18     Q    For how long?

19     A    A few years.

20     Q    Okay.  So in his whole life he lived with

21 you for a total of two years?

Page 281

1      A    Few years, yes.

2      Q    And it's that two years when you say --

3      A    Few.  Few, few.

4      Q    How many is a few?

5      A    Maybe, what, 16 until he graduated from

6  high school, then he wanted to live with his mother.

7      Q    So he was 18 when he graduated from high

8  school.  Is that right?

9      A    Yes.

10     Q    And how old was he when he moved in with

11 you?

12     A    With me?

13     Q    Yes, sir.

14     A    He was still a minor.  Just going to high

15 school, so 16.

16     Q    Okay.  So 16 to 18, he lived with you for

17 two years, right?

18     A    Yeah.

19     Q    Okay.  And then as soon as he could choose,

20 he moved out and in with his mom, right?

21     A    Yes.

Page 282

1      Q    And so that $74,000 you say that he spent,

2  it must have been just during those two years, right?

3  16 to 18?

4      A    Yes.

5      Q    Okay.  And you said it was mostly on cars.

6  He certainly wouldn't have spent any money on cars

7  until he was 16 because he couldn't drive, right?

8      A    Yep.

9      Q    Did he ever buy you a car out of that

10 money?

11     A    No.

12     Q    Did you ever drive any car that was bought

13 with that money?

14     A    No.

15     Q    Okay.  All right.  Here's a case, Janice D.

16 Montgomery versus Damond T. Durant, Sr. involving a

17 recorded judgment.

18         That's also you, right?

19     A    Yes.

20     Q    And in this case your wages were being

21 garnished.  Is that right?

Page 283

1    A    Yes.

2    Q    Okay.  Did you also forget that your wages

3  were being garnished by the mother of your child when I

4  asked you earlier about civil proceedings from the

5  beginning of the world to the present that you were a

6  party to?  Did you also forget that?

7        MR. GOLDBERG:  Objection to form, but you

8  can answer.

9    A    Yes.

10    Q    Can you see how I would find it difficult

11  to believe that you would forget things like having a

12  house repossessed and having your wages garnished?  Can

13  you see how that would be hard for somebody to believe?

14  That you would forget those things?

15        MR. GOLDBERG:  Objection to form, but you

16  can answer.

17    A    I don't know what you would believe, but

18  I'm telling you what I remember and what I know.

19    Q    There is a case in Howard County, Karim,

20  LLC versus Damond Durant involving a tenant holding

21  over.  I see listed as Defendants is your wife and

Page 284

1  Damond Durant with Falls Road addresses.

2        Do you see that, sir?

3    A    Yes.

4    Q    Is this case involving you?  You're the

5  Damond Durant listed here?

6    A    Yes.

7    Q    And it says here that there was a trial in

8  this case on February 7, 2002.

9        Do you see that, sir?

10    A    Yeah, I see that.

11        THE REPORTER:  Cary, 2022?  Not 2002?

12        MR. HANSEL:  Yes.  I'm so sorry.  Goodness.

13        THE REPORTER:  Just checking.

14        MR. HANSEL:  No, that's okay.  I appreciate

15  that.  I actually have dyscalculia, which is a form of

16  dyslexia and numbers are sometimes hard.  Thank you.

17  BY MR. HANSEL:

18    Q    So were you at that trial on February 7,

19  2022?

20    A    No, I was not there.

21    Q    Okay.  Were you aware that there was a

Page 285

1  trial recently?

2    A    No.

3    Q    You were certainly served with papers in

4  this case, right?

5    A    Served with papers?

6    Q    Yes, sir.

7    A    This was an eviction.

8    Q    Yeah, you were served with papers, right?

9  Eviction notices, papers related to the case?

10    A    Eviction papers, yes.

11    Q    Okay.  All right.  And, you know, I mean,

12  it says here that the sheriff -- there was a request

13  that the sheriff serve you.

14        Did the sheriff serve you?

15    A    No, they left a paper on the door, like,

16  evictions.

17    Q    Okay.  And you got it and you were aware of

18  these court dates and proceedings, right?

19    A    Yes.

20    Q    And the case was filed in November of 2021.

21        Do you see that?

Page 286

1    A    Yes.

2    Q    And that this recent hearing was February

3  of 2022.

4    A    No, can --

5    Q    Well, wait a minute.  Do you see the recent

6  hearing was February of 2022?

7    A    Yes, I see that.

8    Q    Okay.  So you had to have been served

9  sometime between November of 2021 and February of 2022,

10  right?

11    A    That's what it says, yes.

12    Q    Okay.  And the February hearing, your wife

13  appeared for that, right?  February of 2022?

14    A    Yes.

15    Q    Okay.  And were you there also?

16    A    No.

17    Q    And you certainly knew in February that

18  your wife was going to go to this hearing, right?  She

19  didn't keep that some kind of top secret information,

20  did she?

21    A    No.

Case 1:20-cv-03146-DKC   Document 102-3   Filed 03/01/24   Page 32 of 56

Page 287

1   Q    So you knew that there was a trial

2   scheduled in February of 2022, right?

3   A    Yes.

4   Q    And your wife, when she got home, I'm sure

5   told you about the outcome of it, right?

6   A    No one went to court.

7   Q    Okay.  Whenever it happened you were aware

8   in February of 2022 of the outcome, right?

9   A    Yeah, I know what it was about.  I know why

10  it happened, yes.

11  Q    Okay.  And it says here that what was

12  negotiated by consent was that the eviction would take

13  place no later than March of 2022.  Is that right?

14  A    We had to be out of the house, yes.

15  Q    And did you, in fact, leave in early March

16  of 2022 as a result of this case?

17  A    Yes, we were out of the house.

18  Q    Now, sir, March of 2022 was three months

19  ago and you were evicted and had to move out of a house

20  and there were court proceedings in that case as

21  recently as four months ago.

Page 288

1       So I've got to ask you.  How is it that you

2   didn't mention this one the eight or ten times that

3   I've asked you about civil proceedings in which you

4   were a party?

5       MR. GOLDBERG:  Objection.  Form.  And I

6   think you have asked this question seven to eight times

7   and you get the same answer every time.  So asked and

8   answered, but you can answer.

9   A    What do you want to know about this?

10  Q    Sir, I want an answer to my question.

11      Did you forget about this?  That you were

12  evicted three months ago?  Did you forget that?

13      MR. GOLDBERG:  Objection.  Form.  Asked and

14  answered.

15      THE WITNESS:  Answer?

16      MR. HANSEL:  Yes.

17      MR. GOLDBERG:  Yes.

18  A    The original owner had passed.  It belonged

19  to someone else.  There were plenty of things that

20  needed to be fixed in the apartment.  They just wanted

21  us out and so they had a formal -- filed a formal

Page 289

1   complaint to have us leave the house and we agreed.

2   That was it.

3   Q    No, sir.  The other ones you told me you

4   forgot about.  I'm asking you, when I asked you earlier

5   about civil cases, did you also forget about this one?

6   A    Yes, yes.

7       MR. GOLDBERG:  Objection.  Form.  Same

8   objections as before.

9   Q    So how is it, sir, that you forgot about a

10  case that resulted in your eviction just three months

11  ago?  How did you forget about that?

12      MR. GOLDBERG:  Objection.  Form.  Asked and

13  answered.  You can answer.

14  A    It has nothing to do with what's -- why

15  we're here.

16  Q    No, sir.  You didn't tell me it has nothing

17  to do with it and that's why you didn't mention it.

18  And my question, as you'll remember, called for every

19  civil proceeding in the history of the world that

20  involved you.

21      So what you told me was you forgot about

Page 290

1   this in the three months since you were evicted.  So

2   now I'm asking you, sir, how is it that in three months

3   you managed to forget about an eviction case?

4       MR. GOLDBERG:  Objection.  Form.  Asked and

5   answered.  You can answer.

6   A    I forgot.

7   Q    Okay.  Are you on any medications that

8   affect your memory?

9   A    No, sir.

10  Q    Do you have any disabilities that affect

11  your memory?

12  A    No, sir.

13  Q    Have you had any injuries that affect your

14  memory?

15  A    No, sir.

16  Q    When was the last time you smoked

17  marijuana?

18      MR. GOLDBERG:  Objection.  Form.

19  Relevance.  You can answer.

20  A    Junior high.

21  Q    Okay.  When was the last time you ingested

Deposition of Damond Durant, Volume 2

Case 1:20-cv-03146-DKC    Document 102-3    Filed 03/01/24    Page 33 of 56

Jawone L. Nicholson vs. State of Maryland, et al.

Page 291

1  edible forms of marijuana?

2       MR. GOLDBERG:  Objection.

3    **A    Never.**

4    Q    Have you ever used any other drugs without

5  legal authority?  That includes illicit drugs and it

6  also includes prescriptions that were not prescribed or

7  used as prescribed.

8       Have you ever used any other drugs without

9  legal authority?

10      MR. GOLDBERG:  I'm going to object and

11 direct my client not to answer.  At this point, Cary,

12 it's gone beyond the scope of any kind of reasonable

13 inquiry that would be in any way proportionately

14 related to the case.  There is no reason for the

15 question.

16      MR. HANSEL:  Well, he forgot an eviction

17 that took place three months ago and I think most

18 people would agree that's remarkable.  I first asked if

19 he had an injury, I then asked if he had any mental

20 disabilities and so now the only remaining issue is I

21 asked if there were prescription medications and he

Page 292

1  said --

2       MR. GOLDBERG:  So ask a different question

3  as prior drug use may have related and I might have him

4  answer, but to just ask him if he's ever used drugs,

5  I'm not going to stand for that.

6  BY MR. HANSEL:

7    Q    Have you ever used any drugs, other than

8  the marijuana in junior high, that might affect your

9  memory?

10      MR. GOLDBERG:  Objection.  Relevance.

11 Form, but you can answer.

12   **A    No.**

13   Q    Do you have any other explanation for how

14 it is that in three months you managed to forget these

15 eviction proceedings?

16      MR. GOLDBERG:  Objection.  Form.

17 Relevance.  Asked and answered, but you can answer.

18   **A    I just didn't remember it.  I remember when**

19 **were you pull it up, then I recall it, then I can tell**

20 **you what happened, but I just didn't remember.**

21   Q    So there is an October, 2017 case that

Page 293

1  involves State of Maryland versus you.

2       Do you see this?

3    **A    That says, Junior.**

4    Q    Is this you or your son?

5    **A    That's Junior.**

6    Q    There is a Dartmouth Road apartment in

7  Baltimore.  Is that you or your son?  I'm sorry.  Fair

8  enough.

9       So earlier you didn't recall his date of

10 birth.  It says here, May of 1992.  Do you agree with

11 me he was born in May of '92?

12   **A    Yes.**

13   Q    Okay.  So by my count, then, he would have

14 been 18 in May of 2010.  Do I have that right?

15   **A    Yes.**

16      MR. HANSEL:  Okay.

17      THE REPORTER:  Excuse me, Cary.  I don't

18 mean to interrupt.

19      (A discussion was held off the record.)

20 BY MR. HANSEL:

21   Q    All right.  We have now looked at the

Page 294

1  Maryland cases.  Is it still your position you have

2  never been charged with a crime or any violation of law

3  in any other state?

4       MR. GOLDBERG:  Objection.  Form.

5  Relevance.  You can answer.

6    **A    That I can remember, no.**

7    Q    In other words, you have not been charged

8  with a crime or a violation of law in any other state.

9  Is that your testimony?

10      MR. GOLDBERG:  Objection.  Form.

11 Relevance.  Mischaracterization of testimony.  He just

12 testified that he can't recall.

13   Q    As far as you remember, is that your

14 testimony?

15      MR. GOLDBERG:  Objection.  Form.

16 Relevance.  You can answer.

17   **A    I don't remember.**

18      MR. HANSEL:  Okay.  All right.  Let's go

19 off the record for a very brief time.  I'll need five

20 minutes.  We'll come back on and I'll be brief and

21 we'll wrap up.

Case 1:20-cv-03146-DKC    Document 102-3    Filed 03/01/24    Page 34 of 56

Page 295

1    MR. GOLDBERG:  Okay.  Thank you.

2    THE WITNESS:  Thank you.

3    THE REPORTER:  Thank you.

4    (There was a brief recess taken.)

5    MR. HANSEL:  Officer, thank you for your

6  time here today.  I don't have anything further for

7  you.  I appreciate the opportunity to speak.  Your

8  counsel may have some questions, but I doubt it.

9    MR. GOLDBERG:  I actually do have some

10  questions.

11    MR. HANSEL:  Sure.

12    EXAMINATION BY MR. GOLDBERG:

13  Q    Mr. Durant, as you know, I'm your counsel

14  in this case, the proceeding against you.

15    In all the cases that we just reviewed, was

16  there any criminal convictions?

17  **A    No.**

18  Q    Based on falsifying information?

19  **A    No.**

20  Q    As far as you know, are there any

21  allegations in this lawsuit as to theft of any kind?

Page 296

1  **A    No.**

2  Q    Are there any allegations of you lying

3  about your Statement of Probable Cause?

4  **A    My Statement of Probable Cause?**

5  Q    Sorry.  In any of the incident reports in

6  this case, at the peace order hearing, are there any

7  allegations that you're lying?

8  **A    No.**

9  Q    Have you ever testified at a criminal

10  proceeding as a witness?

11  **A    Only as an officer.**

12  Q    So as an officer have you ever had your

13  memory refreshed by seeing a document?

14  **A    Yes.**

15  Q    Do you believe that's what happened today?

16  **A    Yes.**

17  Q    As to any Internal Affairs investigation,

18  would it have been appropriate for you to ask the

19  status of an ongoing Internal Affairs investigation?

20  **A    Say it one more time.**

21  Q    As far as any Internal Affairs

Page 297

1  investigation that arose out of this lawsuit, would it

2  have been appropriate for you at any time to ask about

3  an Internal Affairs investigation?

4  **A    Would it be appropriate if I were to ask?**

5  Q    Yes.

6  **A    That's their investigation.  I don't --**

7  **that's their investigation.**

8  Q    When you were approached to cooperate with

9  the investigation, did you cooperate?

10  **A    Yes.**

11  Q    Did you provide a recorded statement?

12  **A    Yes.**

13  Q    Did you ever object to assisting in their

14  investigation?

15  **A    No.  I cooperated.**

16  Q    And were you ever charged criminally for

17  any conduct you exhibited in this case?

18  **A    No.**

19  Q    Now, I want to take you through -- I want

20  to go back to the incident.

21    I know you may have testified to some of

Page 298

1  these questions before, but because it was the last

2  session, I may ask you some repeat questions and my

3  apologies for repeating testimony.

4    How many people did you see when you first

5  got out of your car that day and noticed individuals

6  across the cul-de-sac?

7  **A    When I got out of my car, two.**

8  Q    And when you first approached them did you

9  notice how big they were?

10  **A    Yes.**

11  Q    Were they both bigger than you?

12  **A    One was bigger than me, one was about my**

13  **size or maybe a tad bigger.**

14  Q    Do you know if Plaintiff was the one who

15  was bigger than you?

16  **A    Yes.**

17  Q    Was he much bigger than you?

18  **A    Yes.**

19  Q    So you also testified that you turned --

20  well, let me start with this.

21    Who escalated the verbal exchange between

Deposition of Damond Durant, Volume 2C

Case 1:20-cv-03146-DKC    Document 102-3    Filed 03/01/24    Page 35 of 56

Jawone L. Nicholson vs. State of Maryland, et al.

Page 299

1  the two of you?  I say the two of you, I'm speaking of
2  the Plaintiff and his cohort and then you as the other
3  party.  So between the two of those parties, who
4  instigated the verbal language between the two of you?
5      **A      They did.**
6      Q      And they used profane language to your
7  face?
8      **A      Yes.**
9      Q      And despite that profane language did you
10  pull out your firearm at that point?
11      **A      No.**
12      Q      And when you had said your peace to them,
13  that you thought they should get out of there, this
14  isn't where they belong, you did do that, right?  You
15  testified to that earlier.  That is what you said to
16  them?  That they shouldn't be here, this isn't a place
17  to hang out?
18      **A      Yes.**
19      Q      That this isn't is place to wait for your
20  bus?
21      **A      Yes.**

Page 300

1      Q      And despite your politeness towards them
2  and directness towards them, you were faced with surly,
3  profane, frankly rude behavior; is that correct?
4      **A      Yes.**
5      Q      So at this point you turn your back and
6  start to walk away, correct?
7      **A      Yes.**
8      Q      And you don't have any visual sight of them
9  at that point, right?
10      **A      Yes.**
11      Q      And you testified you heard footsteps
12  coming towards your back.  Is that right?
13      **A      Yes.**
14      Q      About how fast were the footsteps?
15      **A      Quick pace.**
16      Q      So was it more of, like, you heard someone
17  walking towards your back or was it repeated footsteps
18  in a pattern that made you think someone was coming
19  towards your back?
20      **A      Someone was coming towards my back.**
21      Q      And based on -- you already testified that

Page 301

1  you were intimidated and maybe even scared when you
2  were speaking with them because of their size, correct?
3      **A      Yes.**
4      Q      So having already spoken to them, did you
5  believe that they were aggressive?
6      **A      They talked very aggressive, yes.**
7      Q      Okay.  So your testimony that you were
8  intimidated by their size, maybe even fearful of their
9  size, and understood them to be aggressive in their
10  words, hearing footsteps did you believe that you were
11  about to be assaulted or battered?
12      **A      Yes.**
13      Q      And before that moment, when that fear --
14  were you afraid in that moment?
15      **A      Yes.**
16      Q      And when you were afraid in that moment,
17  right before that moment, did you -- had you at all
18  mentioned that you had a firearm on your person?
19      **A      No.**
20      Q      Did you reveal your firearm before that
21  moment to the individuals at the scene?

Page 302

1      **A      No.**
2      Q      So when you turned around and you did
3  reveal your firearm, correct?
4      **A      Yes.**
5      Q      But it was never pointed in their
6  direction?
7      **A      No, it wasn't ever pointed in their**
8  **direction.**
9      Q      The barrel of the gun was straight down
10  toward the ground, regardless if it was in front of
11  you, behind you, correct?
12      **A      Yes.**
13      Q      So did you believe in that moment that that
14  was a necessary decision to protect your safety?
15      **A      Yes.**
16      Q      And did you believe it was necessary
17  because your safety was in jeopardy in that moment?
18      **A      Yes.**
19      Q      And do you believe that it was a reasonable
20  decision?
21      **A      Yes.**

1    Q    And in your experience, if someone -- if an

2 officer is attacked from behind or they fear they are

3 being attacked from behind, do you think that the

4 person attacking that officer has an advantage in that

5 skirmish?

6    A    Yes.

7    Q    And before whoever ran at your back did so,

8 you noticed that at least one of them had a knife on

9 their person, correct?

10    A    Yes.

11    Q    So when you turned around, you also had a

12 knife on your person, correct?

13    A    Possibility, yes.

14    Q    Can you tell us why you might not have

15 brandished your knife rather than your firearm?

16    A    I didn't want a knife because he might have

17 some skills with his knife.  I wanted the situation

18 quelled right then and there.  I didn't want an

19 opportunity of we both stabbing each other for whatever

20 reason.  That wasn't my intent.

21    Q    And so when you turned around and

1 brandished your firearm did that stop the situation

2 right then and there?

3    A    Yes.

4    Q    So at any point -- about how long was the

5 firearm out of your pocket?

6    A    Until they walked away.

7    Q    How long was that?

8    A    I'm not sure.  Minute, maybe.

9    Q    In that entire time the firearm, the barrel

10 of the gun, was never pointed in their direction at

11 all, correct?

12    A    Yes.

13    Q    Okay.  So would you believe that the amount

14 of force that you used was proportional for purposes of

15 de-escalating any potential scenario that was about to

16 arise?

17    A    Yes.

18    Q    I'm going to ask you a hypothetical.

19         If you didn't have a firearm on you, do you

20 think that you had the fighting skills necessary to

21 quell two attackers of their size on you?

1    A    No, sir.

2    Q    Would you have stood a chance?

3    A    No, they would have overwhelmed me.

4    Q    Do you believe that if there is -- just

5 because there may or may not -- just because there is a

6 No Trespassing sign that someone should be in the

7 private curtilage of another person's property?

8    A    No, I believe private property is private

9 property.

10    Q    When you approached them, were you calm?

11    A    Yes.

12    Q    And I'm talking about when -- I'll ask

13 again.

14         When you first approached them after

15 getting out of your vehicle and had not communicated

16 with them yet, were you calm?

17    A    Little nervous.  Not calm, but nervous.

18    Q    But did you raise your voice at them?

19    A    No.

20    Q    Did you yell at them?

21    A    No.

1    Q    A person of that size, did you think he was

2 16 years old?

3    A    No.

4    Q    Have you ever encountered a situation where

5 you have had to defend yourself with someone running up

6 from behind you?

7    A    No, I never had to defend myself against

8 that.

9    Q    So this is the first and only time that you

10 can recall?

11    A    Yes.

12    Q    So despite whatever training or experience

13 you received as an officer this is the first scenario

14 where it came to fruition in live action?

15    A    Yes.

16    Q    Okay.  Did you ever see their bus arrive or

17 van arrive to pick them up?

18    A    No.

19    Q    Did Howard County charge you with any

20 crimes?

21    A    No.

Page 307

1    Q    How long after they arrived, how long after

2 the Howard County Police arrived, did they give you

3 your weapon back to you and allow you to go freely?

4    **A**    **When they felt that it was -- they had**

5 **enough information, I guess. Because when it was over**

6 **they gave it back to me.**

7    Q    So about how long, best guess, would you

8 say it took to recover your firearm back from the

9 Howard County Police after they temporarily confiscated

10 it?

11    A    From when they took it?

12    Q    Yes.

13    **A**    **Maybe five minutes.**

14    Q    You're an officer. If you believe someone

15 else had committed a crime and had a gun on them would

16 you give them their firearm back if you thought they

17 had committed a crime?

18    **A**    **Well, if it wasn't a police officer and**

19 **they had a gun, they probably would be in handcuffs**

20 **before -- you know, during that situation.**

21    Q    Well, let's change the hypothetical.

Page 308

1      If someone had a knife on their person that

2 was legal, but you saw them breaking and entering,

3 would you give them their knife back if you thought

4 they had just committed a burglary?

5    **A**    **No.**

6    Q    Do you think, in your opinion, that Howard

7 County Police thought you committed a crime that day?

8    **A**    **I don't think they thought I committed a**

9 **crime, no.**

10    Q    In your capacity as an officer have you

11 ever stopped an individual for being on private

12 property?

13    **A**    **Yes.**

14    Q    Was it your understanding that when you

15 stopped those two individuals that day that you were

16 questioning them and were going to walk away and live

17 your life without issue?

18    **A**    **That was the plan once I was walking away.**

19    Q    So you think had you not heard them running

20 up behind you, you would not have turned around and

21 de-holstered your weapon?

Page 309

1    **A**    **Yes, I wouldn't have never done that.**

2    Q    Is it possible that your fear tricked you

3 into thinking you heard footsteps running up from

4 behind you?

5    **A**    **No, that's what I heard.**

6    Q    When you turned around quickly, did you

7 recognize which individual was running toward you?

8    **A**    **What did we call him last time?**

9    Q    There is a Mr. Brian Hatcher?

10    **A**    **Mr. Hatcher was the closest to me.**

11    Q    So of the two individuals who are alleging

12 that -- Mr. Nicholson in this case is alleging that a

13 firearm was pointed in his face. I believe. Don't

14 quote me on that. I'd have to go back to the

15 Complaint. The point is, that the barrel of the gun

16 was raised towards his direction.

17      If that were the case, would the gun have

18 been raised in his direction or would it actually have

19 been raised in Brian Hatcher's direction?

20    **A**    **Well, if it was raised, if I raised it,**

21 **which I did not, it would have been Mr. Hatcher.**

Page 310

1    Q    Because he was close to your person when

2 you turned around, correct?

3    **A**    **Yes.**

4    Q    Do you know why he's not a witness to this

5 suit?

6    **A**    **No.**

7      MR. HANSEL: He is a witness.

8    Q    Do you know why he's not a party to the

9 suit? Thank you, Cary.

10    **A**    **No.**

11    Q    When you testified that the Baltimore

12 Police, quote, teach us to draw firearms, unquote, did

13 you mean that in every single circumstance that you

14 ever encounter as a police officer you're taught to

15 draw your firearm?

16    **A**    **No.**

17    Q    Did you mean that in certain circumstances

18 where you believe it's necessary, reasonable and

19 proportional drawing your firearm may be required?

20    **A**    **Yes.**

21    Q    Do you believe that this was a situation,

Page 311

1  based on your experience, that it was necessary to draw

2  your firearm?

3      **A**    **Yes.**

4      Q    That it was reasonable to draw your

5  firearm?

6      **A**    **Yes.**

7      Q    And that it was proportionately related to

8  the amount of force that could have been thrust upon

9  you?

10     **A**    **Yes.**

11     Q    I think it's fair to say, Mr. Nicholson,

12 based on your testimony, that you have had some

13 financial issues.  Would you characterize that as

14 correct?

15     THE REPORTER:  I'm sorry, Mr. Nicholson?

16     Q    I'm sorry.  Mr. Durant.

17     It would be fair to say that you have had

18 some financial issues in the past, correct?

19     **A**    **Yes.  Still do.**

20     Q    Despite having those issues, have you ever

21 had an allegation of impropriety when it pertains to

Page 312

1  confiscation of evidence on the job?

2      **A**    **No.**

3      Q    Stealing money?

4      **A**    **No, sir.**

5      Q    Stealing drugs?

6      **A**    **No, sir.**

7      Q    Stealing firearms?

8      **A**    **No, sir.**

9      Q    So do you believe it's a fair

10 characterization that any financial issues are separate

11 from any of the allegations in this matter?

12     **A**    **Yes.**

13     Q    Do you know exactly what Mr. Nicholson is

14 claiming caused his damage in this case?

15     **A**    **Not exactly, no.**

16     Q    Was anyone -- were there any witnesses

17 besides Brian Hatcher to your firearm being out of your

18 pocket?

19     **A**    **Not that I know of, no.**

20     Q    Did any of the individuals who arrived on

21 scene, any individuals, police, Erica Hamlet,

Page 313

1  Mr. Nicholson's sister, anyone, see you with your

2  firearm out of your pocket at all?

3      **A**    **No.**

4      Q    Did you ever tell Mr. Nicholson or

5  Mr. Hatcher that they were under arrest?

6      **A**    **No.**

7      Q    Did you ever tell them that they were not

8  free to leave?

9      **A**    **No.**

10     Q    Now, let's break that down.  Did you ever

11 tell them that they were not under arrest?  Did you

12 ever tell them they were under arrest up until the

13 moment where your back was turned and you were walking

14 away?

15     **A**    **Never told them they were under arrest.**

16     Q    Did you ever tell them they were not free

17 to leave at any point until the moment where your back

18 was turned?

19     **A**    **No.**

20     Q    In fact, all you wanted them to do was

21 leave, correct?

Page 314

1      **A**    **Yes.**

2      Q    Do you believe that they refused to leave

3  the area?

4      **A**    **Yes.**

5      MR. GOLDBERG:  I have no further questions.

6      MR. HANSEL:  I have a single question

7  follow-up.

8      EXAMINATION BY MR. HANSEL:

9      Q    The first person to speak during the

10 interaction was you speaking to them, right?

11     **A**    **Yes.**

12     MR. HANSEL:  Nothing further.  Thank you.

13     Madam Reporter, we'll take a big one, a

14 small one.  If you e-mail it to me, that's awesome.  I

15 think I gave the order last time, but it's the same

16 one.  That's it from me.

17     THE REPORTER:  Very good.  Mr. Goldberg?

18     MR. GOLDBERG:  Read and sign, please, and

19 I'll take a big and a small.

20     MR. HANSEL:  And I like mine ASCII and PDF,

21 both, please.  Anybody else need anything before I log

Case 1:20-cv-03146-DKC    Document 102-3    Filed 03/01/24    Page 39 of 56

Deposition of Damond Durant, Volume 2                                    Jawone D. Nicholson vs. State of Maryland, et al.

Page 315

1  out?

2       MR. GOLDBERG:  No.  Thank you, Mr. Hansel

3  and Ms. Carranza.  And thank you, Sue, I appreciate it.

4       THE REPORTER:  Sure.  Thank you.

5       (Deposition was concluded at 12:26 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

Page 316

1          CERTIFICATE OF DEPONENT

2

3       I hereby certify that I have read and

4  examined the foregoing transcript, and the same is a

5  true and accurate record of the testimony given by me.

6

7       Any additions or corrections that I feel are

8  necessary will be made on the Errata Sheet.

9

10

11

12  _____

13  DAMOND DURANT

14

15

16  _____

17  Date

18

19  (If needed, make additional copies of the Errata Sheet

20  on the next page or use a blank piece of paper.)

21

Page 317

1              ERRATA SHEET

2  Case: Nicholson vs. State of Maryland, et al.

3  Witness: DAMOND DURANT (Volume II)     Date: 6/30/2022

4  PAGE/LINE      SHOULD READ      REASON FOR CHANGE

5  _____

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

Page 318

1  State of Maryland SS:

2       I, SUSAN M. LIEBRECHT, a Notary Public of the

3  State of Maryland, Carroll County, do hereby certify

4  that the within-named witness personally appeared

5  before me at the time and place herein set out, and

6  after having been duly sworn by me, according to law,

7  was examined by counsel.

8       I further certify that the examination was

9  recorded stenographically by me and this transcript is

10 a true record of the proceedings.

11      I further certify that I am not of counsel to

12 any of the parties, nor in any way interested in the

13 outcome of this action.

14      As witness my hand and notarial seal this

15 15th day of July, 2022.

16

17

18                          Susan M. Liebrecht, RPR
                            Notary Public

19 My Commission Expires:

20 September 8, 2025

21

**WORD INDEX**

**< $ >**
**$1,889.09**
 275:*16* 276:*3*
**$1,900** 275:*16*
**$100,000** 225:5
**$14,000** 248:*12*
**$300,000** 229:8
 230:6, *12*
 232:*18* 239:3
**$350** 262:*15*
**$450** 263:*1*
**$5,000** 240:*15*
**$55,000** 220:2
**$60,000** 239:*13*,
 *16*, *21* 240:5, *17*
**$74,000** 282:*1*

**< 0 >**
**08** 265:*16*
**09** 235:6

**< 1 >**
**1:20-cv-03146**
 170:7
**100** 171:*14*
**100,000** 225:*1*
**1000** 248:7
**105** 261:*21*
**107** 224:*21*
**12:26** 315:5
**14** 248:*11*
**1500** 249:6
**15th** 318:*15*
**16** 281:5, *15*, 16
 282:3, 7 306:2
**16,000** 224:*20*
**167** 225:*16*
**16th** 221:2
**17** 197:*14*
**173** 172:6
**17th** 221:2
 222:6
**18** 235:8 237:3,
 6, *10*, 14 259:*1*
 280:*14* 281:7,
 16 282:3
 293:*14*

**18th** 237:*18*
 240:*18*
**1992** 293:*10*
**19th** 171:*14*
 238:*1*

**< 2 >**
**2/22/1972**
 260:*19*
**2000** 261:*3*
 263:6
**2002** 284:8, *11*
**200-plus** 259:*12*
**2010** 293:*14*
**2014** 220:2
 277:7
**2015** 277:*11*
**2017** 235:7, 9,
 *17* 244:*13*
 257:7 258:*18*
 292:*21*
**2019** 220:*19*
 221:*3* 222:6
**2020** 225:4
**2021** 197:*14*
 224:*14, 19*
 225:*4* 285:*20*
 286:9
**2022** 170:*14*
 172:*3* 284:*11*,
 *19* 286:3, 6, 9,
 *13* 287:2, 8, *13*,
 *16, 18* 318:*15*
**2025** 318:*20*
**203** 269:*20*
**21** 247:2, 8
**21202** 171:*15*
**21218** 171:7
**227,000** 251:*18*
**2514** 171:6
**268** 257:2
**27** 249:*10*
**2704** 258:*4*, 6, 8,
 *19*, 20, 21
**28** 244:*13*
**295** 172:7

**< 3 >**
**30** 170:*14*

**172**:*3*
**300** 246:*10*
**300,000** 229:6,
 *21* 231:8 232:*1*
 238:6 239:9
**301-461-1040**
 171:8
**305** 262:*1*, 9
**30's** 249:*1*, 10
**314** 172:6
**3-5-0** 262:9
**3500** 177:4
**3511** 225:*19*
**3-5-1-1** 225:*20*

**< 4 >**
**410-685-1120**
 171:*16*
**452,000** 244:*14*
 245:*16* 246:9
**4985** 269:*20*
 270:*1*

**< 6 >**
**6/30/2022** 317:*3*
**60** 246:*19*
**60,000** 239:*7*,
 *12* 246:*14*
**60-some** 239:6

**< 7 >**
**7** 244:*13* 284:8,
 *18*
**75,803.83**
 246:*15*, 18

**< 8 >**
**8** 318:*20*

**< 9 >**
**9:23** 170:*14*
**90,000** 224:*14*
**90's** 234:*15, 16,
 19, 20, 21*
**9105** 192:*18*
 193:*1*
**92** 293:*11*
**95** 243:9
 252:*18*

**99** 235:5, *6*, 8

**< A >**
**a.m** 170:*14*
**abandoned**
 216:9, *16*
**able** 183:7, 8
 251:*11*
**accident** 243:9,
 *12*
**accidents** 243:6
 249:*14* 252:*17*
 268:7
**account** 223:*19*
 237:*18*, *21*
 238:3, *20*
 239:*13*
**accurate** 316:5
**action** 306:*14*
 318:*13*
**actions** 188:4
 199:*18* 205:*15*
**activity** 178:2
**actual** 250:*15*
**additional**
 316:*19*
**additions** 316:7
**address** 213:3
 257:*10* 261:*1*
 265:3 269:*21*
 270:6
**addresses** 284:*1*
**adjustable**
 266:*12*
**admit** 264:8
**adopt** 271:3
**advantage**
 303:4
**Affairs** 179:*17*
 187:7 190:4
 205:17, *21*
 206:*13* 207:2, 7,
 9 208:4, 14, 17
 209:2, 4 211:8,
 14 215:18
 217:8 219:6, *11*,
 14, 16, 20 220:4,
 19 296:17, 19,
 21 297:3

**affect** 290:8, *10*,
 *13* 292:8
**afford** 266:*14*
**afraid** 301:*14*,
 16
**aggressive**
 301:5, 6, 9
**aggressor**
 192:5 201:*20*
**ago** 263:7
 272:5, 9 274:*17*
 287:*19*, 21
 288:*12* 289:*11*
 291:*17*
**agree** 198:*20*
 210:8 216:*13*
 235:8, *16* 246:2
 257:*16* 258:*1*,
 11 262:*14*
 270:8 274:9
 276:*21* 277:3, 8
 278:*15* 291:*18*
 293:*10*
**agreed** 220:2
 289:*1*
**ahead** 176:9
 255:*19*
**al** 170:7 178:*3*
 270:5 276:*11*
 317:2
**Alan** 276:*14*, 16
**alive** 227:*17*
**allegation**
 311:*21*
**allegations**
 295:*21* 296:2, 7
 312:*11*
**alleging** 309:*11*,
 12
**allow** 307:3
**amount** 229:*12*,
 *13*, 20 239:*4*, 5,
 6, *21* 246:*18*, 20
 304:*13* 311:8
**answer** 178:*21*
 180:*11*, 17, 18,
 20 181:15
 182:*1*, 8, 16, 21
 183:*11*, 19
 184:3 186:6, *11*

187:*19* 196:8
197:2, *8* 198:*13*
199:*14*, *20*
200:7, *12* 201:9,
*13* 202:2
203:*13* 204:*20*
205:8 206:2
207:*11*, *12*
209:*16* 211:*10*
215:*10*, *15*, *21*
216:5, *11*, *18*
217:3, *10*, *21*
218:*11* 219:9
222:*12* 223:7,
*12*, *16*, *21* 224:*4*,
*17* 225:8 226:5
227:9 228:*12*
230:5, *11*, *17*
232:*13*, *20*
233:7, *12*, *21*
234:5 235:*11*,
*19* 236:3
243:*15* 248:*1*
252:4, *10*
254:*11*, *12*, *14*
255:*18* 256:*12*
264:3, *11*, *21*
266:*19* 267:8,
*14* 268:*1*
279:*15* 283:8,
*16* 288:7, *8*, *10*,
*15* 289:*13*
290:5, *19*
291:*11* 292:4,
*11*, *17* 294:5, *16*
**answered**
180:*17* 181:*15*
182:*1*, *8*, *16*
183:*11*, *19*
195:*18* 200:*12*
206:2 215:*10*
216:5, *11* 217:3,
*10* 219:9
220:*10* 222:*12*,
*21* 223:*16*, *21*
224:*4* 226:5
230:*17* 232:*13*
255:*14* 288:8,
*14* 289:*13*

290:5 292:*17*
**answers** 264:*16*
**anybody** 175:7
184:*11*, *15*, *17*
185:*16* 189:*20*
207:*18*, *19*, *20*
211:*3*, *14*
213:*13* 216:2, 7,
*8*, *20* 219:6
259:*21* 314:*21*
**anyway** 248:*17*
**apartment**
288:*20* 293:6
**apologies** 298:*3*
**apologize** 185:*3*
228:5
**apparently**
262:*12*
**APPEARANCE
S** 171:*1*
**appeared**
286:*13* 318:4
**appreciate**
271:7 284:*14*
295:7 315:3
**approach**
264:*17* 273:*13*
**approached**
297:8 298:8
305:*10*, *14*
**appropriate**
199:7 296:*18*
297:2, *4*
**approximate**
232:*1*
**approximately**
178:9 244:*14*
245:*16*
**area** 192:*20*
314:3
**areas** 192:*18*
201:7
**argumentation**
264:*14*
**Argumentative**
198:*13* 264:*21*
**arising** 203:*11*
205:*4*
**arose** 297:*1*

**arrest** 259:*20*
313:5, *11*, *12*, *15*
**arrested** 260:5
**arrive** 306:*16*,
*17*
**arrived** 307:*1*,
*2* 312:*20*
**article** 222:4, *5*,
*7*
**ASCII** 314:*20*
**aside** 254:*20*
**Asked** 180:*16*
181:*14*, *21*
182:7, *15*
183:*10*, *18*
185:9 195:*17*
199:*17* 200:*11*
206:*1* 207:*17*
215:4, *9* 216:*4*,
*10* 217:2, *9*
219:8 220:9
222:*11*, *20*
223:*15*, *20*
224:*3* 226:4, *6*
230:*16* 232:*12*
255:*13* 262:*19*
263:*3* 267:3, *17*
271:*12* 274:*17*
275:4, *19*
278:*19* 283:*4*
288:*3*, 6, 7, *13*
289:*4*, *12* 290:*4*
291:*18*, *19*, *21*
292:*17*
**asking** 177:*13*
179:*12* 189:*15*
204:4, *14* 205:2
218:5 220:*3*
232:*16* 243:*3*
254:*21* 255:*10*,
*11* 256:*4* 268:*4*,
*12* 271:*21*
272:5 273:2
289:*4* 290:2
**assaulted**
301:*11*
**assigned**
176:*21* 225:*12*
**assistance**

179:9, *11*
**assisting** 297:*13*
**Associates**
270:4, *10*
273:*21* 274:*13*
**assume** 212:7
215:*16* 222:*17*
263:*18*
**attacked** 200:*1*
303:2, *3*
**attackers**
304:*21*
**attacking** 303:4
**attempt** 199:*4*
**attempted**
193:*21*
**attempts** 198:*3*
**attended** 191:*3*
**attendees** 191:*4*
**attorney** 261:7
262:*21*
**attorney/client**
204:*4*
**attorneys**
213:*12*
**audio** 207:*21*
**authored** 198:2
**authority** 291:5,
*9*
**available** 194:*21*
**Avenue** 260:*17*
261:*1* 265:*3*, *8*,
*13*
**avoid** 244:*1*
251:*21* 252:7
279:*20*
**award** 229:*14*,
*17*, *20* 231:*16*
251:*17*
**awarded** 229:*3*,
*11* 231:8 233:2
280:6
**aware** 188:*12*
200:*17* 215:*18*
224:9 250:*20*
251:2, *6* 284:*21*
285:*17* 287:7
**awesome** 314:*14*

**back** 173:*11*, *13*
175:7, 9 180:*21*
181:*19*, *20*
182:5 201:*11*
228:*18* 233:*14*
241:*13* 259:*12*
279:*21* 294:*20*
297:*20* 300:5,
*12*, *17*, *19*, *20*
303:7 307:3, *6*,
*8*, *16* 308:*3*
309:*14* 313:*13*,
*17*
**background**
244:*11*
**bad** 234:*11*
**badge** 225:*11*,
*17*, *19*
**Baker** 171:*13*
**Ball** 189:*8*, *11*,
*15* 206:9, *10*, *14*
**Baltimore**
171:7, *15* 180:9
185:*16* 196:5,
*10*, *15* 197:*16*
198:*6* 214:*4*
218:*16* 220:*18*,
*21* 221:9 222:*4*,
*7* 224:6 225:5
250:6 257:*11*
266:6 293:7
310:*11*
**bankruptcy**
243:*17*, *19*, *21*
244:9, *13*, *20*
245:*13*, *14*
246:8 249:*13*,
*18* 250:4 252:*1*,
6, *8*, *11* 254:2
268:*10*
**barely** 259:*1*
**barrel** 302:9
304:9 309:*15*
**based** 251:6
260:2 295:*18*
300:*21* 311:*1*,
*12*
**basis** 174:*14*
194:*19* 204:3

< B >

**battered** 301:*11*
**beginning** 283:*5*
**BEHALF**
171:*3, 11*
**behavior** 300:*3*
**believe** 201:*6*
283:*11, 13, 17*
296:*15* 301:*5,
10* 302:*13, 16,
19* 304:*13*
305:*4, 8* 307:*14*
309:*13* 310:*18,
21* 312:*9* 314:*2*
**belong** 299:*14*
**belonged** 288:*18*
**benefit** 237:*1*
**best** 232:*18*
307:*7*
**beyond** 291:*12*
**big** 187:*14*
298:*9* 314:*13,
19*
**bigger** 298:*11,
12, 13, 15, 17*
**bike** 247:*13*
248:*1, 6, 10*
**biologically**
271:*9, 10*
**birth** 234:*2, 6*
260:*19* 261:*1*
293:*10*
**birthday**
234:*11, 12*
237:*19* 238:*1*
240:*18*
**bit** 173:*12*
241:*16*
**Black** 189:*7*
276:*10* 277:*5*
**Black-Thaxton**
277:*17, 21*
278:*1, 8*
**blank** 316:*20*
**board** 209:*7*
**Bobbitt** 184:*21*
**body** 181:*13*
**born** 234:*8, 10,
14, 17* 235:*5, 7*
260:*18* 293:*11*

**bought** 239:*18,
19* 282:*12*
**boys** 181:*19*
188:*5*
**BPD** 224:*13*
**brandished**
303:*15* 304:*1*
**brandishing**
180:*7*
**break** 241:*3, 6*
313:*10*
**breaking**
222:*14* 308:*2*
**Brian** 309:*9, 19*
312:*17*
**brief** 241:*12*
294:*19, 20*
295:*4*
**bring** 260:*11*
267:*19*
**broke** 219:*13*
242:*5* 259:*16*
276:*9* 277:*4*
**broken** 249:*11*
268:*6* 277:*1*
**brought** 250:*5*
267:*15* 273:*5*
**bull** 177:*21*
178:*3, 4, 5, 7*
179:*2*
**bunch** 244:*3*
**burglary** 308:*4*
**Burnie** 175:*5*
**bus** 299:*20*
306:*16*
**buy** 174:*19*
239:*18, 20*
240:*4* 282:*9*
**buying** 266:*11*

**< C >**
**call** 176:*14*
183:*9* 188:*17*
212:*14* 221:*1,
12, 21* 224:*21*
225:*10, 12, 18*
241:*8* 309:*8*
**called** 173:*4*
179:*4, 5* 183:*17,
21* 202:*13, 15,

*17* 221:*9, 13, 19*
222:*9* 224:*13*
259:*14* 265:*15*
266:*12* 275:*5*
276:*10* 289:*18*
**calling** 221:*16*
**Calls** 180:*10*
182:*20* 183:*19*
215:*14*
**calm** 182:*13*
305:*10, 16, 17*
**cameras** 213:*17*
**capacity** 308:*10*
**captain** 211:*14*
**car** 243:*6, 9, 11*
249:*14* 252:*17,
18* 253:*11, 12*
268:*7* 282:*9, 12*
298:*5, 7*
**care** 216:*21*
**Carranza**
171:*10* 315:*3*
**Carroll** 318:*3*
**cars** 239:*19, 21*
240:*4, 6, 7, 12,
18* 282:*5, 6*
**CARY** 171:*4*
194:*12* 236:*7*
241:*2* 245:*1*
247:*18* 262:*8*
264:*13* 284:*11*
291:*11* 293:*17*
310:*9*
**cary@hansellaw
.com** 171:*9*
**Case** 170:*6*
179:*16* 192:*8, 9,
12* 197:*12*
202:*18, 20*
203:*6* 205:*11,
13* 207:*4*
210:*16* 214:*1,
12* 217:*7*
219:*20* 220:*20*
223:*4* 229:*1*
233:*5, 10*
241:*17* 244:*7,
10, 20* 245:*13*
249:*12, 13*
250:*3, 5* 256:*16,

*17* 257:*1, 6, 17*
258:*13* 259:*4,
14* 260:*11*
261:*3* 265:*6, 15,
18* 268:*6, 7, 11,
15, 17, 21*
270:*13* 271:*15,
18* 273:*15*
274:*11* 275:*5,
10* 276:*8, 10, 21*
277:*7, 11, 16, 21*
278:*10* 279:*12,
19* 280:*3*
282:*15, 20*
283:*19* 284:*4, 8*
285:*4, 9, 20*
287:*16, 20*
289:*10* 290:*3*
291:*14* 292:*21*
295:*14* 296:*6*
297:*17* 309:*12,
17* 312:*14*
317:*2*
**cases** 257:*5*
259:*12* 267:*4*
268:*14* 269:*10*
271:*13* 272:*2*
274:*10, 12, 16,
17* 275:*4* 289:*5*
294:*1* 295:*15*
**categories**
199:*18*
**Cause** 296:*3, 4*
**caused** 312:*14*
**certain** 310:*17*
**certainly**
194:*18* 195:*5*
222:*3* 248:*3*
250:*20* 257:*14*
261:*15* 277:*15*
282:*6* 285:*3*
286:*17*
**CERTIFICATE**
316:*1*
**certify** 316:*3*
318:*3, 8, 11*
**challenge** 251:*5*
**chance** 231:*6*
247:*13* 305:*2*

**change** 224:*21*
307:*21* 317:*4*
**Chapter** 244:*13*
**characterization**
312:*10*
**characterize**
311:*13*
**charge** 210:*1, 9*
215:*8* 306:*19*
**charged** 209:*6,
13, 20* 210:*20*
211:*3* 212:*3*
254:*5, 7, 13*
255:*1, 5, 11, 19*
256:*4* 261:*15*
262:*20* 263:*10,
16* 268:*2, 3*
294:*2, 7* 297:*16*
**charges** 209:*2,
3, 10* 210:*3, 5,
18* 211:*4, 12, 15,
18* 213:*6, 13*
214:*15* 216:*8,
14, 15* 220:*18,
20* 221:*8, 17*
254:*4* 263:*21*
267:*15* 268:*16*
**Charles** 171:*6*
**Chaz** 189:*8*
206:*9*
**check** 213:*17*
232:*6, 16, 18*
238:*7, 8, 14*
**checking** 284:*13*
**checks** 246:*21*
**child** 279:*7, 8,
12, 17, 18, 20*
280:*12* 283:*3*
**choose** 281:*19*
**Circuit** 249:*19,
20, 21* 250:*5, 6,
10, 21* 251:*2, 5*
**circumstance**
310:*13*
**circumstances**
200:*1* 266:*9*
310:*17*
**CIT** 177:*1*
213:*2*

Office (410) 821-4888
CRC Salomon, Inc.
2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com - info@crcsalomon.com
Facsimile (410) 821-4889
Page: 3

Deposition of Damond Durant, Volume 2

Case 1:20-cv-03346-DKC   Document 102-3   Filed 03/01/24   Page 43 of 56

Jawone D. Nicholson vs. State of Maryland, et al.

cited 249:20
citing 246:15
City 177:3
180:9 196:5, 10,
15 197:17
198:6 219:13
220:2 222:16
224:6 225:5
250:6 277:16,
20 278:3, 7
civil 259:14
268:21 269:1, 9
271:13, 20
272:15 274:17
275:19 278:21
283:4 288:3
289:5, 19
claim 227:14
253:16
claiming 312:14
clear 250:14
262:10 268:19
cleared 181:9,
12
clearly 208:12
250:14 255:15,
18
client 234:4
264:11 291:11
close 177:6, 7
208:6, 7 310:1
closed 276:5
closest 309:10
clothes 239:18,
21 240:18
Coates 261:8
cohort 299:2
collect 238:9
Columbia
269:20 270:1
come 175:7
190:14 207:20
210:1 218:8
227:18 228:14
231:18 252:15
253:1 257:2
261:12 266:9
294:20
comes 188:14

coming 204:1
232:4, 7 238:7,
8 300:12, 18, 20
commands
199:8
commencing
170:14
comment 221:1,
12, 17
Commission
318:19
committed
254:17, 18, 19
255:10 307:15,
17 308:4, 7, 8
committing
255:9
common
192:18, 20
215:12
communicated
203:18 305:15
communication
219:6
communications
173:15 204:5
comp 243:8, 12
249:13 252:19
253:16 268:7
company 259:9
compare 192:1
complaint
186:13, 15, 18,
20, 21 187:1, 12,
17, 20 188:8
205:18 207:6, 9
219:12, 14, 16,
20 220:4 289:1
309:15
Comptroller
275:6
concerned
187:15, 16, 20
190:6, 17 192:8
concluded 315:5
conclusion
180:11
conduct 250:1,
7 297:1
confirm 212:16

confirming
214:9
confiscated
307:9
confiscation
312:1
connection
200:21 203:18
204:10, 18
207:8 208:3
219:12 258:13
262:15
consent 287:12
Constantino
212:10, 18, 21
213:9
Constantino's
212:11
contacted
203:17
continue 245:9
continued
170:12
continuing
174:17 236:8
245:5 257:19
260:14
contract 257:6
conversation
178:12
convicted
254:20
convictions
295:16
convincing
250:15
cooked 190:8
cooks 192:10
cooperate
297:8, 9
cooperated
297:15
copies 316:19
copy 195:6, 13,
14, 15, 20
Corporation
258:19
correct 197:6
200:5 210:12
224:15 225:1, 6

228:2 230:9
235:17 273:8
277:13 300:3, 6
301:2 302:3, 11
303:9, 12
304:11 310:2
311:14, 18
313:21
corrections
316:7
cost 240:14
248:10, 21
249:7
costs 261:21
Counsel 260:9
295:8, 13 318:7,
11
count 263:8
293:13
countersuit
228:19
country 218:9
County 283:19
306:19 307:2, 9
308:7 318:3
couple 203:20
212:2 239:18
244:21
course 224:9
252:20 253:5, 6,
7, 9 263:13
COURT 170:2
188:10, 18
191:13, 14, 19
220:20 221:7
230:8 231:2, 5,
6 233:1, 3
239:8 241:7
243:18, 19
245:13, 17
246:14, 15, 16
249:18, 19, 20,
21 250:4, 5, 6,
10, 21 251:2, 5,
9, 10, 11 261:21
275:2, 3 285:18
287:6, 20
courts 229:7
crime 254:5, 7,
13, 17, 18, 19

255:1, 5, 9, 11,
12, 20 256:4
294:2, 8 307:15,
17 308:7, 9
crimes 306:20
criminal 254:4
263:21 268:11,
15, 16, 21 269:9
271:20 272:15
295:16 296:9
criminally
297:16
cul-de-sac 298:6
current 242:6
curtilage 305:7
custody 280:2,
4, 6

< D >
damage 312:14
damages 251:18
DAMOND
170:12 172:2
173:3 194:10
226:3 244:12
247:11 256:21
257:6, 7 258:4,
11 260:21
265:17 270:5
276:11 278:11,
18 280:15
282:16 283:20
284:1, 5 316:13
317:3
Dartmouth
293:6
dash 276:10
277:5
database 193:9
date 174:2, 3
188:10 197:13
210:13 222:5
234:2, 7 260:19
261:1 277:11
293:9 316:17
317:3
dates 274:11
285:18
daughter
270:20 271:1, 2

Case 1:20-cv-03146-DKC     Document 102-3     Filed 03/01/24     Page 44 of 56

Deposition of Damond Durant, Volume 2                                Jawone D. Nicholson vs. State of Maryland, et al.

**Davey** 206:*19,*
*20*
**day** 173:*13*
175:*10, 21*
179:*2, 4* 183:*13*
184:*7, 13*
185:*21* 186:*3,*
*12, 14, 16* 188:*1,*
*5* 193:*8* 226:*6*
251:*10* 298:*5*
308:*7, 15*
318:*15*
**days** 203:*20*
208:*7*
**deadline** 215:*7,*
*12*
**deal** 187:*14*
**dealer** 174:*9, 19*
**dealing** 204:*21*
205:*1*
**dealings** 205:*2*
**debt** 243:*21*
244:*3, 14*
245:*16, 17*
246:*5*
**debtors** 244:*13*
**December** 263:*6*
**decision** 220:*15*
302:*14, 20*
**declined** 221:*1,*
*11* 264:*11*
**deduce** 183:*5,*
*15*
**de-escalate**
182:*14* 198:*3, 8*
**de-escalating**
304:*15*
**de-escalation**
199:*4* 201:*1*
**defend** 306:*5, 7*
**defendant**
245:*19* 250:*11*
258:*4* 275:*7*
276:*14* 278:*17*
**Defendants**
170:*8* 171:*11*
270:*9* 283:*21*
**defense** 197:*21*
261:*7* 262:*21*
**defined** 197:*1*

**de-holstered**
308:*21*
**department**
176:*15* 180:*2, 9*
185:*17* 196:*5,*
*11, 15* 197:*5, 17*
198:*7* 214:*14*
215:*7, 13* 216:*9*
218:*17, 19*
225:*6, 13*
**departmental**
178:*7* 219:*21*
**Department's**
209:*13*
**depending**
207:*11*
**deploy** 199:*4*
**DEPONENT**
316:*1*
**deposition**
170:*12* 172:*2*
194:*17* 202:*16*
203:*16* 315:*5*
**depositions**
203:*20*
**describe** 189:*6*
206:*15*
**described**
175:*10* 191:*4*
**description**
260:*3*
**despite** 299:*9*
300:*1* 306:*12*
311:*20*
**detective** 194:*10*
**determine**
242:*18*
**determined**
229:*7* 230:*8*
231:*2, 5*
**died** 228:*9*
**different** 271:*7*
274:*10, 11, 12*
292:*2*
**difficult** 283:*10*
**dinner** 190:*7,*
*18* 191:*6*
**direct** 291:*11*
**directing** 234:*4*

**direction** 302:*6,*
*8* 304:*10*
309:*16, 18, 19*
**directness** 300:*2*
**disabilities**
290:*10* 291:*20*
**discipline** 219:*2*
**disciplined**
278:*7*
**discovery**
194:*13, 15, 20*
195:*2* 245:*4*
247:*17*
**discuss** 178:*13*
184:*10, 14*
211:*4, 6* 213:*5,*
*12*
**discussed**
185:*20* 191:*20*
198:*3* 204:*9*
211:*8*
**discussion**
241:*11* 293:*19*
**Disimone**
195:*10*
**dismiss** 210:*11*
221:*7*
**dismissal** 205:*9,*
*10* 210:*14*
**dismissed**
205:*11* 209:*2, 3*
210:*10, 17, 20*
214:*1, 9, 12*
220:*19* 221:*17*
**disposition**
277:*11*
**dispute** 225:*3*
228:*1* 262:*4*
**disrespect**
217:*13*
**distinction**
218:*15*
**DISTRICT**
170:*2, 3* 243:*18*
**DKC** 170:*7*
**document**
194:*16, 19*
196:*19, 20*
197:*13* 245:*3*
264:*9* 296:*13*

**documentation**
214:*8*
**documents**
207:*18* 242:*19*
273:*12*
**doing** 250:*16,*
*17*
**dollars** 247:*2, 7*
**Donelson**
171:*13*
**door** 285:*15*
**doorbell** 213:*17*
**doubt** 295:*8*
**draw** 200:*9*
310:*12, 15*
311:*1, 4*
**drawing** 180:*7*
199:*12, 17, 19*
310:*19*
**drawn** 185:*13,*
*17*
**drew** 181:*2, 6*
200:*4, 14*
**drive** 282:*7, 12*
**driving** 261:*10,*
*15* 262:*4, 15*
**drop** 216:*8*
**dropped** 216:*9,*
*16*
**drove** 252:*19*
253:*9*
**drug** 292:*3*
**drugs** 291:*4, 5,*
*8* 292:*4, 7*
312:*5*
**due** 229:*8*
230:*9*
**duly** 173:*4*
318:*6*
**DURANT**
170:*12* 172:*2*
173:*3* 174:*20*
194:*10* 195:*6, 9*
226:*3* 244:*7, 8,*
*12* 247:*11*
256:*21* 257:*6, 7*
258:*4, 12*
260:*21* 262:*12*
265:*16, 17*
269:*14* 270:*4, 6,*

*10* 276:*11*
278:*10, 11, 18*
280:*16* 282:*16*
283:*20* 284:*1, 5*
295:*13* 311:*16*
316:*13* 317:*3*
**duty** 253:*13*
**dyscalculia**
284:*15*
**dyslexia** 284:*16*

**< E >**
**eager** 215:*3*
**earlier** 182:*11*
209:*1* 213:*3*
246:*13* 259:*4*
262:*19* 263:*2*
267:*3* 271:*12*
275:*19* 276:*8*
278:*19* 283:*4*
289:*4* 293:*9*
299:*15*
**early** 234:*19*
287:*15*
**edible** 291:*1*
**efficiently** 173:*9*
**eight** 235:*6*
278:*20* 288:*2, 6*
**either** 200:*17*
222:*8*
**elicit** 204:*6*
**Email** 171:*9, 17*
**e-mail** 195:*5*
314:*14*
**employed**
212:*19*
**employee**
224:*11*
**encounter**
184:*11, 14*
310:*14*
**encountered**
306:*4*
**ended** 252:*20*
280:*12*
**enter** 192:*18*
193:*1*
**entered** 193:*2*
245:*18, 20*

246:6  263:1
entering  308:2
entire  174:14
191:1  236:9
272:12, 13
304:9
Erica  183:16
193:7  203:7
312:21
Errata  316:8,
19  317:1
escalated
298:21
ESQUIRE
171:4, 12, 20
establish  210:19
estate  230:3, 7,
8, 15  232:11
233:17  236:18
et  170:7  270:5
276:11  317:2
Eubanks
259:14, 16
event  179:5
184:15  191:11
208:4
events  174:1
175:10  176:15
204:16  248:16
277:15
Everybody
279:18
evicted  287:19
288:12  290:1
eviction  285:7,
9, 10  287:12
289:10  290:3
291:16  292:15
evictions  285:16
evidence
213:18  250:15
312:1
evidentiary
245:2
exact  174:2, 3
229:21  258:15
exactly  189:21
233:2  235:2
250:16  312:13,
15

Examination
172:5  173:7
295:12  314:8
318:8
examined
173:6  207:20
316:4  318:7
exchange
298:21
Excuse  262:8
293:17
exhibited
297:17
exhibits  257:19
expensive  240:8
experience
303:1  306:12
311:1
expert  201:3, 7
Expires  318:19
explain  216:2
238:16  240:19
explanation
292:13
extent  173:10
extraction
217:19
eye  217:19

< F >
F-150  249:5
face  299:7
309:13
Facebook
190:16  192:9
223:13  247:10
faced  300:2
facing  219:2
fact  183:6
196:14  197:10
225:4  250:11
276:20  287:15
313:20
facts  227:6
failed  275:15
failure  210:6
270:12, 13
271:15, 18
274:7, 13

Fair  194:3
196:16  197:5,
11  201:1
208:10, 11
222:10, 13
293:7  311:11,
17  312:9
Falls  284:1
false  250:13
falsifying
295:18
familiar  256:16
family  175:12
fancy  240:10, 18
far  215:18
242:11  294:13
295:20  296:21
fast  300:14
father  234:11
father-in-law
184:18  185:6,
12
father-in-law's
184:19
favor  231:8
244:2  246:6, 10
fear  301:13
303:2  309:2
fearful  301:8
February
277:11  284:8,
18  286:2, 6, 9,
12, 13, 17  287:2,
8
Federal  194:21
federally  174:8
feel  316:7
fellow  211:17
276:16, 20
felt  307:4
female  212:15
fight  279:21
280:2, 4
fighting  304:20
figure  195:5
214:3
file  179:19
233:9
filed  187:1
205:18  243:17

244:12  252:1, 8,
11  265:16
274:12  275:4,
10  277:7  279:4
285:20  288:21
files  260:11
filing  188:13
fill  180:1
Financial  257:7
258:19  259:7
311:13, 18
312:10
find  283:10
findings  249:19
fine  218:14
261:21  271:6
fined  262:14
firearm  173:12,
16  180:7
207:20  299:10
301:18, 20
302:3  303:15
304:1, 5, 9, 19
307:8, 16
309:13  310:15,
19  311:2, 5
312:17  313:2
firearms  174:9
310:12  312:7
first  173:4
181:12  193:12
208:18  212:13
226:6  241:5
245:2  291:18
298:4, 8  305:14
306:9, 13  314:9
Fischer  265:16
five  273:19
294:19  307:13
five-minute
241:3
fixed  288:20
Floor  171:14
folks  218:7
follow  215:3
273:20
follows  173:6
follow-up  314:7

footsteps
300:11, 14, 17
301:10  309:3
FOP  188:20
190:4  222:15,
17
force  179:20
180:2, 6, 8, 12
194:3  196:12,
14  197:11
198:16, 21
199:5  201:1
304:14  311:8
foreclosed
266:21  267:11
foreclosure
265:6, 15
268:13
foreclosures
269:17
foregoing  316:4
forget  189:5
206:14  212:13
214:7  267:12
283:2, 6, 11, 14
288:11, 12
289:5, 11  290:3
292:14
forgot  267:11
289:4, 9, 21
290:6  291:16
form  178:20
180:10  182:7,
15  183:10, 18
184:2  186:5, 11
187:18  195:17
196:7, 18  197:7
198:12  200:6,
11  201:8  202:1
203:12  204:19
205:7  206:1
207:10  209:15
211:9  215:9, 14,
20  216:4, 10, 17
217:2, 9, 20
218:10  219:8
220:9  222:11,
20  223:6, 11, 15,
20  224:3  226:4
230:10, 16

Office (410) 821-4888
CRC Salomon, Inc.
2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com - info@crcsalomon.com
Facsimile (410) 821-4889
Page: 6

Deposition of Damond Durant, Volume 2

Case 1:20-cv-03146-DKC    Document 102-3    Filed 03/01/24    Page 46 of 56

Jawone D. Nicholson vs. State of Maryland, et al.

231:*11* 232:*12,*
*19* 233:*6, 11*
234:*3* 252:*3, 9*
255:*13* 264:*2,*
*10, 20* 266:*18*
267:*7, 13, 21*
279:*14* 283:*7,*
*15* 284:*15*
288:*5, 13* 289:*7,*
*12* 290:*4, 18*
292:*11, 16*
294:*4, 10, 15*
**formal** 288:*21*
**forms** 291:*1*
**forth** 279:*21*
**fought** 237:*17*
**found** 201:*19*
209:*20* 210:*14,*
*16* 220:*8, 14*
221:*7*
**Foundation**
186:*10* 187:*19*
202:*2* 207:*11*
209:*16* 223:*12*
230:*11* 268:*1*
**four** 273:*19*
287:*21*
**fourth** 199:*3*
**frankly** 300:*3*
**Fraternal**
188:*21*
**free** 313:*8, 16*
**freely** 307:*3*
**friendly** 177:*8*
**front** 181:*3, 5,*
*7, 9, 10, 13, 16*
302:*10*
**fruition** 306:*14*
**FTPR** 273:*20*
274:*7*
**full** 212:*11*
250:*12*
**Fulton** 260:*17*
261:*1*
**further** 295:*6*
314:*5, 12* 318:*8,*
*11*
**future** 201:*21*
202:*5*

**< G >**
**garnished**
282:*21* 283:*3,*
*12*
**Gates** 270:*4, 9*
273:*21* 274:*13*
**gather** 213:*18*
**getting** 209:*6*
231:*21* 232:*5*
234:*11* 252:*5*
278:*3* 305:*15*
**Give** 174:*5*
193:*17* 199:*7*
205:*20* 219:*14*
234:*13* 237:*4,*
*10, 14* 238:*13*
239:*1* 247:*7*
256:*14* 307:*2,*
*16* 308:*3*
**given** 208:*13*
210:*15* 218:*16*
238:*6* 276:*19*
316:*5*
**Glen** 175:*5*
**Go** 176:*9*
177:*13* 188:*18*
195:*20* 201:*11*
231:*6, 19* 233:*1,*
*3* 241:*5, 10, 13*
251:*13* 255:*19*
258:*3, 4* 274:*2*
286:*18* 294:*18*
297:*20* 307:*3*
309:*14*
**goal** 173:*9*
**going** 173:*9*
174:*12* 179:*13,*
*16* 190:*8*
206:*18* 208:*2*
216:*21* 217:*1,*
*14* 237:*7, 9*
244:*21* 247:*16*
248:*11* 249:*14*
255:*2* 256:*15*
259:*12* 260:*12*
264:*8, 18*
266:*13* 268:*5,*
*14* 273:*18*
274:*6* 275:*1, 5*

281:*14* 286:*18*
291:*10* 292:*5*
304:*18* 308:*16*
**GOLDBERG**
171:*12* 172:*7*
174:*12, 18*
178:*20* 180:*10,*
*16, 20* 181:*14,*
*21* 182:*7, 15, 20*
183:*10, 18*
184:*2* 186:*5, 10*
187:*18* 194:*12,*
*16* 195:*17*
196:*7, 18* 197:*7*
198:*12* 199:*13,*
*20* 200:*6, 11*
201:*8* 202:*1*
203:*12* 204:*3,*
*19* 205:*7* 206:*1*
207:*10, 15*
209:*15* 211:*9*
215:*9, 14, 20*
216:*4, 10, 17*
217:*2, 9, 20*
218:*10* 219:*8*
220:*9* 222:*11,*
*20* 223:*6, 11, 15,*
*20* 224:*3, 16*
225:*7* 226:*4*
227:*8, 15, 19*
228:*3, 11, 16, 20*
229:*2, 5, 10, 15*
230:*4, 10, 16, 21*
231:*4, 11*
232:*12, 19*
233:*6, 11, 20*
234:*3, 9* 235:*10,*
*14, 18* 236:*2, 7,*
*11* 241:*2, 8*
244:*21* 245:*8*
247:*16, 20*
252:*3, 9* 255:*13,*
*17* 257:*18*
260:*9, 15* 264:*2,*
*10, 20* 266:*18*
267:*7, 13, 21*
279:*14* 283:*7,*
*15* 288:*5, 13, 17*
289:*7, 12* 290:*4,*
*18* 291:*2, 10*

292:*2, 10, 16*
294:*4, 10, 15*
295:*1, 9, 12*
314:*5, 17, 18*
315:*2*
**good** 192:*4*
241:*2, 8* 314:*17*
**Goodness**
284:*12*
**graduated**
281:*5, 7*
**grandmother**
190:*3* 227:*20*
228:*5* 229:*9*
232:*14, 15*
280:*8, 10, 11*
**grandmother's**
236:*14*
**grant** 236:*8*
245:*5* 247:*18*
260:*12*
**granted** 174:*13*
201:*17*
**grass** 253:*10*
**greatest** 173:*10*
**Gresham**
257:*10, 13*
258:*5, 6, 9, 12*
**ground** 302:*10*
**grounds** 193:*1*
**GSX-R** 248:*7*
**guess** 184:*6*
202:*14* 207:*3*
211:*11* 212:*2*
217:*6, 11*
218:*12, 13*
232:*21* 236:*6*
249:*1* 254:*15*
259:*9* 307:*5, 7*
**guilty** 262:*3, 5,*
*15*
**gun** 181:*5, 8, 9,*
*10* 182:*19*
183:*3, 7, 8, 15,*
*16* 185:*14, 18*
188:*5* 199:*21*
200:*5, 9* 302:*9*
304:*10* 307:*15,*
*19* 309:*15, 17*

**guy** 189:*7*
206:*16*

**< H >**
**Hamlet** 183:*16*
192:*18* 193:*2, 7*
203:*7* 205:*3*
215:*2* 312:*21*
**Hamlet's** 191:*5*
**hand** 318:*14*
**handcuffs**
307:*19*
**handed** 237:*6*
**hang** 177:*12,*
*14* 222:*5*
299:*17*
**HANSEL**
171:*4, 5* 172:*6*
173:*7* 174:*16*
180:*19* 193:*17*
194:*14* 195:*3, 8*
207:*13* 231:*15*
234:*8* 236:*10*
241:*4, 10, 13, 15*
245:*7, 10, 11*
247:*19* 255:*15*
256:*14* 257:*21*
260:*13, 16*
262:*10, 11*
264:*15* 284:*12,*
*14, 17* 288:*16*
291:*16* 292:*6*
293:*16, 20*
294:*18* 295:*5,*
*11* 310:*7* 314:*6,*
*8, 12, 20* 315:*2*
**happen** 176:*4,*
*7, 13* 204:*17*
205:*5* 214:*5*
**happened**
175:*14* 184:*1*
185:*7, 21* 186:*3,*
*8, 16* 188:*9*
189:*14, 17, 21*
190:*1, 18* 191:*7,*
*13* 192:*11*
204:*10* 207:*8,*
*16* 208:*1*
228:*15* 233:*16*
247:*5* 251:*3*

Deposition of Damond Durant, Volume 2

Case 1:20-cv-03146-DKC    Document 102-3    Filed 03/01/24    Page 47 of 56

Jawone D. Nicholson vs. State of Maryland, et al.

266:7 272:9
277:16, 20
278:7 287:7, 10
292:20 296:15
**hard** 283:13
284:16
**Harner** 244:9
**Hatcher** 309:9,
10, 21 312:17
313:5
**Hatcher's**
309:19
**heading** 207:3
**hear** 191:13, 16,
17 208:16, 18,
20 233:3, 4
248:1
**heard** 173:15
191:10, 19
214:10 300:11,
16 308:19
309:3, 5
**hearing** 189:12,
14, 16 190:1
191:2, 15
192:15 201:12,
13 202:7, 10, 11,
12, 13, 14, 18, 20
203:4, 8, 19
206:10, 13
221:20 262:21
286:2, 6, 12, 18
296:6 301:10
**hearings** 203:6
246:16
**Helaine** 192:18
193:2
**held** 170:13
180:14 181:11
241:11 293:19
**he'll** 184:6
**Hello** 258:7
**help** 179:8, 10,
12
**Henry** 225:16
**high** 281:6, 7,
14 290:20
292:8
**higher** 258:3

**hire** 261:18
**hired** 261:7
**Hispanic** 218:2
**history** 263:11,
17, 21 268:19
271:14, 19
272:7, 10, 11
274:18 278:21
289:19
**hit** 252:18
**holding** 283:20
**holster** 181:1
**home** 175:16,
17 185:4
265:19, 20
266:1, 8, 10, 11,
14, 16 267:2, 11
268:16 269:6
287:4
**honest** 266:3
**hoodie** 181:17
**hope** 272:8
**house** 175:18,
19 177:13, 15,
17 179:5 185:1
192:21 207:20
283:12 287:14,
17, 19 289:1
**Howard** 283:19
306:19 307:2, 9
308:6
**Hudson** 270:4,
9 273:21
274:13
**hundred** 188:5
216:14 247:2, 7
**hung** 222:3
**hypothetical**
304:18 307:21

**< I >**
**ID** 225:11, 17
**idea** 174:5
175:6 259:5
**identified** 270:6
**identify** 210:6
**identifying**
210:2
**II** 170:1, 11

172:2 317:3
**illicit** 291:5
**imagine** 215:2
**imagining** 191:7
**immediately**
254:12
**Impartial**
194:3 196:16
197:6, 11 201:1
**impropriety**
311:21
**incident** 179:14
185:21 186:1, 4,
9, 16, 17 188:9
203:11, 18
204:10 205:4
208:6, 13
213:19 249:3
296:5 297:20
**incidents** 219:7
**include** 209:5
241:6
**includes** 269:1
272:8 291:5, 6
**including**
271:18
**INDEX** 172:1
**individual**
308:11 309:7
**individuals**
298:5 301:21
308:15 309:11
312:20, 21
**information**
173:14 210:15
286:19 295:18
307:5
**ingested** 290:21
**Inheritance**
227:16, 18
228:1, 15
246:14 266:16
**injuries** 290:13
**injury** 291:19
**inquiry** 291:13
**in-service**
197:19
**Instagram**
223:18, 19

**instance** 220:14
**instigated** 299:4
**instructor**
193:12 197:19
**Integration**
194:4 196:21
**intended** 183:3
**intent** 303:20
**intention** 273:11
**intentionally**
196:20
**interaction**
175:11 204:18
277:19 278:4
314:10
**interactions**
175:15 215:3
**interested**
318:12
**Internal** 179:17
187:2, 7 190:4
205:17, 20
206:13 207:2, 7,
9 208:4, 13, 16
209:2, 4 211:8,
14 215:17
217:8 219:6, 11,
14, 15, 19 220:4,
19 296:17, 19,
21 297:3
**Internet** 194:14
**interrupt**
174:15 293:18
**interview** 207:7
208:14, 17, 19,
20
**interviewed**
207:1 208:2, 3,
7 215:1
**interviews**
209:4
**intimidated**
301:1, 8
**investigate**
213:16
**investigation**
216:19 296:17,
19 297:1, 3, 6, 7,
9, 14

**investigators**
179:14
**involve** 227:4
273:21
**involved** 183:8
241:1 253:19
257:17 267:4
276:21 289:20
**involvement**
203:11
**involves** 246:11
293:1
**involving**
275:11 277:1
282:16 283:20
284:4
**irrelevant**
194:20
**issue** 214:15
227:18 246:11
256:7 291:20
308:17
**issued** 192:17
**issues** 191:9
203:11 219:2
311:13, 18, 20
312:10
**items** 257:2

**< J >**
**Janice** 278:12
282:15
**jaw** 219:13
222:15 242:5
249:11 268:6
276:9 277:1, 4
**JAWONE**
170:4 203:4, 19
204:10, 18
242:7
**jeopardy** 302:17
**job** 198:11
312:1
**jog** 242:15
**Jon** 276:10
277:5
**J-O-N** 277:5
**judge** 189:20
190:2, 6, 10, 17
191:3, 4 192:4,

Office (410) 821-4888
CRC Salomon, Inc.

2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com - info@crcsalomon.com

Facsimile (410) 821-4889
Page: 8

Deposition of Damond Durant, Volume 2

Case 1:20-cv-03146-DKC    Document 102-3    Filed 03/01/24    Page 48 of 56

Jawone D. Nicholson vs. State of Maryland, et al.

6, 7 201:*19*
232:*21* 244:8, *9*
249:*18, 19, 21*
250:*5, 6, 10*
**judgment**
231:*7* 244:*1*
245:*18, 20*
246:*6, 9* 282:*17*
**Judiciary**
260:*11*
**July** 244:*13*
318:*15*
**jump** 174:*12*
**June** 170:*14*
172:*3* 197:*14*
220:*19* 221:2
222:6
**Junior** 290:*20*
292:8 293:*3, 5*
**justified** 199:*7,
11*
**justify** 199:*12,
16, 18*

**< K >**
**K8** 248:*7*
**karate** 200:*18*
**Karim** 283:*19*
**keep** 230:*14*
236:*21* 237:*11,
12* 266:*16*
271:*21* 286:*19*
**kept** 176:*10, 11*
210:*13* 266:*13*
**kid** 252:*19*
253:*3*
**kind** 176:*1*
179:9, *11*
186:*20, 21*
202:*12* 210:*10*
248:5 274:*18*
286:*19* 291:*12*
295:*21*
**knew** 222:*7*
250:*16* 286:*17*
287:*1*
**knife** 200:*1, 15*
303:8, *12, 15, 16,
17* 308:*1, 3*

**know** 186:*13,
21* 191:8 202:*4,
14, 15, 16*
209:*19, 21*
211:*7* 214:*18,
20* 215:*19*
218:*12* 219:*1, 4*
220:*13, 17*
221:*4, 5, 16, 19*
222:*1, 2* 231:5
233:*1* 234:*10,
16* 235:2
239:*10* 240:2,
*16* 241:*19*
243:*1, 14*
254:*16* 256:5
259:*7, 10* 260:6
265:5, *18*
269:*15* 272:2, *3*
274:*7, 19, 20*
276:*1, 2, 3*
283:*17, 18*
285:*11* 287:9
288:9 295:*13,
20* 297:*21*
298:*14* 307:*20*
310:*4, 8* 312:*13,
19*
**Knowing**
176:*10* 250:*12*
266:*11*
**knowledge**
215:*6, 13*
**known** 226:2, *9*
244:*7*
**knows** 221:*4*

**< L >**
**language** 299:*4,
6, 9*
**late** 234:*20*
**Latino** 218:*13*
**Law** 171:*5*
263:*11, 16*
264:*1* 294:2, *8*
318:6
**lawsuit** 204:*11,
16* 219:*12*
220:*1, 5* 226:*13,
14, 21* 227:*3*

231:*19* 242:*7*
243:*20* 258:*13*
259:*3* 270:*3, 9*
278:*16* 295:*21*
297:*1*
**lawsuits** 226:*11*
240:*21* 241:*17*
242:*1, 9, 12, 20*
243:*4, 11*
249:*15* 252:*12*
253:*20* 267:*18*
268:5 271:*13*
**lawyer** 188:*17,
18, 19, 20* 189:*1*
204:*1* 206:*7*
207:*14* 209:*19*
211:*3* 222:*15,
16, 17, 18* 223:*1,
4* 233:5 236:*4,
5, 14, 18* 261:*18*
270:*16* 276:*12,
13*
**lawyers** 204:*7*
276:*19*
**lawyer's** 211:*4*
**LCS** 257:*7*
258:*19* 259:*7*
**learn** 214:*1*
**learned** 213:*21*
222:8, *9*
**leave** 287:*15*
289:*1* 313:*8, 17,
21* 314:*2*
**left** 196:*21*
229:*12* 246:*18*
285:*15*
**leg** 182:*3, 6*
**legal** 180:*11*
256:6 280:5
291:*5, 9* 308:*2*
**legally** 271:*5*
**legislative**
202:*19*
**lesson** 194:*2*
196:*4*
**letter** 209:*11,
12, 18* 211:*12*
**level** 200:*2*

**levy** 244:*21*
245:2 247:*16*
260:*12*
**Lewis** 270:*16*
271:8
**license** 261:*10,
16* 262:*5, 6, 16*
**licensed** 174:*9*
261:*12*
**Liebrecht**
170:*15, 21*
318:2, *17*
**lien** 275:*12*
276:*3, 6*
**life** 272:*12, 13*
280:*20* 308:*17*
**Light** 171:*14*
**limitation**
214:*16* 221:8
**line** 174:*14*
194:*18* 236:9
257:*20*
**lines** 273:*20*
**LinkedIn** 224:2
**list** 241:*21*
272:*18, 20*
273:*11, 16*
**listed** 201:2
244:*14* 245:*16*
257:*10* 259:*13*
261:*1* 270:*5, 15*
276:5 278:*17*
283:*21* 284:*5*
**listen** 192:*8*
**listening** 192:*12*
**litigation** 205:*5*
**little** 173:*12*
241:*16* 264:*4*
305:*17*
**live** 173:*18*
176:*10* 280:*15*
281:6 306:*14*
308:*16*
**lived** 258:*6, 8*
260:*17* 265:*11*
269:*19* 280:*20*
281:*16*
**LLC** 283:*20*
**located** 175:*4*

**log** 314:*21*
**logic** 183:*6*
**long** 214:*15, 18*
241:6 254:*11,
14* 263:*7* 272:*4,
9, 10* 280:*18*
304:*4, 7* 307:*1,
7*
**longer** 272:*11*
**look** 179:*14*
195:*21*
**looked** 268:*10*
293:*21*
**looking** 192:*9,
10* 196:*3, 4*
216:*21* 218:*15*
257:5 259:*20*
274:9 276:*19*
277:*3*
**looks** 222:*6*
261:2 275:*15*
**lose** 265:*20*
266:*10*
**losing** 267:*11*
268:*16* 269:5
**lost** 265:*19*
266:8
**lot** 178:*10*
191:7 199:*15*
200:*1, 2* 212:*14*
272:*3*
**low** 180:*14*
**lying** 296:2, *7*

**< M >**
**Madam** 314:*13*
**mail** 188:*14, 15*
**main** 243:*21*
244:*3*
**majority**
245:*17* 246:*5,
10* 251:*17*
**making** 238:*14*
**male** 187:9, *10*
189:*7* 206:*17*
212:*15, 16, 17*
217:*15*
**malice** 250:*15*

Office (410) 821-4888
CRC Salomon, Inc.

2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com - info@crcsalomon.com

Facsimile (410) 821-4889
Page: 9

Deposition of Damond Durant, Volume 2

Jawone D. Nicholson vs. State of Maryland, et al.

man 198:*10*
206:*9* 208:*1*
218:*9* 277:*4*
managed 290:*3*
292:*14*
manner 215:*5*
man's 222:*14*
242:*5* 276:*9*
March 277:*7*
287:*13, 15, 18*
marijuana
290:*17* 291:*1*
292:*8*
Marlboro
265:*3, 7, 9, 11*
married 230:*18,*
*19* 270:*19*
Marsden 261:*7*
MARYLAND
170:*3, 7* 171:*7,*
*15* 173:*20*
243:*19* 256:*17*
257:*1* 259:*14*
260:*11* 275:*6,*
*11* 293:*1* 294:*1*
317:*2* 318:*1, 3*
materials 195:*1*
maternal 228:*5*
229:*8*
matter 201:*2, 7*
203:*1* 264:*7*
312:*11*
Maurice 184:*21*
mean 175:*19*
177:*7, 9* 187:*20*
190:*4* 203:*15*
205:*10* 211:*20*
215:*18* 218:*7*
238:*5* 253:*7, 8*
254:*20* 256:*1, 5*
262:*9* 279:*16*
285:*11* 293:*18*
310:*13, 17*
meaning
218:*13* 225:*16*
231:*17* 253:*9*
means 254:*20*
272:*11*
meant 204:*6*
media 223:*9*

medications
290:*7* 291:*21*
members
175:*12*
memory 242:*16*
290:*8, 11, 14*
292:*9* 296:*13*
men 175:*11*
183:*3* 200:*4, 14,*
*18*
mental 291:*19*
mention 263:*2*
267:*5* 271:*15*
274:*16* 275:*21*
279:*1* 288:*2*
289:*17*
mentioned
249:*13* 252:*15*
269:*5* 276:*8*
301:*18*
methods 198:*1*
Michael 276:*12*
mid 234:*19, 21*
Milan 270:*16*
271:*8*
mind 176:*6*
252:*15*
Mine 237:*20*
238:*2* 272:*11*
314:*20*
minor 234:*1*
235:*17, 21*
239:*2, 12, 17, 20*
240:*5* 281:*14*
minute 242:*3*
254:*21* 274:*17*
286:*5* 304:*8*
minutes 294:*20*
307:*13*
miscarriage
190:*7, 14, 18*
191:*5* 192:*10*
mischaracterizat
ion 196:*19*
294:*11*
misspoken
262:*13*
mixed 234:*11*
model 240:*8*

mom 190:*3*
281:*20*
moment 181:*8*
301:*13, 14, 16,*
*17, 21* 302:*13,*
*17* 313:*13, 17*
Money 227:*5,*
*12, 13* 228:*17*
229:*3, 12, 16*
230:*2, 7, 14*
231:*2, 17, 18, 19,*
*21* 232:*4, 7, 10,*
*14, 15* 233:*2, 17,*
*18* 235:*20*
236:*1, 13, 16, 19*
237:*4, 7, 9, 11,*
*12, 13, 14, 16*
238:*6, 10, 12, 17,*
*21* 240:*3* 247:*3,*
*9* 250:*13* 252:*1,*
*5* 266:*16, 17*
267:*2* 282:*6, 10,*
*13* 312:*3*
Monica 171:*20*
Montgomery
278:*12* 282:*16*
month 174:*5, 6,*
*7* 208:*13, 17*
months 208:*7*
287:*18, 21*
288:*12* 289:*10*
290:*1, 2* 291:*17*
292:*14*
mortgage
266:*12*
mother 183:*8,*
*12* 190:*11, 13*
193:*7* 227:*21*
228:*4, 7, 9*
230:*15, 20*
232:*11* 233:*18*
235:*1* 280:*6*
281:*6* 283:*3*
mother's 228:*4,*
*9*
motorcycle
248:*3, 5*
mouth 214:*7*
move 287:*19*

moved 281:*10,*
*20*


< N >
name 184:*20*
187:*5* 189:*5, 8*
206:*14, 19*
212:*12, 13, 14*
217:*6, 7, 12*
218:*3* 258:*15*
named 270:*16*
276:*12, 13, 14*
277:*4*
names 193:*7*
226:*3, 9*
narrow 218:*6*
near 175:*18*
192:*21*
necessarily
234:*4*
necessary
198:*16, 21*
302:*14, 16*
304:*20* 310:*18*
311:*1* 316:*8*
need 173:*19*
207:*6* 241:*6*
274:*3* 294:*19*
314:*21*
needed 179:*8,*
*10* 236:*21*
247:*4* 288:*20*
316:*19*
negotiated
287:*12*
Neita 276:*15, 16*
Neither 200:*4,*
*14*
nervous 305:*17*
Never 181:*10*
192:*21* 231:*6*
251:*9, 11*
254:*12, 17*
265:*11* 291:*3*
294:*2* 302:*5*
304:*10* 306:*7*
309:*1* 313:*15*
Nichols 205:*15*
NICHOLSON
170:*4* 189:*21*

190:*3* 193:*7*
203:*4, 19*
204:*11, 18*
205:*3* 242:*7*
249:*3, 4, 13*
277:*19* 278:*1, 4*
309:*12* 311:*11,*
*15* 312:*13*
313:*4* 317:*2*
Nicholson's
313:*1*
nicknames
226:*1, 7*
North 171:*6*
224:*14, 19*
Northern 177:*4*
notarial 318:*14*
Notary 170:*15*
318:*2, 18*
notice 209:*3, 6,*
*9* 251:*10* 298:*9*
noticed 197:*13*
298:*5* 303:*8*
notices 285:*9*
notify 211:*12*
November
285:*20* 286:*9*
number 225:*11,*
*12, 15, 17, 19*
269:*20*
numbers
274:*11* 284:*16*


< O >
oath 255:*16*
object 174:*13*
194:*18* 204:*3*
245:*6* 291:*10*
297:*13*
objection
174:*17* 178:*20*
180:*10, 16*
181:*14, 21*
182:*7, 15, 20*
183:*10, 18*
184:*2* 186:*5, 10*
187:*18* 195:*4,*
*17* 196:*7, 18*
197:*7* 198:*12*
199:*13, 20*

Office (410) 821-4888
CRC Salomon, Inc.

2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com - info@crcsalomon.com

Facsimile (410) 821-4889
Page: 10

200:6, 11  201:8
202:1  203:12
204:19  205:7
206:1  207:10
209:15  211:9
215:9, 14, 20
216:4, 10, 17
217:2, 9, 20
218:10  219:8
220:9  222:11,
20  223:6, 11, 15,
20  224:3, 16
225:7  226:4
227:8, 15, 19
228:3, 11, 16, 20
229:2, 5, 10, 15
230:4, 10, 16, 21
231:4, 11
232:12, 19
233:6, 11, 20
234:3  235:10,
14, 18  236:2, 7,
8  245:3, 5
247:17, 18
252:3, 9  255:13
257:18, 20
260:10, 12, 14
264:2, 10, 20
266:18  267:7,
13, 21  279:14
283:7, 15  288:5,
13  289:7, 12
290:4, 18  291:2
292:10, 16
294:4, 10, 15
**objections**
245:1  289:8
**obligation**
280:13
**observation**
183:6
**obvious**  210:11,
19
**obviously**
195:11, 13
204:4  210:9
224:6  242:6
245:8  254:15
**occasion**  202:9

**October**  292:21
**office**  211:4
**Officer**  173:8
174:20  180:15
187:7  190:4
194:10  195:6, 9,
10  207:2, 3, 5, 8
212:10, 11, 18
217:5, 15, 18
219:2, 5, 10
224:10  241:16
245:12  254:18
262:12  276:16,
20  295:5
296:11, 12
303:2, 4  306:13
307:14, 18
308:10  310:14
**officers**  175:13
178:16, 18
196:6, 11, 16
197:5, 11, 17
198:7  211:17
**officer's**  187:5
217:6
**oh**  190:20
220:17  228:5
257:13
**Okay**  175:6, 9,
17  176:2, 5, 9
177:2, 10, 19
178:1, 8  179:11
180:1, 13  181:8,
12  182:4, 11
183:2, 5  184:5
185:5, 8, 9
186:3, 8, 19
187:3, 11, 13
188:4, 8, 12, 19
189:8  190:14,
17  191:18
192:2  193:17
194:9  197:4, 16
198:1, 6  200:14,
17  201:16
202:21  203:3,
17  205:17, 20
206:4  207:5
208:6, 12  209:1,
12  210:9  211:2

212:8, 15, 18
213:5, 8, 16
214:8, 11, 14
217:13  218:5,
14  219:1, 11
220:8, 18
221:11  223:9
225:3, 15  226:1
227:3, 11, 17
228:6, 9, 14
229:1, 4, 14, 17,
20  232:1, 4, 10
234:19  235:5,
15  236:18
237:3, 21  238:3,
12, 19  239:8, 11,
16, 20  240:14,
21  242:3, 11
243:11, 17, 21
246:2, 13  247:7
248:7, 21  249:2,
5, 7, 18  250:20
251:17, 21
252:16  253:11,
13, 19  254:4
256:1, 6  258:16
259:3, 12, 18
260:19  261:5,
12  262:19
265:2, 5, 15
266:5, 7  267:10,
17  269:4, 19
270:12, 15
271:17  273:6,
18  274:6, 21
275:9  278:6, 15,
19  280:2, 5, 20
281:16, 19
282:5, 15  283:2
284:14, 21
285:11, 17
286:8, 12, 15
287:7, 11  290:7,
21  293:13, 16
294:18  295:1
301:7  304:13
306:16
**old**  247:2
281:10  306:2

**once**  177:21
181:20  230:19
308:18
**ones**  242:10, 14
252:14, 15
253:1  272:21
273:5  289:3
**one-year**
214:16  215:12
221:8
**ongoing**  296:19
**online**  273:16
**open**  179:16
**opinion**  244:8,
19, 20  245:12
308:6
**opportunity**
209:7  295:7
303:19
**option**  199:5
**order**  188:11,
13, 16, 17, 21
189:1, 12  191:2,
11, 12  192:17
193:2  201:11,
13, 16  202:7
203:4, 7, 10, 19
204:15  205:5
206:10  296:6
314:15
**ordered**  260:1,
6
**ordinarily**  180:8
**ordinary**  209:5
**original**  229:12
233:14  239:4, 5,
6  288:18
**outcome**
219:19  220:3
221:20  287:5, 8
318:13
**outside**  177:10,
19  265:10
**overdue**  205:12
**overtime**  224:19
**overwhelmed**
305:3
**overwhelming**
245:17  246:5
**owed**  239:8

**owner**  173:14
288:18

**< P >**
**P.C**  171:5, 13
**p.m**  315:5
**pace**  300:15
**Page**  172:5
190:16  199:3
247:10  316:20
**PAGE/LINE**
317:4
**paid**  188:21
224:6  261:21
262:14  263:1
278:3  279:8, 17,
19  280:14
**paper**  214:6
221:5  271:5
285:15  316:20
**papers**  233:9
285:3, 5, 8, 9, 10
**Parkway**  177:4
**part**  189:18
198:15  220:17
231:14  247:6
**participants**
193:8
**particular**
215:17  242:15
**parties**  299:3
318:12
**party**  226:12,
14, 21  241:18
242:1, 6, 8, 12,
21  243:4
249:16  252:12
259:13  267:18
268:5, 21  269:9
271:13, 20
272:16  278:16,
21  283:6  288:4
299:3  310:8
**pass**  192:21
235:1
**passed**  227:21
236:15  288:18
**passenger**
253:12

Deposition of Damond Durant, Volume 2     Jawone L. Nicholson vs. State of Maryland, et al.

Case 1:20-cv-03146-DKC     Document 102-3     Filed 03/01/24     Page 51 of 56

**paternity** 279:4
**pattern** 300:18
**pay** 220:2
222:18 224:20
260:1, 6 270:13
271:15, 18
274:8, 13
275:15 276:6
**paying** 251:21
252:7 279:12
**pays** 279:18
**PBJ** 261:7
**PDF** 314:20
**peace** 188:11,
12, 16, 17 189:1,
11 191:2, 11, 12
192:17 193:2
201:11, 13, 16
202:7 203:4, 7,
10, 19 204:15
205:5 206:10
296:6 299:12
**pendency**
197:12
**Pennsylvania**
265:3, 8, 13
**people** 178:8,
11 212:2 241:6
291:18 298:4
**percent** 188:6
216:14
**person** 187:11
191:3 200:2
218:18 219:1
270:5 301:18
303:4, 9, 12
306:1 308:1
310:1 314:9
**personally**
318:4
**person's** 305:7
**pertains** 311:21
**Peter** 276:13
**phone** 221:1
**photographs**
207:21
**physical** 280:6
**physically** 177:2
**pick** 306:17

**pickup** 248:17,
18 249:4
**piece** 316:20
**pistol** 199:6
**place** 287:13
291:17 299:16,
19 318:5
**placed** 259:19
**Plaintiff** 170:5
171:3 250:12
298:14 299:2
**plan** 194:2
196:4 308:18
**plea** 262:15
263:1
**plead** 262:5
**Please** 180:19
314:18, 21
**pled** 262:3
**plenty** 288:19
**pocket** 181:2, 4,
5, 7, 9, 10, 12, 16
182:2, 9 304:5
312:18 313:2
**point** 181:1
195:16 199:6
210:21 273:18
291:11 299:10
300:5, 9 304:4
309:15 313:17
**pointed** 181:11
302:5, 7 304:10
309:13
**Pointing**
180:12 199:16
**police** 173:12
175:12 179:1, 7
180:9 183:9, 17
185:16 188:21
193:8, 11 196:5,
11, 15, 16 197:4,
17 198:6
209:21 224:10
225:5 254:18
307:2, 9, 18
308:7 310:12,
14 312:21
**Policies** 197:21

**Policing** 194:3
196:17, 21
197:6, 12 201:2
**politeness** 300:1
**position** 294:1
**Possibility**
303:13
**possible** 173:10
309:2
**potential** 304:15
**potentially**
199:6
**powers** 183:5
**prepare** 195:9
**prepared** 194:9
195:6, 15
**prescribed**
291:6, 7
**prescription**
291:21
**prescriptions**
291:6
**PRESENT**
171:20 206:7
251:12 283:5
**pretty** 206:5
208:21 215:2, 3,
12 239:15
255:17
**previously**
226:2
**prior** 222:9
292:3
**private** 305:7, 8
308:11
**Probable** 296:3,
4
**Probably** 212:6
218:15 221:2
234:21 240:6
263:18 267:1
307:19
**problem**
236:10 241:4
245:10 247:19
260:13, 14
**proceeding**
189:2 194:17
269:1 289:19
295:14 296:10

**PROCEEDINGS**
173:1 191:8
243:18 251:3, 6
271:20 272:15
275:20 278:21
283:4 285:18
287:20 288:3
292:15 318:10
**process** 209:5
**produce** 207:17
**produced**
194:12, 20
245:4
**production**
195:1
**profane** 299:6,
9 300:3
**progress** 252:19
**property**
259:17 265:6,
12 305:7, 8, 9
308:12
**proportional**
198:17 199:1
304:14 310:19
**proportionate**
199:5
**proportionately**
291:13 311:7
**protect** 302:14
**provide** 195:6
297:11
**provided** 215:4
223:1, 4
**Public** 170:15
202:7 224:10
318:2, 18
**publicly** 194:21
**pull** 193:18
242:19 264:8,
18 273:12
292:19 299:10
**pulled** 182:2, 9,
12 183:2 188:5
257:1 267:5
**pulling** 270:3
276:9
**punishment**

220:6
**punitive** 251:18
**purchase** 174:8
**purchased**
173:18, 21
**purchaser**
173:16
**purposes** 304:14
**put** 178:6
181:18 182:4, 5,
9 234:6 256:21

< Q >
**quell** 304:21
**quelled** 303:18
**question** 223:3
231:14 233:15
245:6, 9 272:1,
6 288:6, 10
289:18 291:15
292:2 314:6
**questioning**
173:11 174:14
194:19 236:9
257:20 308:16
**questions**
174:15 183:14
191:21 192:3, 4
204:6 264:12,
13 267:19
295:8, 10 298:1,
2 314:5
**Quick** 300:15
**quickly** 309:6
**quite** 272:10
**quote** 309:14
310:12
**quotes** 249:19
**quoting** 250:4

< R >
**radio** 173:15
**raise** 305:18
**raised** 260:18
309:16, 18, 19,
20
**RAM** 249:6, 8
**ran** 173:12
175:7 222:5, 6
303:7

Case 1:20-cv-03146-DKC     Document 102-3     Filed 03/01/24     Page 52 of 56

**Randallstown**
265:21  266:1
**range**  221:3
**rate**  266:12
**read**  214:5, 6
314:18  316:3
317:4
**reading**  221:4
**ready**  180:14
236:12
**real**  271:7
**really**  178:14
185:11  192:12
210:13, 15
240:11  266:3, 4
**reason**  192:5
235:20  267:6, 9
268:13  274:15
275:20  291:14
303:20  317:4
**reasonable**
198:17  199:1
291:12  302:19
310:18  311:4
**rebuffed**  231:13
**recall**  189:4
192:14  201:12,
14, 15  202:21
221:12  222:16
268:4  273:3, 6
292:19  293:9
294:12  306:10
**receive**  209:3, 9
220:6, 11  260:4
**received**  186:13,
18, 20  209:11,
18  212:1
232:14, 15
306:13
**receiving**
186:15
**recess**  241:12
295:4
**recognize**
174:16  244:10,
19  245:12
247:11  257:21
260:13  309:7
**recollection**
191:2  246:17

**record**  189:16
195:4  234:7
241:5, 11, 13
293:19  294:19
316:5  318:10
**recorded**  206:4,
5  282:17
297:11  318:9
**recording**
191:9, 10, 16, 17
221:6
**recover**  307:8
**refer**  209:19
217:14
**reference**
196:20  256:3
**referenced**
258:12
**referring**
205:14
**refers**  245:20
**refresh**  246:17
**refreshed**
296:13
**refused**  237:4
314:2
**regardless**
302:10
**registered**  175:7
**related**  185:21
186:17  204:16
213:18  219:7
244:10  285:9
291:14  292:3
311:7
**relates**  245:18
246:5
**relation**  186:4,
9  188:9
**Relevance**
218:11  223:7
224:16  228:11
230:4, 11
235:10  245:4
290:19  292:10,
17  294:5, 11, 16
**relevancy**
174:14  225:7
227:8  233:20
234:4  236:8

245:5  247:18
257:19  260:10
**relevant**  192:3
243:1, 3  244:11
**reliance**  245:3
**rely**  195:2
**relying**  194:17
**remaining**
291:20
**remarkable**
291:18
**remember**
174:2, 3  178:2,
14  179:10, 12,
15  184:4, 9
185:2  187:4, 12
192:16  209:17
210:4, 5, 7
211:16  213:11,
15  214:10
221:21  235:4,
21  240:9
242:10, 11, 14
243:10, 16
247:6  249:17
253:2  254:1, 3,
16  255:4, 7, 8,
14, 21  256:12
258:20, 21
261:14  263:4
264:4, 5, 18
266:3, 4  267:19
268:2, 8  269:11,
12  271:16
272:3, 19  275:1
279:2, 3, 4, 6, 11,
16  283:18
289:18  292:18,
20  294:6, 13, 17
**remotely**  170:13
**renew**  260:10
**rent**  270:13
271:15, 18
274:8, 13
**repeat**  298:2
**repeated**
250:11  300:17
**repeatedly**
268:9
**repeating**  298:3

**replaying**
176:11
**report**  176:15
179:19, 20
180:2, 9  183:7
**REPORTED**
170:20  173:13
220:21
**reporter**  241:7,
9  262:8, 18
284:11, 13
293:17  295:3
311:15  314:13,
17  315:4
**reports**  207:19
296:5
**repossessed**
283:12
**reprehensible**
250:1, 7
**represent**  189:1
274:6
**represented**
222:15  276:12,
13
**reprimand**
220:7, 16
**reprimands**
220:11
**request**  193:6
241:3  257:19
285:12
**requested**
194:15  195:2, 3
**require**  180:8
195:1
**required**  310:19
**resolve**  229:1
**respond**  199:5
**rest**  175:21
247:3  252:8
**restitution**
260:2, 7
**result**  287:16
**resulted**  279:12
289:10
**results**  257:1
**retired**  187:6
218:20  219:3

**reveal**  301:20
302:3
**reverse**  251:9
**reviewed**  295:15
**right**  175:9
176:14  177:5
178:3  179:6
180:15  181:3, 9,
13  182:6, 11, 14,
19  183:3, 9, 17
186:15  187:15
188:2, 6  189:2,
12  193:12, 13,
17  195:21
196:1, 3, 4, 17
197:12, 14
198:8, 10
201:17, 21
203:21  206:12,
15, 18, 19  207:1
208:14  209:14
210:2, 6, 10, 18,
21  211:7
215:13, 19
216:20  217:16,
19  218:16
221:15  223:1, 3,
5  224:7  225:10,
20  227:1
228:18  229:9,
14, 21  230:3, 15
231:3, 9, 16
232:2, 7, 8, 11
233:5, 9, 14
235:9, 13  237:4
238:4, 8, 10, 14
239:14  240:1,
10  242:13
243:7  244:2, 4,
6, 11, 20  245:13,
15, 21  246:8, 11
247:10  248:3, 6,
8, 17  251:3
252:2, 7, 8
253:13, 17
256:14, 16, 21
257:17  258:1,
14  260:1, 3
261:16, 19
262:1, 5  263:13,

Deposition of Damond Durant, Volume 2

Case 1:20-cv-03146-DKC    Document 102-3    Filed 03/01/24    Page 53 of 56

Jawone D. Nicholson vs. State of Maryland, et al.

19, 20  264:9
265:2, 10
266:21  267:3
269:7, 13, 19
271:3, 21
273:10, 15, 16
274:15  275:4
276:17  277:17,
21  278:2, 4, 16
279:20, 21
280:7, 13  281:8,
17, 20  282:2, 7,
15, 18, 21  285:4,
8, 11, 18  286:10,
13, 18  287:2, 5,
8, 13  293:14, 21
294:18  299:14
300:9, 12
301:17  303:18
304:2  314:10
**Ring**  213:17
**rise**  219:14
**Road**  269:20
270:1  284:1
293:6
**roast**  177:21
178:3, 4, 5, 7
179:3
**rough**  174:5
**roughly**  229:21
230:1  277:12
**RPR**  170:21
318:17
**rude**  300:3
**rule**  239:8
**ruled**  192:4
221:7
**Rules**  194:21
209:14  220:15
**rulings**  250:21
**run**  193:6
**running**  306:5
308:19  309:3, 7
**runs**  192:21

**< S >**
**safety**  302:14,
17
**salary**  224:10,
14

**satisfaction**
264:12
**saw**  182:18
183:15  191:18
202:6  308:2
**saying**  179:10
205:4  209:18,
21  212:2
230:12, 14
261:17  268:3
**says**  194:9
199:11  221:11
244:11  245:15,
17  246:1, 3, 14
247:1, 11
255:15  257:14
261:6, 11  262:2
270:4, 12, 14
277:10  280:5
284:7  285:12
286:11  287:11
293:3, 10
**scared**  301:1
**scenario**  304:15
306:13
**scene**  301:21
312:21
**scheduled**  287:2
**school**  281:6, 8,
15
**scope**  291:12
**screen**  193:20
244:5  256:15
257:3
**scroll**  258:2
**seal**  318:14
**search**  244:7
256:16, 17
257:1  258:13
260:11  261:3
273:16
**second**  193:18
256:15
**secret**  286:19
**see**  177:10
181:19  183:3, 6
184:6  187:2
193:11, 20
194:2, 5, 11
198:4, 18  199:9,

10  201:4, 5
210:21  241:5
244:4, 15
249:21  250:2, 8,
9, 18, 19  251:19,
20  256:11
257:3, 8, 9, 12
261:4  269:11
273:15, 16
274:2, 3, 10, 14
275:8, 13, 14, 17,
18  278:13
283:10, 13, 21
284:2, 9, 10
285:21  286:5, 7
293:2  298:4
306:16  313:1
**seeing**  242:17
296:13
**seeking**  244:1
**seen**  177:19
191:10  195:11
203:3, 7
**send**  178:16, 18,
19  179:1, 7, 13
188:17  211:11
**sentence**  190:9
**separate**  220:4
246:20  312:10
**September**
318:20
**sequence**
225:11, 15
**sergeant**
176:18  177:9
211:13
**serve**  285:13, 14
**served**  251:10
285:3, 5, 8
286:8
**Services**  257:7
258:19  259:8
**session**  298:2
**set**  254:20
318:5
**settled**  219:13
220:2  232:21
277:12, 16, 20
**settlement**
277:10  278:2, 3

**seven**  273:19
274:4, 10, 12
278:20  288:6
**sgoldberg@bake
rdonelson.com**
171:17
**Sgt**  176:18, 20
177:5  178:13
179:6  183:21
184:1, 10, 14
185:13  213:7, 8
**Sharae**  244:12
270:4
**share**  193:19,
21  244:4
256:15
**Sheehan**  276:14
**Sheet**  316:8, 19
317:1
**sheriff**  285:12,
13, 14
**shirt**  193:12
196:3
**Shoot**  188:20
**short**  189:7
**shot**  206:18
**show**  275:5
276:9
**showed**  175:12
190:16
**showing**  244:6
**shows**  250:14
**sic**  205:16
**side**  181:11
182:3, 5, 10
233:4
**sight**  300:8
**sign**  305:6
314:18
**simply**  217:14
**single**  245:18
246:5  310:13
314:6
**sir**  173:17
175:8  183:13
191:1  193:14,
16, 21  219:17
226:10  230:7
233:8, 13
235:17  237:10

242:17  244:6,
17  247:15
251:1, 4  253:18
254:10  255:10,
11  257:8  258:1,
8  260:18, 20
264:7, 17
267:20  268:8,
12, 18  271:7
272:7, 13
273:11, 19
274:6  275:5, 8,
17  276:4, 7
281:13  284:2, 9
285:6  287:18
288:10  289:3, 9,
16  290:2, 9, 12,
15  305:1  312:4,
6, 8
**sister**  313:1
**sitting**  238:12
**situation**  176:1
203:2  303:17
304:1  306:4
307:20  310:21
**situations**  198:8
**six**  273:19
274:16
**size**  298:13
301:2, 8, 9
304:21  306:1
**skill**  200:2
**skills**  200:18
303:17  304:20
**skirmish**  303:5
**sleep**  176:11
**small**  189:10
314:14, 19
**smaller**  189:7
**Smith**  176:19,
20  177:5
178:13  179:6
183:21  184:1,
10, 14  185:13
213:7, 8
**smoked**  290:16
**social**  223:9
**sole**  280:5
**somebody**
283:13

Deposition of Damond Durant, Volume 2

Case 1:20-cv-03146-DKC    Document 102-3    Filed 03/01/24    Page 54 of 56

Jawone D. Nicholson vs. State of Maryland, et al.

**somebody's**
219:*13*
**son** 192:*1*
226:*16, 17, 19,
20* 227:*7, 10, 13*
228:*1* 229:*8*
230:*9* 231:*3, 8,
19, 20* 232:*8*
234:*8, 13* 235:*5,
16* 237:*1* 239:*2,
12, 20* 241:*17*
242:*6* 244:*2*
245:*21* 246:*6,
10, 11, 18* 247:*1*
249:*12* 250:*5,
12* 252:*1*
258:*15, 18*
268:*6* 270:*17,
20* 271:*9* 279:*5*
280:*6, 15* 293:*4,
7*
**sons** 270:*18, 20*
271:*4*
**son's** 230:*20*
232:*11* 233:*18*
234:*2, 6* 266:*15*
**soon** 281:*19*
**sorry** 179:*4*
183:*13* 184:*13*
190:*12* 193:*15*
226:*17* 230:*20*
278:*11* 280:*11*
284:*12* 293:*7*
296:*5* 311:*15,
16*
**sound** 234:*10*
**sounding** 218:*3*
**sounds** 217:*18*
**south** 218:*8*
**Spain** 218:*9*
**Spanish** 217:*11,
19* 218:*2, 4, 7,
12, 13*
**speak** 176:*17*
221:*10* 245:*1*
295:*7* 314:*9*
**speaking** 299:*1*
301:*2* 314:*10*
**special** 200:*18*
**specific** 202:*15*

**specifically**
195:*1* 205:*3*
231:*13*
**speculating**
256:*11*
**speculation**
182:*21* 183:*19*
215:*15*
**spend** 238:*19*
239:*13, 16*
240:*17* 266:*15*
**spending** 250:*14*
**spent** 238:*9, 18*
240:*2* 267:*2*
282:*1, 6*
**spoken** 263:*12,
14, 15* 301:*4*
**sport** 248:*6*
**Sr** 244:*12*
278:*11, 18*
282:*16*
**SS** 318:*1*
**stabbing** 303:*19*
**stand** 188:*4*
216:*14* 292:*5*
**standard** 198:*20*
**stands** 274:*7*
**start** 187:*16*
227:*7* 255:*2*
298:*20* 300:*6*
**starting** 204:*15*
**STATE** 170:*7*
173:*19* 246:*16*
255:*6* 259:*14*
275:*11* 293:*1*
294:*3, 8* 317:*2*
318:*1, 3*
**statement**
205:*20* 206:*4*
296:*3, 4* 297:*11*
**statements**
250:*11*
**STATES** 170:*2*
243:*18*
**stationed**
176:*20*
**status** 296:*19*
**stay** 202:*3, 4*
**Stealing** 312:*3,
5, 7*

**STENOGRAPH
ICALLY**
170:*20* 318:*9*
**step** 173:*11*
**Stepping** 175:*9*
**stole** 259:*16*
**stood** 305:*2*
**stop** 304:*1*
**stopped** 308:*11,
15*
**straight** 182:*3*
302:*9*
**Street** 171:*6, 14*
192:*20* 253:*10*
266:*1*
**struck** 253:*11*
**STUART**
171:*12*
**student** 253:*5*
**students** 199:*4*
**stuff** 210:*14*
**subject** 199:*7,
18* 201:*2, 6*
202:*21*
**submit** 207:*19*
**sue** 227:*7, 13*
228:*14, 18*
259:*19, 20*
315:*3*
**sued** 222:*14*
227:*6, 10*
258:*18* 259:*18*
270:*13*
**suit** 254:*2*
279:*4* 310:*5, 9*
**Sun** 214:*4*
220:*18, 21*
221:*9* 222:*4, 7,
8*
**support** 279:*7,
8, 12, 17, 18, 20*
280:*12*
**supposed**
232:*16, 17*
257:*15*
**Sure** 174:*4, 16*
186:*12* 187:*6,
14* 202:*13*
207:*17* 211:*13*
217:*1* 218:*20,

21* 230:*12*
236:*10* 241:*4,
20* 242:*2, 16*
243:*2* 245:*7*
254:*9, 19* 255:*8*
257:*21* 258:*3*
263:*8* 272:*5*
287:*4* 295:*11*
304:*8* 315:*4*
**surly** 300:*2*
**Susan** 170:*15,
21* 318:*2, 17*
**suspect** 199:*21*
**suspended**
261:*10, 13, 16*
262:*4, 6, 7, 16*
**sweat** 187:*14*
**sworn** 173:*4*
318:*6*


**< T >**
**tactics** 197:*21*
**tad** 298:*13*
**take** 192:*7*
206:*18* 212:*16*
216:*21* 230:*6*
254:*13* 260:*2*
287:*12* 297:*19*
314:*13, 19*
**taken** 207:*21*
229:*7* 230:*2*
241:*12* 295:*4*
**talk** 187:*3*
204:*12* 205:*6*
207:*7, 18*
211:*13, 17*
212:*5* 226:*11*
252:*16* 259:*4*
**talked** 204:*8*
208:*19* 212:*2*
213:*14* 214:*7*
226:*1* 241:*16*
242:*4, 5, 21*
243:*5, 13*
249:*11* 252:*13*
253:*20* 268:*18,
20* 269:*2, 7, 8*
271:*18* 272:*14,
16, 21* 273:*2, 3,
7* 301:*6*

**talking** 232:*2*
254:*9* 263:*9*
274:*20* 305:*12*
**taught** 310:*14*
**tax** 275:*11*
276:*3, 6*
**taxes** 275:*16*
**Taylor** 276:*13*
**teach** 310:*12*
**techniques**
198:*1*
**Telephone**
171:*8, 16*
**telephoned**
220:*21*
**tell** 173:*5*
175:*14* 176:*5*
178:*3, 10, 12*
179:*8, 16, 19*
184:*19* 185:*5,
13, 17* 186:*3, 8,
19* 188:*8, 16*
189:*14, 16, 19,
21* 190:*1, 15, 18*
191:*18* 193:*11*
197:*20* 200:*20*
202:*6* 207:*13*
212:*9* 213:*8*
215:*1* 216:*8, 20*
217:*5, 7* 223:*9*
226:*19* 227:*3*
228:*15* 241:*17*
242:*19* 252:*17*
253:*4, 8* 259:*4,
15* 261:*6*
263:*20* 264:*5,
18* 266:*7*
267:*10* 268:*13*
289:*16* 292:*19*
303:*14* 313:*4, 7,
11, 12, 16*
**telling** 181:*18*
218:*8* 239:*11*
279:*11, 13*
283:*18*
**temporarily**
307:*9*
**ten** 235:*6*
288:*2*

Office (410) 821-4888
CRC Salomon, Inc.

2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com - info@crcsalomon.com

Facsimile (410) 821-4889
Page: 15

Deposition of Damond Durant, Volume 2
Case 1:20-cv-03146-DKC    Document 102-3    Filed 03/01/24    Page 55 of 56
Jawone D. Nicholson vs. State of Maryland, et al.

tenant 283:20
term 225:11
testified 173:6
  231:12 255:14
  294:12 296:9
  297:21 298:19
  299:15 300:11,
  21 310:11
testimony
  202:19 294:9,
  11, 14 298:3
  301:7 311:12
  316:5
Texas 218:8
text 244:7
thank 173:8
  174:18 234:9
  241:9 260:15
  262:18 284:16
  295:1, 2, 3, 5
  310:9 314:12
  315:2, 3, 4
Thanks 207:15
  236:11 247:20
Thaxton
  276:10, 12
  277:5
T-H-A-X-T-O-N
  276:11 277:5
theft 295:21
theory 251:6
thing 185:7
  186:16 189:19
  204:13, 14
  213:9 264:4
  274:18
things 176:6
  196:10 197:16,
  20 198:2
  199:15 200:3
  209:8 272:1, 3,
  4, 8 283:11, 14
  288:19
think 174:21
  175:10 176:16
  180:14 182:12
  186:2 187:5
  188:1 190:17
  192:6, 7, 12
  194:15 195:3

198:10, 14
  201:13 202:10
  206:3, 6, 20
  208:8 214:6
  228:13, 17
  231:12, 13, 15
  234:15 236:19
  242:2, 3 243:20
  248:18, 19
  249:5, 7, 10
  254:2, 20
  255:17 258:18
  264:11 270:2
  272:1 278:20
  288:6 291:17
  300:18 303:3
  304:20 306:1
  308:6, 8, 19
  311:11 314:15
thinking
  176:11, 12
  256:9 309:3
Thomas 176:18,
  20 179:6
thought 218:4,
  9, 20 246:9, 13
  299:13 307:16
  308:3, 7, 8
thoughts 176:5
threat 201:20
  202:5
three 208:9
  240:6, 7, 17
  242:9, 13, 21
  243:5 270:20
  273:19 287:18
  288:12 289:10
  290:1, 2 291:17
  292:14
threw 220:20
thrust 311:8
Thursday
  170:13
time 173:8, 9
  174:1 176:18
  185:1 192:7
  202:6 207:5
  208:1 214:13
  221:19, 21
  222:3 231:14

237:17 241:3
  247:9 248:16,
  20 249:3
  251:13, 14
  253:14 254:11
  263:7 272:5, 9
  288:7 290:16,
  21 294:19
  295:6 296:20
  297:2 304:9
  306:9 309:8
  314:15 318:5
timeline 210:20
timely 215:5
times 278:20
  288:2, 6
timing 276:20
today 173:9
  183:13 204:11
  205:6 216:14
  273:13 295:6
  296:15
told 180:14
  182:11 183:16
  201:12, 14
  204:7 207:6
  208:2 209:1
  214:21 231:7
  246:9 247:3
  251:8 264:6
  287:5 289:3, 21
  313:15
tomorrow 184:6
top 286:19
total 224:20
  239:3 280:21
totaled 246:20
touch 250:13
traffic 261:2, 9
  263:7
train 197:20
training 196:5,
  11, 16 197:5, 10,
  17 198:2, 7, 15
  199:6 200:21
  306:12
transcript
  191:11 249:21
  316:4 318:9

transcripts
  246:16
Tremmell
  260:21 278:11,
  18
Trespassing
  305:6
trial 209:7
  284:7, 18 285:1
  287:1
tricked 309:2
tried 191:21
  279:20
truck 248:17,
  18 249:4
  252:18
true 246:4
  316:5 318:10
trust 237:1
truth 173:5, 6
  264:7
try 251:21
  252:7
trying 182:14
  210:19 218:5
  233:15 242:18
  245:1 256:11
  264:15 266:16
tune 275:16
turn 300:5
turned 237:3, 6,
  10, 14 247:1, 8
  298:19 302:2
  303:11, 21
  308:20 309:6
  310:2 313:13,
  18
Twitter 223:14
two 174:7
  252:20 273:19
  280:21 281:2,
  17 282:2 298:7
  299:1, 3, 4
  304:21 308:15
  309:11
type 179:19
  180:1 200:2
  202:10 256:6
  269:1 271:20

types 199:17
  209:7

< U >
U.S 244:9
Uh-huh 194:6
  244:16 248:13
ultimately
  201:16
understand
  191:1 233:15
  234:6 236:21
  264:16 272:8
understanding
  214:11, 16
  232:18 308:14
understood
  201:17 301:9
unit 212:20
  213:2
UNITED 170:2
  243:18
unnecessary
  264:14
unquote 310:12
Upper 265:3, 7,
  9, 11
use 173:9
  179:20 180:2, 6,
  8, 12 194:3
  196:12, 14
  197:11 201:1
  237:1 292:3
  316:20

< V >
vagueness 197:1
van 306:17
vast 246:10
vehicle 176:3, 8
  255:7 256:2, 3,
  10 259:16
  305:15
vehicles 249:2
verbal 199:7
  298:21 299:4
verbatim
  209:17
versus 244:7
  257:7 259:14

Case 1:20-cv-03146-DKC    Document 102-3    Filed 03/01/24    Page 56 of 56

265:*16* 269:*13*
270:*4, 10*
273:*21* 275:6
276:*11* 278:*12*
282:*16* 283:*20*
293:*1*
**Video** 207:*21*
**videoconference**
170:*13*
**violated** 220:*15*
**violation** 256:5
261:2 263:*11,*
*16* 294:2, 8
**violations**
209:*13* 220:8,
*13* 264:*1*
**Virginia** 254:*8,*
*13, 16* 255:*3, 6,*
*9, 12, 20* 256:7,
*13*
**visual** 300:8
**voice** 305:*18*
**VOLUME**
170:*1, 11* 172:2
317:*3*
**vs** 170:6 317:2

**< W >**
**wages** 282:*20*
283:2, *12*
**wait** 216:7
242:*3* 286:5
299:*19*
**waited** 214:*15,*
*18* 215:7 216:3
**walk** 300:6
308:*16*
**walked** 304:6
**walking** 300:*17*
308:*18* 313:*13*
**want** 191:*1*
193:*18* 212:*16*
234:5, 6 241:*19*
272:*1* 276:9
288:9, *10*
297:*19* 303:*16,*
*18*
**wanted** 182:*13*
202:3 281:6

288:*20* 303:*17*
313:*20*
**wanting** 256:*12*
**Wary** 257:*10,*
*14*
**Watch** 224:*13*
**way** 174:*15*
181:*19* 183:*14*
192:*19* 193:2
237:*17* 238:9
257:*13, 15*
258:5, 6, 9, *12*
278:*1* 280:*14*
291:*13* 318:*12*
**weapon** 180:*12*
199:*12, 16, 19*
307:*3* 308:*21*
**wearing** 193:*11*
**website** 195:*21*
224:*13*
**week** 174:*4*
208:*8, 9* 215:*1*
**weeks** 208:*7, 8,*
*9*
**Well** 178:*15*
179:2 194:*16*
195:*15* 197:*1*
211:7 215:*4*
220:*1* 221:*11*
223:5 231:7
233:5 236:*15*
238:*16* 241:*21*
242:*3* 244:*4*
250:*12* 252:5
254:*11* 264:*15*
266:*20* 267:*1*
270:*19* 276:5
286:5 291:*16*
298:*20* 307:*18,*
*21* 309:*20*
**went** 175:*16, 17,*
*18* 179:*5* 182:2
186:7 189:*11*
190:*1, 20* 217:*1*
253:5, 7 275:*3*
287:6
**we're** 204:*11*
205:6 221:*16*
232:2 249:*14*

289:*15*
**white** 206:*16, 17*
**Wife** 184:*16*
185:*12* 190:*4*
245:*16* 270:*19*
274:*1* 275:6
283:*21* 286:*12,*
*18* 287:*4*
**wife's** 230:*15*
271:*4, 9*
**willing** 242:*17,*
*18*
**withdraw** 199:6
**withdrew**
180:*13*
**within-named**
318:*4*
**witness** 173:*4*
180:*18* 236:*12*
288:*15* 295:2
296:*10* 310:*4, 7*
317:*3* 318:*4, 14*
**witnesses**
213:*17* 312:*16*
**Wittstadt**
269:*13, 16*
**wondering**
221:*15* 247:*21*
**Woodlawn**
265:*21* 266:2
**word** 196:*21*
214:7
**words** 197:*4*
200:9 209:*4*
214:*14, 21*
221:*18* 224:*11*
225:*4* 246:8
253:8 262:*3*
273:6 294:7
301:*10*
**work** 177:*11,*
*20* 182:*18*
184:*12* 186:7, 8
189:*10* 218:*18*
251:*14*
**workers** 243:*8,*
*12* 252:*19*
**working** 212:*6,*
*9*
**works** 218:*16*

**world** 189:*10*
263:*11, 17, 21*
268:*19* 271:7,
*14, 19* 272:*8, 10*
274:*18* 279:*1*
283:5 289:*19*
**worried** 176:*1,*
*3, 6* 178:*15*
182:*13* 191:5
**worry** 187:*13*
**Worth-A-Shot**
174:*21* 175:2, *3*
**wrap** 294:*21*
**write** 232:*17*
**wrong** 188:2
192:6
**wrote** 199:*3*

**< Y >**
**yard** 193:*4*
**Yeah** 179:*1*
181:*16* 185:*4*
186:*18* 191:*16*
196:2 204:*13*
206:*3, 5* 207:*17*
209:*11* 215:*17*
216:2 218:*1, 4*
221:*13* 226:6,
*15* 228:*13*
229:*16* 236:*13,*
*17* 240:*13*
241:*4, 21*
243:*20* 245:7
246:*19* 247:*12*
251:*15, 20*
252:*11* 257:*9,*
*14* 258:*3* 259:2
262:6 263:*18*
264:*4* 267:*17*
279:*8, 10, 16*
281:*18* 284:*10*
285:8 287:9
**year** 234:*8, 13,*
*16* 235:*3, 9*
261:*3* 277:*12*
**years** 174:*5*
235:6, 7 247:2
279:9, *13*
280:*19, 21*

281:*1, 2, 17*
282:2 306:2
**yell** 305:*20*
**Yep** 225:*21*
261:*17* 282:8
**young** 175:*11*
183:*3* 200:*4, 14,*
*18*
**Yukon** 248:*19,*
*21*

**< Z >**
**Zoom** 170:*13*
202:8 203:6